**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VICE GROUP HOLDING INC., *et al.* | Case No. 23-10738 (__) |
| Debtors.[1] | (Joint Administration Requested) |

## DECLARATION OF FRANK A. POMETTI IN SUPPORT
## OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Frank A. Pometti, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer ("CRO") of Vice Group Holding Inc. ("Vice Parent") and the debtors and debtors-in-possession (collectively with Vice Parent, the "Debtors") in the above captioned chapter 11 cases (the "Chapter 11 Cases") and a partner and managing director of AlixPartners, LLP.  I have been authorized by the Debtors to submit this declaration (the "Declaration") on their behalf.

2.      I have more than 20 years of financial and operational experience, specializing in assisting distressed and underperforming companies in all areas of operational and financial restructuring.   Over my career, I have advised debtors, creditors, investors, and court-appointed officers in multiple chapter 11 and out-of-court matters, spanning a wide range of industries.  I have a bachelor's degree from The United States Military Academy at West Point and a master's degree in business administration from the Columbia School of Business.

---

[1]     The last four digits of Debtor Vice Group Holding Inc.'s tax identification number are 4250.  Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://https://cases.stretto.com/vice/.  The location of the Debtors' service address for purposes of these chapter 11 cases is:  49 South 2nd Street, Brooklyn, NY 11249.

3.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations, capital structure and financial condition; my review of the relevant documents; input I received from members of the AlixPartners (as defined below) team, other advisors to the Debtors, and the Debtors' management; and my opinions derived from my experience and knowledge as a restructuring professional.  If called upon to testify, I would testify competently to the facts set forth herein.

4.      On December 28, 2022, the Debtors engaged AP Services, LLC, an affiliate of AlixPartners LLP (together with its affiliates, including AP Services, LLC, "AlixPartners"), to assist it in various matters relating to the Debtors' financial obligations, including the maturity of Senior Secured Term Loans (as defined below).  In connection with the Debtors' engagement of AlixPartners, I became the Debtors' CRO. As CRO, I have led various restructuring and cash preservation initiatives for the Debtors and their non-debtor affiliates (collectively, the "Company" or "VICE"), and also played a leading role in overseeing preparations for the commencement of these Chapter 11 Case.  Through those roles, I have become familiar with the Debtors' operations, day-to-day business affairs and books and records.

5.      I submit this Declaration on behalf of the Debtors in support of: (a) the Debtors' voluntary petitions (collectively, the "Petitions") for relief that they filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") on the date hereof (the "Petition Date"); and (b) the "first-day" pleadings that are being filed contemporaneously herewith (collectively, the "First Day Pleadings").  I have reviewed the Petitions and the First Day Pleadings and believe that the filing of the Petitions and the relief sought in the First Day Pleadings are in the best interests of the Debtors' estates, creditors, and other parties in interest, and are necessary to preserve and

maximize the value of the Debtors' estates.  Moreover, I believe that the relief sought by the First Day Pleadings is properly tailored with the intention of minimizing the adverse effects of the commencement of these Chapter 11 Cases on the Debtors' businesses and operations.

6.      As described in greater detail below, *VICE* grew rapidly from a niche magazine into a global media company that focuses on content centered around news and culture, serving a largely global youth audience.  *VICE* currently reaches its audience in multiple formats including editorial, digital and social video, experiential events, commercials, music videos, scripted and unscripted television, feature documentaries, and movies.  *VICE* distributes the content it creates across multiple distribution channels, including owned and operated digital platforms, social platforms, advertising-based and subscription video on demand streaming services, broadcast and cable television, live events, and experiential campaigns.

7.      Like many other growth companies in the media and technology sectors, *VICE* has been cash flow negative for the past several years.  As a result, *VICE* relied on external funding, raising both debt and equity capital to fuel its rapid growth and to fund expenses in certain parts of its businesses. Although these fund-raising efforts helped to finance *VICE*'s growth, they ultimately led to the Company being burdened by a highly leveraged and unusually complex capital structure.

8.      As current market dynamics trended against the Debtors, the substantial funded debt obligations, dividend requirements from its various classes of preferred stock, and other non-operational expenses and obligations, severely constrained liquidity and interfered with *VICE's* ability to raise additional capital.  The lack of liquidity was particularly problematic for *VICE* given the ongoing capital requirements arising from the fact that the majority of its businesses operate across platforms that require near

constant innovation and adaption to new technologies, and the development of content which requires upfront investment and often takes multiple years to generate returns.

9.      As described in greater detail below, the liquidity strain caused by *VICE*'s lack of profitability was further exacerbated late last year by the maturity of both the Senior Secured Term Loans (as defined below) and the Senior Subordinated Notes (as defined below).  Following an unsuccessful sale process that the Debtors conducted in the summer and autumn of 2022—which itself followed efforts to pursue a SPAC transaction in 2021 that the Company ultimately decided to forgo—on December 12, 2022, the Debtors, the prepetition term lenders (the "Prepetition Term Lenders") under that certain Amended and Restated Credit and Guaranty Agreement, dated November 4, 2019 (as amended, restated, or supplemented, the "Prepetition Senior Secured Credit Agreement") and Fortress Credit Corp., as administrative agent under the Senior Secured Credit Agreement (the "Prepetition Administrative Agent"), entered into a forbearance agreement (the "Initial Forbearance Agreement"), whereby the Prepetition Term Lenders and the Prepetition Administrative Agent agreed to forbear from taking enforcement actions under the Prepetition Senior Secured Credit Agreement through December 15, 2022 (the "Initial Forbearance Period").  On December 27, 2022, the Debtors, the Prepetition Term Lenders and the Prepetition Administrative Agent entered into a second temporary forbearance agreement (the "Second Forbearance Agreement"), which further extended the forbearance period, and, among other things, required my appointment as CRO.

10.      The Second Forbearance Agreement was followed by the entry into a further forbearance agreement among the Debtors and Prepetition Term Lenders, dated January 12, 2023 (the "Third Forbearance Agreement").  The Third Forbearance Agreement extended the forbearance period through May 12, 2023. In connection with

the Third Forbearance Agreement, the Debtors and the Prepetition Term Lenders entered into that certain Incremental Agreement and Amendment No. 25 to Amended and Restated Credit and Guaranty Agreement, dated January 25, 2023 (the "Incremental Credit Amendment"). The Incremental Credit Amendment amended the Prepetition Senior Secured Credit Agreement to allow the Debtors to access up to an aggregate principal amount of $30 million of new Senior Secured Term Loans (the "2023 Multi-Draw Term Loans").[2]  The milestones set forth in the Third Forbearance Agreement required, among other things, that (i) the Debtors initiate a new process to solicit bids to sell substantially all of their assets, and (ii) Vice Parent appoint two new independent directors (selected by the Prepetition Term Lenders) to its board of directors, who together with an existing independent board member, formed a special committee of the board (the "Special Committee").  The forbearance period under the Third Forbearance Agreement has terminated for failure to satisfy the milestones contained therein.

11.    Having just launched a sale process in accordance with the Third Forbearance Agreement (the "Prepetition Marketing Process") in January 2023, the Debtors again faced a severe liquidity crunch.  This was primarily caused by a delay in the receipt of a quarterly payment for the production of content for VICE World News ("VWN") of approximately $34 million (the "Q1 VWN Payment") that was due in mid-January under the Debtors' agreements with GMN Cayman Ltd ("GMNC").  Without having received the Q1 VWN Payment, the Company was forced to draw upon the 2023 Multi-Draw Term Loan far sooner than expected, and this ultimately led to the Debtors

---

[2]    Amendment No. 28 to Amended and Restated Credit and Guaranty Agreement, dated March 22, 2023, allowed the Debtors to access an additional $10 million of 2023 Multi-Draw Term Loans and Amendment No. 31 to Amended and Restated Credit and Guaranty Agreement, dated April 21, 2023, allowed the Debtors to access an additional $3 million of 2023 Multi-Draw Term Loans.

requesting and obtaining advances beyond the original commitments under the 2023 Multi-Draw Term Loan.

12.    Ultimately, on February 13, 2023, the Debtors received a notice from GMNC (the "VWN Termination Notice") of its intention to terminate for convenience the master services agreement (the "VWN MSA") governing the VWN relationship and trigger its wind-down provisions. The impact of termination of the VWN relationship on the entirety of *VICE's* businesses was substantial. While the sale process continued, the Debtors began to assess the implications of the termination of the VWN MSA and explore options to restructure the Company. In parallel, efforts were also pursued to find a replacement counterparty to the VWN MSA. To address the loss of the VWN MSA, the Debtors, with the assistance of their advisors, determined that the best path forward was to implement a number of structural changes to the Company to mitigate the impact of the loss of the VWN contract. These changes included refocusing resources in the Company's news division in favor of its television series and documentary businesses and other digital businesses, while reorganizing its business structure to streamline its overhead. As the Company sought to begin its operational restructuring, it also re-launched a sale and marketing campaign and negotiated a settlement of amounts due to the Debtors from GMNC arising out of its failure to make the Q1 VWN Payment and the delivery of VWN Termination Notice.

13.    The negotiations with GMNC initially focused on an agreement for an immediate payment of a full cash settlement. An initial understanding was reached fairly rapidly for an immediately payable cash settlement, and the parties reached an informal understanding on the terms required to document their agreement. Despite that progress, GMNC delayed in executing a signed agreement, and ultimately sought to impose new terms, and to break the agreed upon amount into multiple payments. The

delay in the receipt of payments from GMNC caused significant hardship to the Debtors by delaying the Company's ability to reorganize, added to the financial strain on the Company in a material manner, and created a large strain on the Prepetition Marketing Process.

14.     Ultimately, on April 26, 2023, Vice Parent, and certain Debtors entered into a Termination Deed with GMNC and certain of its affiliates (the "Termination Deed") in which GMN Cayman HoldCo LLC ("GMNH") agreed to make two payments to the Debtors in the aggregate amount of $50 million (collectively, the "VWN Termination Payment").  While the initial $30 million of the VWN Termination Payment was required to be paid by GMNH no later than May 4, 2023, the Debtors did not receive this payment until May 9, 2023.  The second payment of $20 million is required to be made on or before July 17, 2023.

15.     Over this time period, while the Debtors were negotiating with GMNC over the terms of a settlement, the Debtors utilized the full amount of 2023 Multi-Draw Term Loans, but without any payment for the Q1 VWN Payment and the delivery of VWN Termination Notice, the Debtors found themselves in need of additional funding to continue to meet operating expenses.    As a result, the Debtors sought additional advances from the Prepetition Term Lenders. Ultimately, through a series of amendments to the Amended and Restated Credit and Guaranty Agreement, the Prepetition Term Lenders advanced an additional $27 million above the initial commitment of the 2023 Multi-Draw Term Loans.  With those additional amounts, the aggregate amount of the 2023 Multi-Draw Term Loans grew to $57 million. The Debtors utilized the much-needed funds from the additional advances under the 2023 Multi-Draw Term Loans, among other things, to pay employee compensation and continue to

drive the Prepetition Marketing Process forward for the maximization of value for all stakeholders.

16.     In addition, as described further below, in the final days leading up to these Chapter 11 Cases, Wipro LLC ("Wipro") obtained a judgment against Vice Media LLC ("Vice Media") in the amount of approximately $9.9 million.  Wipro obtained such judgment on May 4, 2023, and on May 5, 2023, Wipro commenced the process of enforcing its judgment through the purported service of a restraining notice under CPLR § 5222(b) (the "Restraining Notice"), limiting the ability of Vice Media to transfer or dispose of its assets, including its cash on hand.

17.     Upon information and belief, on or about May 10, 2023, Wipro served the Debtors' primary cash management bank JPMorgan Chase Bank, N.A. ("JPMC") with a restraining notice similar to the Restraining Notice received by the Debtors, which sought to impose a stay on withdrawals from Vice Media's accounts at JPMC (the "VICE Media JPMC Accounts").  At that time, there were funds in the VICE Media JPMC Accounts in excess of the amounts required to satisfy the stay requirements of the Restraining Notice.  Upon further information and belief, the Prepetition Collateral Agent sought to exercise remedies under their deposit account control agreements for all of the Debtors' accounts at JPMC, including the Vice Media JPMC Accounts.  It is my understanding that JPMC has frozen the VICE Media JPMC accounts pending an order from a court that clarifies the control of the funds in the VICE Media JPMC Accounts.   As set forth in the motion seeking debtor-in-possession financing and use of cash collateral filed contemporaneously herewith, the Debtors are seeking authority to use the funds in the VICE Media JPMC Accounts as the cash collateral of the Prepetition Term Lenders.

18.     The freeze on the Vice Media JPMC Accounts has essentially shut off much of the liquidity of the Debtors.  The lack of liquidity is a particular concern for the Debtors

as they rely heavily on the services of freelancers and independent contractors. In addition, due to the international nature of the Company's businesses (as described in greater detail below), they require liquidity to ensure that non-debtor foreign subsidiaries are able to operate in the ordinary course of business.

19.    This Declaration is divided into four parts. Part I provides an overview of the Debtors and these Chapter 11 Cases. Part II provides a summary of the Debtors' capital structure. Part III describes the circumstances leading to the commencement of these Chapter 11 Cases. Part IV summarizes the First Day Pleadings and the factual bases for the relief requested therein.

## I.    <u>Introduction and Background</u>

20.    *VICE* traces its roots back to 1994, when the current Chairman of the Board of Vice Parent, Shane Smith, co-founded and launched *Voice of Montreal*, an alternative punk focused magazine, in Montreal, Quebec, Canada. From those humble beginnings *VICE* has expanded into a global, multi-platform media company with a collection of powerful brands, producing premium award-winning content for a highly engaged global youth audience.

21.    With offices and production hubs in 20 central locations around the world, and more than 1,300 employees globally, *VICE* creates thousands of pieces of content each week globally, including editorial, digital and social video, experiential events, commercials, music videos, scripted and unscripted television, feature documentaries, and movies. *VICE* has a unique and well-earned brand that has broad recognition among its audience. Some of *VICE*'s distinctive logos and brands are as follows:



### A. Business Segments and Organizational Structure.

22.     The Company comprises Vice Parent, and 189 wholly owned subsidiaries, of which 32 are Debtors in these Chapter 11 Cases. The Company operates globally spanning three primary regions:

- North America ("NA"), which comprises the United States and Canada. *VICE*'s worldwide headquarters, as well as its regional headquarters for NA, is located in Brooklyn, New York.

- Europe and Middle East ("EMEA"), which includes offices in Eastern Europe, Western Europe, the Nordic countries, and the Middle East. *VICE*'s regional headquarters for EMEA is located in London.

- Asia Pacific ("APAC"), which includes operations in India, China, Korea, Singapore, Japan and Australia. *VICE*'s regional headquarters for APAC is located in Singapore.

An organizational chart depicting each of the *VICE* subsidiaries is attached hereto as **Exhibit A**.

23.     *VICE* currently operates through five primary business segments: (i) the studios group ("Studios Group"), (ii) publishing ("Publishing"), (iii) *VICE* TV, and (iv) VIRTUE, a creative advertising agency ("VIRTUE"), and (v) *VICE* News ("*VICE* News").

