**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VICE GROUP HOLDING INC., *et al.* | Case No. 23-10738 (__) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF BRENT HERLIHY IN SUPPORT OF DEBTORS' MOTION FOR
ENTRY OF AN ORDER (I) ESTABLISHING BIDDING, NOTICING, AND
ASSUMPTION AND ASSIGNMENT PROCEDURES, (II) AUTHORIZING AND
APPROVING THE DEBTORS' ENTRY INTO THE STALKING HORSE
AGREEMENT, (III) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS AND (IV) GRANTING RELATED RELIEF**

I, Brent Herlihy, hereby declare under penalty of perjury:

1.      I am a Partner in the Restructuring and Special Situations Group at PJT Partners LP

("PJT"), a global investment banking firm listed on the New York Stock Exchange with its

principal offices at 280 Park Avenue, New York, New York 10017.   PJT is the proposed

investment banker to Vice Group Holding Inc. and its debtor affiliates, the debtors and debtors in

possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11

Cases").

2.      I submit this declaration (this "Declaration") in support of the *Debtors' Motion for

Entry of an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures,

(II) Authorizing and Approving the Debtors' Entry Into the Stalking Horse Agreement,

(III) Approving the Sale of Substantially all of the Debtors' Assets and (IV) Granting Related Relief*

---

1       The last four digits of Debtor Vice Group Holding Inc.'s tax identification number are 4250.  Due to the large
        number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their
        federal tax identification numbers is not provided herein.   A complete list of such information may be obtained
        on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/vice.  The location of the
        Debtors' service address for purposes of these chapter 11 cases is:  49 South 2nd Street, Brooklyn, NY 11249.

(the "Sale Motion"), filed contemporaneously with this Declaration, and approval of the proposed

bidding and auction procedures (the "Bidding Procedures") to govern the sale of the assets of the

Debtors and certain of their non-debtor affiliates as described therein.[2]

3.      The statements in this Declaration, except where specifically noted, are based on

my personal knowledge or opinion, on information that I have received from the Debtors'

employees or advisors, or employees of PJT working directly with me or under my supervision,

direction, or control, or from the Debtors' records maintained in the ordinary course of their

businesses.  I am not being compensated for this testimony other than through payments received

by PJT as a professional proposed to be retained by the Debtors in these Chapter 11 Cases.[3]  If I

were called upon to testify, I could and would testify competently to the facts set forth in this

Declaration.  I am over the age of 18 years and am authorized to submit this Declaration on behalf

of the Debtors.

**Background and Qualifications**

4.      PJT is a leading global financial advisory firm with more than 900 employees in

eleven offices in the United States, Europe, and Asia.  The firm offers integrated advisory services

for mergers and acquisitions, restructuring and special situations, and fund placement.  PJT is an

industry leader in advising companies and creditors in all aspects of complex restructurings and

bankruptcies.  The firm has extensive experience providing financial advisory and investment

banking services to financially distressed companies, including representing both debtors and

lenders in the procurement and provision of postpetition financing. PJT is a registered broker-

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sale Motion or the Sale Order, as applicable.

[3]    Pursuant to PJT's engagement letter with the Debtors, subject to court approval, PJT would be entitled to a fee in respect of any sale of the Debtors' assets as set forth therein.

dealer with the United States Securities and Exchange Commission and is a member of the Securities Investor Protection Corporation and is regulated by the Financial Industry Regulatory Authority.

5.      I have 10 years of restructuring experience, advising companies, creditors, and sponsors in restructurings and special situations, and have worked across numerous industries, including power, media and telecommunications, retail, automotive, industrials, aerospace, and oil and gas.  Prior to joining PJT in 2015, I worked in the Restructuring and Reorganization Group at The Blackstone Group L.P. from 2013 to 2015.  Prior to that, I received a J.D. from Harvard Law School and an M.B.A. from Harvard Business School.  I also worked in the mergers and acquisitions group of Lazard Frères & Co. LLC from 2007 to 2009, after obtaining a B.A. in politics from Princeton University.

6.      Over the course of my career, I have advised senior management and boards of directors in a wide variety of industries in connection with restructurings, mergers and acquisitions, and financing transactions.  I have been involved in numerous restructurings, including, among others, Aegean Marine Petroleum, Covia, Danaos, Desarolladora Homex, ExGen Texas Power, Frontera Holdings, Fusion Connect, GenOn Mid-Atlantic, Key Energy Services, LATAM Airlines Group, Preferred Sands, Quicksilver Resources, Sandy Creek Energy Station, SAS Scandinavian Airlines, and Talen Energy Supply.