As *VICE* has been exploring options to restructure its business operations, it has been evaluating whether to combine certain business segments. A description of each of the Company's recent business segments is set forth in greater detail below.

### 1.    Studios Group

24.    The Studios Group, which operates through its *VICE* Studios and Pulse Films Limited ("<u>Pulse</u>") labels, comprises a complete end-to-end production studio delivering premium and award-winning global scripted and unscripted television, documentary, and film content, as well as commercials and music videos. The content created and produced by the Studios Group is delivered to a broad network of distribution partners that span multiple platforms, including broadcast and cable television and streaming platforms domestically and internationally. The Studios Group prides itself on its strong creative teams and unparalleled talent relationships that are focused on producing multi-genre premium content across creative disciplines on a global scale. The Studios Group has garnered significant acclaim and award-recognition for its films, documentaries, and recurring scripted TV series, music videos, and commercials, including *Flee* (distributed by Neon), *The Beastie Boys Story* (available on Apple TV+), and *Gangs of London* (available on Sky Atlantic and AMC).

25.    *VICE* Studios focuses primarily on three regions (NA, EMEA, and APAC) and three content areas (documentary films, factual content, and scripted TV). *VICE* Studios works with major domestic and international streaming services and views its substantial global footprint to be a differentiator.

26.    Pulse is an award-winning production and talent management company that was founded in 2005, with offices in London and Los Angeles. *VICE* acquired a majority stake in Pulse in 2016, and it became a wholly owned subsidiary of the Company in 2021. Historically, Pulse generated the majority of its revenue from the production of

commercials, music videos, non-fiction, and scripted content in its offices in the United States and United Kingdom. Some of Pulse's more recent notable projects include music videos such as *Harry Styles' 'Satellite'*, documentaries such as *Lewis Capaldi: How I Am Feeling Now* and *The Disappearance of Madeleine McCann*, and commercials for Stella Artois, McDonalds, H&M, Apple, and others.

### 2.    Publishing

27.    Publishing is an award-winning global digital publishing business that operates through its portfolio of brands, including "*VICE*", i-D (a fashion and culture based print and digital magazine), and Refinery29, Inc. (a digital media and entertainment platform focused on a female audience that operates through Debtor, Refinery29 Inc. ("Refinery29")).  Publishing creates and distributes thousands of pieces of content monthly in multiple formats through a digital presence that reaches approximately 400 million people globally.   Content generated by Publishing is distributed on its owned and operated websites and channels, as well as through a network of third-party websites, mobile applications and social and digital media platforms (*e.g.*, YouTube, Facebook, Instagram, Twitch, Twitter, TikTok, Snapchat, etc.).

28.    Publishing focuses on the creation and distribution of cultural and lifestyle content in video, news, editorial, social media, and audio.  Publishing generates revenue through its comprehensive portfolio of advertising products and services, with the majority of its revenue derived from the branded content and advertising offerings sold directly by *VICE*'s sales team to marketers.  Branded content revenue principally is generated from advertisers (including internationally recognizable food and beverage, retail, fashion brands, and in partnership with some of the largest ad agencies in the world) seeking *VICE*'s expertise to produce custom video and editorial content that builds brand awareness and promotes their products and services.  Advertisers purchase

digital media ad space on the *VICE* digital platforms through banners and video on websites and on third-party platforms (such as YouTube) and mobile applications. *VICE*'s advertising business is driven by brands who want contextual adjacency to *VICE's* content (branded or not) and the two products are often packaged together. Advertisers also pay for insights generated on *VICE*'s platforms, including the brand awareness of different demographics of its audience.

29.    Publishing also generates revenue through affiliate commerce and experiential events. Affiliate commerce revenue is generated from embedding affiliate links for products into articles on *VICE*'s digital platforms that allow users to click through the affiliate links in order to purchase products, with *VICE* earning a commission on the sales attributed to *VICE* from the click throughs. Experiential marketing revenue is generated when advertisers engage the Publishing team to ideate, strategize, organize and produce branded or co-branded events to promote brands, products or services, and through Publishing's own branded experiential events.

### 3.    *VICE* TV

30.    *VICE* TV is a cable channel that offers news, documentaries, film and reality television series distributed in over 60 million homes in the U.S. The *VICE* TV channel is operated by Vice Television Network, LLC (a non-debtor subsidiary that is 50.1% owned by A+E Networks ("AETN")) and is bundled with the A&E, History, and Lifetime channels. *VICE* TV licenses its content to third party distributors globally, including AVOD (ad-supported video on demand), SVOD (subscription video on demand) and FAST (free ad-supported streaming television) distribution.

31.    *VICE* TV produces its own programs and content. In addition, *VICE* TV also acquires programming rights from *VICE* News, *VICE* Studios, and third parties. The majority of the domestic cable networks' revenue is derived from affiliate fees and

advertising sales. *VICE* TV also sells and licenses programs developed by *VICE* TV worldwide to television broadcasters and to subscription video-on-demand services as well as advertising relating to video-on-demand services.

32.    *VICE* TV provides content and programming under multi-year licensing agreements with multi-channel video programming distributors, including cable and satellite television operators. *VICE* TV generates revenue from: (i) affiliate fees for carriage as described above, (ii) advertising sold on the network with AETN, and (iii) sponsorships and other advertising products relating to specific programming.

### 4.    VIRTUE

33.    VIRTUE is *VICE*'s in-house creative advertising agency. VIRTUE works with prominent brands in a consultative process to drive brand strategy and produce assets (including commercials, digital ads, experiential events, Web3 enabled content, etc.), while leveraging insights and analytics around culture, some of which are from *VICE*'s content businesses. Through that work, VIRTUE drives high-value, brand-direct relationships into the *VICE* ecosystem.

34.    VIRTUE operates in most of *VICE*'s offices worldwide, with a regional organization that resembles *VICE*'s global footprint (*i.e.*, NA, EMEA, and APAC), with NA and EMEA representing VIRTUE's largest regions in terms of revenue. VIRTUE's client base includes Fortune 500 companies and other large consumer-facing brands.

35.    VIRTUE has two sources of revenue: professional services revenue and production revenue. VIRTUE earns professional services revenue (which typically is recuring in nature) from companies that retain VIRTUE to develop creative and brand strategy for their products and services—such as creating a visual identity for a new product campaign and crafting an advertising strategy which is culturally focused and helps brands reach hard to reach and valuable consumers. VIRTUE also earns production

revenue (which typically is project-based) from other advertising companies that retain VIRTUE to produce content assets conceptualized for their clients or for one-off productions for brands not otherwise working with VIRTUE.

### 5.    *VICE* News

36.     *VICE* News is a ground-breaking news platform built for youth audiences. *VICE* News creates original in-depth multiformat content that is distributed through video, editorial, audio and social media channels.  These distribution channels include cable channels (*i.e.*, *VICE* TV and Showtime), broadcast television, AVOD and SVOD distributors, podcast platforms, owned and operated websites and channels, and third-party platforms (e.g., YouTube, Twitch, Instagram, Twitter, TikTok, Snapchat, etc.).  The original content created by *VICE* News, including VWN, was utilized across other *VICE* business segments; however, following the termination of the VWN MSA, *VICE* has been analyzing the impact on those interrelationships.

37.     VWN was launched in 2019 to expand the global presence of *VICE* News that would allow *VICE* to monetize the creation of documentary content and short-form stories that target a global audience.  VWN content, which was produced primarily under the VWN MSA and various ancillary agreements related thereto, provided *VICE* with a steady stream of stable and profitable revenue for the Company.  In 2022, *VICE* was paid approximately $134 million under the VWN MSA.

38.     The receipt of the VWN Termination Notice had a significant impact on *VICE*, beyond the direct costs of winding down the operations of VWN, as *VICE* had to develop alternative strategies to create alternative content for its other segments at its own expense.   As of the date hereof, the Debtors continue to work on a longer-term strategy to address the termination of the VWN MSA and reposition the Company for profitable growth.  The longer-term strategy will involve a leaner news organization.  In

that regard, *VICE* has announced that it is reducing its news related workforce during May and June 2023.  This reduction includes discontinuing *VICE News Tonight* on *VICE* TV (the last VTN broadcast will be in May).    The reductions in the size of *VICE* News comes at the same time that several of *VICE* News' main competitors, including CNN, CBS News, ABC News, BuzzFeed News, Vox and News Corp are reported to have reduced their news staffing levels.

## II.   Capital Structure[3]

39.    The Debtors are burdened by a highly leveraged capital structure, which includes not only large levels of funded debt, but also an exceptionally complex set of preferred stock at Vice Parent (collectively, the "Preferred Stock").   As discussed below, much of the Company's current capital structure dates back to a transformation of the Company in 2019. The Debtors overburdened capital structure has weighed heavily on the Company in a manner that both has limited the Company's flexibility to adapt to changing market conditions and constrained its ability to utilize capital for operational growth.

### A.    The Funded Debt Obligations

40.    At the heart of the Debtors' capital structure are approximately $834 million of obligations under the Debtors funded debt issued or guaranteed by the Debtors (the "Funded Debt Obligations").  The Funded Debt Obligations comprise the following:

---

[3]   The description of the Debtors' indebtedness provided in this Declaration is for informational purposes only and is qualified in its entirety by reference to the actual documents that contain the specific terms and obligations.  Nothing in this Declaration is intended to be an admission as to any rights or security interests under such documents and agreements.

| Debt | Amount Outstanding |
|------|-------------------|
| Prepetition Senior Secured Credit Agreement | $474.6 million |
| JPM Overdraft Facility | $9.8 million[4] |
| The Pulse Notes | $20.9 million |
| Senior Subordinated Notes | $328.7 million |
| **Total Funded Debt** | **$834 million** |

Descriptions of the Funded Debt Obligations and the Preferred Stock are set forth below.

### 1.    Prepetition Senior Secured Credit Agreement

41.    As of the Petition Date, the Debtors had a total of $474.6 million aggregate principal amount (inclusive of principal, PIK interest, and PIK forbearance fees) of term loans (the "Prepetition Senior Secured Term Loans") outstanding under the Prepetition Senior Secured Credit Agreement by and among Vice Parent, as borrower, certain subsidiaries of Vice Parent from time to time party thereto as guarantors, the Prepetition Term Lenders, the Prepetition Administrative Agent, and Wilmington Trust, National Association, as collateral agent (in such capacity, the "Prepetition Collateral Agent"). The Prepetition Senior Secured Term Loans consist of two separate loans: (i) an initial term loan in the aggregate principal amount of $250 million (the "Initial Prepetition Secured Term Loan") and (ii) the 2023 Multi-Draw Term Loans, of which $57 million in principal was drawn and outstanding as of the Petition Date.  All obligations under the Prepetition Senior Secured Credit Agreement and the guarantees of those obligations are

---

[4]    As discussed below, the JPM Overdraft Facility is denominated in British pounds sterling.  The U.S. dollar amounts set forth in this table represent and approximation based upon the conversions of GBP to USD.

secured by a first-priority security interest in substantially all of the property and assets of the Debtors (the "Prepetition Collateral").

42.    The Initial Prepetition Secured Term Loan matured on December 9, 2022 (the "Maturity Date").  The Debtors failed to repay the Initial Prepetition Secured Term Loans on the Maturity Date, which constituted an event of default under the Prepetition Senior Secured Credit Agreement (the "Maturity Default").  The occurrence of the Maturity Default caused interest on the Initial Prepetition Secured Term Loans to accrue interest at the Default Rate (as defined below), and also triggered cross-defaults under the provisions of several of the Senior Subordinated Notes (as defined below) and the Pulse Note (as defined below).   The 2023 Multi-Draw Term Loans, made available in connection with the Third Forbearance Agreement as part of the Incremental Agreement and Amendment No. 25 to the Amended and Restated Credit and Guaranty Agreement dated January 25, 2023, will mature on the earlier of a "Forbearance Termination Event" (defined in the Third Forbearance Agreement) or May 12, 2023.

43.    Interest on the Initial Prepetition Secured Term Loans accrues at the rate of SOFR plus 9%, provided that the Debtors have the option (which it regularly exercised) to elect to pay the non-SOFR portion of the interest on the Initial Prepetition Secured Term Loans in kind, whereupon, if such election is made, the interest rate on the Initial Prepetition Secured Term Loans would increase to SOFR plus 12%.  The default rate of interest for the Initial Prepetition Secured Term Loans is +3% per annum, which may be paid in kind unless the Prepetition Term Lenders make a contrary demand (the "Default Rate"). The 2023 Multi-Draw Term Loans bear interest at the rate of SOFR plus 12%, with the SOFR portion payable in cash, and the remainder payable in kind.

### 2.    JPM Overdraft Facility

44.    Certain of the Debtors have outstanding guarantee obligations under an uncommitted multicurrency overdraft facility pursuant to that certain Uncommitted Overdraft Facility, dated October 17, 2016 (as amended, supplemented, or modified from time to time, the "Overdraft Facility") between Vice Europe Holding Limited ("VEHL") and JPMC.  The Overdraft Facility was established to be available from time to time to cover overdrafts on VEHL's accounts with JPMC.   The Overdraft Facility is guaranteed by several affiliates of VEHL, including Debtors Vice Parent and Vice Media.  Initially, the Overdraft Facility had an overdraft limit of GB£3 million, however, pursuant to an amendment letter dated September 25, 2017, the overdraft limit was increased to GB£10 million.  The Overdraft Facility accrues interest at a rate equal to two percent plus the market index rate for specified currencies, and such interest is paid monthly or quarterly in arrears (the "Overdraft Interest").  If amounts under the Overdraft Facility are not paid when due, the Overdraft Facility bears interest at a rate of the Overdraft Interest plus four percent per annum.  As of the Petition Date, there are outstanding obligations under the Overdraft Facility of approximately $9.8 million.  JPMC has setoff rights against the Debtors and also is secured pursuant to an Assignment of Deposits among Debtor Vice Media and JPMC, dated May 1, 2019, pledging certain deposit accounts held by Vice Media and its subsidiaries in favor of JPMC as security for costs and expenses incurred by JPMC in connection with the covered bank accounts.  The Prepetition Overdraft Facility is also a secured "Cash Management Agreement" under the Prepetition Credit Agreement and is supported by a pari passu security interest in the Prepetition Collateral.

### 3.    The Pulse Notes

45.    In connection with the Company's 2016 acquisition of a majority stake in Pulse, Debtor Vice Holding Inc. ("Vice Holding") entered into a shareholders agreement

with the original founders and sellers of Pulse (the "Pulse Sellers"), which allowed such sellers to put their shares in Pulse Films to VEHL, such that it would be required to purchase such sellers' shares of Pulse Films (the "Pulse Seller Shares") for an amount determined in accordance with a specified formula (the "Put Option"). In April 2021, the Pulse Sellers exercised their Put Option, which would have obligated the Company to pay $53,240,000 in cash.