**I.      The Company Has Been Extensively Marketed Prepetition.**

7.      As further described in the *Declaration of Frank A. Pometti in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), many challenging factors led to the Company's decision to pursue a sale of their businesses in 2022.  In the spring of 2022, *VICE* management began working with PJT and LionTree LLC ("LionTree")

to assist *VICE* in exploring a sale that would maximize value for the benefit of creditors and other stakeholders. With the support of PJT and LionTree, *VICE* launched a marketing process (the "2022 Marketing Process") for a potential sale of the whole Company ("WholeCo"), while also considering individual sales of *VICE* Studios, and VIRTUE. PJT and LionTree reached out to 15 parties in connection with the WholeCo process, 28 parties for the *VICE* Studios process, and 21 parties for the VIRTUE process.

8.      Through the 2022 Marketing Process, three non-binding indications of interest were received for *VICE* Studios and VIRTUE (the "2022 Partial Bids").   The Board of Directors of Vice Parent decided not to transact on the 2022 Partial Bids and, in the summer of 2022, halted the *VICE* Studios and VIRTUE processes to focus on a WholeCo sale process (the "2022 WholeCo Process"). The 2022 WholeCo Process lasted through Fall 2022 and resulted in the Company receiving indications of interest from two prospective bidders. The Company reached advanced stages of negotiation and documentation with one of the two WholeCo bidders. Ultimately, however, by late 2022, the Company and such bidder were unable to reach an agreement to transact.

9.      As described in the First Day Declaration, the Special Committee was constituted in January 2023, which included two new directors designated by the Prepetition Term Lenders. Following the appointment of the Special Committee, the Debtors' renewed their sale process, which has remained underway since that time (the "2023 Marketing Process").

10.     As part of the 2023 Sales Process, prior to the selection of the proposed Stalking Horse Bidder, PJT and LionTree solicited interest from 133 counterparties for WholeCo and/or certain of its business segments. Out of the 133 counterparties, 88 executed non-disclosure agreements ("NDAs").  Initially, the 2023 Marketing Process yielded three indications of interest

for WholeCo, two indications of interest for *VICE* Studios, one indication of interest for VIRTUE, and four indications of interest for Publishing and/or its sub-brands.

11.    As further described in the First Day Declaration, in February 2023, GMN Cayman Ltd ("GMNC") terminated its agreements with the Debtors relating to the production of *VICE* World News content.   The *VICE* World News content and related agreements were material for the businesses in terms of revenue, and the termination had consequences that rippled through the business.   With the assistance of its advisors, the Debtors determined that they needed to implement a number of structural changes to the Company to mitigate the impact of the loss of the *VICE* World News contract.   These changes included focusing resources on the Company's remaining digital businesses as well as certain key third party relationships and implementing significant cost reductions resulting in a leaner news organization. The Debtors, PJT and LionTree informed counterparties that were more active in the sales process of these developments and provided them with updated diligence and other information reflecting the loss of the *VICE* World News contract and the actions that the Debtors plan to undertake to mitigate the loss of that contract.

12.    While the Debtors have received no binding bids from any third parties to date (other than the Stalking Horse Bid), there are discussions continuing with select bidders that submitted indications of interest in the prepetition marketing process or have otherwise performed significant diligence with respect to a potential purchase of the Company. The Debtors, PJT and LionTree expect that some of these discussions will continue in chapter 11 and may result in a binding bid. At this time, however, the Stalking Horse Agreement is the only binding bid available to the Company.

13.     As described above, the Debtors' assets have been marketed extensively through a sale and marketing process that has lasted approximately one year. In total, since May 2022, PJT and LionTree engaged with over 155 potential buyers; over 95 of those parties executed NDAs. The proposed Bidding Procedures are intended to conclude this process with an additional, transparent marketing process and committed Stalking Horse Bid.

## II.    The Stalking Horse Agreement Was Extensively Negotiated and Establishes a Floor of Value.

14.     The Stalking Horse Agreement has allowed the Debtors to commence these Chapter 11 Cases with a committed floor of value and proceed along a clear path to conclude their sale process.  In making that commitment and agreeing to fund a new debtor in possession financing facility (the "DIP Facility"), the Prepetition Term Lenders have agreed to recapitalize and own the Debtors.  The Stalking Horse Agreement allows for a sale of substantially all Assets for a credit bid of $225 million pursuant to Section 363(k) of the Bankruptcy Code, together with the assumption of certain liabilities.