46.     In lieu of paying the obligations due in respect of the Put Option, on December 8, 2021, a wholly owned subsidiary of VEHL, Vice Europe Pulse Holding Limited ("VEPH"), purchased the Pulse Seller Shares by paying a total aggregate amount of $10 million in cash and issuing $43,240,000 of 10% secured and guaranteed redeemable loan notes due 2023 (the "Pulse Notes") to the Pulse Sellers. VEPH's obligations in respect of the Pulse Notes were guaranteed by VEH and Vice Holding. To secure its obligations under the Pulse Notes, VEPH pledged 100% of its equity interests in Pulse Films pursuant to a share charge (the "Share Charge"). The rights of the Pulse Sellers to receive payments under the Pulse Notes and to exercise any rights under the Share Charge are fully subordinate to the rights of the Prepetition Term Lenders under the Prepetition Senior Secured Credit Agreement, pursuant to the Subordination and Intercreditor Agreement, dated December 8, 2021, among Pulse Sellers, B & C 3, LLC, as the security agent for the holders of the Pulse Notes, the Prepetition Collateral Agent, and Prepetition Administrative Agent (the "Pulse Notes Subordination Agreement"). Under the terms of the Pulse Notes Subordination Agreement, payment to the holders of the Pulse Notes is precluded for so long as an event of default under the Prepetition Senior Secured Credit Agreement remains outstanding, and until the Prepetition Term Lenders have been repaid in full, and holders of the Pulse Notes may not exercise rights or remedies in respect of the Pulse Notes absent the prior written consent of the Prepetition

Term Lenders. Moreover, pursuant to the Pulse Notes Subordination Agreement, the Pulse Sellers waived the right to object to any use of cash collateral or debtor-in-possession financing that has the consent of the Prepetition Term Lenders, and likewise consented to the priming of the Pulse Notes by such debtor-in-possession financing to the extent that the Prepetition Senior Secured Term Loans also are primed. As of the Petition Date, the aggregate principal amount of the Pulse Notes is approximately $20.9 million.

### 4.     Senior Subordinated Notes

47.     As described below, the Debtors have a complex set of Preferred Stock, including the Series A-1 Preferred Stock and the Series A-3 Preferred Stock issued to TPG Virat Holdings 1, L.P. ("TPG") and Sixth Street Virat Holdings 2, LLC ("SSP" and, together with TPG and certain of their respective affiliates, the "Senior Preferred Shareholders").  In conjunction with the Company's entry into the Prepetition Senior Secured Credit Agreement in 2019, Vice Parent amended the certificate of designation governing such preferred stock to permit the issuance, in April 2020, of senior subordinated unsecured notes due 2022 (the "Initial Subordinated Notes") to the Senior Preferred Shareholders, in satisfaction of certain dividends arising under the Series A-1 and A-3 Preferred Stock (as discussed further below) rather than either paying such dividends in cash or increasing the dividend accrual rate to an Incremental Building Default Rate (as defined in the A&R Certificate of Designation discussed below). On each dividend payment date for the Series A-1 and A-3 Preferred Stock, the principal amount of the Initial Subordinated Notes was increased in an amount equal to a specified portion of the dividends then due on the Series A-1 and A-3 Preferred Stock.  Although the Initial Subordinated Notes relieved the Debtors of the burdens of paying accrued dividends on the Series A-1 and A-3 Preferred Stock in cash, it increased the Company's debt-load,

which continued to grow through payments in kind of interest on the Initial Subordinated Notes.

48.    Beginning in early 2022, to address cash shortfalls, Vice Parent issued several series of subordinated unsecured notes, as issuer, to the Senior Preferred Shareholders, as purchasers (the "Subsequent Subordinated Notes" and, together with the Initial Subordinated Notes, the "Senior Subordinated Notes").  The Subsequent Subordinated Notes were issued in various series, which respectively were dated February 25, 2022, April 29, 2022, May 27, 2022, June 14, 2022, August 2, 2022, August 12, 2022, August 26, 2022, August 29, 2022, September 13, 2022, November 2, 2022, and November 14, 2022.

49.    Under the terms of the Subsequent Subordinated Notes, the Debtors have the ability to elect, for all or a portion of the interest due for the applicable period on the Subsequent Subordinated Notes, to (i) pay interest in cash at 9% per annum, or (ii) capitalize (*i.e.*, PIK) such interest and add it to the then outstanding principal amount of the Subsequent Subordinated Note at the rate of 12% per annum.  Pursuant to subordination agreements entered into for each issuance of the Senior Subordinated Notes, the Senior Subordinated Notes indebtedness and related rights of TPG and SSP are subordinate to the indebtedness and rights of the Prepetition Term Lenders under the Prepetition Senior Secured Credit Agreement.  Each Subordinated Note issuance, and the associated principal amount outstanding as of the Petition Date are set forth below:

| Senior Subordinated Notes | Amount as of 5/15/23 |
| --- | --- |
| Initial Subordinated Notes | $206,671,643.69 |
| Series B, Senior Subordinated Notes issued February 25, 2022 | $29,187,106.95 |
| Series B, Senior Subordinated Notes issued April 29, 2022 | $28,578,558.33 |
| Series C, Senior Subordinated Notes issued May 27, 2022 | $5,663,683.08 |
| Series C, Senior Subordinated Notes issued June 14, 2022 | $5,632,094.30 |

| Senior Subordinated Notes | Amount as of 5/15/23 |
|---|---|
| Series D, Senior Subordinated Notes issued August 2, 2022 | $5,543,822.50 |
| Series E, Senior Subordinated Notes issued August 12, 2022 | $5,525,782.07 |
| Series F, Senior Subordinated Notes issued August 26, 2022 | $3,850,367.84 |
| Series G, Senior Subordinated Notes issued August 29, 2022 | $8,792,181.36 |
| Series G, Senior Subordinated Notes issued September 13, 2022 | $10,939,713.52 |
| Series H, Senior Subordinated Notes issued November 2, 2022 | $10,764,848.07 |
| Series H, Senior Subordinated Notes issued November 14, 2022 | $7,506,039.74 |
| **Total** | **$328,655,841.46** |

**B.    The Preferred Stock**

50.    As a result of various investments and capital raises through the years, Vice Parent has developed a complex and restrictive equity structure.  Ahead of the common equity of Vice Parent sits 11 series and sub-series of Preferred Stock, a set forth below:



As of the Petition Date, Series A-1, Series A-2, Series A-3, Series A-4, Series D, Series E, and Series F Preferred Stock are entitled to receive dividend payments (with Series D, E, and F dividends paid in kind).

51.     The Series A-1, A-2, A-3, and A-4 Preferred Stock (collectively, the "Series-A Preferred Stock") were issued as part of a recapitalization of the Company in 2017. Holders of the Series-A Preferred Stock, which is convertible into common stock at the option of the holder, are entitled to quarterly dividend payments of 12% of the stated value of the Series-A Preferred Stock.  Dividends on the Series A-2 and A-4 Preferred Stock is entirely paid-in-kind (*i.e.*, through an increase in the stated value series of Preferred Stock).  When initially issued, dividends on the Series A-1 and Series A-3 Preferred Stock were to receive 50% of their quarterly dividends in cash and 50% in stock commencing in 2019; however in accordance with the Fifth Amended and Restated Certificate of Designation of Senior Convertible Preferred Stock, Series A (as amended, supplemented, or supplemented and amended, the "A&R Certificate of Designation") and previous amendments to such certificate of designation, holders of the Series A-1 and A-3 Preferred Stock are no longer entitled to receive a cash dividend, but instead receive 50% of the quarterly dividend PIK and 50% in the issuance of Senior Subordinated Notes.

52.     The Series A-1 and Series A-3 Preferred Stock are held entirely by the Senior Preferred Shareholders. Under the A&R Certificate of Designation, the consent of the Senior Preferred Shareholders is required, for, among other things, any of the following actions (subject to certain exceptions):

- Consummation of a liquidation of Vice Parent.

- Issuance, authorization or creation of shares of (a) Series A Preferred Stock, (b) any equity securities that vote as a single class with any of the Series A Preferred Stock or (c) any equity securities that are senior to or on parity with the Series A Preferred Stock.

- Incurrence of debt for borrowed money.

- Adoption, amendment, waiver or otherwise modification of any provision of the Charter or By-Laws in a manner that, by its terms would be adverse to the rights or obligations of the Series A-1

Preferred Stock or Series A-3 Preferred Stock or would be materially adverse to such holders relative to the holders of any other class or series of stock of the Company.

- Entry into or materially amend any transaction with a Designated Affiliate (other than a subsidiary).

- Declaration or payment of certain dividends or other distribution.

- Redemption, repurchase, or cancellation of any equity securities.

- Undertake any action, or permit any event or circumstance to occur, which contravenes the negative covenants set forth in the Prepetition Senior Secured Credit Agreement.

Under the Amended and Restated Investors' Rights Agreement dated February 25, 2022, by and among Vice Parent and the investors named on Schedule A thereto, the Senior Preferred Shareholders (as holders of the Series A-1 and Series A-3 Preferred Stock) also have the right to designate directors with a majority of the voting power of the board of directors of Vice Parent. Pursuant to the Third Amended and Restated Certificate of Incorporation of Vice Parent, if, at any time, the Senior Preferred Shareholders have not appointed the maximum number of directors to which they are entitled, the voting power of their seated directors would be increased such that they, in the aggregate, would have the full voting as if a majority of directors had been seated.

53.     On March 21, 2023, the Senior Preferred Shareholders, the Prepetition Term Lenders, and the Prepetition Administrative Agent, entered into that certain sharing agreement (the "Proceeds Agreement"). Pursuant to the Proceeds Agreement, the Prepetition Term Lenders, the Prepetition Administrative Agent, and the Senior Preferred Shareholders agreed to share in the proceeds of any kind received for distribution in respect of any claims against Vice Parent or its subsidiaries in accordance with a distribution waterfall distribution set forth therein. Although Vice Parent was not

involved in the negotiation of the Proceeds Agreement, it executed the agreement to acknowledge its terms.

**III.**   **Circumstances Leading to These Chapter 11 Cases**

    **A.**   **Profitability and Highly Leveraged Capital Structure**

54.   In 2017, following the issuance of significant amounts of Preferred Stock, the Company invested significant capital in content, operations and infrastructure that did not provide an immediate return and resulted in significant losses and increased expenses.  In 2019 the Company raised additional capital to fund ongoing operations, non-operating expenses and liabilities and operational restructurings.  This left the Company saddled with a significant amount of leverage in the form of the Prepetition Senior Secured Term Loans, Senior Subordinated Notes and Preferred Stock. Complicating the Company's financial situation was the fact that it did not generate sufficient free cash flow to pay its debts and continued to operate at a loss for several years prior to the Petition Date.

55.   Compounding those issues, the Company found itself confronting the maturity of the Prepetition Senior Secured Term Loans and Senior Subordinated Notes in 2022, while continuing to deal with the headwinds resulting from the COVID-19 pandemic and resulting macro-economic forces (that were aggravated by the war in the Ukraine), which together impacted the Company's revenues, from, among other things, a contraction of advertising spending across the market since 2020.  The Company's lack of free cash flow and liquidity profile became particularly acute when GMNC failed to make the Q1 VWN Payment in January 2023 and then terminated the VWN MSA.

B.    **Industry and Market Dynamics**

56.    The media industry is subject to rapid and frequent changes in technology, evolving customer preferences and the frequent introduction of new content and features.  Indeed, in the relatively short time since *VICE* was founded in 1994, the print and digital media landscapes have evolved enormously.  Although *VICE* has worked hard to be at the forefront of that evolution, the cost of investing to develop new technologies is significant.

57.    In recent years, *VICE*'s revenue generation operations, cash flows, and financial position were negatively impacted by the overall decline in advertising markets, and further hampered by challenges in monetizing news and cultural content programmatically due to platform imposed filters.  Additionally, the COVID-19 outbreak and the start of the conflict in Ukraine disrupted certain production activities and resulted in delays, postponements, or cancellations of certain revenue sources.

58.    In the face of market headwinds, over the last two years the Company continued to raise capital for continued operations and investments, while management implemented a series of additional cost-saving actions intended to improve profitability. Ultimately, the business challenges confronting *VICE*, the complexity of the Company's governance and capital structure, and the rapid deterioration of the debt and equity capital markets severely constrained *VICE*'s access to new capital and impeded the Company's strategic efforts to find an adequate solution.

C.    **Capital Raising Initiatives**

59.    Over the past decade, *VICE* expanded significantly, acquiring complementary businesses and breaking into new markets, resulting in the need for access to additional capital.  This rapid growth and resulting financing activity ultimately

contributed to the liquidity challenges the Company has experienced over the past five years.

### 1.    The 2020 Rights Offering

60.    In the Summer of 2020, the Company needed cash to fund its ongoing operations, and certain stockholders agreed to lead a round of financing to raise up to $80 million in new money.  The Company issued units of Series D-1 and Series D-2 Preferred Stock to raise the capital needed to fund operations. Series D-1 Preferred Stock had a liquidation value (and was convertible) in an amount equal to five times the purchase price of the Series D-1 and Series D-2 Preferred Stock.  Series D-2 Preferred Stock was convertible into approximately 62.5% of the fully diluted common equity of the Company.  In connection with the 2020 Rights Offering, Series D-3 Preferred Stock was issued to the management of the Company, had a liquidation value of $19.32 per share (which would amount to approximately $12 million in the aggregate) and was convertible into a number of shares equal to $19.32 divided by the conversion price as adjusted.  The lead investors in the 2020 equity raising transaction (the "2020 Rights Offering") included certain funds of Technology Crossover Ventures ("TCV"), Lupa Investment Holdings, LP ("Lupa"), and TWDC Investment Enterprises, LLC, who were prior investors and stockholders of the Company.  Given the related-party nature of the 2020 Rights Offering, the 2020 Rights Offering was extended to allow all other shareholders of the Company an opportunity to participate.  Through the 2020 Rights Offering, the Company was able to raise an additional $74 million of new money.

61.    Following the 2020 Rights Offering, the Company began to explore potential merger transactions including a transaction with a special purpose acquisition company ("SPAC") to take the Company public (the "SPAC Transaction").  In March 2021, *VICE* entered into a letter of intent for the SPAC Transaction.  Although the

Company incurred significant professional fees and management dedicated substantial time and effort to the SPAC Transaction—including an extensive roadshow—the SPAC market eroded significantly during 2021, and the contemplated SPAC Transaction ultimately was cancelled in July 2021.

### 2.    Series E/F Recapitalization and the 2021 Rights Offering

62.    From April 2021 to August 2021, management reviewed various financing options available to the Company. With external financing options not being available on terms reasonably acceptable to Vice Parent or its board of directors, management began to discuss internal financing options, including potential senior and junior equity investments from existing stockholders.   In May 2021, the Company entered into a subordinated note agreement with certain investors to raise $25 million in convertible bridge notes (the "2021 Bridge Notes").