15.     There have been extensive arms-length negotiations between the Debtors and the Prepetition Term Lenders, through their respective advisors, regarding the terms of the Stalking Horse Agreement.  The negotiations occurred over the course of several weeks, with both parties represented by sophisticated counsel and advisors.  The Special Committee frequently, and the entire Board of Directors on a more limited basis, was updated during this process and provided feedback and direction to the Company's management and advisors. An example of a positive outcome of such negotiations is the Stalking Horse Bidder's agreement to forgo any break-up fee under the Stalking Horse Agreement.  The terms of the Stalking Horse Agreement were negotiated and agreed to without collusion, in good faith, and from arm's-length bargaining positions.

16.     Although the Stalking Horse Agreement does not provide for a break-up fee, it does provide for an Expense Reimbursement, which is a reasonable term under the circumstances.  The Expense Reimbursement is capped in an aggregate amount of up to $1.5 million for reimbursement of reasonable and documented out-of-pocket third-party expenses (including attorneys' fees) incurred by the Stalking Horse Bidder in connection with the Stalking Horse Agreement.  The Expense Reimbursement only is payable where the Stalking Horse Bidder is not ultimately the Successful Bidder.  The Stalking Horse Bidder has committed substantial time and resources and incurred associated opportunity cost.  The Stalking Horse Agreement will provide a floor of value and facilitate the Debtors' efforts to obtain a higher or better value for their assets.  I believe, therefore, that the proposed Expense Reimbursement is reasonable and appropriate under the circumstances.

**III.     The Proposed Timeline Is Reasonable Under the Circumstances.**

17.     The timeline contemplated by the Bidding Procedures, while expeditious, is consistent with the milestones in the DIP Credit Agreement (the "DIP Milestones") and otherwise is reasonable under the circumstances.  As I describe in my declaration in support of the motion seeking approval of the DIP Financing, without the DIP Financing—which currently is the only postpetition financing available to the Debtors—the Debtors will suffer significant impairment to their business operations and cannot continue as a going concern.  It is vitally important that the Debtors be afforded the opportunity to proceed with an efficient sale process within the DIP Milestones to preserve value for all stakeholders.  And as described above, there already has been a thorough and extensive marketing process for the Debtors.  Many of the potential buyers most likely to make Qualified Bids on the Assets have already engaged with the Company, completed extensive diligence, had the opportunity to make proposals prepetition, are aware of the

Company's situation, and, if interested, should be capable of submitting meaningful bids by the

Bid Deadline.  In addition, potential bidders who have not previously conducted diligence on the

Debtors' businesses will have immediate access to, subject to the execution of an appropriate

confidentiality agreement, a significant amount of information regarding the Assets, including, but

not limited to, a confidential information memorandum.

**IV.    The Proposed Bidding Procedures Are Designed to Maximize Value and Are Reasonable and Appropriate Under the Facts and Circumstances of these Chapter 11 Cases.**

18.    The Bidding Procedures, which were heavily negotiated between the Prepetition

Term Lenders and the Debtors, are designed to facilitate final, binding offers and achieve the

highest or otherwise best bids under the circumstances and the DIP Milestones.  The process

governed by the Bidding Procedures will serve the important objectives of obtaining a fair and

reasonable purchase price, at the highest or otherwise best value, for the Assets, which will inure

to the benefit of all parties in interest in these Chapter 11 Cases.

19.    Importantly, the Bidding Procedures allow flexibility as to the scope of the Assets

and business segments a bidder may want, as well as the forms of consideration.  Some purchasers

only may be interested in purchasing certain Assets or business segments, rather than the entire

Company.  Accordingly, the Bidding Procedures specifically allow those parties to submit bids for

any combination of Assets.  The Bidding Procedures also permit, but do not require, the Debtors

to conduct separate auctions for such Assets depending on the nature of any Qualified Bids.  These

procedures were designed with the goal of encouraging the sale of as many of the Assets on a

going concern basis as possible while providing the Debtors maximum flexibility in deciding

whether to execute such sales, based on the Debtors' reasonable business judgment.  It is my

opinion that the Bidding Procedures, in fact, will result in the Debtors obtaining the highest or otherwise best offer for the Assets.

20.     The active and comprehensive marketing process for the Assets, both through the 2022 Marketing Process and then the 2023 Marketing Process, has resulted in the Assets being marketed nearly continuously for the better part of the year prior to the Petition Date.   The Debtors are continuing their discussions with certain bidders, which may result in the submission of additional bids, in accordance with the terms of the Bidding Procedures, that would be in excess of the Stalking Horse Bid.   As a result, I believe that entering into the Bidding Procedures and the Stalking Horse Agreement is appropriate and reasonable under the circumstances.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: May 15, 2023

*/s/ Brent Herlihy*
Name: Brent Herlihy
Title: Partner, PJT Partners LP