63.    Around the same time, negotiations around a proposed term sheet to invest in senior preferred equity securities in an interim equity financing ensued with a group of investors that included TPG, SSP, TCV, Lupa, and Antenna Group, Inc. ("Antenna" and, together with TPG, SSP, TCV, and Lupa, the "Investors").   The Company's management reviewed and analyzed the terms of the proposed financing from the Investors (the "Proposed Financing") with the Company's external advisors, and an extensive dialogue between the Company and the Investors ensued regarding the terms of the Proposed Financing. The Proposed Financing involved: (i) the issuance to the Investors of units of Series E Preferred Stock, with each such unit comprising one share of Series E-1 Preferred Stock and three and eight thousand six hundred ninety-three ten-thousandths (3.8693) of a share of Series F Preferred Stock,  for an aggregate consideration of $85 million in the form of cash and cancellation of certain indebtedness (the "Series E/F Recapitalization"); (ii) the issuance of Series E-2 Preferred Stock to certain investors,

including, among others, TCV and Lupa for an aggregate consideration of $25 million in the form of cancellation of the 2021 Bridge Notes; and (iii) a rights offering to other stockholders to purchase up to an aggregate of $25 million of preferred equity (the "2021 Rights Offering"). The Series E/F Recapitalization occurred on August 31, 2021, and the 2021 Rights Offering commenced on October 25, 2021, and closed on December 8, 2021, resulting in a series of recapitalization transactions and the raising of approximately $110 million in the form of cash and cancellation of indebtedness.

     **D.**     **2022 Sale Process**

64.     Despite the Debtors' capital raising efforts, the Company continued to struggle to maintain adequate liquidity to meet their financial obligations and were not profitable in 2021 or 2022. As the Company continued to face tightening liquidity, and a looming maturity of the Prepetition Senior Secured Term Loans and its Senior Subordinated Notes, it began to consider and develop wider strategic alternatives.

65.     In the spring of 2022, *VICE* management began working with PJT Partners LP ("PJT") and LionTree LLC ("LionTree") to assist it in exploring a sale that would maximize value for the benefit of creditors and other stakeholders. With the support of those advisors, *VICE* launched a marketing process for a potential sale of the Company or certain of its business segments. The Company received indications of interest from several prospects, two bids for a whole company transaction, and reached advance stages of negotiation and documentation with one of those bidders. Ultimately, despite a lengthy and protracted process, the Company was unable to conclude a transaction with any of the bidders. When no sale transaction was able to be completed, the Debtors were unable to pay the Prepetition Senior Secured Term Loans at maturity and entered into

the Initial Forbearance Agreement with the Prepetition Term Lenders and the Prepetition Administrative Agent on December 12, 2022.

### E.      Second Forbearance Agreement and My Appointment as CRO

66.      As noted above, on December 27, 2022, the Debtors, the Prepetition Term Lenders and the Prepetition Administrative Agent entered into the Second Forbearance Agreement.   The forbearance period provided for under the Second Forbearance Agreement would have expired at 12:01 a.m. on January 12, 2023.   The Second Forbearance Agreement provided for a forbearance fee equal to 1% of the indebtedness under the Prepetition Senior Secured Credit Agreement, which was payable in kind, and also imposed certain milestones, including the appointment of a chief restructuring officer by December 28, 2022, the delivery of a 13-week cash flow forecast to the Prepetition Administrative Agent by January 4, 2023, and the payment of fees and expenses of the Prepetition Term Lenders' advisors.   In satisfaction of the milestones under the Second Forbearance Agreement, I became the Debtors' CRO.

67.      Following the delivery of a 13-week budget in accordance with the Second Forbearance Agreement, the Debtors and Prepetition Term Lenders engaged in further intensive negotiations regarding the terms of additional new money financing and forbearance with the objective of facilitating a renewed, more robust sale process to occur outside of chapter 11.   Those negotiations were complicated by the broad governance rights of the Senior Preferred Shareholders, whose consent was needed in order for the Company to agree to additional financing and other proposed terms.

### F.      Third Forbearance Agreement and Appointment of the Special Committee

68.      Narrowly overcoming those complications, on January 12, 2023, the Company, Prepetition Term Lenders and the Prepetition Administrative Agent entered

into the Third Forbearance Agreement.    In contrast to the previous forbearance agreements, the Third Forbearance Agreement provided relatively longer period of forbearance—through May 12, 2023—to allow the Company to execute on an out of court sale process under the auspices of the newly formed Special Committee.    The Third Forbearance Agreement included a term sheet for bridge financing to fund that sale process in the form of the 2023 Multi-Draw Term Loans.    The Company paid a 10% PIK forbearance fee to the Prepetition Term Lenders in connection with the Third Forbearance Agreement.

69.    Aside from longer term liquidity constraints, the $5 million initial draw on the 2023 Multi-Draw Term Loans occurred earlier than originally planned, due to the Company not having received a payment from GMNC in the amount of $34 million that was due on January 15, 2023.    As described above, GMNC is the primary commissioner of the VWN content.

### G.    VWN MSA Termination

70.    For the past several years, the VWN MSA was a significant source of stable and profitable revenue for the Company, including approximately $134 million in annual revenue in 2022.    The VWN MSA called for quarterly payments from GMNC to *VICE*, with the Q1 VWN Payment having been due on January 15, 2023.    In early January 2023, representatives of *VICE* began to inquire with GMNC about the precise timing of Q1 VWN Payment.    Upon information and belief, in those conversations *VICE* received assurance that the Q1 VWN Payment would be made on a timely basis.    As the end of January approached and into February, those discussions intensified, and it is my understanding that *VICE*'s representatives continued to receive assurances that the Q1 VWN Payment would be made imminently and that GMNC remained committed to the

VWN MSA.  Despite those assurances, *VICE* received the VWN Termination Notice, indicating that GMNC would be terminating the VWN MSA for convenience pursuant its terms (a "Termination for Convenience").

71.     Under the VWN MSA, a Termination for Convenience would be effective 60 days after the giving of notice under the VWN MSA, during which time *VICE* was required to wind down the operations of VWN in a manner that mitigated the costs of termination.  Upon a Termination for Convenience, GMNC was obligated to reimburse *VICE* for up to $50 million of documented wind down expenses.  In order to address the uncertainty around the calculation and the length of time involved in the calculation and proof of reimbursable expense, *VICE* ultimately agreed to a resolution of the wind down expenses in February 2023.  Despite that resolution and the documentation of an agreed upon form termination agreement with GMNC, GMNC delayed the final execution of the Termination Deed.

72.     Ultimately, on April 26, 2023, Vice Parent, and certain Debtors entered into the Termination Deed with GMNC and certain of its affiliates in which GMNH agreed to pay the VWN Termination Payment.  While the initial $30 million of the VWN Termination Payment was required to be paid by GMNH no later than May 4, 2023, the Debtors did not receive this payment until May 9, 2023.  The $20 million second part of the VWN Termination is required to be made on or before July 17, 2023.

**H.      The Wipro Judgement and Enforcement Action**

73.     In May of 2020, Wipro LLC, a former technology and enterprise services provider to Vice Media, commenced an arbitration proceeding relating to the termination of its agreement with Debtor Vice Media.  On March 1, 2023, the arbitrator ruled in favor

of Wipro, awarding it approximately $7.9 million, plus pre-award interest at a rate of 9%, which, together with the $7.9 million judgment amounted to approximately $9.9 million.

74.     On May 4, 2023, Wipro obtained a judgment in respect of its arbitration award from the Supreme Court of the State of New York.  On May 5, 2023, it purportedly served a restraining notice pursuant to CPLR § 5222(b) on Vice Media, limiting its ability to access its cash or dispose of any of its assets, which resulted in additional defaults under the Prepetition Senior Secured Credit Agreement for which the Prepetition Term Lenders had not granted forbearance.

75.     Upon information and belief, on or about May 10, 2023, Wipro served JPMC with a restraining notice similar to the Restraining Notice received by the Debtors, which sought to impose a stay on withdrawals from the VICE Media JPMC Accounts.  At that time, there were funds in the VICE Media JPMC Accounts in excess of the amounts required to satisfy the stay requirements of the Restraining Notice.  Upon further information and believe, the Prepetition Collateral Agent sought to exercise remedies under their deposit account control agreements for all of the Debtors' accounts at JPMC, including the Vice Media JPMC Accounts.   It is my understanding that JPMC has frozen the VICE Media JPMC accounts pending an order from a court that clarifies the control of the funds in the VICE Media JPMC Accounts.   As set forth in the motion seeking debtor-in-possession financing and use of cash collateral filed contemporaneously herewith, the Debtors are seeking authority to use the funds in the VICE Media JPMC Accounts as the cash collateral of the Prepetition Term Lenders.

**I.     Prepetition Marketing Process**

76.     In January 2023, the Debtors re-engaged with LionTree and PJT to run a second sale process to solicit interest in a sale transaction, which has remained underway

since that time. LionTree and PJT initially contacted groups of potential financial and strategic investors who are experienced in investing in the media sector, operational turnarounds and/or distressed situations. The Debtors' marketing efforts are ongoing, and as part of these Chapter 11 Cases, the Debtors intend to conclude a robust and active sale process. In total, prior to the Petition Date, the Debtors solicited interest from approximately 150 potential investors, over 85 of which had executed nondisclosure agreements ("NDAs"). Several of the parties contacted could have potentially been acquirors of some or all of the Company's businesses, as well as providers of postpetition financing to fund a going-concern reorganization.

77.     Additionally, because of the VWN MSA Termination, a revised business plan was developed by the Company and presented to interested acquirors as they were informed of the planned end to VWN MSA.  Due to the business plan changes mid-sale process and new information being provided to potential acquirors who had begun their diligence based on projections that included the VWN MSA, the timeline for pursuing an out-of-court sale was further extended.

**J.     DIP Financing and Cash Collateral**

78.     The Debtors also require the immediate use of cash collateral, and in particular the funds in the VICE Media JPMC Accounts.  The DIP Facility was specifically sized after taking into account the use of the amounts in the VICE Media JPMC Accounts.

79.     With the assistance of their advisors, the Debtors sought proposals for debtor-in-possession financing ("DIP Financing") from potential third-party sources. Negotiations for DIP Financing began in February 2023, and then resumed in earnest in April when it became clear that the VWN payment for the first quarter of 2023 would not be received as previously anticipated.  However, no one was willing to provide DIP

Financing on a junior basis, and the Prepetition Term Lenders would not consent to being primed. Without alternative financing available, the Debtors engaged in negotiations with the Prepetition Term Lenders. After months of hard-fought negotiations, the Debtors and the Prepetition Term Lenders agreed upon the terms of a senior secured superpriority debtor-in-possession multi-draw term loan facility comprised of $10 million in new money term loans and a roll-up of $50 million in existing Prepetition Senior Secured Term Loans under the Prepetition Senior Secured Credit Agreement, for a total facility size of $60 million (the "DIP Facility"). The DIP Facility will be provided by Fortress Investment Group, Soros Fund Management, Monroe Capital, and their respective affiliated funds (collectively, the "DIP Lenders"), who have committed to provide the full amount of the DIP Facility.

80.    The DIP Facility contains certain key milestones (the "DIP Milestones"), including the following:

| Date | Milestone |
|------|-----------|
| **On the Petition Date** | The Debtors shall file a motion to approve the Bidding Procedures (as defined below) |
| **No later than three days after the Petition Date** | The Debtors shall file the Stalking Horse Agreement |
| **No later than 15 days after the Petition Date** | The Debtors shall obtain entry of an order approving the Bidding Procedures and authorizing the Debtors to enter into the Stalking Horse Agreement |
| **No later than 35 days after the Petition Date** | The Debtors shall have conducted the Auctions with respect to the 363 Sale (as defined below), if necessary. |
| **No later than 40 days after the Petition Date** | The sale hearing shall take place and the Debtors shall obtain entry of an order approving the sale |
| **No later than 55 days after the Petition Date** | The 363 Sale process shall close. |

81.    In my view, the DIP Milestones, while tight, are appropriate under the circumstances.  In particular, with respect to the DIP Milestones relating to the 363 Sale, it should be noted that, in light of the Debtors' liquidity position, time is of the essence to complete the 363 Sale in order to best position the Company to survive as a going concern. The Debtors believe that, notwithstanding the tight deadlines in DIP Milestones, as

discussed herein, the prepetition marketing process was extensive, and the Debtors believe that there is ample time for competing bids to the Stalking Horse Bid (as defined below) to be submitted prior to an auction.

82.    As described above, pursuant to the Prepetition Overdraft Facility, JPMC has setoff rights against certain of the Debtors' accounts and the obligations owing to JPMC are supported by a *pari passu* security interest in the Prepetition Collateral.  In the weeks leading up to the Petition Date, the Debtors and DIP Lenders negotiated with JPMC and reached an agreement with JPMC in which JPMC has consented to the terms of the Debtors' DIP Financing and entry of the interim and final orders authorizing the Debtors to obtain such DIP Financing (the "JPMC Consent and Forbearance").[5]  The JPMC Consent and Forbearance provides that JPMC will agree to forbear from exercising any remedies or terminating the Debtors' cash management agreements with JPMC solely as a result of these Chapter 11 Cases or the Debtors' insolvency.  The period of forbearance under the agreement terminates on the earlier of November 10, 2023, at 11:59 p.m. (New York City time), and the occurrence of a Forbearance Termination Event (as defined therein).

83.    It is my understanding that with respect to the Pulse Notes, the Debtors and DIP Lenders did not require the Pulse Sellers' consent to obtain DIP Financing because the Pule Notes Subordination Agreement explicitly provides that if the Debtors seek to obtain financing under section 363 or 364 of the Bankruptcy Code, then: (i) the Pulse Sellers will not raise any objection to such DIP Financing or request any other relief in

---

[5]    The terms of the agreement with JPMC were memorialized in that certain Consent and Forbearance Agreement dated as of May 14, 2023.

connection with any interest in any asset and (ii) the security interests and liens of the Pulse Sellers, if any, will be subordinate to such DIP Financing.

84.    The Debtors require access to borrowings under the DIP Facility to fund the costs of administering these Chapter 11 Cases, near-term working capital needs and ongoing business operations. Specifically, based on the Debtors' forecasts, the Debtors anticipate that they will be unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover the projected restructuring costs of these Chapter 11 Cases without access to the postpetition financing provided by the DIP Facility. The DIP Facility will provide the greatest chance of avoiding negative impacts to *VICE*'s businesses, by assuring vendors and other third parties that the Debtors will be able to continue operating business-as-usual.  It will also allow for the continuation of the Debtors' sale process and facilitate obtaining the highest and best bid.[6]

### K.    The Stalking Horse Bid

85.    Once the Debtors' path towards a sale through chapter 11 (the "363 Sale") came into focus, the Debtors and the Prepetition Term Lenders worked quickly to develop and negotiate a sale term sheet and bidding procedures. The foundation of the 363 Sale process is a stalking horse bid (the "Stalking Horse Bid") to be provided by Fortress (in such capacity, the "Stalking Horse Bidder") to purchase substantially all of

---

[6]    A further description of the DIP Facility and the process to obtain it is set forth in the *Declaration of Brent Herlihy in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Declaration").

the Company's assets. The Stalking Horse Bid will provide a value "floor" to entice further bidding.

86.     The Stalking Horse Bid is the result of hard-fought, arm's-length negotiations with the Stalking Horse Bidder and represents the highest and best offer for the Debtors' assets.   Although the prepetition marketing process did not yield an actionable transaction prior to the Petition Date other than the Stalking Horse Bidder, it did result in the terms of a stalking horse bid that the Debtors believe will spark further interest in their business segments and yield a competitive and value-maximizing 363 Sale process. Armed with the benefit of the prepetition marketing process, the Debtors are confident that the Stalking Horse Bid represents the best terms available as of the Petition Date. The Debtors are hopeful that the Stalking Horse Bid will strengthen interest in their assets—further to the interest that was evidenced in the prior marketing processes.

87.     The Debtors have developed bidding procedures and auction procedures (the "Bidding Procedures") that will facilitate a competitive process for the Company's assets.  The urgency of the Debtors' current situation dictates that time is of the essence for completing the 363 Sale.   Accordingly, contemporaneously with the filing of this Declaration, the Debtors have filed *Debtors' Motion to Shorten Notice to Consider Debtors' Motion for Entry of an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Authorizing and Approving the Debtors' Entry into the Stalking Horse Agreement, (III) Approving the Sale of Substantially all of the Debtors' Assets and (IV) Granting Related Relief* (the "Motion to Shorten"), which seeks an expedited hearing to approve the Bidding Procedures. A further description of the Motion to Shorten is included in Exhibit B to this Declaration.

L.    **Commencement of the Chapter 11 Cases**

88.    Against the backdrop described above, the Debtors commenced these Chapter 11 Cases.  The Debtors' objective in these Chapter 11 Cases is simple—to complete an open and transparent sale and auction process that will allow them to maximize the value of their businesses. With the protections and tools afforded under chapter 11, the Debtors will be able preserve the value of their assets and execute on a restructuring of their balance sheets.  As the Debtors refine and seek to implement their restructuring strategy, the immediate focus of these Chapter 11 Cases is the stabilization of the Debtors' businesses and the relief requested in the First Day Pleadings.

IV.    **Overview of First Day Pleadings**

89.    Today the Debtors filed their First Day Pleadings, which seek orders granting various forms of relief needed to stabilize the Debtors' businesses, transition to operating as debtors-in-possession and facilitate an efficient administration of these Chapter 11 Cases. A description of the relief requested and the facts supporting each of the First Day Pleadings is set forth in **Exhibit B**.

90.    I am familiar with the content of the First Day Pleadings.  The First Day Pleadings seek authority and Court approval to, among other things, honor employee-related wages and benefits obligations, pay claims of certain vendors and suppliers critical to the Debtors' business operations, and ensure the continuation of the Debtors' cash management system and other operations in the ordinary course of business.

91.    The relief requested in the First Day Pleadings is urgently necessary to minimize the risk of business disruption and preserve the value of the Debtors' assets. The relief sought will inure to the benefit of all stakeholders of the Debtors.  Obtaining the relief sought in the First Day Pleadings will permit the Debtors to preserve and

maximize the value of their estates for the benefit of all of their stakeholders.  Absent this first day relief, the Debtors' estates would suffer immediate and likely irreparable harm.

92.    On behalf of the Debtors, I request that the Court grant the relief requested in the First Day Pleadings and thank the Court for its expedited consideration of them.

## V.    **Information Required by Local Rule 1007-2**

93.    Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which I have provided in the exhibits attached hereto as **Exhibit C** through **Exhibit M**. Specifically, these exhibits contain the following information with respect to the Debtors (on a consolidated basis, unless otherwise noted):

- **Exhibit C** provides the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in these chapter 11 cases, and a brief description of the circumstances surrounding the formation of the committee, pursuant to Local Bankruptcy Rule 1007-2(a)(3).

- **Exhibit D** provides the following information with respect to each of the holders of the debtors' 30 largest unsecured claims, excluding claims of insiders: the creditors name; the address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the telephone number; the name(s) of the person(s) familiar with the debtors' account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured, pursuant to Local Bankruptcy Rule 1007-2(a)(4).

- **Exhibit E** provides the following information with respect to each of the holders of the five largest secured claims against the debtors: the creditor's name; address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and an indication of whether the claim or lien is disputed at this time, pursuant to Local Bankruptcy Rule 1007-2(a)(5).

- **Exhibit F** provides a summary of the debtors' assets and liabilities, pursuant to Local Bankruptcy Rule 1007-2(a)(6).

- **Exhibit G** provides a summary of the publicly held securities of the debtors, pursuant to Local Bankruptcy Rule 1007-2(a)(7).

- **Exhibit H** provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity: the name; address; and telephone number of such entity and the court in which any proceeding relating thereto is pending, pursuant to Local Bankruptcy Rule 1007-2(a)(8).

- **Exhibit I** provides a list of property comprising the premises owned, leased, or held under other arrangement from which the debtors operate their business, pursuant to Local Bankruptcy Rule 1007-2(a)(9).

- **Exhibit J** sets forth the location of the debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the debtors outside the territorial limits of the United States, pursuant to Local Bankruptcy Rule 1007-2(a)(10).

- **Exhibit K** provides a list of the nature and present status of each action or proceeding, pending or threatened, against the debtors or their property where a judgment or seizure of their property may be imminent, pursuant to Local Bankruptcy Rule 1007-2(a)(11).

- **Exhibit L** sets forth a list of the names of the individuals who comprise the debtors' existing senior management, their tenure with the debtors, and a brief summary of their relevant responsibilities and experience, pursuant to Local Bankruptcy Rule 1007-2(a)(12).

- **Exhibit M** provides the estimated amount of payroll to the debtors' employees (not including officers, directors, and equity holders) and the estimated amounts to be paid to officers, equity holders, directors, and financial and business consultants retained by the debtors, for the 30-day period following the Petition Date, pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A).

- **Exhibit N** provides a schedule, for the 30-day period following the Petition Date, of estimated cash receipts and disbursements, net gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the filing of the chapter 11 cases, and any other information relevant to an understanding of the foregoing, pursuant to Local Bankruptcy Rule 1007-2(b)(3).

94.    I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: May 15, 2023

/s/ *Frank A. Pometti*
Name: Frank A. Pometti
Title: Chief Restructuring Officer

**<u>Exhibit A</u>**

**Corporate Organization Chart**

# VICE GROUP ORGANIZATIONAL CHART



# VICE GROUP ORGANIZATIONAL CHART



# VICE GROUP ORGANIZATIONAL CHART



## Exhibit B

**Evidentiary Support for First Day Pleadings[1]**

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the applicable First Day Pleading.

I.      **Procedural First Day Pleadings**

  A.      **Debtors' Motion for Entry of an Order Authorizing and Directing Joint Administration of Chapter 11 Cases (the "<u>Joint Administration Motion</u>")**

1.      In the Joint Administration Motion, the debtors seek entry of an order directing joint administration of their Chapter 11 Cases for procedural purposes only.  As set forth above, the Debtors are "affiliates" with one another as that term is defined in section 101(2) of the Bankruptcy Code and as used in Bankruptcy Rule 1015(b), with *VICE* as the direct or ultimate parent. Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest. As such, joint administration of the Chapter 11 Cases is appropriate pursuant to Bankruptcy Rule 1015(b).

2.      Joint administration of these cases is also appropriate because it will avoid the unnecessary time and expense of duplicative motions, applications, orders, and other papers and related notices that otherwise would need to be filed in all of the cases absent joint administration.  By permitting counsel for all parties in interest to file all notices, applications, motions, and other pleadings under a single case number, I believe that joint administration will promote judicial economy and avoid duplicative and potentially confusing filings.  Accordingly, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

B.     **Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Granting Related Relief (the "Schedules Motion")**

3.     In the Schedules Motion, the Debtors seek entry of an order (i) extending the initial 14-day period to file their schedules of assets and liabilities and statements of financial affairs for an additional 30 days, for a total of 44 days, without prejudice to the Debtors' ability to request additional time or to seek other relief, and (ii) granting related relief.

4.     The Court's grant of an extension of time to file the Schedules and Statements is appropriate in light of the circumstances surrounding these Chapter 11 Cases.  It is my understanding that in order to prepare the Schedules and Statements, the Debtors must compile information from books, records, and documents relating to the claims of numerous creditors, as well as the Debtors' assets and contracts.  This information is voluminous and collecting it requires a substantial expenditure of time and effort on the part of the Debtors and their professional advisors in the near term— when these resources would be best used to ensure a smooth transition of the Debtors into chapter 11.  In my opinion, focusing the attention of key personnel on critical operation and chapter 11 compliance issued during the early days of these Chapter 11 Cases will maintain the stability of the Debtors' business operations and facilitate the Debtors' smooth transition into chapter 11, thereby maximizing value for their estates, their creditors, and other parties in interest.

5.     While the Debtors, with the help of their professional advisors, are working diligently and expeditiously on the preparation of the Schedules and Statements, resources have concentrated on the aforementioned objectives.  Accordingly, the employees with the expertise to complete the Schedules and Statements have been pre-

3

occupied by numerous other restructuring work matters in addition to their ordinary course duties as employees of the Debtors. I believe that the immense volume of information that must be assembled and compiled and the potentially hundreds of employee and professional hours required to complete the Schedules and Statements constitute good and sufficient cause for granting the requested extension of time. In addition, I understand that employee efforts during the initial postpetition period are critical, and the Debtors must devote their time and attention to business operations to maximize the value of the Debtors' estates during this period.

6.     Due to the amount of work entailed in completing the Schedules and Statements for cases of this size, and the competing demands upon the limited number of employees available to assist the Debtors and their professionals, I understand that the Debtors will not be able to complete the Schedules and Statements properly and accurately within the required 14-day time period provided for under Bankruptcy Rule 1007(c), and, therefore, I believe that ample cause exists for the requested extension.

**C.     Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Prepare a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) Authorizing the Debtors to File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (III) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (IV) Approving the Form and Manner of Notifying Creditors of Commencement, and (V) Granting Related Relief (the "<u>Creditor Matrix Motion</u>")**

7.     The Debtors have filed a purely administrative or procedural motion seeking entry of an order (i) authorizing the Debtors to prepare a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor; (ii) authorizing the Debtors to file a consolidated list of the Debtors' 30 largest unsecured creditors; (iii) authorizing the Debtors to redact certain personally identifiable information;

4

(iv) approving the form and manner of notifying creditors of the commencement of these Chapter 11 Cases; and (v) granting related relief.

8.      Permitting the Debtors to file a consolidated list of creditors, as opposed to a separate creditor matrix for each Debtor, is, in my opinion, warranted under the circumstances of these cases. Indeed, because the Debtors estimate that they have thousands of creditors and other parties in interest, I believe that filing separate creditor matrices for each Debtor would be a duplicative and burdensome task. Additionally, I understand that converting the Debtors' computerized information to a format compatible with the matrix requirements would be time-consuming and, more importantly, would greatly increase the risk of error. As such, I believe that the Debtors' request to file the consolidated list of creditors as it is currently formatted and in accordance with the procedures outlined in the Creditor Matrix Motion is reasonable and warranted under the circumstances.

9.      The Debtors, working together with AlixPartners LLP and Stretto, Inc. ("Stretto") have already prepared a single, consolidated list of the Debtors' creditors in electronic format.  The Debtors are prepared to make the Creditor Matrix available in electronic form to any party in interest who so requests (or in non-electronic form at such requesting party's sole cost and expense) in lieu of submitting a mailing matrix to the clerk of this Court.

10.     The Debtors also request authority to prepare a consolidated list of the Debtors' 30 largest unsecured creditors.  Compiling separate top-20-creditor lists for each individual Debtor would consume a substantial amount of the Debtors' time and resources.  I believe that a single, consolidated list of the Debtors' 30 largest unsecured, non-insider creditors will aid the U.S. Trustee in its efforts to communicate with these

creditors.  Filing a single consolidated list of the 30 largest unsecured creditors in these
Chapter 11 Cases is appropriate for these reasons.

11.      Additionally, the Debtors request authority to redact certain personally
identifiable information from their lists of creditors.  The Debtors respectfully submit that
it is appropriate to authorize the Debtors to redact from any paper filed or to be filed with
the Court in these Chapter 11 Cases, including the lists of creditors and their Schedules
and Statements, (i) the home addresses of individual creditors—including the Debtors'
employees—and individual equity holders and (ii) the names, addresses, and other
personally identifiable data of any natural person to the extent they are processed subject
to applicable UK, EU, or Jersey privacy laws because, respectively, (x) such information
can be used to perpetrate identity theft and phishing scams or to locate survivors of
domestic violence, harassment, or stalking under 11 U.S.C. § 107(c)(1), and (y) disclosure
risks violating such applicable UK, EU, or Jersey privacy laws, exposing the Debtors to
potential civil liability and significant financial penalties.

12.      The Debtors propose to provide an unredacted version of the Creditor
Matrix, Schedules and Statements, and any other applicable filings redacted pursuant to
the proposed Order to (i) the Court, the U.S. Trustee, counsel to any official committee
appointed in these Chapter 11 Cases, and (ii) any party in interest upon a request to the
Debtors (email is sufficient) or to the Court that is reasonably related to these Chapter 11
Cases.  In each case, this would be subject to a review of whether such disclosure, on a
case-by-case basis, would violate any obligation under the Data Protection Regimes, or
any other privacy or data protection law or regulation.  In addition, the Debtors will
distribute as applicable any notices that are received at the Debtors' corporate
headquarters and are intended for a current employee.

13.     Finally, the Debtors request authority to serve their proposed notice of commencement, and all mailings directed by the Court or the U.S. Trustee, through their proposed claims and noticing agent.  The notice of commencement informs creditors of the commencement of these Chapter 11 Cases, the time and location of the Section 341 Meeting, and the Bar Dates. The notice of commencement also provides instructions for attending the Section 341 Meeting and the procedure for filing proofs of claim.  I believe that using Stretto to promptly provide notices to all applicable parties will maximize efficiency in administering these Chapter 11 Cases and will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee.  Additionally, Stretto will assist the Debtors in preparing creditor lists and mailing initial notices, and, therefore, there are efficiencies in authorizing Stretto to mail the notice of commencement of these Chapter 11 Cases.

14.     Accordingly, I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates.

**D.     Debtors' Application Seeking Entry of an Order (I) Authorizing and Approving the Appointment of Stretto, Inc. as Claims and Noticing Agent and (II) Granting Related Relief (the "<u>Claims and Noticing Agent Application</u>")**

15.     The Debtors seek entry of an order appointing Stretto as claims and noticing agent for the Debtors in these Chapter 11 Cases effective as of the Petition Date including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' Chapter 11 Cases, and (ii) granting related relief.

16.     The Debtors selected Stretto because it is one of the nation's leading bankruptcy administrators and has extensive experience performing these tasks in cases of this size.  I believe that Stretto is well-qualified to perform the services contemplated

in its retention application.  I believe that Stretto's rates are competitive and reasonable given Stretto's quality of services and expertise.  The terms of Stretto's retention are set forth in the Engagement Agreement attached to the Claims and Noticing Agent Application as **Exhibit C**; *provided* that Stretto is seeking approval solely of the terms and provisions as set forth in their application and the proposed order attached thereto.

17.     Given the number of anticipated claimants and the complexity of the Debtors' businesses, I believe that the appointment of Stretto as claims and noticing agent is in the best interest of the Debtors' estates and their creditors, because the distribution of notices and the processing of claims will be expedited, and the Clerk's Office will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

## II.     **Operational First Day Pleadings**

### A.     **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Taxes and Fees and (II) Granting Related Relief (the "Taxes Motion")**

18.     In the ordinary course of their businesses, the Debtors collect, incur, and withhold income taxes, sales taxes, use taxes, value-added taxes, personal property taxes, franchise taxes and fees, foreign taxes, and various other governmental taxes, fees, and assessments.  The Debtors pay or remit Taxes and Fees to various federal, state, provincial, local, and foreign governmental units, including taxing authorities (on a periodic basis (monthly, quarterly, semi-annually, or annually) depending on the nature and incurrence of a particular Tax or Fee and as required by applicable laws and regulations.  The Debtors generally pay and remit Taxes and Fees through checks and electronic transfers that are processed through their banks and other financial institutions

or service providers.  The Debtors estimate that approximately $1.3 million in Taxes and Fees are outstanding as of the Petition Date.

19.     Any failure by the Debtors to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including: (i) the Governmental Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from these Chapter 11 Cases; (ii) the Governmental Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates; and (iii) in some instances, certain of the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the Debtors' restructuring. Taxes and Fees not paid on the due date as required by law may result in fines and penalties, the accrual of interest, or both.  Moreover, the Debtors also collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Governmental Authorities, and these funds may not constitute property of the Debtors' estates.

20.     I believe that the relief requested in the Taxes Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

**B.      Debtors' Motion for Entry of Interim and Final Orders (I) Establishing Notice and Objection Procedures for Transfers of Equity Securities and Claims of Worthless Stock Deductions and (II) Granting Related Relief (the "NOL Motion")**

21.     Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders (i) establishing notice and objection procedures related to certain transfers of and declarations of worthlessness for federal or state tax purposes with respect to the existing Common Stock or Preferred Stock of *VICE*, or any beneficial ownership thereof; (ii)

9

directing that any purchase of, sale of, or other transfer or declaration of worthlessness with respect to *VICE* Stock in violation of the procedures set forth therein be null and void *ab initio*; and (iii) granting related relief, including scheduling a hearing to consider approval of the NOL Motion on a final basis.

22.    I understand that the Debtors generate various Tax Attributes that are of significant value to the Debtors and their estates because the Debtors may be able to utilize the Tax Attributes to offset any taxable income generated by transactions consummated during and after these Chapter 11 Cases. Additionally, the Debtors may be able to carry forward certain of those Tax Attributes to offset federal taxable income or federal liability in future years. I believe that any termination or limitation of the Tax Attributes, including during the first month of these Chapter 11 Cases, could cause significant and irreparable damage to the Debtors' estates and stakeholders.

23.    The Debtors estimate that, as of the Petition Date, they collectively have federal and state NOL carryovers in excess of $1 billion. The Debtors also may have additional disallowed business interest carryforwards, foreign tax credits, net unrealized built-in loss or other Tax Attributes as of the Petition Date. Furthermore, the Debtors believe that, based on currently available information, they may generate significant additional Tax Attributes in the current and future tax years, including during the pendency of these Chapter 11 Cases. The Tax Attributes provide the potential for material future tax savings or other tax structuring possibilities in these Chapter 11 Cases because the Debtors can generally carry forward their Tax Attributes to offset future taxable income, thereby reducing their future aggregate tax obligations. Additionally, such Tax Attributes may generally be utilized by the Debtors to offset any taxable income generated by transactions consummated during these Chapter 11 Cases. Thus, the value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

24.     If no restrictions on trading or worthlessness deductions are imposed as requested in the NOL Motion, such trading or deductions could severely limit or even eliminate the Debtors' ability to utilize the Tax Attributes. I believe that the loss of these valuable estate assets could lead to significant negative consequences for the Debtors, their estates, their stakeholders, and the overall reorganization process. I further believe that the procedures and other relief requested in the NOL Motion may be critical for maximizing estate value and will help ensure a meaningful recovery for creditors. I believe that the relief requested in the NOL Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest.

**C.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue to (A) Utilize their Existing Cash Management System, (B) Maintain their Existing Bank Accounts, (C) Perform Intercompany Transactions, (D) Utilize and Maintain their Existing Business Forms and (E) Utilize their Corporate Credit Card Programs and (II) Granting Related Relief (the "<u>Cash Management Motion</u>")**

25.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to continue to (a) utilize their existing cash management system, (b) maintain their existing bank accounts, (c) perform intercompany transactions, (d) utilize and maintain their existing business forms, and (e) utilize their corporate credit card programs and to pay any related expenses or fees with respect to the same; and (ii) setting the date of a final hearing and granting related relief.

26.     In the ordinary course of its business, the Company, like other business enterprises of its size and scope, utilizes a sophisticated centralized cash management system to collect, transfer, and disburse funds in a manner that promotes the efficient operation of its integrated business operations.  The Cash Management System is a critical component of the Company's complex global operations and is integral to the ability of the Debtors and their non-Debtor affiliates to process payrolls and satisfy obligations to

vendors and content providers.  The Cash Management System allows the Company to manage cash efficiently and maintain control over the administration of their accounts, while facilitating cash monitoring, forecasting, and reporting functions.

27.    The Cash Management System currently utilizes 46 bank accounts that the Debtors control,[8] which are identified on **Exhibit C** to the Cash Management Motion.  In addition, the Cash Management System utilizes 228 bank accounts of Non-Debtor Affiliates, excluding accounts of non-Debtor joint ventures in which the Company is a party.  An illustrative schematic of the Cash Management System is attached as **Exhibit D** to the Cash Management Motion.

28.    The Cash Management System generally operates through a division of the Bank Accounts into three regional segments: (i) the United States and Canada ("NA Region"); (ii) Europe, the Middle East, and Africa ("EMEA Region"); and (iii) Asia and the Pacific ("APAC Region").  All of the Debtor Bank Accounts are in the NA Region and the EMEA Region, with 43 Debtor Bank Accounts in the United States and three Debtor Bank Accounts in the United Kingdom.

29.    Of the 46 Debtor Bank Accounts, 44 are at JPMorgan Chase Bank, N.A. ("JPMC"), one is at City National, N.A. ("City National"), and one is at PNC. Of the Debtor Bank Accounts at JPMC, 41 are part of the NA Region (all of which are located in the United States) and three are part of the EMEA Region (all of which are located in the United Kingdom).  The Debtor Bank Accounts at PNC and City National are both part of the NA Region (located in the United States).

---

[8]    The Debtors have an interest in one escrow account in the United States that is at PNC Bank, N.A. ("PNC").

30.     The Debtors incur periodic service charges and other fees in connection with the maintenance of the Cash Management System, including processing fees and monthly bank fees for certain Bank Accounts.  Bank Fees average approximately $42,000 per month for monthly bank fees, and approximately $25,000-$40,000 per month for overdraft interest, depending on utilization.  The banks to whom Bank Fees are owed may have rights of setoff for such fees against amounts on deposits in the various Bank Accounts.  Specifically, in the case of JPMC, some of these Bank Fees are secured pursuant to an Assignment of Deposits among Debtor *VICE* Media LLC and JPMC, dated May 1, 2019, pledging certain deposit accounts held by *VICE* Media LLC and its subsidiaries in favor of JPMC as security for costs and expenses incurred by JPMC in connection with the covered Bank Accounts.

31.     JPMC, PNC, and City National are Authorized Depositories in the Southern District of New York by the Office of the United States Trustee for the Southern District of New York, pursuant to the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees*.

32.     The Debtors use a variety of preprinted business forms in the ordinary course of business.  To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, the Debtors request that the Court authorize their continued use of all Business Forms in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession. The Debtors submit that once they have exhausted their existing stock of Business Forms, they shall ensure that any new Business Forms are clearly labeled "Debtor in Possession," and with respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor in Possession."

13

33.     In the ordinary course of business, the Debtors maintain various company paid Corporate Cards that are utilized to pay for certain work-related expenses, emergencies, online purchases of supplies, and other small, non-recurring purchases made on behalf of the Debtors.  The Corporate Cards are issued by three credit card providers, American Express ("AMEX"), JPMC, and Barclays PLC.  As of the Petition Date, approximately 318 Corporate Cards have been issued by the Corporate Card Providers.

34.     In general, Corporate Cards are issued to specific employees, such as Production Managers, who file expense reports for the Debtors' payment of business-related expenses incurred on the Corporate Cards.  The Debtors directly incur certain business-related expenses through the Corporate Cards, without the Debtors' employees incurring any reimbursable expenses.  The Debtors receive monthly statements for purchases (the "Corporate Card Expenses") made with the Corporate Cards in the preceding month.  The cards issued by Barclays are paid primarily through a direct debit, the cards associated with JPMC are paid via EFT Debit.  The AMEX cards maintain individualized statements, and the company pays the *VICE* Media Debtor entity's cards via a general EFT Debit or through ACH payments and the Refinery29 Debtor entity's cards by wire.  Once the Debtors determine that the Corporate Card Expenses comply with the Debtors' policies and procedures, the Debtors typically pay at least part of the outstanding Corporate Card Expenses within 30 days of receipt of such statements.  Due to the individualized nature of the AMEX statement, the company contributes weekly towards the balance of each card in order to avoid late payment fees. As of the Petition Date, the Debtors estimate that there are $380,000 of accrued but unpaid purchasing card expenses from JPMC that will become due and owing within the first twenty-one days of these Chapter 11 Cases.

35.     The Company, comprising both the Debtors and Non-Debtor Affiliates, forms a single, integrated global enterprise under common management.  As part of that integrated enterprise, the Debtors engage in numerous Intercompany Transactions. Intercompany Transactions include, among other things, global management and legal services, production services, IT services, purchasing, and maintaining insurance policies on behalf of the Company. In the ordinary course of business, the Debtors make Intercompany Transactions to either (a) reimburse certain Debtor or non-Debtor affiliates for various expenditures associated with their business or (b) fund certain Debtors' or non-Debtor affiliates' accounts in anticipation of such expenditures, as needed.

36.     The Debtors track all Intercompany Transactions through their accounting system and can ascertain, trace, and account for all Intercompany Transactions. If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.

37.     I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

     **D.**     **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue their Prepetition Insurance Coverage and Pay Prepetition Obligations Thereunder, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Continue to Pay Insurance Brokerage Commissions, and (II) Granting Related Relief (the "__Insurance Motion__")**

38.     By the Insurance Motion the Debtors request entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) continue their prepetition insurance coverage and pay all prepetition obligations thereunder, (b) renew, amend,

supplement, extend, or purchase insurance coverage in the ordinary course of business on a postpetition basis, and (c) satisfy payment of prepetition obligations on account of, and continue to pay, Insurance Brokerage Commissions in the ordinary course, and (ii) setting the date of a final hearing and granting related relief.

39.     In the ordinary course of business, the Debtors maintain approximately 30 insurance policies that are administered by a variety of third-party carriers, providing, among other things, general liability coverage, excess liability, employer's liability, property coverage, production coverage (including coverage for producer liability, cast issues, imminent peril, extra expenses, event cancellation and other production related issues), directors' and officers' liability, employment practices liability, fiduciary liability, crime/theft, international general liability, cyber and technology, errors and omissions, business travel accident and security incident response coverage.  A list of the Debtors' Insurance Policies and Insurers is attached as **Exhibit C** to the Insurance Motion.

40.     From time to time, the Company takes out limited Insurance Policies for specific, time-defined projects.  As of the Petition Date, the Debtors are current on all obligations owing under such Project-Based Insurance Policies.  The Debtors are seeking authority, but not direction, to continue to take out such Project-Based Insurance Policies as needed for their projects in the ordinary course of business.  Continuation and renewal of the Insurance Policies and entry into new insurance policies, as applicable, are essential to the preservation of the value of the Debtors' properties and assets.  Moreover, in many instances, coverage provided by the Insurance Policies is required by regulation, laws, and contracts governing the Debtors' commercial activities, including the requirement of the U.S. Trustee that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.

41.    The Debtors typically obtain their Insurance Policies through their Insurance Brokers who assist the Debtors with: (i) obtaining comprehensive, cost-effective insurance coverage for their operations; (ii) negotiating policy terms, provisions, and premiums; (iii) administering claims; and (iv) providing ongoing support throughout policy periods.  The Debtors pay the Insurance Brokers the entire amount of the Insurance Premium due under certain Insurance Policies, from which the Insurance Broker deducts a percentage of the Insurance Premium as compensation for its services, and direct payment of the remaining funds to the applicable Insurer.  I believe that the Insurance Brokers' services are necessary to the Debtors' ability to obtain Insurance Policies on reasonable terms and at competitive rates.  The Insurance Brokers' services will also facilitate the proper maintenance of the Debtors' Insurance Policies post-petition and ensure adequate protection of the Debtors' property. As of the Petition Date, the Debtors do not believe there are any unpaid pre-petition obligations in connection with the Insurance Brokerage Commissions.

42.    The Debtors' ability to maintain the Insurance Policies, to renew, supplement, and modify the same as needed, and to enter into new insurance policies as needed in the ordinary course of business, is essential to preserving the value of the Debtors' businesses, operations, and assets.  In many instances, insurance is required by statutes, rules, regulations, and contracts that govern the Debtors' commercial activities, including the requirements of the U.S. Trustee that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.  In particular, it is critical that the Debtors maintain their production coverage in order to complete content driven projects on a timely and uninterrupted basis.  Accordingly, I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all

other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

    **E.**    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Certain (A) Freelancers, (B) Critical Vendors, and (C) Foreign Vendors and (II) Granting Related Relief (the "<u>Critical Vendors Motion</u>")**

    43.    Pursuant to the Critical Vendors Motion the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to pay or otherwise honor certain prepetition claims and obligations, in the ordinary course of business, owing to: (a) Freelancers; (b) Critical Vendors; and (c) Foreign Vendors, and (ii) setting the date of a final hearing and granting related relief.

    44.    As a multiplatform media company, *VICE* relies on continuing access to, and relationships with, its Key Suppliers, which include irreplaceable Freelancers who are essential for the Debtors' production activities, vendors who are critical to the development and production of content and advertising, and other crucial vendors and service providers.

    45.    Additionally, many of the Debtors' obligations to Key Suppliers arise out of the Debtors' agreements with their customers and are essential to allow the Debtors to fulfill such agreements. Often, when the Debtors enter into an agreement with a customer, such customer may require the Company to use certain vendors in connection with that agreement. In such cases, the use of the Key Supplier's services is critical for the Debtors' ability to continue the existing relationship with the customer. Any interruption of such Key Suppliers' services as a consequence of a failure to pay them might cause significant harm to the Debtors' customer relationships and might even result in the termination of the Debtors' current projects, leading to a loss of revenue that the Debtors cannot afford.

46.    Due to the industries in which the Debtors operate, in the ordinary course of business, they have historically utilized the services of more than 1,800 Freelancers. The Freelancers, who either are engaged directly by the Debtors or through Staffing Agencies include writers, influencers, producers, and other creative talent, and are essential to the Debtors' production of journalism, advertising, television, films, podcasts, digital content, and other content. The Freelancers play a central role in the Debtors' operations.  They possess specific qualifications, skills, and expertise, without which the Debtors would not be able to produce the high-quality content for which they are known around the world.  The Freelancers are critical to the Debtors' ongoing viability, and their importance cannot be overstated.

47.    Subject to the Court's approval, the Debtors intend to pay Key Supplier Claims only to the extent necessary to preserve their businesses.  The Debtors have designated a core group of executives, advisors, and employees who have experience in the Debtors' business and in the Debtors' value-preserving process, which will review, assess, and, as appropriate, recommend payment on account of trade claims to determine whether they should be treated as Key Supplier Claims.  In return for paying Key Supplier Claims, the Debtors will use commercially reasonable efforts to condition payment of such claims upon each such Key Supplier's agreement to continue supplying goods and services to the Debtors in accordance with Customary Trade Terms.  In particular, the Debtors will have each Critical Vendor, with the exception of (i) Freelancers and (ii) any Critical Vendor with a prepetition balance of less than $50,000, execute a Trade Agreement.  Additionally, in connection with making a payment to a Foreign Vendor with prepetition claims exceeding $50,000, the Debtors will seek an acknowledgement that such Foreign Vendor will continue providing services to the Debtors on Customary Trade Terms.

48.     After an extensive review and analysis of the Debtors' vendors, the Debtors and their advisors identified the vendors that they rely on to continue to generate revenue on an uninterrupted basis and operate their businesses. The Critical Vendors include vendors and suppliers who provide the Debtors with various goods and services, including, but not limited to, production equipment and services, content, licensing, information technology services, telecommunications equipment and services, and advertising and marketing-related services.  The Debtors' trade relationships with their Critical Vendors generally are not governed by long-term contracts, and the Debtors believe that those trade relationships may materially deteriorate if the Debtors are unable to pay Critical Vendor Claims, causing interruptions and delays in the Debtors' operations, with potentially devastating effects on the value of the Debtors' estates.

49.     The Critical Vendors provide mission-critical goods and services that support the Debtors' production of content and advertising.  Any attempt to replace these Critical Vendors would be highly disruptive to the Debtors' businesses and operations, particularly during the Debtors' transition into chapter 11. Payment of the Critical Vendor Claims is essential to avoid costly disturbances to the Debtors' businesses during these Chapter 11 Cases at this critical juncture.

50.     Due to the international scope of the Debtors' businesses, a critical component of the Debtors' operations involves transacting with Foreign Vendors. The Foreign Vendors supply goods and services to the Debtors that are crucial to the Debtors' ongoing international operations and for the continuation of their businesses in the ordinary course during these Chapter 11 Cases, including production equipment and services, content, licensing, information technology services, and advertising and marketing-related services.  Maintaining existing relationships with the Foreign Vendors

is essential for the Debtors to continue to operate in the ordinary course.  Replacing these Foreign Vendors would be time-consuming, impracticable, and cost-prohibitive.

51.     I believe that the relief requested in the Critical Vendors Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**F.     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, and other Obligations Arising from Compensation and Benefits Programs and (B) Continue Compensation and Benefits Programs and (II) Granting Related Relief (the "<u>Wages Motion</u>")**

52.     Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to (a) pay prepetition wages, salaries, reimbursable expenses, and other obligations arising from the Compensation and Benefits Programs in the ordinary course of business as provided therein and (b) continue to administer the Compensation and Benefits Programs, and (ii) and granting related relief.

53.     As of the Petition Date, following a significant reduction in force, the Debtors directly employ approximately 679 employees,[9] of which five are part-time Employees.  All of the Debtors' Employees that are the subject of the relief requested in the Wages Motion are employed in the United States.[10]  The majority of the Employees are salaried; however, approximately six Employees are paid on an hourly basis. Approximately 151 of the Employees are members of various labor unions and are

---

[9]     In addition to the Debtors' Employees, the Debtors' non-debtor affiliates employ approximately 684 individuals at various locations throughout the world.

[10]    Debtor entity Vice Europe Holding Limited, is incorporated in the Bailiwick of Jersey and has one employee. However, this individual is paid by, and receives all of his employment benefits from, non-debtor entity Vice UK Limited.  Accordingly, the Debtors do not seek relief to pay the compensation and benefits of this employee pursuant to the Wages Motion.

covered by various collective bargaining agreements.  After implementing certain cost-cutting initiatives and an operational restructuring, in part due to the termination of the VWN agreement, the Debtors made a series of workforce reductions.  On May 5, 2023, the Debtors reduced their workforce by approximately 32 employees, following an initial reduction in force of approximately 32 employees in April 2023 (collectively, the "RIF"). For the avoidance of doubt, I note that the numbers in this paragraph reflect the RIF.

54.     In the ordinary course of business, the Debtors make severance payments to certain non-Insider, rank-and-file former employees in the event of a termination of employment by the Debtors that is not for "cause."  The Debtors also subsidize the cost of COBRA premiums for eligible Employees for the duration of the negotiated severance period, as well as one month of outplacement services.  As a result of the RIF, certain non-insider former employees are entitled to severance, which the Debtors seek to pay in the ordinary course of business and pursuant to a final order only.

55.     The Debtors' Workforce is critical to preserving the value of the Debtors' estates.  Failure to maintain the continued, uninterrupted services of their Workforce would upend the Debtors' restructuring and jeopardize their businesses as a going concern.  The Employees rely on their compensation and benefits to pay their daily living expenses.  The individuals that comprise the Workforce would experience significant financial hardship if the Court does not permit the Debtors to continue paying their compensation and provide them with health and other benefits.  Accordingly, the relief requested in the Wages Motion is necessary and appropriate under the facts and circumstances of these Chapter 11 Cases.

56.     The Debtors seek authority to pay the aggregate amounts related to prepetition amounts owed on account of the Compensation and Benefits Programs set forth in the table below:

| Compensation and Withholdings | Interim Amount | Final Amount |
|---|---|---|
| Employee Wages | - | - |
| Commissions | $350,000 | $550,000 |
| Withholding Obligations | - | - |
| Payroll Processing Fees | $76,500 | $1,286,000 |
| Reimbursable Business Expenses | $35,000 | $70,000 |
| **Health and Welfare Programs** | **Interim Amount** | **Final Amount** |
| Medical, Dental, and Vision Insurance | $255,600 | $255,600 |
| Flexible Spending Account Programs | $2,600 | $2,600 |
| Other Health Benefits | $1,330 | $1,330 |
| Life and AD&D | $40,000 | $40,000 |
| Disability Benefits | $180,000 | $360,000 |
| 401(k) and Pension Plans | $2,000 | $2,000 |
| Time Off Policies | - | $1,038,400 |
| Miscellaneous Benefits | $2,500 | $2,500 |
| **Severance and Incentive Programs** | **Interim Amount** | **Final Amount** |
| Non-Insider Severance Practices | - | $700,000 |
| Non-Insider Discretionary Bonuses | - | $10,000 |
| **Total** | **$945,530** | **$4,318,430** |

57.     I believe that the Employees provide the Debtors with services necessary to conduct the Debtors' businesses, and that absent the payment of the amounts owed under the Compensation and Benefits Programs, the Debtors may experience significant employee turnover and instability at this critical time.  Additionally, a significant portion of the value of the Debtors' businesses is tied to their Workforce, which cannot be replaced without significant cost and efforts—which may not even be possible at this juncture.

58.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Compensation and Benefits Programs to priority treatment.  As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan.  Additionally, the Debtors should be authorized to pay certain withholding obligations amounts that governments, Employees, and judicial authorities have designated for deduction from Employees' wages and that federal, state, and local government require the Debtors to remit.

59.     In light of the foregoing, I believe that payment of prepetition obligations with respect to the Compensation and Benefits Programs is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood to retain the Employees as the Debtors seek to operate their businesses in these Chapter 11 Cases.  For these reasons, the relief requested in the Wages Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

G.     **Debtors' Motion for Entry of an Order (I) Prohibiting Utility Providers from Discontinuing, Altering, or Refusing Service, (II) Approving Proposed Form of Adequate Assurance of Payment to Utility Providers, (III) Establishing Procedures for Resolving Requests for Additional Assurance, and (IV) Granting Related Relief (the "Utilities Motion")**

60.     Pursuant to the Utilities Motion, the Debtors seek entry of an order (i) prohibiting the Utility Providers and Consenting Foreign Utility Providers (as defined herein) from discontinuing, altering, or refusing service, (ii) approving the proposed form of adequate assurance of payment to the Utility Providers and Consenting Foreign Utility Providers, (iii) establishing procedures for resolving requests for additional adequate assurance of payment, and (iv) granting related relief.

61.     In the ordinary course operation of the Debtors' businesses, the Debtors obtain water, sewer service, telecommunications, electricity, waste disposal, natural gas, and other similar services from a number of utility providers. A list of the Utility

Providers that directly provide Utility Services to the Debtors, together with the average monthly payment for each Utility Provider, and where available, the Debtors' account number with each Utility Provider is attached to the Utilities Motion as **Exhibit B**.

62.    The Debtors' businesses rely on the uninterrupted receipt of Utility Services for their operations.  If a Utility Provider were to refuse or discontinue service, even for a brief period, the Debtors' business operations could be disrupted. Such a disruption could jeopardize the Debtors' ability to administer the Chapter 11 Cases and adversely affect not only their production of revenue generating content, but also their employee relations and morale, which, in turn, would negatively affect the Debtors' financial and operational condition to the detriment of the Debtors' estates.  Accordingly, it is essential that the Utility Services continue uninterrupted during the Chapter 11 Cases.

63.    To the best of the Debtors' knowledge there are no defaults or arrearages with respect to undisputed invoices for prepetition Utility Services. In the aggregate, the Debtors paid approximately $170,000 per month during the 2022 calendar year for Utility Services.  The Debtors estimate that approximately $650,000 of invoices on account of prepetition Utility Services have accrued and remain payable. The Debtors estimate that the cost for Utility Services that will need to be paid by the Debtors to the Utility Providers during the next 30 days will total approximately $170,000.

64.    The Debtors intend to pay post-petition obligations to the Utility Providers, and, as applicable to their landlords and other third parties who make such payments directly to the Utility Providers, in a timely manner and in the ordinary course of business on a post-petition basis.  The Debtors believe that they will have sufficient funds to pay amounts described in the Motion by virtue of anticipated access to post-petition financing and cash collateral.

65.    To provide additional assurance of payment for Utility Services, the Debtors propose to deposit $84,250 into a segregated account, within thirty days after the Petition Date.  The amount of the Aggregate Adequate Assurance Deposit is equal to the aggregate of all Individual Utility Monthly Payment Average Amounts.

66.    I believe that the Proposed Adequate Assurance, in conjunction with the Debtors' ability to pay for future Utility Services in accordance with their prepetition practice, constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of payment as required by section 366 of the Bankruptcy Code. To the extent that any Utility Provider believes that additional assurance is required, the Adequate Assurance Procedures provide reasonable and necessary procedures to do so and avoid a haphazard and chaotic process.

67.    I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**H.    Debtors' Motion to Shorten Notice to Consider Debtors' Motion for Entry of an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Authorizing and Approving the Debtors' Entry into the Stalking Horse Agreement, (III) Approving the Sale of Substantially all of the Debtors' Assets and (IV) Granting Related Relief (the "<u>Motion to Shorten</u>")**

68.    Pursuant to the Motion to Shorten, the Debtors seek entry of an order (a) shortening the notice and objection periods for the Debtors' Bidding Procedures Motion, setting the hearing to consider entry of the Bidding Procedures Order, including approval of the Bidding Procedures on or before May 26, 2023 at 10:00 a.m. (Eastern Time) and setting the objection deadline to entry of the Bidding Procedures Order to May 24, 2023 at 10:00 a.m. (Eastern Time), two business days before the Hearing, and (b) granting related relief.

69.     The Debtors seek to have the Bidding Procedures Motion heard on 12 days'
notice, in compliance with the DIP Milestones. Failure to comply with the DIP Milestones
will constitute an event of default under the DIP Credit Agreement that would result in
the maturity and acceleration of the DIP Facility and the loss of access to critical cash
collateral. Without continued access to the DIP Facility and cash collateral, the Debtors
would likely liquidate, to the detriment of the Debtors, their stakeholders, and all other
parties-in-interest. The DIP Facility is a crucial part of the Debtors' 363 Sale process,
without which the Debtors cannot conclude their year-long, extensive, marketing
campaign.

70.     In light of the Debtors' extensive marketing efforts, the Debtors' liquidity
runway in these Chapter 11 Cases, and the need to comply with the DIP Milestones, the
Debtors have proposed an expeditious timeline for the marketing and sale of their
businesses through the Bidding Procedures. The proposed timeline balances the need to
provide adequate and appropriate notice to parties in interest and potential bidders with
the need to quickly and efficiently run a sale process to maximize the value of the Debtors'
estates.

71.     Further, the Motion to Shorten will not impact the notice periods for
objection to the sale or the assumption and assignment of executory contract.  Interested
parties will have more than enough time to object as they wish to the sale process or any
aspect of the sale. Accordingly, I believe that the relief requested in the Motion to Shorten
is in the best interest of the Debtors' estates, their creditors, and all other parties in interest
and will facilitate the Debtors' ability to efficiently close a value-maximizing sale process.

*[Remainder of page left blank intentionally]*

<u>**Exhibit C**</u>

**Committees Organized Prepetition**

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge, there was no committee formed prior to the Petition Date to participate in the Debtors' ongoing restructuring efforts.

**Exhibit D**

**Consolidated List of the Holders of the Debtors' 30 Largest Unsecured Claims**

Pursuant to Local Rule 1007-2(a)(4), the following is a consolidated list of the Debtors' creditors holding the 30 largest unsecured claims (the "Consolidated Creditor List") based on the Debtors' unaudited books and records as of the Petition Date. The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 30 largest unsecured claims.

**Top 30 Unsecured Creditors**

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. |
|---|---|---|---|---|---|
| | | | | | Unsecured claim |
| 1 | Wipro LLC<br>2 Tower Centre Boulevard, Suite 2200<br>East Brunswick, NJ 08816<br>United States | farhan.shekhani@wipro.com | Arbitration Award | - | 9,905,086.59 |
| 2 | CNN Productions Inc.<br>One CNN Center<br>Atlanta, GA 30303<br>United States | rebecca.conners@warnermedia.com | Third Party Production | - | 3,798,333.00 |
| 3 | Antenna TV S.A.<br>10-12 KIFISIAS Ave<br>MAROUSSI<br>Greece | Jochem.dekoning@antenna-group.com | Consultancy Services Agreement | - | 3,795,400.00 |
| 4 | Antenna TV S.A.<br>10-12 KIFISIAS Ave<br>MAROUSSI<br>Greece | Jochem.dekoning@antenna-group.com | Trade Debts | - | 2,750,000.00 |
| 5 | Ernst & Young US<br>PO BOX 640382<br>Pittsburgh, PA 15264<br>United States | gss.accountsreceivable@xe02.ey.com | Professional Services | - | 2,137,298.67 |
| 6 | Horizon Media Inc<br>75 Varick St, 16th Floor<br>New York, NY 10013<br>United States | sfried@horizonmedia.com | Ad Serving Fees | - | 2,121,962.14 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. |
|---|---|---|---|---|---|
| | | | | | Unsecured claim |
| 7 | Home Box Office 1100 Avenue of the Americas New York City, NY 10036 United States | jeannette.francis@hbo.com | Licensing | - | 1,763,157.90 |
| 8 | FTI Consulting, Inc. 350 South Grand Avenue Suite 3000 Los Angeles, CA 90071 United States | On file | Professional Services | - | 1,392,441.65 |
| 9 | VICE TELEVISION NETWORK LLC 235 E. 45TH STREET New York City, NY 10017 United States | aeremitinfo-intl@aenetworks.com | Trade Debts | - | 1,350,666.00 |
| 10 | WORKDAY INC 6230 STONERIDGE MALL ROAD Pleasanton, CA 94588 United States | legal@workday.com | Software | - | 1,251,939.33 |
| 11 | Adobe Systems Incorporated 345 Park Avenue San Jose, CA 95110 United States | bhunting@adobe.com | Software | - | 1,216,376.00 |
| 12 | RANKER INC 6420 Wilshire Blvd Suite 500 Los Angeles, CA 90048 United States | YING@RANKER.COM | Software | - | 1,062,863.87 |
| 13 | Getty Images Inc. PO Box 953604 St. Louis, MO 63195-3604 United States | arprocessing@gettyimages.com | Digital, Images, Video | - | 1,015,154.08 |
| 14 | Two Twenty Five Broadway Company 160 Broadway 1st Fl New York, NY 10038 United States | david@braunre.com | Rent | Unliquidated | 952,679.81 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. |
|---|---|---|---|---|---|
| | | | | | Unsecured claim |
| 15 | A&E TELEVISION NETWORKS, LLC 235 E 45TH STREET New York, NY 10036 United States | aeremitinfo-intl@aenetworks.com | Trade Debts | - | 937,500.00 |
| 16 | Amazon Web Services, Inc. P.O. BOX 84023 Seattle, WA 98124 United States | aws-receivables@amazon.com | Information Security | - | 820,287.73 |
| 17 | Web Holdings LLC 49 South 2nd Street Brooklyn, NY 11249 United States | pinny@ctadigital.com | Rent | Unliquidated | 824,649.94 |
| 18 | Piano Software Inc 111 S Independence Mall East, Suite 950 Philadelphia, PA 19106 United States | receivable@piano.io | Market Research | - | 630,702.00 |
| 19 | XWP.Co Pty Ltd 664 Collins Street, Level 13 Docklands, VIC 3008 Australia | billing@xwp.co | Technology Consulting | - | 583,900.00 |
| 20 | Bailey Duquette P.C. 104 Charlton Street, 1W New York, NY 10014 United States | marc@baileyduquette.com | Legal Services | - | 571,692.53 |
| 21 | Con Edison PO Box 1702 New York, NY 10116-1702 United States | corpcom@coned.com | Utilities | - | 539,732.75 |
| 22 | Justin Stefano 525 University Avenue Palo Alto, California 94301 United States | joseph.yaffe@skadden.com | R29 Put Holding | - | 521,596.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. |
|---|---|---|---|---|---|
| | | | | | Unsecured claim |
| 23 | SALESFORCE.COM INC LANDMARK ONE MARKET STREET SUITE 300 San Francisco, CA 94105 United States | payment@salesforce.com | Software | - | 515,927.23 |
| 24 | Paul Hastings Europe LLP 515 S. Flower Street, Suite 2500 Los Angeles, CA 90071 United States | matthewpoxon@paulhastings.com | Legal Services | | 499,339.87 |
| 25 | ASANA, INC. 1550 BRYANT ST STE 800 San Francisco, CA 94103 United States | AR@ASANA.COM | Software | | 469,423.66 |
| 26 | Wolftech Broadcast Solutions Agnes Mowinckels Gate 6 5008 Bergen Norway | ab@wolftech.no +47 901 22 462 | Software | - | 420,875.00 |
| 27 | ORACLE AMERICA INC 500 Oracle Parkway Redwood City CA 94065 United States | peter.fernan@oracle.com | Software | Unliquidated | 416,953.89 |
| 28 | JPMorgan Chase NA P.O. Box 15918 Mail Suite DE1-1404 Wilmington, DE 19850 United States | patrick.j.minnick@jpmorgan.com | Purchasing Cards | | 399,438.08 |
| 29 | Presidio Networked Solutions Group, LLC 12120 SUNSET HILLS RD, SUITE 202 Reston, VA 20190 United States | PNSGremittanceAdvices@presidio.com | Software | - | 385,444.25 |
| 30 | DAVIS WRIGHT TREMAINE LLP 920 5th Ave, Suite 3300 Seattle, WA 98104-1610 United States | achpaymentnotification@dwt.com | Legal Services | - | 364,116.34 |

**Exhibit E**

**Consolidated List of the Holders of the Debtors' Largest Secured Claims**

Pursuant to local Rule 1007-2(a)(5), to the best of the Debtors' knowledge the table below shows the largest secured claims against the Debtors prior to the Petition Date.

| Name of Creditor | Complete Mailing Address | Amount of Claim | Description of Collateral | Contingent, unliquidated, or disputed |
|---|---|---|---|---|
| Fortress Credit Corporation | c/o Fortress Investment Group LLC 1345 Avenue of the Americas, 46th Floor New York, NY 10105 Attn: General Counsel gccredit@fortress.com | 474,572,920 | First-priority security interest in substantially all of the property and assets of the Debtors | - |
| Thomas Benski and Marisa Clifford and B&C 3, LLC (as agent) | TB: Earl Villa, COMO Parrot Cay Provideciales TKCA IZZ, Turks and Caicos Islands MC: 26 Birchwood Avenue London N10 3BE | 20,939,275 | Share capital of Pulse Films Limited | Unliquidated |
| JP Morgan Chase Bank, N.A. | 25 Bank Street Canary Wharf London E14 5JP | 9,841,275 | Guaranteed by several affiliates of VEHL, including Debtors Vice Parent and Vice Media, LLC | Unliquidated |

## Exhibit F

Pursuant to Local Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis. The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with their affiliated debtors and non-debtors as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Assets and Liabilities | Amount (Approximate) |
|---|---|
| Total Assets (Book Value as of December 31, 2022) | Approximately $350 million |
| Total Liabilities (Book Value as of December 31, 2022) | Approximately $596 million |

**<u>Exhibit G</u>**

**Summary of the Publicly Held Securities of the Debtors**

  Pursuant to Local Rule 1007-2(a)(7), the Debtors have no classes of shares of stock, debentures, or other securities of the Debtors that are publicly held.

## Exhibit H

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following provides a list of all of the debtor's property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the court in which any proceeding relating thereto is pending.

Certain property of the Debtors is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, joint venturers, secured creditors, or agents. Through these arrangements, the Debtors' ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical.

**Exhibit I**

Pursuant to Local Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operates their businesses as of the Petition Date.

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| VICE MEDIA LLC | 49 South Second Street | Brooklyn | NY | 11249 |
| REFINERY 29 INC. | 11821 Mississippi Avenue and 2050 S. Westgate Avenue | Los Angeles | CA | 90025 |
| VICE MEDIA LLC | 1625 Electric Avenue | Los Angeles | CA | 90291 |
| VICE MEDIA INC. | 589 Venice Boulevard | Los Angeles | CA | 90291 |
| VICE MEDIA LLC | 1717 DeSales Street, N.W. | Washington | DC | 20036 |

## Exhibit J

### Location of Debtors' Assets, Books, and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

As of December 31, 2022, the Debtors had assets of approximately $350 million as provided in Exhibit F, substantially all of which are held in the United States. Further information will be provided in documents to be filed in these Chapter 11 Cases.

### Books and Records

While the Debtors might have books and records in each of the locations listed above in which the Debtors operate in the ordinary course, the Debtors' books and records are primarily located at 49 South 2nd Street, Brooklyn, NY 11211.

### Debtors' Assets Outside the United States

The Debtors do not have significant assets located outside of the territorial limits of the United States. In the ordinary course of business, on any given day, the Debtors may own title to goods and merchandise that is in transit to the United States from locations outside the territorial limits. Such goods only remain outside the United States for the duration of shipping and transport. Because of the constant movement of this property, providing a comprehensive list of such goods and merchandise would be impractical.

## Exhibit K

**Summary of Legal Actions Against the Debtors**

Pursuant to Local Rule 1007-2(a)(11), the list below reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these Chapter 11 Cases.

| Debtor | Matter Name | Description |
|---|---|---|
| VICE MEDIA LLC | WIPRO LLC vs VICE MEDIA LLC | Judgment and restraining notice in *In the matter of the Application of WIPRO, LLC against Vice Media LLC,* Supreme Court of the State of New York County of New York (Index No. 651159/2023), May 4, 2023 (Borrok, J.). |

## Exhibit L

### The Debtors' Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following schedule provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name/ Position | Relevant Experience/Responsibilities | Tenure |
|---|---|---|
| *Bruce Dixon* Co-Chief Executive Officer | Mr. Dixon has served as Co-Chief Executive Officer since 2023. Mr. Dixon previously served as Chief Financial Officer at Vice since 2021 and prior to that was Chief Financial Officer of Vice Studios. Before working at Vice, Dixon was finance director, global markets for BBC Studios, and group controller and head of FP&A for Central Media Enterprises. | 2015 - Present |
| *Hozefa Lokhandwala* Co-Chief Executive Officer | Mr. Lokhandwala has served as Co-Chief Executive Officer since 2023. Mr. Lokhandwala previously served as the Chief Strategy Officer since 2018. Prior to Vice, Mr. Lokhandwala mostly recent served as a Managing Director, Head of Content & Entertainment Investment Banking at J.P. Morgan. | 2018 - Present |
| *Maria Harris* Chief Legal Officer | Ms. Harris has served as Chief Legal Officer since 2022. Prior to Vice, Ms. Harris was Chief Legal Officer at Packable Holdings LLC, a private equity-backed e-commerce platform. She previously spent nearly four years as general counsel at SoulCycle Inc. Harris is a former in-house lawyer at the Body Shop International Ltd. and Revlon Inc. | 2022 - Present |
| *Daisy Auger-Dominguez* Chief People Officer | Ms. Auger-Domínguez has served as Chief People Officer since 2020. Prior to Vice, Ms. Auger-Domínguez was an independent HR consultant advising Fortune 500 companies, startups and social-impact organizations on workplace culture as well as diversity and inclusion initiatives. Ms. Auger-Dominguez is a founder of Auger-Dominguez Ventures, a consultancy firm, and served in various roles at Viacom, Google, Disney-ABC Television, Time Warner and Moody's. | 2020 - Present |
| *Nadja Bellan-White* Chief Marketing and Commercial Officer | Ms. Bellan-White has served as the Global Chief Marketing Officer since 2020. Most recently prior to Vice, Ms. Bellan-White served as the Executive Partner for Ogilvy & Mather Worldwide. In 2014, she was promoted to CEO of Ogilvy Africa in Nairobi, Kenya where she managed its business across the continent. | 2020 - Present |
| *Cory Haik* Chief Digital Officer | Ms. Haik has served as Chief Digital Officer since 2019. Prior to Vice, Ms. Haik was most recently the Publisher of millennial-focused news organization, Mic. Previously, she helped grow the digital platforms for The Washington Post while also leading innovative initiatives under Jeff Bezos as | 2019 - Present |

| Name/ Position | Relevant Experience/Responsibilities | Tenure |
|---|---|---|
| | Executive Director, Emerging News Products. | |
| *Subrata De* President, Global News | Ms. De has served as President, Global News since 2023. Ms. De was previously executive producer and showrunner for Investigations by VICE on Hulu and VICE on HBO, the Emmy-winning weekly newsmagazine. Before joining Vice, she was a VP at ABC News. She also spent several years at MSNBC as the executive producer of Andrea Mitchell Reports, and at NBC News as a senior producer. | 2018 - Present |
| *Morgan Hertzan* Executive VP, GM, ViceTV | Mr. Hertzan has served as Executive VP, GM ViceTV since 2019. Prior to Vice, Mr. Hertzan was previous a partner at Efran Films and a senior vice president and general manager of Walt Disney Television/ABC News' Lincoln Square Studios. | 2019 - Present |
| *Chris Garbutt* President, Virtue Chief Creative Officer, VMG | Mr. Garbutt has served as Chief Creative Officer since 2021 after the firm Mr. Garbutt founded, Pltfrmr, was acquired by Vice. Prior to forming Pltfrmr, Mr. Garbutt was global chief creative officer, TBWA\Worldwide. | 2021 - Present |
| *Davud Karbassioun* Global President, Commercials and Entertainment | Mr. Karbassioun has served as Global President, Commercials and Entertainment since 2022. He previously served as Global President of Commercials and Branded Entertainment of Pulse Films. Before joining Pulse Films, he worked at BBH for 15 years where he was the Worldwide Chief Production Officer. | 2017 - Present |
| *Danny Gabai* Chief Creative Officer, Studios | Mr. Gabai has served as Chief Creative Officer, Studios since 2019. Prior to Vice, Gabai was a literary agent at WME with such clients as Roman Coppola and Chris Milk. | 2012 - Present |
| *Vanessa Case* SVP, Global Head of Unscripted Production | Ms. Case has served as Global Head of Unscripted Production since 2022, after previously serving as SVP of Production and Operations NA and SVP Studio VICE Canda since 2018. Prior to Vice, Ms. Case was most recently EVP Content at Blue Ant Media. She has also held positions at Shaw, CanWest and Alliance Atlantis. | 2018 - Present |
| *Jamie Hall* COO of Scripted Production | Mr. Hall has served as COO of Scripted Production since 2020 after previously serving as President-Scripted TV and EVP - Production & Commercial Affairs since 2018. Prior to Vice, Mr. Hall was the COO of Big Light Productions. He previously worked at Eleven as head of commercial affairs and Lime Pictures as Group Head of Production. | 2018 - Present |
| Frank Pometti Chief Restructuring Officer | Mr. Pometti has served as Chief Restructuring Officer since 2022. Frank is Partner and Managing Director at AlixPartners in the Turnaround & Restructuring Practice. | 2022 - Present |

| Name/ Position | Relevant Experience/Responsibilities | Tenure |
|---|---|---|
| Mark Del Priore Interim Chief Financial Officer | Mr. Del Priore has served as Interim Chief Financial Officer since 2023. Mark is a Director at AlixPartners in the Turnaround & Restructuring Practice. He has been with AlixPartners since 2020. Prior to AlixPartners, he was the Chief Financial Officer at Harte Hanks and SITO Mobile. | 2023 - Present |

## Exhibit M

**The Debtors' Payroll for the 30-Day Period
Following the Filing of the Debtors' Chapter 11 Petitions**

Pursuant to Local Rules 1007-2(b)(1)–(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained by the Debtors.

| Payments | Payment Amount ($ in millions) |
|---|---|
| Estimated amount of payment to the employees (exclusive of officers, directors, and stockholders) | $8,250,000 |
| Estimated amount proposed to be paid to officers, stockholders, and directors | $500,000 |
| Estimated amount proposed to be paid to financial and business consultants retained by the Debtors | $0 |

## Exhibit N

**The Debtors' Estimated Cash Receipts and Disbursements for the 30-Day Period Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount ($ in millions) |
|------|------------------------|
| Cash Receipts | ~$30,000,000 |
| Cash Disbursements | ~$49,200,000 |
| Net Cash Gain | ~($19,200,000) |
| Unpaid Obligations (excluding professional fees) | ~$17,400,000 |
| Unpaid Receivables (excluding professional fees) | ~$20,700,000 |