UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re                                      Chapter 11

       Vice Media LLC,                     Case no.  23-10738

                           Debtor.

-----------------------------------------------------------x

## OBJECTION TO CURE AMOUNT

       49 South Second Street LLC, as landlord (the "Landlord") of Vice Media LLC (the "Debtor") under the lease annexed hereto as exhibit "A" for certain premises defined in the Lease at 49 South Second Street, Brooklyn, New York (the "Premises"), as and for its objection to the Debtor's proposed cure amount, respectfully represents as follows:

       1.        Under section 365(b)(1) of the Bankruptcy Code, as a condition to lease assumption, the Debtor must cure all outstanding defaults and compensate the Landlord for any actual pecuniary loss, including the payment of related attorneys' fees and late fees. *See* 11 U.S.C. §365(b)(1)(B). *See LJC Corp. v. Boyle*, 768 F.2d 1489, 1494-96 (D.C. Cir. 1985); *In re Bullock*, 17 B.R. 438, 439 (B.A.P. 9th Cir. 1982); *In re BAB Enterprises, Inc.*, 100 B.R. 982, 984 (Bankr. W.D. Tenn. 1989); *In re Westview 74th St. Drug Corp.*, 59 B.R.747, 757 (Bankr. S.D.N.Y. 1986); *In re Ribs of Greenwich Vill., Inc.*, 57 B.R. 319, 322 (Bankr. S.D.N.Y. 1986).

       2.        As of May 15, 2023, pursuant to the invoices annexed hereto as Exhibit B, the Landlord estimates that monetary arrears total $351,958, or $23,208 more than the Debtor's estimate.

3.      In addition, the Debtor may be responsible for other charges including

legal fees and late fees in an amount to be determined.

4.      The Landlord reserves it right to amend and/or supplement this Objection,

to include, without limitation, attorneys' fees, additional cure amounts as they are determined

and/or accrue, and other objections to assumption and assignment regarding any proposed

assignee's ability to perform under the Lease.

WHEREFORE, the Landlord requests that any order entered by the Court

approving the assumption and of the Lease require the Debtor to pay the Landlord's cure amount

instead of the Debtor's proposed cure amount and that the Court grant such other and further

relief as this Court deems just and proper.

Dated: New York, New York
       June ___, 2023

**BACKENROTH FRANKEL & KRINSKY, LLP**
**Attorneys for Landlord**

By:     s/Mark Frankel
        488 Madison Avenue 23rd Floor
        New York, New York 10022
        (212) 593-1100
        mfrankel@bfklaw.com

2

# Exhibit A

EXECUTION VERSION

# AGREEMENT OF LEASE

49 SOUTH SECOND STREET LLC, Landlord

and

VICE MEDIA INC., Tenant

| | |
|---|---|
| Premises: | Entire Rentable Area of the Building located at<br>49 South Second Street<br>Brooklyn, New York |
| Date: | As of July 1, 2014 |

# TABLE OF CONTENTS

**Article**                                                                                      **Page**

1. DEFINED TERMS ...................................................................................................1
2. COMMENCEMENT DATE; PURPOSE; ETC........................................................2
3. RENT; ADDITIONAL RENT; ETC.........................................................................3
4. SERVICES ................................................................................................................9
5. ASSIGNMENT; SUBLETTING; ETC....................................................................11
6. DEFAULT ...............................................................................................................16
7. RE-LETTING; ETC.................................................................................................17
8. LANDLORD MAY CURE DEFAULTS..................................................................18
9. ALTERATIONS ......................................................................................................18
10. LIENS ......................................................................................................................21
11. REPAIRS; DESTRUCTION....................................................................................21
12. END OF TERM .......................................................................................................23
13. SUBORDINATION AND ESTOPPEL; ETC..........................................................23
14. CONDEMNATION .................................................................................................26
15. REQUIREMENTS OF LAW ..................................................................................27
16. CERTIFICATE OF OCCUPANCY ........................................................................28
17. POSSESSION ..........................................................................................................28
18. QUIET ENJOYMENT ............................................................................................29
19. RIGHT OF ENTRY .................................................................................................29
20. VAULT SPACE .......................................................................................................30
21. INDEMNITY ...........................................................................................................30
22. LANDLORD'S LIABILITY ...................................................................................31
23. CONDITION OF PREMISES; TENANT'S INITIAL INSTALLATION; ETC. ....32
24. JURY WAIVER; DAMAGES ................................................................................34
25. NO WAIVER; ETC. ................................................................................................34
26. SIGNAGE; WIRELESS NETWORK; ETC. ...........................................................35
27. NOTICES .................................................................................................................36
28. HEAT; AIR-CONDITIONING; ETC. ....................................................................37
29. SECURITY DEPOSIT ............................................................................................37
30. RENT CONTROL ...................................................................................................39
31. SHORING ...............................................................................................................39
32. EFFECT OF CONVEYANCE; ETC. .....................................................................39
33. RIGHTS OF SUCCESSORS AND ASSIGNS .......................................................40
34. CAPTIONS ..............................................................................................................40
35. LEASE SUBMISSION; APPLICABLE LAW ........................................................40
36. BROKERAGE .........................................................................................................40
37. ARBITRATION ......................................................................................................41
38. INSURANCE ...........................................................................................................41
39. LATE CHARGES ....................................................................................................43
40. ENVIRONMENTAL COMPLIANCE ...................................................................43
41. LEASE FULLY NEGOTIATED .............................................................................44
42. USE RESTRICTIONS ............................................................................................44
43. ANTI-TERRORISM REQUIREMENTS ...............................................................45
44. ADDITIONAL DEFINITIONS ..............................................................................45
45. RENEWAL OPTION ..............................................................................................46
46. ROOF USE ..............................................................................................................48
47. RIGHT OF FIRST OFFER .....................................................................................48
EXHIBIT A - Diagram of Demised Premises
EXHIBIT A-1 - Diagram of Roof Space
EXHIBIT B - Guarantee
SCHEDULE A - Rules and Regulations

**LEASE** ("Lease") made as of this 1st day of July, 2014, between 49 SOUTH SECOND STREET LLC, a New York limited liability company, with an office at 49 South Second Street, Brooklyn, New York 11211, hereinafter referred to as "Landlord" and VICE MEDIA INC., a Delaware corporation, with an address at 99 North 10th Street, Brooklyn, New York 11249, hereinafter referred to as "Tenant".

<strong>WITNESSETH:</strong>

Landlord hereby leases to Tenant and Tenant hereby hires from Landlord the entire rentable area of the building known as 49 South Second Street, Brooklyn, New York, which space is comprised of the Phase I Premises and the Phase II Premises (collectively, the "Demised Premises"), each as more particularly depicted on Exhibit A (which is not necessarily to scale) annexed hereto and made part hereof, for a term of years, to commence on the Phase I Commencement Date and the Phase II Commencement Date, as applicable, and to expire on the Expiration Date, or until such term shall sooner end as herein provided, all such dates inclusive, upon the terms and conditions hereinafter provided. For all purposes under this Lease: (a) the rentable square foot area of the Phase I Premises shall be deemed to be 16,000 rentable square feet; (b) the rentable square foot area of the Phase II Premises shall be deemed to be 7,500 rentable square feet; and (c) the rentable square foot area of the Demised Premises shall be deemed to be 23,500, irrespective of any disparity between (i) such figure and any actual measurement of such area, or (ii) the usable area thereof.

Landlord and Tenant further covenant and agree as follows:

1. **DEFINED TERMS**

In this Lease, the following defined terms shall have the meanings indicated:

I. **"285 Kent Lease"** shall mean that certain lease, of even date herewith, between Tenant and Web Holdings LLC (an Affiliate of Landlord), for certain space (the "285 Kent Space", as more particularly described in the 285 Kent Lease) in the building (the "285 Kent Building") known as 285 Kent Avenue, Brooklyn, New York.

II. **"Additional Rent"** shall have the meaning ascribed to it in Article 3 of this Lease.

III. **"Affiliate"** shall mean any entity, directly or indirectly, controlled by, controlling or under common control with another entity.

IV. **"Applicable Rate"**, shall mean, as of any date, an annual rate equal to the average of all prime rates published for such date in *The Wall Street Journal* (Eastern Edition) plus four (4%) percent.

V. **"Base Tax Year"** shall have the meaning ascribed to it in Article 3B(i)(a) of this Lease.

VI. **"Broker"** shall mean Cushman & Wakefield, Inc.

VII. **"Building"** shall be the building known as 49 South Second Street, Brooklyn, New York.

VIII. **"Business Days"** shall mean all days, except Saturdays, Sundays and all days designated as holidays (i) under any union contracts applicable to the Building; (ii) under federal law; or (iii) under New York State law.

IX. **"Combined Premises"** shall mean the Demised Premises and 285 Kent Space collectively.

X. **"Commencement Dates"** shall have the meaning ascribed to it in Article 2A of this Lease.

XI. **"Demised Premises"** shall have the meaning ascribed in the Witnesseth paragraph above.

XII. **"Expiration Date"** shall mean June 30, 2022.

33241.2

XIII.    **"Fixed Annual Rent"** shall mean the rent payable pursuant to Article 3A hereof.

XIV.    **"Permitted Use"** shall mean general, administrative and executive offices for the conduct of Tenant's business (and that of its Affiliates and any permitted subtenants or other permitted occupants), and other reasonable uses ancillary and related thereto.

XV.    **"Phase I Premises"** shall have the meaning ascribed in the Witnesseth paragraph above.

XVI.    **"Phase II Premises"** shall have the meaning ascribed in the Witnesseth paragraph above.

XVII.    **"Rent"** shall mean Fixed Annual Rent and Additional Rent, collectively.

XVIII.    **"Roof Space"** shall have the meaning ascribed to it in Article 46 of this Lease.

XIX.    **"Security Deposit"** shall be the sum of $646,250.00, as more particularly set forth in Article 29 of this Lease.

XX.    **"Tenant's Initial Installation"** shall have the meaning set forth in Article 23B of this Lease.

XXI.    **"Tenant's Proportionate Share"** shall have the meaning ascribed to it in Article 3B(i)(b) of this Lease.

2.    **COMMENCEMENT DATE; PURPOSE; ETC.**

A.    (i)    The term of this Lease with respect to the Phase I Premises shall commence on July 1, 2014 (the "Phase I Commencement Date"), subject to the provisions of Article 17B of this Lease.

(ii)    (a)    The term of this Lease with respect to the Phase II Premises shall commence on the date (the "Phase II Commencement Date", together with the Phase I Commencement Date, the "Commencement Dates") that Landlord delivers vacant possession of the Phase II Premises to Tenant, but in no event prior to July 1, 2014, subject to the provisions of Article 17B of this Lease.

(b)    Landlord shall, in accordance with the foregoing, fix the Phase II Commencement Date and notify Tenant of the date so fixed. When the Phase II Commencement Date has so been determined, the parties hereto shall, within fifteen (15) days after Landlord's request therefor, execute a written agreement confirming such date as the Phase II Commencement Date. Any failure of the parties to execute such written agreement shall not affect the validity of the Phase II Commencement Date as fixed and determined by Landlord, as aforesaid.

B.    Tenant, by entering into occupancy of each of the Phase I Premises and the Phase II Premises, shall be conclusively deemed to have agreed that Landlord, up to the time of such occupancy of such portion of the Demised Premises, had performed all of its obligations hereunder with respect to such portion of the Demised Premises and that such portion of the Demised Premises was in satisfactory condition as of the date of such occupancy, unless within fifteen (15) days after such date Tenant shall give written notice (hereinafter called the "Punch List Notice") to Landlord specifying the respects in which the same were not in satisfactory condition, in which event the Demised Premises shall be conclusively deemed to be in satisfactory condition except for the items set forth in the Punch List Notice for which Landlord is responsible hereunder and latent defects. The giving of the Punch List Notice shall have no effect whatsoever upon the respective Commencement Dates for such space.

C.    Tenant shall use the Demised Premises solely for the Permitted Use, and for no other purpose, such covenant being of the essence of this Lease. The use of all or any portion of the Demised Premises for any use other than the Permitted Use, shall be a prima facie breach of such covenant. Notwithstanding anything contained herein to the contrary, a breach of such covenant shall be deemed a material and substantial default by Tenant under this Lease, for which Landlord shall have all remedies available to it under this Lease and under the law, including, without limitation, the right to enforce such covenant by injunctive or other appropriate equitable relief. Subject to reasonable security requirements, requirements of law, emergencies, the provisions of this Lease, and the

2

commercially reasonable rules and regulations of the Building, Tenant shall have access to the Demised Premises on a 24-7-365 basis.

D.    Neither the Demised Premises, nor the halls, corridors, stairways, elevators or any other portion of the Building shall be used by Tenant or Tenant's servants, employees, licensees, invitees or visitors so as to cause any congestion of the public portions of the Building or the sidewalks or roadways adjoining the Building whether by trucking or by the congregating or loitering thereon of Tenant and/or the servants, employees, licensees, invitees or visitors of Tenant.

E.    Notwithstanding anything contained in this Lease to the contrary, Tenant shall be permitted to host private social events in the Demised Premises in connection with the Permitted Use, provided, however, that: (i) Tenant shall comply at all times with all applicable laws, orders, rules and regulations related to hosting such events, including, without limitation, those regarding the serving of food or alcohol and those related to public assembly; (ii) the number of persons in the Demised Premises shall not exceed the legally permitted capacity of the Demised Premises; (iii) Tenant shall not advertise such events to the public; (iv) such events shall not be open to the public; (v) if any such event is reasonably anticipated to have more than one hundred (100) attendees (other than Tenant's employees), Tenant shall provide Landlord with at least five (5) Business Days' prior written notice of any such event, which notice shall specify the nature of the event, whether food or alcohol will be served at such event, the scheduled duration of such event and the approximate number of expected attendees (other than Tenant's employees); and (vi) Tenant shall ensure that Tenant has insurance coverage reasonably acceptable to Landlord in connection with each such event. Tenant shall comply with all applicable provisions of the Lease with respect to such events, and Tenant acknowledges and agrees that the provisions of this Lease regarding Landlord's right to access the Demised Premises and/or to temporarily stop services to the Demised Premises shall take precedence over Tenant's rights pursuant to this paragraph E, and that Landlord shall not be liable to Tenant for any interruption, cancellation or other adverse effect on any such event as a result of any action permitted by Landlord under this Lease.

**3.    RENT; ADDITIONAL RENT; ETC.**

Tenant agrees to pay as rent herein provided at the office of Landlord or such other place as Landlord may designate, which designation shall be made upon at least five (5) Business Days prior written notice from time to time, payable in United States legal tender by good and sufficient check drawn on a bank having a branch in the City and State of New York, by wire transfer of funds, or by electronic funds transfer, and without any notice (except as specifically set forth herein), set off or deduction whatsoever, each of the types of rent set forth in this Article 3.

Any sum other than Fixed Annual Rent payable hereunder shall be deemed additional rent ("Additional Rent") and due within ten (10) days after demand therefor unless otherwise specifically provided. Landlord shall have the same rights and remedies hereunder with respect to Tenant's non-payment of Additional Rent as it has with respect to Tenant's non-payment of Fixed Annual Rent. Tenant warrants that the obligation to pay rent hereunder, whether any such payment is timely made or not, is an integral part of Tenant's business and made in the ordinary course thereof.

A.    <u>Fixed Annual Rent.</u>

(i)    (a)    There is herein reserved to Landlord for the entire term of this Lease with respect to the Phase I Premises Fixed Annual Rent equal to the aggregate amount of the sums hereinafter set forth. Fixed Annual Rent shall be paid in advance as follows: commencing on the Phase I Commencement Date, and on the first day of each calendar month thereafter throughout the term of this Lease, Tenant shall pay to Landlord, without notice, deduction, set off or reduction (except as specifically set forth herein), monthly payments of Fixed Annual Rent equal to one-twelfth (1/12th) of each of the following annual amounts (except that the first monthly installment of Fixed Annual Rent with respect to the Phase I Premises, and the "One Time Rent Payment" (as hereinafter defined in paragraph A(iii) of this Article) in the aggregate amount of $673,333.33, is being paid upon the execution hereof):

(I)    from the Phase I Commencement Date through June 30, 2015: Eight Hundred Eighty Thousand and 00/100 ($880,000.00) Dollars per *annum* ($73,333.33 *per* month);

3

(II) from July 1, 2015 through June 30, 2016: Nine Hundred Two Thousand and 00/100 ($902,000.00) Dollars per *annum* ($75,166.67 *per* month);

(III) from July 1, 2016 through June 30, 2017: Nine Hundred Twenty-Four Thousand Five Hundred Fifty and 00/100 ($924,550.00) Dollars per *annum* ($77,045.83 *per* month);

(IV) from July 1, 2017 through June 30, 2018: Nine Hundred Forty-Seven Thousand Six Hundred Sixty-Three and 75/100 ($947,663.75) Dollars per *annum* ($78,971.98 *per* month);

(V) from July 1, 2018 through June 30, 2019: Nine Hundred Seventy-One Thousand Three Hundred Fifty-Five and 34/100 ($971,355.34) Dollars per *annum* ($80,946.28 *per* month);

(VI) from July 1, 2019 through June 30, 2020: Nine Hundred Ninety-Five Thousand Six Hundred Thirty-Nine and 23/100 ($995,639.23) Dollars per *annum* ($82,969.94 *per* month);

(VII) from July 1, 2020 through June 30, 2021: One Million Twenty Thousand Five Hundred Thirty and 21/100 ($1,020,530.21) Dollars per *annum* ($85,044.18 *per* month); and

(VIII) from July 1, 2021 through the Expiration Date: One Million Forty-Six Thousand Forty-Three and 46/100 ($1,046,043.46) Dollars per *annum* ($87,170.29 *per* month).

 (b) Should the Phase I Commencement Date occur on any day other than the first day of a calendar month, then the Fixed Annual Rent for the unexpired portion of such calendar month shall be adjusted and prorated on a *per diem* basis and any overpayment of the first month's Fixed Annual Rent shall be credited against the next calendar month's installment of Fixed Annual Rent coming due. Notwithstanding anything contained herein to the contrary, in the event Tenant defaults beyond any applicable notice and/or grace period at any time prior to the Phase I Commencement Date, and this Lease terminates as a result thereof, then and in such event, the Phase I Commencement Date shall be accelerated to be the date of the occurrence of such default.

 (c) For so long as Tenant is not in default, beyond any applicable grace or cure period, of any monetary or other material term of this Lease, Tenant shall receive (i) a rent credit against Fixed Annual Rent for the Phase I Premises up to an aggregate of Four Hundred Forty Thousand and 00/100 ($440,000.00) Dollars, which rent credit shall be applied, until exhausted, in thirty-six (36) equal installments of Twelve Thousand Two Hundred Twenty-Two and 22/100 ($12,222.22) each, against the first thirty-six (36) full monthly installments of Fixed Annual Rent payable hereunder with respect to the Phase I Premises, except the installment being paid upon execution hereof, and (ii) a rent credit against Fixed Annual Rent for the Phase I Premises up to an aggregate of Three Hundred Thousand and 00/100 ($300,000.00) Dollars, which rent credit shall be applied, until exhausted, in eight (8) equal installments of Thirty-Seven Thousand Five Hundred and 00/100 ($37,500.00) each, against the eight (8) monthly installments of Fixed Annual Rent payable hereunder with respect to the Phase I Premises to occur in the calendar months of January 2015, 2016, 2017, 2018, 2019, 2020, 2021 and 2022. If the term of this Lease is terminated prior to its stated expiration date due to Tenant's default beyond any applicable grace, notice and/or cure period, then, in addition to all other damages, rights and remedies herein provided and provided by law for Landlord, Landlord shall be entitled to the return of the unamortized portion of the total amount of such rent credit theretofore enjoyed by Tenant, which sum shall be deemed Additional Rent due and owing prior to such termination of the term hereof. Such unamortized portion shall be computed by multiplying the total rent credit theretofore enjoyed by Tenant hereunder by a fraction, the numerator of which shall be 96 minus the total number of calendar months of the term of this Lease which have elapsed after the Phase I Commencement Date but prior to such termination, and denominator of which shall be 96. The obligation of Tenant to pay such Additional Rent to Landlord shall survive the termination of the term of this Lease. To the extent that any portion of the foregoing rent credit shall be disallowed by reason of a default by Tenant (as set forth above), and Tenant shall subsequently cure such default (without this Lease being terminated), such disallowance shall be rescinded (it being understood and agreed that in no event shall the aggregate rent credit with regard to the Phase I Premises exceed $440,000.00).

 (ii) (a) There is herein reserved to Landlord for the entire term of this Lease with respect to the Phase II Premises Fixed Annual Rent equal to the aggregate amount of the sums hereinafter set forth. Fixed Annual Rent shall be paid in advance as follows: commencing on the Phase II Commencement Date, and on the first day of

each calendar month thereafter throughout the term of this Lease, Tenant shall pay to Landlord, without notice, deduction, set off or reduction (except as specifically set forth herein), monthly payments of Fixed Annual Rent equal to one-twelfth (1/12th) of each of the following annual amounts:

(I)     from the Phase II Commencement Date through June 30, 2015: Four Hundred Twelve Thousand Five Hundred and 00/100 ($412,500.00) Dollars per *annum* ($34,375.00 *per* month);

(II)    from July 1, 2015 through June 30, 2016: Four Hundred Twenty-Two Thousand Eight Hundred Twelve and 50/100 ($422,812.50) Dollars per *annum* ($35,234.38 *per* month);

(III)   from July 1, 2016 through June 30, 2017: Four Hundred Thirty-Three Thousand Three Hundred Eighty-Two and 81/100 ($433,382.81) Dollars per *annum* ($36,115.23 *per* month);

(IV)    from July 1, 2017 through June 30, 2018: Four Hundred Forty-Four Thousand Two Hundred Seventeen and 38/100 ($444,217.38) Dollars per *annum* ($37,018.12 *per* month);

(V)     from July 1, 2018 through June 30, 2019: Four Hundred Fifty-Five Thousand Three Hundred Twenty-Two and 82/100 ($455,322.82) Dollars per *annum* ($37,943.57 *per* month);

(VI)    from July 1, 2019 through June 30, 2020: Four Hundred Sixty-Six Thousand Seven Hundred Five and 89/100 ($466,705.89) Dollars per *annum* ($38,892.16 *per* month);

(VII)   from July 1, 2020 through June 30, 2021: Four Hundred Seventy-Eight Thousand Three Hundred Seventy-Three and 54/100 ($478,373.54) Dollars per *annum* ($39,864.46 *per* month); and

(VIII)  from July 1, 2021 through the Expiration Date: Four Hundred Ninety Thousand Three Hundred Thirty-Two and 87/100 ($490,332.87) Dollars per *annum* ($40,861.07 *per* month).

(b)     Should the Phase II Commencement Date occur on any day other than the first day of a calendar month, then the Fixed Annual Rent for the unexpired portion of such calendar month shall be adjusted and prorated on a *per diem* basis and any overpayment of the first month's Fixed Annual Rent shall be credited against the next calendar month's installment of Fixed Annual Rent coming due. Notwithstanding anything contained herein to the contrary, in the event Tenant defaults beyond any applicable notice and/or grace period at any time prior to the Phase II Commencement Date, and this Lease terminates as a result thereof, then and in such event, the Phase II Commencement Date shall be accelerated to be the date of the occurrence of such default.

(c)     For so long as Tenant is not in default, beyond any applicable grace or cure period, of any monetary or other material term of this Lease, Tenant shall receive a rent credit against Fixed Annual Rent for the Phase II Premises up to an aggregate of Two Hundred Six Thousand Two Hundred Fifty and 00/100 ($206,250.00) Dollars, which rent credit shall be applied, until exhausted, in thirty-six (36) equal installments of Five Thousand Seven Hundred Twenty-Nine and 17/100 ($5,729.17) each, against the first thirty-six (36) full monthly installments of Fixed Annual Rent payable hereunder with respect to the Phase II Premises. If the term of this Lease is terminated prior to its stated expiration date due to Tenant's default beyond any applicable grace, notice and/or cure period, then, in addition to all other damages, rights and remedies herein provided and provided by law for Landlord, Landlord shall be entitled to the return of the unamortized portion of the total amount of such rent credit theretofore enjoyed by Tenant, which sum shall be deemed Additional Rent due and owing prior to such termination of the term hereof. Such unamortized portion shall be computed by multiplying the total rent credit theretofore enjoyed by Tenant hereunder by a fraction, the numerator of which shall be 96, minus the number of full calendar months between the Phase I Commencement Date and the Phase II Commencement Date, minus the total number of calendar months of the term of this Lease which have elapsed after the Phase II Commencement Date but prior to such termination, and denominator of which shall be 96 minus the number of full calendar months between the Phase I Commencement Date and the Phase II Commencement Date. The obligation of Tenant to pay such Additional Rent to Landlord shall survive the termination of the term of this Lease. To the extent that any portion of the foregoing rent credit shall be disallowed by reason of a default by Tenant (as set forth above), and Tenant shall

5

subsequently cure such default (without this Lease being terminated), such disallowance shall be rescinded (it being understood and agreed that in no event shall the aggregate rent credit with regard to the Phase II Premises exceed $206,250.00).

      (iii)    Tenant shall, simultaneously with the execution and delivery of this Lease by Landlord and Tenant, deliver to Landlord the sum of Six Hundred Thousand and 00/100 ($600,000.00) Dollars (the "One Time Rent Payment"), which sum shall be deemed Additional Rent under this Lease. It is agreed that, subject to paragraph 17B(i), the One Time Rent Payment is an inducement for Landlord to enter into this Lease with Tenant and that such sum shall not be refundable or revocable under any circumstance, including, without limitation, the termination of this Lease prior to the commencement of the term hereof, except if and to the extent such termination arises due to Landlord's acting maliciously or in bad faith.

      B.    <u>Tax Escalation</u>. Tenant shall pay to Landlord, as Additional Rent, tax escalation in accordance with this paragraph B:

      (i)    Definitions: For the purpose of this Article, the following definitions shall apply:

      (a)    The term "Base Tax Year" as hereinafter set forth for the determination of real estate tax escalation, shall mean the average of: (i) the New York City real estate tax year commencing July 1, 2014 and ending June 30, 2015, and (ii) the New York City real estate tax year commencing July 1, 2015 and ending June 30, 2016 (i.e., "Base Tax Year" representing an amount of Real Estate Taxes).

      (b)    The term "Tenant's Proportionate Share", for purposes of computing tax escalation, shall mean (i) with respect to the Phase I Premises, sixty-eight (68%) percent; (ii) with respect to the Phase II Premises, thirty-two (32%) percent; and (iii) with respect to the Demised Premises, one hundred percent (100%). Tenant's Proportionate Share has been computed on the basis of a fraction, the numerator of which is the rentable square foot area of each of the foregoing spaces, and the denominator of which is the total rentable square foot area of the office and commercial space in the Building Project. The parties acknowledge and agree that the total rentable square foot area of the office and commercial space in the Building Project shall be deemed to be 23,500 rentable square feet. It is further understood and agreed that Tenant's Proportionate Share shall apply only to those portions of the Demised Premises which have actually been delivered by Landlord to Tenant, prorated for the applicable portion of the Comparative Year.

      (c)    The term "the Building Project" shall mean the aggregate combined parcel of land on a portion of which the Building is constructed and the Building.

      (d)    The term "Comparative Year" shall mean the New York City real estate tax year commencing July 1, 2015 and ending June 30, 2016, and each subsequent period of twelve (12) months occurring during the term of this Lease (or such other period of twelve (12) months occurring during the term of this Lease as hereafter may be duly adopted as the tax year for real estate tax purposes by the City of New York).

      (e)    The term "Real Estate Taxes" shall mean the total of all property taxes and special or other assessments levied, assessed or imposed at any time by any governmental authority upon or against the Building Project, any business improvement district ("BID") assessment payable by the Building Project, and, also, any tax or assessment levied, assessed or imposed at any time by any governmental authority in connection with the receipt of income or rents from said Building Project to the extent that same shall be in lieu of all or a portion of any of the aforesaid taxes or assessments, or additions or increases thereof, upon or against said Building Project. Real Estate Taxes shall not include franchise, income, transit, profit, gains, estate, gift, sales or other tax or governmental imposition unless, due to a future change in the method of taxation or in the taxing authority, or for any other reason, a franchise, income, transit, profit, gains, estate, gift, sales or other tax or governmental imposition, however designated, shall be levied against Landlord in substitution in whole or in part for the Real Estate Taxes, or in lieu of additions to or increases of

said Real Estate Taxes. As to special assessments which are payable over a period of time extending beyond the term of this Lease, only a pro rata portion thereof covering the portion of the term of this Lease unexpired at the time of the imposition of such assessment, shall be included in "Real Estate Taxes." If by law, any assessment may be paid in installments, then, for the purposes hereof (a) such assessment shall be deemed to have been payable in the maximum number of installments permitted by law and (b) there shall be included in Real Estate Taxes, for each Comparative Year in which such installments may be paid, the installments of such assessment so becoming payable during such comparative year, together with interest payable during such Comparative Year.

(f)      Where more than one assessment is imposed by the City of New York for any tax year, whether denominated an "actual assessment" or "transitional assessment" or otherwise, then the phrases herein "assessed value" and "assessments" shall mean whichever of the actual, transitional or other assessment is designated by the City of New York as the taxable assessment for that tax year.

(g)      The phrase "Real Estate Taxes payable during the Base Tax Year" shall mean the amount which is the average of the Real Estate Taxes payable with respect to the 2014/2015 tax year and the 2015/2016 tax year.

(ii)      (a)      Before or after the start of each Comparative Year (but in no event later than one hundred twenty (120) days after the start of such Comparative Year), Landlord shall furnish to Tenant a statement of the Real Estate Taxes payable for such Comparative Year, and a statement of the Real Estate Taxes payable for the Base Tax Year. If the Real Estate Taxes payable for such Comparative Year exceed the Real Estate Taxes payable for the Base Tax Year, Additional Rent for such Comparative Year, in an amount equal to Tenant's Proportionate Share of the excess, shall be due from Tenant to Landlord, and such Additional Rent shall be payable by Tenant to Landlord, within ten (10) days of Landlord's written demand therefore (but in no event earlier than thirty (30) days prior to the date such Real Estate Taxes are due from Landlord to the taxing authority (without penalty or interest). Upon Tenant's written request, Landlord shall provide Tenant with copies of the relevant real estate tax bills. The benefit of any discount for any earlier payment or prepayment of Real Estate Taxes shall accrue solely to the benefit of Landlord, and such discount shall not be subtracted from the Real Estate Taxes payable for any Comparative Year.

(b)      Should the Real Estate Taxes payable during the Base Tax Year be reduced by final determination of legal proceedings, settlement or otherwise, then, the Real Estate Taxes payable during the Base Tax Year shall be correspondingly revised, the Additional Rent theretofore paid or payable hereunder for all Comparative Years shall be recomputed on the basis of such reduction, and Tenant shall pay to Landlord as Additional Rent, within ten (10) Business Days after being billed therefor, any deficiency between the amount of such Additional Rent as theretofore computed and the amount thereof due as the result of such recomputations. Should the Real Estate Taxes payable during the Base Tax Year be increased by such final determination of legal proceedings, settlement or otherwise, then appropriate recomputation and adjustment also shall be made.

(c)      As long as Tenant is a tenant and is not in default, beyond any applicable grace, notice or cure period, of any monetary obligation hereunder, if Tenant shall have made a payment of Additional Rent under this paragraph and Landlord shall receive a refund of any portion of the Real Estate Taxes payable for any Comparative Year after the Base Tax Year on which such payment of Additional Rent shall have been based, as a result of a reduction of such Real Estate Taxes by final determination of legal proceedings, settlement or otherwise, Landlord shall promptly after receiving the refund credit to Tenant Tenant's Proportionate Share of the refund less Tenant's Proportionate Share of the actual, reasonable, out-of-pocket expenses (including reasonable attorneys' and appraisers' fees) incurred by Landlord in connection with any such application or proceeding. If prior to the payment of Real Estate Taxes for any Comparative Year,

Landlord shall have obtained a reduction of that Comparative Year's assessed valuation of the Building Project, and therefore of said Real Estate Taxes, then the term "Real Estate Taxes" for that Comparative Year shall be deemed to include the amount of Landlord's actual, reasonable, out-of-pocket expenses in obtaining such reduction in assessed valuation, including reasonable attorneys' and appraisers' fees.

(d)    The statement of the Real Estate Taxes to be furnished by Landlord as provided above shall be certified by Landlord and shall constitute a final determination as between Landlord and Tenant of the Real Estate Taxes for the periods represented thereby, unless Tenant within thirty (30) days after they are furnished shall give a written notice to Landlord that it disputes their accuracy or their appropriateness, which notice shall specify the particular respects in which the statement is inaccurate or inappropriate. If Tenant shall so dispute said statement then, pending the resolution of such dispute, Tenant shall pay the Additional Rent to Landlord in accordance with the statement furnished by Landlord. Landlord and Tenant shall, reasonably and in good faith, cooperate to resolve any dispute with respect to any statement of the Real Estate Taxes.

C.    <u>Failure to Bill</u>. Landlord's failure to bill or tender any escalation statement or any other statement or any delay in billing or tendering any such escalation statement or other statement for all or any portion of any amount of Additional Rent otherwise payable pursuant to this Lease shall not constitute a waiver of Landlord's rights to bill Tenant at any subsequent time (during or subsequent to the term of this Lease) retroactively for the entire amount so unbilled (which previously unbilled amount shall be payable within ten (10) Business Days after demand therefor) and to collect any such amount, if and so long as such billing occurs within three (3) years after the applicable Comparative Year. Notwithstanding anything contained herein to the contrary, Tenant's obligation to pay any Fixed Annual Rent and Additional Rent shall survive the expiration or earlier termination of this Lease for a period of three (3) years.

D.    <u>No Right to Apply Security</u>. Tenant shall not have the right to apply the Security Deposit, if any, to assure Tenant's faithful performance of Tenant's obligation hereunder to the payment of any installment of Fixed Annual Rent or Additional Rent.

E.    <u>No Reduction in Fixed Annual Rent</u>. In no event shall the Fixed Annual Rent under this Lease be reduced by virtue of any decrease in the amount of any Additional Rent payment under this Article or any other provision of this Lease. If Landlord receives from Tenant any payment less than the sum of the Fixed Annual Rent and Additional Rent then due and payable pursuant to this Lease, Tenant hereby waives its right, if any, to designate the items to which such payment shall be applied and agrees that Landlord in its sole discretion may apply such payment in whole or in part to any Fixed Annual Rent, Additional Rent or to any combination thereof then due and payable hereunder. Unless Landlord shall otherwise expressly agree in writing, acceptance of any portion of the Fixed Annual Rent or Additional Rent from anyone other than Tenant shall not relieve Tenant of any of its other obligations under this Lease, including the obligation to pay other Fixed Annual Rent and Additional Rent, and Landlord shall have the right at any time, upon notice to Tenant, to require Tenant (rather than someone other than Tenant) to pay the Fixed Annual Rent and Additional Rent payable hereunder directly to Landlord. Furthermore, such acceptance of Fixed Annual Rent and Additional Rent shall not be deemed to constitute Landlord's consent to an assignment of this Lease or a subletting or other occupancy of the Demised Premises by anyone other than Tenant, nor a waiver of any of Landlord's rights or Tenant's obligations under this Lease.

F.    <u>Survival of Obligations</u>. Landlord and Tenant's obligation to make the adjustments and payments referred to in the preceding paragraphs of this Article shall survive any expiration or termination of this Lease.

G.    <u>No Waiver</u>. Subject to the provisions of Article 3C hereof, any delay or failure of Landlord in billing any tax escalation hereinabove provided shall not constitute a waiver of or in any way impair the continuing obligation of Tenant to pay the same hereunder.

4.    **SERVICES**

A.    <u>General</u>: Landlord shall provide no services, except as specifically set forth in this Lease.

B.    <u>Electricity and Gas</u>:

(i)    The parties acknowledge and agree that Tenant, at its own expense, and as part of the applicable phase of Tenant's Initial Installation, shall diligently commence and complete all necessary applications and alterations and installations, so that Tenant shall obtain and pay for all of its electricity and gas requirements for the Demised Premises, including all electricity and gas used by the heating or air conditioning equipment servicing the Demised Premises, directly from the public utility(ies) servicing the Building. Tenant, at its expense, shall make all efforts necessary to cause a separate meter (or submeter) to be installed in the Demised Premises to measure Tenant's electricity and gas usage therein, and Tenant, at its expense, shall maintain, repair and/or replace such meter or submeter as necessary throughout the term of this Lease, reasonable wear and tear excepted. Such installation shall be effected in accordance with all applicable laws, rules and regulations.

(ii)    Tenant covenants and agrees that at all times its use of electricity will not exceed the capacity of existing feeders to the Demised Premises or the risers or wiring installations therein and Tenant shall not use any electrical equipment which, in Landlord's reasonable judgment, will overload such installation. Any risers, feeders or other equipment or service proper or necessary to supply Tenant's electrical and gas requirements, upon written request by Tenant and the written prior approval of Landlord (which approval shall not be unreasonably withheld, conditioned or delayed), will be installed by and at the sole but reasonable cost and expense of Tenant, provided that, in Landlord's reasonable judgment, the same are necessary and will not cause damage or injury (except reparable damage cause by the installation thereof) to the Building or the Demised Premises or cause or create a dangerous or hazardous condition or entail excessive or unreasonable alterations, repairs or expense or materially interfere with or disturb other tenants or occupants. Only rigid conduit or other conduit as permitted by applicable law will be allowed. Only copper conductors and connectors or other conductors and connectors permitted by applicable law shall be used.

(iii)    Landlord shall not in anywise be liable or responsible to Tenant for any loss or damage or expense which Tenant may sustain or incur if either the quantity or character of electric or gas service is changed or is no longer available or suitable for Tenant's requirements, except if and to the extent resulting from the negligence or willful misconduct of Landlord or its agents, employees or contractors. Electricity and electric service, as used herein, shall mean any element affecting the generation, transmission, and/or redistribution of electricity, including but not limited to, services which facilitate the distribution of service.

(iv)    It is understood and agreed as follows: (1) there is currently approximately 1,200 amps of electrical distribution originating from a panel located adjacent to the entrance in the lobby of the Building (the "Existing Electrical Distribution"), but it has not yet been determined whether the service entering the panel is adequate to serve the 1,200 amps of distribution after Tenant completes Tenant's Initial Installation; (2) within thirty (30) days after the date that this Lease is executed and delivered by Landlord and Tenant, Tenant shall provide Landlord with a "load letter" from a licensed electrical engineer for submission to Consolidated Edison ("Con Ed") substantiating the actual electrical capacity required by Tenant for its operations in the Demised Premises inclusive of any Building-related requirements (including, without limitation, the elevator and pumps) (the "Required Electrical Capacity"); (3) if such load letter shall substantiate a required electrical capacity of less than 1,400 amps, then the Required Electrical Capacity shall mean such lesser amount, but in no event less than 1,200 amps; and (4) based on Con Ed's review and engineering determination, Landlord shall use commercially reasonable efforts to perform (or cause to be performed) all work necessary ("Landlord's Electrical Work") to cause the Required Electrical Capacity to be delivered to the Building for Tenant's use on or before February 1, 2015 (the "Landlord Electrical Work Outside Date"). In the event that Landlord does not complete Landlord's Electrical Work on or prior to the Landlord Electrical Work Outside Date, Tenant may, at Tenant's sole option, upon notice to Landlord, either (x) perform the remainder of Landlord's Electrical Work on Landlord's behalf, and Landlord shall reimburse Tenant for the actual, reasonable out-of-pocket cost thereof within ten (10) days after written demand therefor, or (y) require Landlord, at Landlord's cost, to use commercially reasonable efforts to cause the Required Electrical Capacity to be delivered to the Building temporarily from the 285 Kent Building (which 285 Kent Building, Landlord represents to Tenant, has sufficient electrical capacity currently available to it for Landlord to cause such

9

requirement to be effectuated). Notwithstanding the foregoing, it is understood and agreed that Landlord's obligation shall be limited to causing 1,200 amps, at Landlord's cost and expense, to be distributed and available for Tenant's use in the Building, and that any cost or expense in excess of providing 1,200 amps (including, without limitation, any additional or replacement piping, wiring or equipment in connection with same) shall be at Tenant's expense, to be paid to Landlord within ten (10) days after written demand therefor, as Additional Rent under this Lease. Notwithstanding anything contained herein to the contrary, it is understood and agreed that the Landlord Electrical Work Outside Date shall be postponed by one day for each day of delay in the performance of Landlord's Electrical Work caused by or due to any reason beyond Landlord's reasonable control, including, without limitation, the act or failure to act by Con Ed or any other utility company or provider servicing the Building. The parties agree that they will use commercially reasonable efforts to cooperate with each other, and to coordinate the performance of Landlord's Electrical Work with Tenant's Initial Installation so that the performance of one does not unreasonably interfere with the performance of the other.

C.    Water: On each of the applicable Commencement Dates water shall be available and provided to Tenant in the Demised Premises for ordinary office lavatory (i.e., sink and toilet), cleaning and pantry uses through the existing plumbing system of the Building at Landlord's cost and expense. If Tenant uses water for any purpose other than ordinary office lavatory (i.e., sink and toilet), cleaning and pantry uses, Landlord may install a water meter or meters to measure Tenant's water consumption for all purposes and Tenant agrees to pay for the installation and maintenance thereof and for water consumed as shown on said meter or meters. If Tenant uses water for any purpose other than ordinary lavatory, cleaning and pantry uses (i.e., showers, pool, etc.), or if such meter or meters reflect monthly charges for water use in excess of $350.00 per month, then Tenant shall pay to Landlord Tenant's Proportionate Share thereof. Tenant shall be permitted to use any meter or sub-meter currently existing in the Demised Premises; it being understood and agreed, however, that as part of Tenant's Initial Installation, Tenant shall install any additional meter or sub-meter necessary to measure Tenant's water consumption in the Demised Premises. Throughout the duration of Tenant's occupancy Tenant shall keep said meter or meters and all related equipment in good working order and repair, reasonable wear and tear excepted, at Tenant's cost and expense. In the event Tenant uses water in excess of such ordinary lavatory, cleaning and pantry use as set forth above Tenant covenants and agrees to pay Tenant's Proportionate Share of the sewer rent, charge or any other tax, rent, levy or charge which now or hereafter is assessed, imposed or a lien upon the Demised Premises or the realty of which they are a part pursuant to law, order or regulation made or issued in connection with the use, consumption, maintenance or supply of water, water system or sewage or sewage connection or system. Any bill or bills rendered by Landlord shall be payable by Tenant as Additional Rent.

D.    Sprinkler System: Anything elsewhere in this Lease to the contrary notwithstanding, if the New York Board of Fire Underwriters or the Insurance Services Office, or any bureau, department or official of the federal, state or city government, require or recommend the installation of a sprinkler system or that any changes, modifications, alterations, or additional sprinkler heads or other equipment be made or supplied in an existing sprinkler system or that any changes, modifications, alterations, or additional sprinkler heads or other equipment be made or supplied in an existing sprinkler system by reason of Tenant's business, or the location of partitions, trade fixtures, or other contents of the Demised Premises, or if any such sprinkler system installations, changes, modifications, alterations, additional sprinkler heads or other such equipment, become necessary to prevent the imposition of a penalty or charge against the full allowance for a sprinkler system in the fire insurance rate set by any said board of fire underwriters or by any fire insurance company due to Tenant's particular manner of use or occupancy of the Demised Premises (as distinguished from general office use thereof), Tenant shall, at Tenant's expense, promptly make such sprinkler system installations, changes, modifications, alterations, and supply additional sprinkler heads or other equipment as required, whether the work involved shall be structural or non-structural in nature. Landlord shall maintain, repair and replace any sprinkler system located in the Demised Premises and/or common areas of the Building, as necessary to keep it in good working order and repair, at Landlord's sole cost and expense; provided, however, that if such sprinkler system is damaged by the negligence or willful misconduct of Tenant or its agents, contractors, employees, or invitees, Tenant shall restore the system to good working condition at its own expense. Landlord shall provide Tenant with one or more points of connection to the Building's existing fire and life safety systems and shall reasonably cooperate with Tenant (including, without limitation, signing any necessary or requested applications or permits) if Tenant elects to connect the Building with the 285 Kent Building in order to allow for direct access between the Demised Premises and the premises demised under the 285 Kent Lease in order to combine any existing fire and life safety systems in the Building and the 285 Kent Building to create one integrated system to cover both the Building and the 285 Kent Building.

E.    <u>Elevator</u>:  Landlord and Tenant acknowledge that there is currently one (1) elevator (the "Elevator") servicing the Building, which elevator services the first, second and third floors of the Building on a 24 7 365 basis (subject to emergencies, requirements of law and the applicable provisions of this Lease).  During the term of this Lease, Tenant shall, at its sole cost and expense, maintain, service, or repair the Elevator as necessary, including, without limitation, performing any work, servicing or inspection required by any applicable law, order, rule or regulation.  Within thirty (30) days of the Phase I Commencement Date, Tenant shall enter into a written service contract for the Elevator with a vendor reasonably acceptable to Landlord who shall, pursuant to such service contract, regularly service and maintain the Elevator at Tenant's sole cost and expense.  Landlord represents that the Elevator is in working order as of the date hereof, and will be in working order as of the Phase I Commencement Date.  Notwithstanding anything contained herein to the contrary, Landlord shall, at its sole cost and expense, promptly replace (as necessary) the Elevator, except if and to the extent such replacement is necessitated by Tenant's negligence or willful misconduct, or by Tenant's failure to maintain the Elevator as required pursuant to this paragraph, in which event such replacement shall be at Tenant's sole cost and expense, which cost shall be payable as Additional Rent hereunder.

F.    <u>Cleaning</u>:

1.    Landlord shall not provide any cleaning services to the Demised Premises.  Tenant shall keep and maintain the entire inside of the Demised Premises in reasonably clean and orderly condition at all times.

2.    Landlord shall not provide any refuse removal services at the Building.  Tenant shall independently contract for the removal of its rubbish and refuse, but only by such contractor as shall first have been approved in writing by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.  Removal of refuse and rubbish shall be subject to such reasonable rules and regulations as Landlord may from time to time impose.  Tenant covenants and agrees, at its sole cost and expense, to comply with all present and future laws, orders and regulations of all state, federal, municipal and local governments, departments, commissions and boards regarding the collection, sorting, separation and recycling of waste products, garbage, refuse and trash.  Tenant shall pay all actual, reasonable, out-of-pocket costs, expenses, fines, penalties or damages that may be imposed on Landlord or Tenant by reason of Tenant's failure to comply with the foregoing obligations, and, at Tenant's sole cost and expense, shall (except to the extent resulting from Landlord's gross negligence or willful misconduct) indemnify, defend and hold Landlord harmless (including reasonable legal fees and expenses) from and against any actions, claims and suits arising from such non-compliance, utilizing counsel reasonably satisfactory to Landlord.  Tenant shall not throw, and shall not permit to be thrown, anything out of doors, windows or skylights, off of roofs, or into hallways, stairways or elevators, and shall not place food or objects on outside windows.

3.    Tenant, at its own cost and expense, shall keep the Demised Premises free from vermin, rodents or anything of like, objectionable nature ("Vermin"), and shall employ only such Vermin exterminating contractors as are approved by Landlord.  In the event of Tenant's failure to keep the Demised Premises free from Vermin after ten (10) days' notice from Landlord, Landlord shall have the right, at Tenant's expense, to take all necessary and proper measures to eradicate any and all Vermin from the Demised Premises.

**5.    ASSIGNMENT; SUBLETTING; ETC.**

A.    Except as otherwise expressly permitted by the provisions of this Article 5, Tenant, for itself, its heirs, distributees, executors, administrators, legal representatives, successors and assigns, expressly covenants that it shall not assign, mortgage or encumber this Lease, nor underlet, or suffer or permit the Demised Premises or any part thereof to be used or occupied by others, without the prior written consent of Landlord in each instance.  Provided that the primary purpose of the transaction is to transfer this Lease, the transfer of a majority of the issued and outstanding capital stock of any corporate tenant or subtenant of this Lease or a majority of the total record equity interests (or a majority of the ultimate beneficial ownership interest) in any partnership or limited liability company tenant or subtenant or any other form of entity or organization, however accomplished, and whether in a single transaction or in a series of transactions, or the conversion of a tenant or subtenant entity to another form of entity including, without limitation, a limited liability company or a limited liability partnership, or a transfer of control of any entity shall, in each case, be deemed an assignment of this Lease or of such sublease.  The merger or consolidation of a tenant or subtenant, whether a corporation, partnership, limited liability company or other form of

11

entity or organization, where the net worth of the resulting or surviving corporation, partnership, limited liability company or other form of entity or organization, is less than the net worth of Tenant or subtenant immediately prior to such merger or consolidation shall be deemed an assignment of this Lease or of such sublease.  Tenant shall notify Landlord in writing in the event that Tenant intends to seek to assign this Lease or to sublease all or a part of the Demised Premises.  Except as otherwise herein provided, if this Lease shall be assigned, or if the Demised Premises or any part thereof shall be underlet or occupied by anybody other than Tenant, Landlord may, after default by Tenant, collect rent from the assignee, undertenant or occupant, and apply the net amount collected to the rent herein reserved, but no assignment, underletting, occupancy or collection shall be deemed a waiver of the provisions hereof, the acceptance of the assignee, undertenant or occupant as tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained.  The consent by Landlord to an assignment or underletting shall not in any way be construed to relieve Tenant from obtaining the express consent in writing of Landlord to any further assignment or underletting.  In no event shall any permitted subtenant assign or encumber its sublease or further sublet all or any portion of its sublet space, or otherwise suffer or permit the sublet space or any part thereof to be used or occupied by others, without Landlord's prior written consent in each instance.  A modification, amendment or extension of a sublease shall be deemed a sublease.  In no event may this Lease be assigned to or any portion of the Demised Premises be underlet to a Prohibited Person (as hereinafter defined in Article 43).  If any lien is filed against the Demised Premises or the Building of which the same form a part for brokerage services claimed to have been performed for Tenant, whether or not actually performed, the same shall be discharged by Tenant within ten (10) Business Days thereafter, at Tenant's expense, by filing the bond required by law, or otherwise, and paying any other necessary sums, and Tenant agrees to indemnify Landlord and its agents and hold them harmless from and against any and all claims, losses or liability resulting from such lien for brokerage services rendered.  For the purposes of this Article, an "interest" shall mean a right to participate, directly or indirectly, through one or more intermediaries, nominees, trustees or agents, in any of the profits, losses, dividends, distributions, income, gain, losses or capital of any entity or other organization. The listing of a name other than that of Tenant, whether on the doors of the Demised Premises, the Building directory or otherwise shall not vest any right or interest in this Lease or the Demised Premises and shall not be deemed to be the consent of Landlord to any assignment or transfer of this Lease, to any sublessee of the Demised Premises, or to any use or occupancy thereof by anyone not Tenant.

B.	(i)	Except for any assignment or sublease covered by paragraphs G or H of this Article, if Tenant desires to assign this Lease or to sublet all but not part of the Demised Premises, it shall first submit to Landlord a written request for consent to such transaction which request shall contain or be accompanied by the documents described in paragraph C of this Article.  In the case of an assignment or a sublease of all (but not part) of the Demised Premises, Landlord may then, by notice to such effect ("Landlord's Termination Notice") given within thirty (30) days after the receipt of Tenant's request for consent, terminate this Lease on the effective date of the proposed transaction (the "Termination Date"), but in no event earlier than ninety (90) days nor later than one hundred eighty (180) days following the date of Landlord's Termination Notice.  Tenant shall then vacate and surrender the Demised Premises on or before the Termination Date and the term of this Lease shall end on the Termination Date as if that were the original expiration date of the term of this Lease.

(ii)	Except for any assignment or sublease covered by paragraphs G or H of this Article, if Tenant desires to sublet a floor or more but not all of the Demised Premises for (1) a period of four (4) years or more, or (2) for a period to commence after the fifth (5th) anniversary of the Phase I Commencement Date, then Tenant shall first submit to Landlord a written request for consent to such transaction, which request shall contain or be accompanied by the documents described in paragraph C of this Article.  Landlord may then, by notice to such effect ("Landlord's Deletion Notice") given within thirty (30) days after the receipt of Tenant's request for consent, delete from the Demised Premises the space proposed to be subleased (the "Deleted Portion"), on the effective date of the proposed transaction (the "Deletion Date"), but in no event earlier than sixty (60) days nor later than one hundred eighty (180) days following the date of Landlord's Deletion Notice.  Upon such Deletion Date, the Fixed Annual Rent and Additional Rent due under this Lease shall be appropriately proportionately adjusted, and all other provisions of this Lease shall be deemed modified, so as to reflect such deletion of space from the Demised Premises.  Tenant shall vacate and surrender the Deleted Portion on or before the Deletion Date and the term of the leasing of such space shall end on the Deletion Date as if that were the original expiration date of the term of the leasing of such space.  Landlord shall accept the Deleted Portion "as is" except that Landlord, at Tenant's expense for actual, reasonable, out-of-pocket costs and with Tenant's cooperation, shall perform all such work and make all such alterations as may be reasonably required physically to demise the Deleted Portion from the remainder of the

Demised Premises (including, without limitation, separation of Building systems and associated wiring, duct work and piping) and to permit lawful occupancy of such spaces, except that Landlord shall use commercially reasonable efforts not to unreasonably interfere with the operation and conduct of Tenant's business in the Demised Premises (it being understood and agreed that Landlord shall be authorized to perform such work during normal business hours and shall not be required to use overtime labor in connection with same).

C.    If Tenant requests Landlord's consent to a specific assignment or subletting, or in any other circumstance where Tenant is required to provide the information described in this paragraph C, Tenant shall submit in writing to Landlord (i) the name and address of the proposed assignee or subtenant, (ii) either, at Tenant's election, (1) a duly executed counterpart of the proposed agreement of assignment or sublease, or (2) a duly executed counterpart of a term sheet or letter of intent setting forth all of the material business terms of the proposed agreement of assignment or sublease, (iii) reasonably satisfactory information as to the nature and character of the business of the proposed assignee or subtenant, and as to the nature of its proposed use of the space, and (iv) banking, financial or other credit information relating to the proposed assignee or subtenant reasonably sufficient to enable Landlord to determine the financial responsibility and character of the proposed assignee or subtenant.

D.    If Landlord shall not have exercised its termination option, or shall not have such option, as the case may be, as provided in paragraph B above, then, subject to paragraph F below, Landlord shall not unreasonably withhold, condition or delay its consent to Tenant's request for consent to such specific assignment or subletting, and Landlord shall respond to Tenant's request within thirty (30) days after Landlord's receipt thereof (and all applicable information or documents required hereunder). Any consent of Landlord under this Article shall be subject to the terms of this Article and the effectiveness of any assignment or sublease under this Article shall be conditioned upon there being no monetary or other material default by Tenant, beyond any grace, notice and/or cure period, under any of the terms, covenants and conditions of this Lease at the time that Landlord's consent to any such subletting or assignment is requested and on the date of the commencement of the term of any proposed sublease or the effective date of any proposed assignment. Notwithstanding anything contained herein to the contrary, if Landlord consents to a proposed assignment or sublease based on a term sheet or letter of intent, as described in paragraph C above, and Tenant fails to execute and deliver to Landlord a duly executed copy of the assignment agreement or sublease within sixty (60) days after the giving of such consent, or the economic terms of such agreement of assignment or sublease are materially different from the terms contained in the approved term sheet or letter of intent, as the case may be, then Tenant shall again comply with the provisions of paragraphs B and C of this Article before assigning this Lease or subletting all or any part of the Demised Premises.

E.    Tenant understands and agrees that no assignment or subletting shall be effective unless and until Tenant, upon receiving any necessary Landlord's written consent (and unless it was theretofore delivered to Landlord) causes a duly executed copy of the sublease or assignment to be delivered to Landlord within ten (10) Business Days after execution thereof. Any such sublease shall provide that the subtenant shall comply with all applicable terms and conditions of this Lease to be performed by Tenant hereunder. Any such assignment of this Lease shall contain an assumption by the assignee of all of the terms, covenants and conditions of this Lease to be performed by Tenant.

F.    Anything herein contained to the contrary notwithstanding:

(i)    The transfer of outstanding capital stock of any corporate tenant, for purposes of this Article, shall not include the sale of such stock by persons other than those deemed "insiders" within the meaning of the Securities Exchange Act of 1934 as amended, and which sale is effected through the "over-the-counter market" or through any recognized stock exchange.

(ii)    No assignment or subletting shall be made:

(a)    Intentionally Deleted;

(b)    Intentionally Deleted;

(c)    By the legal representatives of Tenant or by any person to whom Tenant's interest under this Lease passes by operation of law, except in compliance with the provisions of this Article;

13

(d)       To any person or entity for the conduct of a business which is not in keeping with the standards and the general character of the Building;

(e)       To a subtenant for less than an entire floor of the Demised Premises (other than to an Affiliate of Tenant); and

(f)       In the event of a sublease, for a term that shall expire not later than one (1) day prior to the expiration of the term of this Lease.

(iii)      No subtenant shall have a right to sublet further or assign its sublease except in accordance with the provisions of this Article 5 (mutatis mutandis).

G.       Anything herein above contained to the contrary notwithstanding, the provisions of paragraph B above and paragraph I below shall not apply to, and Landlord's consent shall not be required with respect to, an assignment of this Lease, or sublease of all or part of the Demised Premises, to an Affiliate of Tenant, provided the net worth of the transferee or transferees, after such transaction, is equal to or greater than Tenant's net worth immediately prior to such transaction; provided that Tenant gives Landlord at least ten (10) Business Days prior written notice of the transaction; provided that the Guarantor confirms in a writing reasonably satisfactory to Tenant that the Guarantee (each term as defined in Article 29E of this Lease) shall remain in full force and effect notwithstanding such assignment; and provided, also, that any such transaction complies with the other provisions of this Article.  Subject to the execution by Landlord of a commercially reasonable confidentiality agreement in connection therewith, Tenant shall provide Landlord with banking, financial or other credit information relating to Tenant and the proposed assignee or subtenant reasonably sufficient to enable Landlord to determine the net worth of Tenant on the date hereof or immediately prior to such transaction, and the net worth of the assignee or subtenant immediately following such transaction.

H.       Anything herein above contained to the contrary notwithstanding, the provisions of paragraph B above and paragraph I below shall not apply to, and Landlord's consent will not be required with respect to an assignment of this Lease, or sublease of all but not part of the Demised Premises, to any corporation or other entity (each a "Successor Entity") (a) to which substantially all the assets of Tenant are transferred or (b) into or with which Tenant may be merged or consolidated, provided that the net worth, experience and reputation of such transferee or of the resulting or surviving corporation or other entity, as the case may be, is equal to or greater than the net worth, experience and reputation of Tenant and Guarantor; provided that the Guarantor confirms in a writing reasonably satisfactory to Tenant that the Guarantee shall remain in full force and effect notwithstanding such assignment, immediately prior to such transfer; provided Tenant gives Landlord at least thirty (30) days prior written notice of the transaction; and provided, also, that any such transaction complies with the other provisions of this Article. Tenant shall provide Landlord with banking, financial or other credit information relating to Tenant and the proposed assignee or subtenant reasonably sufficient to enable Landlord to determine the net worth of Tenant on the date hereof or immediately prior to such transaction, and the net worth of the assignee or subtenant immediately following such transaction.

I.       If Landlord shall not have exercised its termination or deletion option, as the case may be, and/or Tenant effects any assignment or subletting (except as set forth in paragraphs G and H above), then Tenant thereafter shall pay to Landlord an amount equal to: (i) fifty (50%) percent of any rent or other consideration (including, without limitation, sums for the sale or rental of fixtures, furniture, equipment and other personal property) paid to Tenant by any subtenant, less all actual, reasonable, out-of-pocket expenses incurred by Tenant in connection with such subletting (including, without limitation, any reasonable brokerage commissions, reasonable attorneys' fees, reasonable tenant concessions and other inducements which are consistent with then-existing market conditions, and costs and expenses directly relating to obtaining Landlord's consent to the relevant subletting), which is in excess of the rent allocable (strictly on a *per* square foot basis, without regard to any other allocation of value, by dividing aggregate consideration by the rentable square feet of the area so sublet) to the subleased space accruing during the term of the sublease, or (ii) fifty (50%) percent of any other profit or gain (including, without limitation, sums for the sale or rental of fixtures, furniture, equipment and other personal property), less all actual, reasonable, out-of-pocket expenses incurred by Tenant in connection with such assignment (including, without limitation, any reasonable brokerage commissions, reasonable attorneys' fees, reasonable tenant concessions and other inducements which are consistent with then-existing market conditions, and costs and expenses directly

14

relating to obtaining Landlord's consent to the relevant assignment) realized by Tenant from any such subletting or assignment. All sums payable hereunder by Tenant (if any) shall be payable to Landlord as Additional Rent upon receipt thereof by Tenant.

J.    Each subletting pursuant to this Article shall be subject to all of the covenants, agreements, terms, provisions and conditions contained in this Lease. Notwithstanding any such subletting to any subtenant and/or acceptance of rent or Additional Rent by Landlord from any subtenant, Tenant shall and will remain fully liable for the payment of the Fixed Annual Rent and Additional Rent due and to become due hereunder and for the performance of all of the covenants, agreements, terms, provisions and conditions contained in this Lease on the part of Tenant to be observed and performed and for all of the acts and omissions of any licensee, subtenant, or any other person claiming under or through any subtenant that shall be in violation of any of the obligations of this Lease, and any such violation shall be deemed to be a violation by Tenant. Tenant further agrees that, notwithstanding any such subletting, no further subletting (including, without limitation, any extensions or renewals of any initial sublettings) of the Demised Premises by Tenant, or any person claiming through or under Tenant shall, or will be, made, except upon compliance with, and subject to, the provisions of this Article.

K.    Any assignment or transfer shall be made only if, and shall not be effective until, the assignee shall execute, acknowledge and deliver to Landlord an agreement, in form and substance reasonably satisfactory to Landlord, whereby the assignee shall assume all of the obligations of this Lease on the part of Tenant to be performed or observed and whereby the assignee shall agree that the provisions contained herein shall, notwithstanding such assignment or transfer, continue to be binding upon it in respect of all future assignments and transfers. The original named Tenant covenants that, notwithstanding any assignment or transfer whether or not in violation of the provisions hereof, and notwithstanding the acceptance of Fixed Annual Rent and/or Additional Rent by Landlord from an assignee, transferee or any other party, the original named Tenant shall remain fully liable for the payment of the Fixed Annual Rent and Additional Rent and for the other obligations of this Lease on the part of Tenant to be performed or observed through the term of this Lease.

L.    If Landlord shall decline to give consent to any proposed assignment or sublease, or if Landlord shall exercise one of Landlord's options under paragraph B of this Article, Tenant shall indemnify, defend and hold Landlord harmless from and against any and all losses, liabilities, costs and expenses (including reasonable attorneys' fees) resulting from any claims that may be made against Landlord by the proposed assignee or subtenant or by any brokers or other persons claiming a commission or similar compensation in connection with the proposed assignment or sublease. This provision shall survive the expiration or sooner termination of this Lease. Tenant shall pay to Landlord, within thirty (30) days after demand, Landlord's actual, reasonable out-of-pocket costs (including, without limitation, reasonable legal, architect's and engineering fees) incurred in connection with reviewing Tenant's request for any such consent, as well as any other documents or instruments required in connection therewith.

M.    The joint and several liability of Tenant and any immediate or remote successor in interest to Tenant, and the due performance of the obligations of this Lease on Tenant's part to be performed or observed, shall not be discharged, released or impaired in any respect by any agreement or stipulation made by Landlord extending the time of, or modifying any of the obligations of, this Lease, or by any waiver or failure of Landlord to enforce any of the obligations of this Lease.

N.    The term "Tenant" when used in this Article shall include the originally denominated Tenant and each proximate or remote assignee thereof or successor in interest thereto. The term "control" as used in this Article shall mean, in the case of a corporation, ownership or voting control, directly or indirectly, of fifty (50%) percent or more of all the voting stock, and in the case of a limited liability company, joint venture or partnership or similar entity, ownership, directly or indirectly, of fifty (50%) percent or more of the general or other partnership (or similar) interests therein. Wherever in this Article Tenant or any other person is required to provide Landlord with banking, financial or other credit information such information shall include, without limitation, a balance sheet (in reasonable detail, listing all assets and liabilities and prepared in accordance with generally accepted accounting principles) of each relevant party to the transaction in question certified to Landlord by an independent certified public accountant.

15

O.      (i)      Notwithstanding anything contained herein to the contrary, provided that Tenant is not in default beyond any applicable notice and/or grace period under this Lease, the provisions of this Article shall not apply to, and Landlord's consent shall not be required with respect to any written agreement between Tenant and any Associated Party (as hereinafter defined), which agreement permits such persons or entities to occupy a portion of the Demised Premises (each a "Permitted Licensee"), provided that (1) no more than fifteen (15%) percent of the area of the Demised Premises shall be occupied by Permitted Licensees at any one time, and (2) such agreement shall reflect that it is subject and subordinate to the terms and provisions of this Lease.  Notwithstanding the foregoing, Tenant shall not be required to have an agreement with a Permitted Licensee unless such Permitted Licensee has more than five (5) employees in the Demised Premises or occupies a portion of the Demised Premises for a term of more than ten (10) Business Days.  Upon request from Landlord (no more than three (3) times in any 12-month period) Tenant shall provide Landlord with a list of all Permitted Licensees currently in the Building.  No Permitted Licensee shall have a sublease of any portion of the Demised Premises, nor shall any demising walls be erected in the Demised Premises in connection with a license to a Permitted Licensee, nor shall any Permitted Licensee have any privity with Landlord or any right to enforce the provisions of this Lease against Landlord. Tenant shall be responsible to Landlord to ensure that all Permitted Licensees comply with all of the terms and provisions of this Lease with respect to the use and occupancy of the Demised Premises, including, without limitation, the obligation to vacate same when the term of this Lease expires or is otherwise terminated.  It is acknowledged by Landlord and Tenant that it is the intention of the parties that the Demised Premises shall not be used for transient occupancy by such Permitted Licensees.  The term "Associated Party" when used herein, shall mean parties with whom Tenant has a bona fide business relationship, including Affiliates of Tenant, which relationship shall not be for the purposes of allowing such party to license space from Tenant.

(ii)      In the event that a Permitted Licensee (a) has more than five (5) employees in the Demised Premises or (b) occupies a portion of the Demised Premises for more than ten (10) Business days, Tenant agrees that: (x) Tenant shall give Landlord at least ten (10) days' prior written notice of any such transaction (which notice shall contain the name and address of such Permitted Licensee, reasonably satisfactory information as to the nature and character of the business of such Permitted Licensee, and as to its proposed use of the space and its relationship to Tenant, and shall include a copy of such agreement (if and to the extent such agreement reflects any agreement between Tenant and such Permitted Licensee with regard to the use and occupancy of the Demised Premises, and then only such portion of such agreement which contemplates or refers in any way to the Demised Premises); and (y) any such transaction shall be subject to all other applicable provisions of this Lease.  Any such agreement shall provide that such Permitted Licensee shall comply with all applicable terms and conditions of this Lease on the part of Tenant to be performed (except payment of rent).

6.      **DEFAULT**

A.      If: (a) Fixed Annual Rent or Additional Rent or any other payment due hereunder is not paid when due and such failure to pay such Fixed Annual Rent or Additional Rent continues for a period of ten (10) days after notice to Tenant thereof, or if  Landlord shall receive Fixed Annual Rent after the date when first due more than two (2) times within any twelve-month period; or (b) Tenant shall have failed to cure a default in the performance of any covenant of this Lease (except the payment of Rent), or any rule or regulation hereinafter set forth, within thirty (30) days after written notice thereof from Landlord, or if such default cannot be completely cured in such time, if Tenant shall not promptly proceed to cure such default within said thirty (30) days, or shall not complete the curing of such default with due diligence; or (c) irrespective of that Tenant's interest in this Lease may have been assigned (with or without Landlord's consent [if permitted herein or by law]) when and to the extent permitted by law, a petition in bankruptcy shall be filed by or against Tenant or if Tenant shall make a general assignment for the benefit of creditors, or receive the benefit of any insolvency or reorganization act; or (d) a receiver or trustee is appointed for any portion of Tenant's property and such appointment is not vacated within thirty (30) days; or (e) an execution or attachment shall be issued under which the Demised Premises shall be taken or occupied or attempted to be taken or occupied by anyone other than Tenant, and same is not vacated within thirty (30) days; or (f) Intentionally Deleted; or (g) Tenant shall default beyond any applicable notice, grace or cure period under any other lease, license or occupancy agreement between Tenant and Landlord, including, without limitation, the 285 Kent Lease; or (h) Intentionally Deleted; or (i) Tenant shall have made a material misrepresentation herein, and Tenant shall have failed to correct such misrepresentation within thirty (30) days after written notice thereof from Landlord, or, if such misrepresentation cannot be completely cure in such time, if, Tenant shall not promptly proceed to correct such misrepresentation within said thirty (30) days, or shall not complete the correcting of such misrepresentation with

16

due diligence; then and in any such event Landlord may terminate this Lease on five (5) Business Days' prior written notice to Tenant. Notwithstanding anything herein to the contrary set forth, Tenant shall not commit waste or cause any damage to any portion of the Building irrespective of whether within or without the Demised Premises. The willful infliction of damage on any property or the material interference with the quiet enjoyment by any other occupant of the Building shall be deemed to be a conditional limitation of the term of this Lease. Tenant shall not create any material nuisance or other material disturbance within the Building.

B.      The termination of this Lease (which shall include, without limitation, any rights of renewal or extension thereof) shall be effective on the fifth (5th) Business Day following the notice first referred to in the preceding paragraph without the need for any further act and thereupon this Lease shall terminate as completely as if that were the date originally fixed for the expiration of the term of this Lease; but Tenant shall remain liable as hereinafter provided, and Landlord may institute summary or other proceedings to repossess the Demised Premises or re-enter and take possession of the Demised Premises by the exercise of self-help or any other means permitted by law.

C.      Landlord hereby authorizes its then current managing agent of the Building, if any, at any time to act on Landlord's behalf to make demands on and give notices to Tenant hereunder, including without limitation, (a) demands for payment of rent or Additional Rent, performance of any obligation, or cure of any default, (b) notices of default or termination, and (c) all other notices that may be required by law or this Lease in connection with or as a predicate to any action or proceeding for rent and/or possession of the Demised Premises. Tenant acknowledges and agrees that such managing agent is authorized to give such notices and shall not (and hereby waives the right to) contest such authorization or raise any defense to any action or proceeding predicated on any allegation of lack of such authorization. Landlord represents there is not currently a managing agent for the Building (the Building is currently self-managed). Landlord shall provide Tenant with written notice in the event Landlord appoints a managing agent for the Building.

D.      Tenant acknowledges and agrees that all notices of default and demands for the payment of rent or performance of any other obligation shall be sent or delivered to the Demised Premises and notwithstanding that Tenant may have another office or place of business (of which Landlord may have actual knowledge) or may have vacated the Demised Premises, delivery of any such notice or demand or delivery of service of process to the Demised Premises shall be sufficient for all purposes (including, without limitation, obtaining jurisdiction over [and entry of judgment against] Tenant in any action or proceeding), with a copy of any such notice sent to the addresses set forth in Article 27 of this Lease (or such other address as may be provided pursuant to the provisions of said Article 27).

7.      RE-LETTING; ETC.

A.      Tenant hereby expressly waives any right of redemption granted by any present or future law. "Re-enter" and "re-entry" as used in this Lease are not restricted to their technical legal meanings. In the event of a breach or threatened breach of any of the covenants or provisions hereof Landlord shall have the right of injunction. Mention herein of any particular remedy shall not preclude Landlord from any other available remedy. Landlord shall recover as liquidated damages, in addition to accrued rent and other charges, if Landlord's re-entry is the result of Tenant's bankruptcy, insolvency, or reorganization, the full rental for the maximum period allowed by any act relating to bankruptcy, insolvency or reorganization.

B.      In case of any re-entry, dispossess by summary proceedings or termination of the term hereof due to Tenant's default, (x) the rent shall become due thereupon and be paid up to the time of such re-entry, dispossess and/or termination; (y) Landlord may re-let the Demised Premises or any part or parts thereof, either in the name of Landlord or otherwise, for a term or terms, which may at Landlord's option be less than or exceed the period which would otherwise have constituted the balance of the term of this Lease and may grant concessions or occupancy free of rent for any period; and (z) Tenant shall also pay Landlord as liquidated damages for the failure of Tenant to perform any obligation, at Landlord's election, either of the amounts provided for in item (1) or item (2) below and, in addition thereto, the amounts provided for in item (3) below. Landlord shall have no obligation to re-let the Demised Premises, and its failure or refusal to do so, or failure to collect rent on re-letting, shall not affect Tenant's liability hereunder. In no event shall Tenant be entitled to a credit or repayment for re-rental income which exceed

17

the sums payable to Tenant hereunder or which covers a period after the original term of this Lease.  Said items (1), (2) and (3) are as follows:

(1)    A sum which, at the time of such re-entry, dispossess or termination, as the case may be, represents the then value (using a discount rate equal to the yield on United States Treasury obligations selected by Landlord maturing closest to the date set forth herein as the then established expiration date of the term of this Lease) of the amount by which (x) the aggregate of the Fixed Annual Rent and any regularly payable Additional Rent hereunder that would have been payable by Tenant for the period commencing with such re-entry, dispossess or termination, as the case may be, and ending on the date then established herein for the expiration of the term of this Lease exceeds (y) the aggregate fair market rental value of the Demised Premises for the same period (which sum is sometimes hereinafter called "the lump sum payment"); or

(2)    Sums equal to any deficiency between the rent hereby reserved and/or covenanted to be paid and the net amount, if any, of the rents collected (*i.e.*, the amount of rents collected hereunder less all of the costs referred to in item (3) below incurred by Landlord) on account of the lease or leases of the Demised Premises for each month of the period which would otherwise have constituted the balance of the term of this Lease. Such deficiency shall become due and payable monthly, as it is determined; and

(3)    A sum to be added to such lump sum payment or deficiency, as the case may be, equal to the actual, reasonable, out of pocket expenses that Landlord incurs in connection with re-letting the Demised Premises and pursuing Landlord's rights and remedies (whether or not any legal action is commenced) including, but not limited to, legal expenses, reasonable attorneys' fees, court costs, brokerage commissions, advertising costs, the value of any rent-free period, the costs of all alterations and decorations deemed advisable by Landlord to market the Demised Premises following such re-entry or dispossess or in connection with leasing the Demising Premises to a new tenant and costs to keep the Demised Premises in good order and/or for preparing the same for re-letting. Notwithstanding anything contained herein to the contrary, Tenant shall have no obligation to pay Landlord's costs, expenses or disbursements in any proceeding in which there shall have been rendered a final judgment against Landlord, and the time for appealing such final judgment shall have expired.

C.    If Landlord re-enters the Demised Premises for any cause, or if Tenant abandons or vacates the Demised Premises, any property left in the Demised Premises by Tenant shall be deemed to have been abandoned by Tenant, and Landlord shall have the right to retain or dispose of such property in any manner without any obligation to account therefor to Tenant.  If Tenant shall at any time default hereunder beyond any and all applicable notice, grace and/or cure periods, and if Landlord shall institute an action or summary proceeding against Tenant based upon such default, then Tenant will reimburse Landlord for the legal expenses and fees thereby incurred by Landlord.

## 8.    LANDLORD MAY CURE DEFAULTS

If Tenant shall default beyond any applicable notice, grace and/or cure period in performing any covenant or condition of this Lease, Landlord may perform the same for the account of Tenant, and if Landlord, in connection therewith, or in connection with any default by Tenant, makes any reasonable, out-of-pocket expenditures or incurs any obligations for the payment of money, including, but not limited to, attorneys' fees and disbursements, such sums so paid or obligations incurred by Landlord shall be deemed to be Additional Rent hereunder, and shall be paid by Tenant to Landlord, together with interest at the Applicable Rate calculated from the date of each expenditure by Landlord, within ten (10) Business Days after delivery to Tenant of any bill or statement therefor, and if Tenant's Lease term shall have expired at the time of the making of such expenditures or incurring such obligations, such sums shall be recoverable by Landlord as damages.

## 9.    ALTERATIONS

A.    Tenant shall make no decoration, alteration, addition, installation or improvement (each, an "alteration") in the Demised Premises, without the prior written consent of Landlord (but subject to the provisions of paragraph B of this Article), and then only by contractors or mechanics first approved by Landlord (but subject to the provisions of subparagraph B(iv) of this Article), which approval shall not be unreasonably withheld, conditioned or delayed, and only in such manner and with such materials as shall be reasonably approved by

Landlord. Landlord shall respond to Tenant's request for approval within fifteen (15) Business Days after Landlord's receipt thereof. If Landlord withholds its approval of Tenant's proposed alteration, Tenant shall make appropriate modifications to such proposed alteration to correct or eliminate the objections specified by Landlord in such disapproval and shall resubmit the modified request for approval to such alteration to Landlord within ten (10) days after they are returned to Tenant unapproved. The terms and provisions set forth in this Article governing the approval and disapproval of alterations shall apply equally to approving and disapproving revised plans and specifications with regard to such alterations and all change orders (except that, in the case of Landlord's response to a resubmission of a modified request, the reference to "fifteen (15) Business Days" shall be changed to "seven (7) Business Days"). If Landlord fails to respond to any such request for approval within such fifteen (15) Business Day period, then Tenant may send Landlord a second notice of Tenant's request for approval. If Landlord fails to respond to such second notice within five (5) Business Days after the date of Landlord's receipt of the same, then Landlord shall be deemed to have approved such plans and specifications. Tenant agrees that any such second notice shall contain a statement, in bold face type and capital letters, that the subject plans and specifications shall be deemed approved if Landlord fails to respond within such five (5) Business Day period. Notwithstanding the foregoing, Landlord's consent shall not be required in connection with any work ("Decorative Work") which is purely cosmetic or decorative (including, without limitation, painting or wall covering) which does not require a building permit.

B.      Anything in this Article to the contrary notwithstanding, Landlord shall not unreasonably withhold, condition or delay approval of written requests of Tenant to make nonstructural interior alterations in the Demised Premises, provided that such alterations do not adversely affect utility services, plumbing and electrical lines or other systems of the Building (other than to a *de minimis* extent). Notwithstanding the foregoing, Landlord shall not unreasonably withhold, condition or delay approval of the installation of a boiler in the Building, provided same is performed in accordance with the applicable provisions of this Article. All alterations shall be performed in accordance with the following conditions:

(i)      All alterations requiring the submission of plans to any governmental agency (including the department of buildings of the City of New York (the "DOB")) shall be performed, in all material respects, in accordance with plans and specifications first submitted to Landlord for its prior written approval. Except with regard to Decorative Work, Landlord shall be given, in writing, a good description of all other alterations.

(ii)     All alterations shall be performed in a good and workmanlike manner. Except with regard to Decorative Work, Tenant shall, prior to the commencement of any such alterations, at its sole cost and expense, obtain and exhibit to Landlord any governmental permit required in connection with such alterations. Within thirty (30) days after the completion of any such alterations, Tenant shall, at its sole cost and expense, obtain and exhibit to Landlord any such permits, sign-offs, approvals and certificates of completion or certificates of occupancy required in connection with such completed alterations (failing which Landlord may do so at Tenant's expense, which sums shall be deemed Additional Rent under this Lease and due upon demand). Any application or other submission to the DOB (or other governmental authority) which is required in connection with any permitted alteration hereunder (including, without limitation, Tenant's Initial Installation) shall be signed by an authorized representative of Landlord. Landlord shall reasonably cooperate with Tenant (at no liability or expense to Landlord) in submitting any such applications and/or obtaining such permits (including, without limitation, by executing same as owner of the Building).

(iii)    Except with regard to Decorative Work, all alterations shall be performed in compliance with all other applicable provisions of this Lease, all Building regulations (including specifications for construction material and finishes criteria adopted by Landlord for the Building) and with all applicable laws, ordinances, directions, rules and regulations of governmental authorities having jurisdiction, including, without limitation, the Americans with Disabilities Act of 1990, as amended, New York City Local Law No. 5/73 and New York City Local Law No. 58/87 and similar present or future laws, and regulations issued pursuant thereto, and also New York City Local Law No. 76 and similar present or future laws, and regulations issued pursuant thereto, on abatement, storage, transportation and disposal of asbestos, which work, if required, shall be effected at Tenant's sole cost and expense, by contractors and consultants approved by Landlord and in strict compliance with the aforesaid rules and regulations and with Landlord's rules and regulations thereon. Notwithstanding anything to the contrary herein contained, Tenant agrees not to perform any work that affects the structural elements of the Building or any Building mechanical system without Landlord's prior written consent.

19

(iv)     All work shall be performed using only such labor as will not result in jurisdictional disputes or strikes, by contractors and subcontractors approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed with regard to nonstructural alterations which do not effect the systems servicing the Demised Premises or the structure of the Building.

(v)     All work to be performed by Tenant shall be done in a manner that will not unreasonably interfere with or disturb other tenants and occupants of the Building or any adjacent building.  To the extent Tenant is performing core drilling or demolition having excessively high noise levels (the "Special Work") on a floor in the Building with other tenants currently in possession on such floor, no Special Work shall be permitted on such floor between the hours of 8:00 a.m. and 6:00 p.m. on Mondays through Fridays.  If Tenant wishes to perform any Special Work on such floor during the hours referenced in the immediately preceding sentence and Tenant gives reasonable prior notice to Landlord thereof specifying the days and hours during which such Special Work will occur, Landlord shall consider such request in good faith and endeavor to accommodate Tenant's request taking into account any other tenants on such floor.

(vi)     During the course of any alterations or other work requiring a permit from any governmental authority, Tenant shall cause its contractors to provide the following insurance, issued by an insurance company reasonably satisfactory to Landlord: worker's compensation and disability insurance covering all persons employed for such work; commercial general liability and property damage insurance naming the holder of any mortgage on the Building, Landlord, its managing agent and its designees as additional insureds, written on a per occurrence basis with a per occurrence limit of not less than $3,000,000; builder's risk insurance in an amount reasonably satisfactory to Landlord; and business automobile liability insurance for all owned, non-owned and hired vehicles with a $1,000,000 combined single limit;

(vii)     Except with regard to Decorative Work, Tenant shall deliver to Landlord prior to commencing any alteration, certificates of the insurance required under clause (vi) above naming with respect to such insurance, except workers compensation and disability insurance, Landlord, its managing agent, its mortgagees and other designees with an insurable interest, as additional insureds.

(viii)     Notwithstanding anything herein set forth to the contrary, within thirty (30) days after final completion of any alteration requiring the filing of plans with the Department of Buildings and/or the issuance of a building permit, Tenant shall deliver to Landlord final record drawings of the alteration including, as may be pertinent to the work performed, a reflected ceiling plan, mechanical and electrical drawings, partition plan and any other drawings which may be required to indicate accurately the layout and systems of the Demised Premises. Tenant shall require its architect to load and maintain such record plans on a CADD system.

C.     In the event that Tenant effects certain demolition and other alterations in and to the Demised Premises and the 285 Kent Space necessary to connect certain portions of the Demised Premises to certain portions of the 285 Kent Space ("Tenant's Combination Alterations"), Tenant shall effect such alterations in accordance with all applicable laws, rules and regulations and in accordance with the provisions of this Article and all other applicable provisions of this Lease, except that Tenant, at Landlord's option, to be made by written request to Tenant at least twelve (12) months prior to the Expiration Date (as same may be extended pursuant to the provisions of Article 45 of this Lease) shall effect such work as is necessary to deliver the Demised Premises and the 285 Kent Space to Landlord as two separate buildings, including, without limitation, all work necessary to restore any walls demolished in connection with Tenant's Combination Alteration, extinguishing any easement or easements recorded in connection therewith and restoring the certificates of occupancy for such buildings as they were prior to effecting such alterations.  Additionally, the expiration dates of the term of this Lease and the 285 Kent Lease shall be extended for a period of two (2) months, which 2-month extension period shall be in accordance with all of the terms and conditions of this Lease and the 285 Kent Lease which are then in effect during the final year of both leases.  Notwithstanding anything herein set forth to the contrary, if (a) Tenant requests, prior to the end of the term of this Lease, written confirmation from Landlord that the Building is to be demolished or substantially altered ("Redeveloped") immediately after the end of the term of this Lease, and (b) Landlord provides written confirmation to Tenant of same, then Tenant shall not be required to do the work required under this paragraph.

## 10.    LIENS

Prior to commencement of its work in the Demised Premises, Tenant shall obtain and deliver to Landlord a written letter of authorization, in form reasonably satisfactory to Landlord's counsel, signed by architects and engineers involved in such work, which shall confirm that any of their drawings or plans are to be removed from any filing with governmental authorities, on request of Landlord, in the event that said architect, engineer or designer thereafter no longer is providing services with respect to the Demised Premises. With respect to contractors, subcontractors, materialmen and laborers, and architects, engineers and designers, for all work or materials to be furnished to Tenant at the Demised Premises, Tenant agrees to obtain and deliver to Landlord written and unconditional waivers of mechanics liens upon the Demised Premises or the Building as to the amounts required to be paid, after payments to the contractors, their subcontractors and vendors, Tenant's architects, engineers, designers and consultants, subject to any then applicable provisions of the Lien law. Notwithstanding the foregoing, Tenant at its expense shall cause any lien filed against the Demised Premises or the Building, for work or materials claimed to have been furnished to Tenant, to be discharged of record within thirty (30) days after notice thereof.

## 11.    REPAIRS; DESTRUCTION

A.    <u>Tenant Repairs</u>.  Tenant shall keep the Demised Premises clean and in good order and repair, ordinary wear and tear excepted.  Tenant shall take good care of the Demised Premises and the fixtures and appurtenances therein, and shall make all repairs necessary to keep them in good working order and condition, ordinary wear and tear excepted, including structural repairs to be made at Tenant's expense when necessitated by the act, omission or negligence of Tenant or its agents, employees, contractors or invitees.  All damage or injury to the Demised Premises or to any other part of the Building, or to its fixtures, windows, equipment and appurtenances, whether requiring structural or nonstructural repairs, caused by or resulting from the carelessness, omission, neglect or improper conduct of, or alterations made by, Tenant or Tenant's agents, employees, invitees or licensees, shall be repaired by Tenant at its sole expense, and to the satisfaction of Landlord in its sole but reasonable discretion (if the required repairs are within the Demised Premises and do not affect the structural integrity of the Building), or by Landlord (if the required repairs are not within the Demised Premises or affect the structural integrity of the Building) at Tenant's sole expense. Tenant shall also repair all damage to the Building and the Premises caused by the moving of Tenant's Property. All the aforesaid repairs shall be of first quality and class and shall be made in accordance with the provisions of Article 9 of this Lease. If Tenant fails after ten (10) days written notice from Landlord (or such shorter period as may be required due to an emergency or as Landlord may be limited to pursuant to any Superior Interest) to proceed with due diligence to make repairs required to be made by Tenant, the same may be made by Landlord, at Tenant's sole expense, and the commercially reasonable expenses thereof incurred by Landlord, shall be paid to Landlord as Additional Rent after rendition of a bill or statement therefor.  The exterior walls of the Building, the windows and the portions of all window sills outside same and areas above any hung ceiling are not part of the Demised Premises, and Landlord hereby reserves all rights to such parts of the Building.  Landlord shall replace, at the expense of Tenant, any plate glass and other glass damaged or broken as a result of any act, omission or negligence of Tenant, its agents, employees or contractors. Tenant shall at its own expense make repairs or replacements to any concourse or sidewalk and curbs adjacent to the Demised Premises where made necessary by the negligence or willful misconduct of Tenant, its agents, employees, customers or contractors; and Tenant shall keep said concourse, sidewalks and curbs free from dirt, rubbish, snow and ice. Notwithstanding anything contained herein to the contrary, and subject to the waiver of subrogation provisions of Article 38E of this Lease, Landlord shall, at its sole cost and expense, make any repairs or replacements to the Demised Premises necessitated by the negligence or willful misconduct of Landlord or any of the Landlord parties.

B.    <u>Landlord Repairs</u>. Landlord, at its expense, shall (i) maintain, repair, and replace (if necessary) the public, structural and exterior portions of the Building, and the Building systems and facilities, except if and to the extent necessitated by the negligence or willful misconduct of Tenant or its agents, employees or contractors, or if and to the extent same are the responsibility of Tenant under this Lease (such as the repair and maintenance of the Elevator), in which case same shall be at Tenant's expense and payable as Additional Rent hereunder, or payable directly by Tenant, as the case may be, and (ii) make any repairs or replacements to the Demised Premises necessitated by the negligence or willful misconduct of Landlord or any of the Landlord Parties (as hereinafter defined in Article 21A hereof).  Landlord represents that the Building systems and equipment servicing the Demised Premises will be in working order as of the applicable Commencement Date.  Except as specifically provided in

21

paragraph C of this Article or elsewhere in this Lease, there shall be no allowance to Tenant for the diminution of rental value and no liability on the part of Landlord by reason of inconvenience, annoyance or injury to business arising from Landlord, Tenant or others, making or failing to make any repairs, alterations, additions or improvements in or to any portion of the Building or the Demised Premises, including the erection or operation of any crane, derrick or sidewalk shed; provided, that Landlord shall use commercially reasonable efforts to minimize any interference with tenant's business operations in the Demised Premises as a result of such repairs or improvements (it being understood and agreed, however, that such repairs or improvements may be performed on Business Days during ordinary business hours). It is specifically agreed that Tenant shall not be entitled to any set off or reduction of Rent by reason of any failure of Landlord to comply with the covenants of this or any other Article of this Lease. Tenant agrees that Tenant's sole remedy at law in such instance will be by way of an action for damages for breach of contract. The provisions of this paragraph B with respect to the making of repairs shall not apply in the case of fire or other casualty, which are dealt with in paragraph C of this Article.

C.    <u>Destruction</u>. (i)  If the Combined Premises shall be partially or totally damaged or destroyed or wholly rendered untenantable by fire or other casualty and Landlord shall not elect to terminate this Lease as provided below in this paragraph C, the damage to the Combined Premises shall be repaired at the expense of Landlord to the condition existing as of the Phase I Commencement Date or the Phase II Commencement Date (as the case may be), reasonable wear and tear excepted, but without prejudice to the rights of subrogation, if any, of Landlord's insurer. Landlord shall be solely responsible for repairing any such damage to the exterior and so called "core and shell" of the Combined Premises, but shall not be required to repair or restore any of Tenant's property or any alteration or leasehold improvement made by or for Tenant at Tenant's expense. Tenant shall give Landlord prompt notice of any damage or destruction to the Demised Premises. The rent shall abate in proportion to the portion of the Combined Premises not usable by Tenant relative to the total area of the Combined Premises for the period from the date of the damage or destruction to (a) the date the damage to the Combined Premises for which Landlord is responsible shall be substantially repaired (i.e. the exterior and so called "core and shell" have been restored); or (b) if the Combined Premises is so damaged or destroyed, the date which shall be the earlier to occur of (1) ninety (90) days after Landlord completes the restoration work required by the provisions of this paragraph, and (2) five (5) days after the date that Tenant takes possession of the applicable portion of the Combined Premises for its business purposes. Landlord shall not be liable to Tenant for any delay in restoring the Combined Premises, Tenant's sole remedy being the right to an abatement of rent, as above provided. If (x) more than fifty (50%) percent of the Combined Premises are rendered untenantable by fire or other casualty and if Landlord shall decide not to restore the Combined Premises, (y) more than fifty (50%) percent of the Combined Premises are rendered untenantable by fire or other casualty during the last twenty-four (24) months of the term hereof, or (z) if the Combined Premises shall be so damaged that Landlord shall decide to demolish it or to rebuild it (whether or not the Demised Premises have been damaged), Landlord may within sixty (60) days after such fire or other cause give written notice to Tenant of its election that the term of this Lease shall automatically expire no less than ten (10) Business Days after such notice is given. Tenant hereby expressly waives the provisions of Section 227 of the Real Property Law and agrees that the provisions of this Article shall govern and control in lieu thereof. Landlord and Tenant shall reasonably cooperate with each other in order to make any applicable insurance proceeds available for the restoration and repair work required by the provisions of this paragraph.

(ii)    Subject to Landlord's right to cancel this Lease pursuant to subparagraph (i) above, within sixty (60) days after the date of any fire or other casualty which renders the Combined Premises wholly untenantable for the purposes of Tenant's permitted use hereunder, Landlord shall deliver to Tenant a statement setting forth Landlord's good faith estimate (based on an estimate by a reputable contractor, registered architect, or licensed professional engineer designated by Landlord) as to the time required to repair such damage. If the estimate of the time period exceeds twelve (12) months from the date of such casualty, Tenant may elect to terminate this Lease by giving Landlord written notice thereof not later than thirty (30) days after the receipt of such statement (time being of the essence). If such notice is given, the term of this Lease shall expire upon the fifteenth (15th) day after notice of such election is given by Tenant, and Tenant shall vacate and surrender the Combined Premises in its then "as is" condition upon the expiration of such fifteen (15) day period (it being understood and agreed that neither Landlord nor Tenant shall be permitted to terminate either this Lease or the 285 Kent Lease without terminating both leases). Notwithstanding anything to the contrary contained herein, if (i) either Tenant shall not have elected to terminate this Lease and the 285 Kent Lease pursuant to the provisions hereof or Tenant shall not have had the right to terminate this Lease and the 285 Kent Lease pursuant to the provisions hereof because the estimated time period set forth in Landlord's estimate did not exceed twelve (12) months, and (ii) Landlord shall have failed to make such

22

repairs on or before the date which is one (1) month after the estimated time period set forth in Landlord's estimate, then Tenant may elect to terminate this Lease by notice given to Landlord within fifteen (15) days after the expiration of such one (1) month period.  If Tenant makes such election, the term of this Lease shall expire on the fifteenth (15th) day after notice of such election is given by Tenant, and Tenant shall vacate the Combined Premises and surrender the same to Landlord in accordance with the provisions of this subparagraph C(ii).

## 12.    END OF TERM

Tenant shall surrender the Demised Premises to Landlord at the expiration or sooner termination of this Lease in good order and condition, except for reasonable wear and tear and damage by fire or other casualty, and Tenant shall remove all of its property, subject to the provisions of Article 9C of this Lease.  Tenant agrees that any personal property remaining in the Demised Premises following the expiration of the term of this Lease (or such earlier date as of which the term hereof may have been terminated) shall for all purposes be deemed conveyed to and to be the property of Landlord who shall be free to dispose of such property, at Tenant's cost, in any manner Landlord deems desirable.  Landlord may retain or assign any salvage or other residual value of such property.  In consideration of Landlord's disposing of such property, Tenant shall reimburse Landlord or pay to Landlord any actual, reasonable, out-of-pocket cost that Landlord may incur in disposing of such property within ten (10) days after demand therefor.  If Tenant holds over for more than thirty (30) days after the expiration or sooner termination of the term of this Lease, Tenant shall indemnify and save Landlord harmless against all costs, claims, loss or liability resulting from such delay by Tenant in so surrendering the Demised Premises, including, without limitation, any claims made by any succeeding tenant founded on such delay.  Additionally, the parties recognize and agree that other damage to Landlord resulting from any failure by Tenant timely to surrender the Demised Premises will be substantial, will exceed the amount of monthly rent theretofore payable hereunder, and will be impossible of accurate measurement.  Tenant therefore agrees that if possession of the Demised Premises is not surrendered to Landlord within one (1) day after the expiration or sooner termination of the term of this Lease, then Tenant will pay Landlord as liquidated damages for each month and for each portion of any month during which Tenant holds over in the Demised Premises after expiration or termination of the term of this Lease, (i) for the first month or portion of such first month during which Tenant holds over in the Demised Premises after the expiration or termination of the term of this Lease, a sum equal to one and one-half (1.5) times the average Rent and additional rent which were payable per month under this Lease during the last six (6) months of the term thereof; and (ii) for any month or portion of a month after such first month during which Tenant holds over in the Demised Premises after expiration or termination of the term of this Lease, a sum equal to two (2) times the average Rent and additional rent which were payable per month under this Lease during the last six (6) months of the term thereof.  The aforesaid obligations shall survive the expiration or sooner termination of the term of this Lease. Anything in this Lease to the contrary notwithstanding, the acceptance of any rent shall not preclude Landlord from commencing and prosecuting a holdover or summary eviction proceeding, and the preceding sentence shall be deemed to be an agreement expressly "providing otherwise" within the meaning of Section 232-c of the Real Property Law of the State of New York and any successor law of like import.  Tenant expressly waives, for itself and for any person claiming through or under Tenant, any rights which Tenant or any such Person may have under the provisions of Section 2201 of the New York Civil Practice Law and Rules and of any successor law of like import then in force in connection with any holdover summary proceedings which Landlord may institute.  Tenant's obligations under this Article shall survive the expiration or sooner termination of the term of this Lease.  At any time during the term of this Lease, upon reasonable prior notice to Tenant (which notice may be oral and given the same day access is required), Landlord may exhibit the Demised Premises to prospective purchasers or mortgagees of Landlord's interest in the Building, provided Landlord shall use shall use commercially reasonable efforts to minimize any interference with Tenant's business operations in the Demised Premises as a result of same, and shall be accompanied by a designated representative of Tenant if Tenant shall have made such representative available to Landlord (which shall be at no cost or expense to Landlord).  During the last year of the term of this Lease, upon reasonable prior notice to Tenant (which notice may be oral and given the same day access is required), Landlord may exhibit the Demised Premises to prospective tenants, provided Landlord shall use reasonable efforts to minimize any interference with Tenant's business operations as a result of same.

## 13.    SUBORDINATION AND ESTOPPEL; ETC.

A.    This Lease and Tenant's rights hereunder are and shall be subject and subordinate to any and all master leases of the Building Project, ground or underlying leases and to all mortgages, Building loan agreements,

leasehold mortgages, spreader and consolidation agreements and other similar documents and instruments (individually, a "Superior Interest" and collectively, "Superior Interests"), which may now or hereafter affect such leases or the real property of which the Demised Premises form a part and to all renewals, modifications, consolidations, replacements, extensions, assignments, spreaders, consolidations and refinancings thereof and to all advances made or hereafter made thereunder. This Article shall be self-operative and no further instrument of subordination shall be necessary. In confirmation of such subordination, Tenant shall within ten (10) days after written request execute any instrument in recordable form that Landlord or the holder of any Superior Interest may reasonably request. The foregoing power of attorney is a power coupled with an interest and not revocable during the term of this Lease. In the event that any ground or underlying lease is terminated, or any mortgage foreclosed, this Lease shall not terminate or be terminable by Tenant unless Tenant was specifically named in any termination or foreclosure judgment or final order for the purposes of terminating this Lease or the interest of Tenant in the Demised Premises. Landlord represents that as of the date hereof there is no Superior Interest other than a mortgage (the "Existing Mortgage") in favor of Investors Bank (the "Existing Mortgagee").

B.       Any holder of a Superior Interest may elect that this Lease shall have priority over such Superior Interest and, upon notification by such holder of a Superior Interest to Tenant, this Lease shall be deemed to have priority over such Superior Interest, whether this Lease is dated prior to or subsequent to the date of such Superior Interest. In the event that any master lease or any other ground or underlying lease is terminated as aforesaid, or if the interests of Landlord under this Lease are transferred by reason of or assigned in lieu of foreclosure or other proceedings for enforcement of any mortgage, or if the holder of any mortgage acquires a lease in substitution therefor, or if the holder of any Superior Interest shall otherwise succeed to Landlord's estate in this Lease or the Building, or the rights of Landlord under this Lease, then Tenant will, at the option to be exercised in writing by the lessor under any such master lease or other ground or underlying lease, the holder of any other Superior Interest or such purchaser, assignee or lessee, as the case may be, (i) attorn to it and will perform for its benefit all the terms, covenants and conditions of this Lease on Tenant's part to be performed with the same force and effect as if said lessor, mortgagee or such purchaser, assignee or lessee, were the landlord originally named in this Lease, or (ii) enter into a new lease with said lessor, mortgagee or such purchaser, assignee or lessee, as landlord, for the remaining term of this Lease and otherwise on the same terms, conditions and rentals as herein provided. The foregoing provisions shall inure to the benefit of any such successor landlord, shall apply notwithstanding that, as a matter of law, this Lease may terminate upon the termination of any Superior Interest, shall be self-operative upon any such request and no further instrument shall be required to give effect to said provisions; provided, however, that upon request of any such successor landlord, Tenant shall promptly execute and deliver, from time to time, any instrument in recordable form that any successor landlord may reasonably request to evidence and confirm the foregoing provisions of this paragraph, in form and content reasonably satisfactory to each such successor landlord, acknowledging such attornment and setting forth the terms and conditions of its tenancy. Upon such attornment, this Lease shall continue in full force and effect as a direct lease between such successor landlord and Tenant upon all of the then executory terms of this Lease except that such successor landlord shall not be: (a) liable for any previous act or omission or negligence of any prior landlord under this Lease (including, without limitation, Landlord); (b) subject to any counterclaim, demand, defense, deficiency, credit or offset which Tenant might have against any prior landlord under this Lease (including, without limitation, Landlord), except to the extent same continues after succession; (c) bound by any modification, amendment, cancellation or surrender of this Lease or by any prepayment of more than one month's rent or Additional Rent, unless such modification, cancellation, surrender or prepayment shall have been approved in writing by the successor landlord; (d) bound by any security deposit, cleaning deposit or other prepaid charge which Tenant might have paid in advance to any prior landlord under this Lease (including, without limitation, Landlord), unless such payments have been received by the successor landlord; and (e) bound by any agreement of any landlord under this Lease (including, without limitation, Landlord) with respect to the completion of any improvements affecting the Demised Premises, the Building, the land or any part thereof or for the payment or reimbursement to Tenant of any contribution to the cost of the completion of any such improvements.

C.       If the then current term of any master, ground or other underlying lease to which this Lease is subordinate shall expire prior to the date set forth herein for the expiration of this Lease, then, unless (i) the term of such underlying or other lease shall have been extended, which extension Landlord may arbitrarily decline to enter into, or (ii) the holder of any Superior Interest shall elect, in writing, to have Tenant attorn to it, the term of this Lease shall expire on the date of the expiration of any master, ground or other underlying lease to which this Lease is subordinate, notwithstanding the later termination date herein above set forth. If any such master, ground or other

24

underlying lease is renewed or if the holder of any Superior Interest shall elect, in writing, to have Tenant attorn to it, then the term of this Lease shall expire as herein above set forth and, Tenant shall attorn to the holder of such Superior Interest on the terms and conditions set forth in paragraph B above for attornment.

D.    From time to time, Tenant, on fifteen (15) days' prior written request by Landlord, time being of the essence, will deliver to Landlord and the holder of any Superior Interest a statement in writing (on which any person to whom it is addressed or certified may rely) certifying that this Lease is unmodified and is in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and identifying the modifications) and the dates to which the rent and other charges have been paid, the amounts of Fixed Annual Rent and Additional Rent, stating the date of expiration of the term hereof and whether any renewal option exists (and if so, the terms thereof), stating whether any defense or counterclaim to the payment of any rent exists, whether any allowance or work is due to Tenant from Landlord, stating whether or not, to the best knowledge of Tenant, Landlord is in default in performance of any covenant, agreement or condition contained in this Lease and, if so, specifying each such default of which Tenant may have knowledge, stating whether any bankruptcy case has been commenced with respect to Tenant,  and containing such other information as the holder of any Superior Interest may reasonably request.  Any such statement that contains language to the effect that such statement is not a waiver of rights or remedies for possible but unspecified defaults or with respect to defaults discovered subsequent to the delivery of the statement and/or that in the case of a conflict between such statement and this Lease that the terms of this Lease control, shall not comply with Tenant's obligations under this paragraph D. Nothing contained herein will be deemed to impair any right, privilege or option of the holder of any Superior Interest. If, in connection with obtaining, continuing or renewing financing or refinancing for the Building and/or the land on which it is located, the lender shall request reasonable modifications to this Lease as a condition to such financing or refinancing, Tenant will not unreasonably withhold, delay or defer its consent thereto, provided that such modifications do not materially and adversely increase the obligations of Tenant hereunder (except, to the extent that Tenant may be required to give notices of any defaults by Landlord to such lender with the granting of such additional time for such curing as may be required for such lender to get possession of the said Building and/or such land) or materially and adversely affect the leasehold interest hereby created or the rights of Tenant thereunder.  If any act or omission by Landlord shall give Tenant the right, immediately or after the lapse of time, to cancel or terminate this Lease or to claim a partial or total eviction, Tenant shall not exercise any such right until: (a) it shall have given written notice of such act or omission to each holder of any Superior Interest of which it has written notice, and (b) a reasonable period for remedying such act or omission shall have elapsed following such notice (which reasonable period shall be equal to the period to which Landlord would be entitled under this Lease to effect such remedy, plus an additional thirty (30) day period), provided such holder or lessor shall, with reasonable diligence, give Tenant notice of its intention to remedy such act or omission and shall commence and continue to act upon such intention.

E.    Notwithstanding anything contained herein to the contrary: (i) Landlord shall obtain from the Existing Mortgagee, for the benefit of Tenant, a subordination, non-disturbance and attornment agreement (the "EM SNDA"), in the form then customarily used by the Existing Mortgagee (provided same is commercially reasonable), but in any event providing in substance that so long as Tenant is not then in default under this Lease beyond any applicable notice and/or grace period, the Existing Mortgagee will not take any action to recover possession of the Demised Premises, notwithstanding any foreclosure of the mortgage; (ii) this Lease is expressly conditioned upon the execution and delivery to Tenant of the EM SNDA, and, if Landlord is unable to obtain the EM SNDA within thirty (30) days after the date that this Lease is executed and delivered by Landlord and Tenant, then and in such event, Tenant shall have the right to terminate both this Lease and the 285 Kent Lease (but not either separately), which termination shall be effective on the tenth (10th) Business Day following Landlord's receipt of such notice without the need for any further act, and this Lease and the 285 Kent Lease shall terminate upon such date as if such date were the date originally fixed herein for the expiration of the term of the Lease, provided that if Landlord obtains the EM SNDA on or before the tenth (10th) Business Day, Tenant's termination shall be null and void; (iii) this Lease shall not be subject or subordinate to any future Superior Interest hereafter entered into by Landlord during the term of the Lease, unless Landlord shall have obtained from the holder of any such Superior Interest, for the benefit of Tenant, a subordination, non-disturbance and attornment agreement, in a commercially reasonable form that is then customarily used by the holder of such Superior Interest, which provides that, so long as Tenant is not then in default under this Lease beyond any applicable notice and/or grace period, the grantor of such subordination, non-disturbance and attornment agreement will not take any action to recover possession of the Demised Premises, notwithstanding any foreclosure of the mortgage or termination of the ground or other underlying lease, as the case may be, and (iv) Tenant (and Landlord, if required) shall promptly execute and deliver

25

any such subordination, non-disturbance and attornment agreement, and Tenant shall pay any reasonable attorneys' fees incurred in connection therewith. Notwithstanding the foregoing provisions of this Paragraph E, Tenant shall not have the right to terminate this Lease if Landlord diligently pursues and uses commercially reasonable efforts to obtain the EM SNDA (including, without limitation, agreeing to pay the costs and expenses of the Existing Mortgagee in connection with same) due to delays by the Existing Mortgagee in responding to (x) Landlord's request for the issuance of such EM SNDA, (y) Landlord's or Tenant's requests for commercially reasonable modifications of same, or (z) executing and delivering such EM SNDA (it being understood and agreed that notwithstanding the foregoing provisions of this sentence Tenant shall have the right to terminate this Lease if such EM SNDA has not been executed and delivered within sixty (60) days after the execution and delivery of this Lease).

14.    **CONDEMNATION**

A.    In the event that all or substantially all of the Building or the Demised Premises shall be lawfully condemned or taken in any manner for any public or *quasi*-public use or purpose, this Lease and the term and estate hereby granted shall forthwith cease and terminate as of the date of vesting of title (hereinafter referred to as the "date of taking"), and Tenant shall have no claim against Landlord for, or make any claim for, the value of any unexpired term of this Lease, and the rent and Additional Rent shall be apportioned as of such date.

B.    In the event that any part of the Demised Premises shall be so condemned or taken, then this Lease shall be and remain unaffected by such condemnation or taking, except that the rent and Additional Rent allocable to the part so taken shall be apportioned as of the date of taking, provided, however, that Tenant may elect to cancel this Lease and the 285 Kent Lease (but not one or the other of such leases) in the event more than twenty-five (25%) percent of the aggregate of the Demised Premises and the 285 Kent Space should be so condemned or taken, provided such notice of election is given by Tenant to Landlord not later than thirty (30) days after the date when title shall vest in the condemning authority. Landlord shall promptly give Tenant copies of any notice received from the condemning authority as to vesting. Upon the giving of such notice, this Lease and the 285 Kent Lease shall terminate on the thirtieth (30th) day following the date of such notice and the rent and Additional Rent shall be apportioned as of such termination date. Upon such partial taking and this Lease continuing in force as to any part of the Demised Premises, the rent and Additional Rent shall be diminished by an amount representing the part of said rent and Additional Rent properly applicable to the portion or portions of the Demised Premises which may be so condemned or taken. If as a result of the partial taking (and this Lease continuing in force as to the part of the Demised Premises not so taken), any part of the Demised Premises not taken is damaged, Landlord agrees with reasonable promptness to commence the work necessary to restore the damaged portion to the condition existing immediately prior to the taking (subject to paragraph D below), and prosecute the same with reasonable diligence to its completion. In the event Landlord and Tenant are unable to agree as to the amount by which the rent and Additional Rent shall be diminished, the matter shall be determined by arbitration in New York City.

C.    Nothing herein provided shall preclude Tenant from appearing, claiming, proving and receiving in the condemnation proceeding, Tenant's moving expenses, and the value of Tenant's fixtures, or Tenant's alterations, installations and improvements (to the extent, only, paid for by Tenant and not reimbursed by Landlord or by insurance), which do not become part of the Building, or property of Landlord; or, in the case of temporary taking, so long as rent hereunder is paid to Landlord, Tenant may make a claim for rental value of and damages to the Demised Premises (which are of a nature that Tenant is obligated hereunder to repair same) or damages to Tenant's furniture and fixtures.

D.    In the event that only a part of the Demised Premises shall be so taken and Tenant shall not have elected to cancel this Lease as above provided, the entire award for a partial taking shall be paid to Landlord, and Landlord, at Landlord's own expense, shall to the extent of the net proceeds (after deducting reasonable expenses including attorneys' and appraisers' fees) of the award restore the unaffected part of the Building to substantially the same condition and tenantability as existed prior to the taking.

E.    Until said unaffected portion is restored, Tenant shall be entitled to a proportionate abatement of rent for that portion of the Demised Premises which is being restored and is not usable until the completion of the restoration or until the said portion of the Demised Premises is used by Tenant, whichever occurs sooner. Said unaffected portion shall be restored by Landlord, at its sole cost and expense, within a reasonable time but not more

26

than six (6) months after the taking; provided, however, if Landlord is delayed by strike, lockout, the elements, or other causes beyond Landlord's control, the time for completion shall be extended for a period equivalent to the delay. Should Landlord fail to complete the restoration within the said six (6) months or the time as extended, Tenant may elect to cancel this Lease and the 285 Kent Lease (but not one or the other of such leases), and the term hereby granted provided such notice of election is given by Tenant to Landlord not later than thirty (30) days after the end of said six (6) months of time or the time as extended.

## 15.    REQUIREMENTS OF LAW

A.      (i)      Tenant at its expense shall comply with all laws, orders and regulations of any governmental authority having or asserting jurisdiction over the Demised Premises (whether any such law, order or regulation is in effect on, or enacted or made effective after, the date hereof, whether contemplated or foreseen on the date hereof or not), which shall impose any violation, order or duty upon Landlord or Tenant with respect to the Demised Premises or the use or occupancy thereof.

(ii)      If the Building shall at any point prior to the fifth anniversary of the Phase I Commencement Date be subject to any law, order or regulation enacted and effective after the date hereof affecting its structural integrity; the physical condition of its façade, roof, parapets, sidewalks, vaults or other exterior part thereof; its life, fire, sprinkler or other safety systems; its mechanical, plumbing, electrical or ventilating systems; the accessibility of the Building and its accouterments to the handicapped or disabled; the regulation, containment, abatement, or removal of any Hazardous Substance (as hereinafter defined in Article 40) therein (including, without limitation, asbestos and asbestos containing materials) or any other installation, improvement or alteration, including, without limitation, compliance with New York City Local Law No. 5/73, Local Law 11/98, Local Law 16/84, Local Law 26/2004, Local Law 476, Local Law 564-A, Local Law 967-A, Local Law 973-A, Chapter 3 of Article 28 of the Administrative Code of the City of New York, the Americans with Disabilities Act of 1990, as amended, the New York Energy Conservation Construction Code, any energy conservation code and any law respecting the conversion of the Building to utilize submeters to measure electricity consumption or any other law or regulation, which requires Landlord to incur any obligation or expense to install, alter, make any addition to, improve or repair the Building or any system thereof or any equipment or accouterment to any of the foregoing or install any new system, Tenant shall pay to Landlord during the term hereof, simultaneously with each installment of fixed annual rent, as additional rent hereunder, commencing on the first day following Landlord's notice or demand for payment thereof, monthly installments equal to the product that results from multiplying (a) the quotient that results from dividing (x) the aggregate expenses (including, without limitation, expenses for material and labor, architectural, legal, engineering and other professional fees, interest on and other costs incurred in connection with any loan to finance such alteration, addition, or improvement, and all related equipment and apparatus, and rents for leased tools and equipment) incurred from time to time by Landlord (either prior to or during the term hereof) for such alteration, addition, improvement or repair and not theretofore recovered by Landlord from tenants under lease provisions comparable to this paragraph A as of the date of Landlord's demand for payment under this paragraph A, by (y) the remaining period over which each such item of expenses may be amortized (as determined by Landlord) in accordance with generally accepted accounting principles ("GAAP"); by (b) the number of months remaining in the term of this Lease; by (c) Tenant's Proportionate Share. Tenant acknowledges that the amortization period of any constituent part of any such alteration or improvement may be different from the amortization period of any other constituent part and any item of expense may be amortized over a period different than any other item of expense, and, also, that expenses may be incurred at different times including prior to or during the term hereof. Landlord may, therefore, separately compute the payments due by Tenant pursuant to this subparagraph (ii) taking into account the various amortization periods of such constituent parts and their individual costs and the times at which expenses are incurred and bill Tenant taking each of those factors into account, billing separately for each component part.  The monthly installments payable by Tenant on account of any such alteration, addition or improvement may vary depending on the various amortization periods selected by Landlord and costs of the constituent parts and by virtue of new or additional expenses being incurred from time to time.  Tenant shall pay each such monthly amount, as determined above in this paragraph, as Additional Rent hereunder, over the term hereof until the earlier of the date that such expenses have been fully reimbursed to Landlord or the expiration of the term hereof.

(iii)      The foregoing shall not require Tenant to perform or (except as hereinafter set forth) pay for any structural work but shall require Tenant to perform, at its sole cost and expense, work, including asbestos

abatement and abatement of any other hazardous or toxic material that may become necessary by reason of any Tenant installation, alteration, improvement or work and to reimburse Landlord for the cost of performing structural repairs or alterations required by Tenant's negligence or willful misconduct, by Tenant's breach of this Lease, by Tenant's particular manner of use or occupancy of the Demised Premises (as distinguished from general, executive and administrative offices), or any alterations performed by or on behalf of Tenant.

B.       Tenant shall require every person engaged by Tenant to clean any window in the Demised Premises from the outside, to use the equipment and safety devices required by Section 202 of the Labor Law and the rules of any governmental authority having or asserting jurisdiction.

C.       Tenant at its expense shall comply with all requirements of the New York Board of Fire Underwriters, or any other similar body affecting the Demised Premises and shall not use the Demised Premises in a manner which shall increase the rate of fire insurance of Landlord or of any other tenant, over that in effect prior to this Lease. If Tenant's use of the Demised Premises increases the fire insurance rate, Tenant shall reimburse Landlord for all such increased costs. That the Demised Premises are being used for the Permitted Use shall not relieve Tenant from the foregoing duties, obligations and expenses.

16.      CERTIFICATE OF OCCUPANCY

Tenant will at no time use or occupy the Demised Premises in violation of any relevant portion of any certificate of occupancy issued for or any statute governing the use of the Building. The statement in this Lease of the nature of the business to be conducted by Tenant shall not be deemed to constitute a representation or guaranty by Landlord that such use is lawful or permissible in the Demised Premises under the certificate of occupancy for the Building or any such statute. It is agreed that Landlord is currently in the process of amending the current certificate of occupancy for the Building by filing, at Landlord's cost, an Alt-1 to increase the authorized occupancy to 100 persons per floor, and that Landlord will self-certify in connection with same. Landlord shall use commercially reasonable efforts to complete said amendment and self-certification in a diligent and prompt manner. If Landlord is unable to file an Alt-1 or amend the current certificate of occupancy by the applicable Commencement Date, and the preceding event prevents Tenant from performing Tenant's business operations for more than five (5) Business Days, then the rent shall abate for each day after such fifth (5th) Business Day until Landlord files an Alt-1 or amends the current certificate of occupancy as described above.

17.      POSSESSION

A.       Subject to the provisions of paragraph B of this Article, if Landlord shall be unable to give possession of any portion of the Demised Premises on either of the Commencement Dates, as applicable, because of the retention of possession of any occupant thereof or any alteration or construction work, or for any other reason except as hereinafter provided, Tenant shall not be subject to any liability for such failure. In such event, this Lease shall stay in full force and effect, without extension of its term. However, the Rent and term hereunder shall not commence until Landlord delivers vacant possession of the Demised Premises to Tenant (provided that Landlord shall use commercially reasonable efforts to provide Tenant with at least three (3) Business Days' prior written notice thereof). If delay in possession is due to work, changes or decorations being made by or for Tenant, or is otherwise caused by Tenant, there shall be no rent abatement and the term and rent shall commence on the date(s) specified in this Lease. If permission is given to Tenant to occupy the Demised Premises or other premises prior to the date specified as the commencement of the term, such occupancy shall be deemed to be pursuant to the terms of this Lease, except that the parties shall separately agree as to the obligation of Tenant to pay rent for such occupancy. The provisions of this Article are intended to constitute an "express provision to the contrary" within the meaning of Section 223(a), New York Real Property Law.

B.       (i)       Tenant acknowledges that it has been advised that a portion of the Phase I Premises is currently occupied by DayGlo Ventures LLC ("DayGlo") pursuant to a certain lease with Landlord (the "DayGlo Lease"), the term of which is scheduled to expire on October 30, 2017; and that Landlord and DayGlo are currently negotiating regarding the execution and delivery of a certain agreement (the "DayGlo Cancellation Agreement") pursuant to which term of the DayGlo Lease will be cancelled effective as of June 30, 2014. It is agreed that, except as set forth in paragraph 17A above, Landlord shall have no liability whatsoever to Tenant in the event that Landlord and DayGlo do not execute and deliver the DayGlo Cancellation Agreement, or in the event that Landlord

and DayGlo do execute the DayGlo Cancellation Agreement but DayGlo holds over in the Phase I Premises after such June 30, 2014 cancellation date. However, in the event of such a holdover by DayGlo, Landlord shall use commercially reasonable efforts to obtain vacant possession of the Phase I Premises, including, without limitation, the commencement and diligent prosecution of a summary holdover dispossess proceeding against DayGlo. Landlord shall not enter into any agreement with DayGlo (whether oral or written) pursuant to which the term of the DayGlo Lease is extended or DayGlo is permitted to remain in occupancy beyond the scheduled expiration date in the DayGlo Lease or the cancellation date under the DayGlo Cancellation Agreement, whichever is earlier. In the event that Tenant has paid the One Time Rent Payment to Landlord pursuant to paragraph 3A(iii) and DayGlo fails to surrender possession of the portion of the Phase I Premises currently occupied by DayGlo pursuant to the DayGlo Lease on or before July 1, 2014, then Landlord agrees to pay Tenant an amount equal to $400,000.00 minus Landlord's actual out-of-pocket costs and expenses (including reasonable legal fees) in connection with negotiating such DayGlo Cancellation Agreement and obtaining vacant possession of such space for Tenant's use and occupancy.

(ii)    Tenant acknowledges that it has been advised that the Phase II Premises is currently occupied by Death By Audio Inc. ("DBA") pursuant to a certain lease with Landlord (the "DBA Lease"), the term of which is scheduled to expire on November 30, 2014; and that Landlord and DBA are currently negotiating regarding the execution and delivery of a certain agreement (the "DBA Cancellation Agreement") pursuant to which term of the DBA Lease will be cancelled prior to such November 30, 2014 date. It is agreed that, except as set forth in paragraph 17A above, Landlord shall have no liability whatsoever to Tenant in the event that Landlord and DBA do not execute and deliver the DBA Cancellation Agreement, or if Landlord and DBA do execute and deliver the DBA Cancellation Agreement but DBA holds over in the Phase II Premises after the effective date of such cancellation or scheduled expiration date of the DBA Lease, as the case may be. However, in the event of such a holdover by DBA, Landlord shall use commercially reasonable efforts to obtain possession of the Phase II Premises, including, without limitation, the commencement and diligent prosecution of a summary holdover dispossess proceeding against DBA. Landlord shall not enter into any agreement with DBA (whether oral or written) pursuant to which the term of the DBA Lease is extended or DBA is permitted to remain in occupancy beyond the scheduled expiration date in the DBA Lease or the cancellation date under the DBA Cancellation Agreement, whichever is earlier.

## 18.    QUIET ENJOYMENT

Landlord covenants that, if and so long as this Lease is in full force and effect, Tenant may peaceably and quietly enjoy the Demised Premises, subject to the terms, covenants and conditions of this Lease and of any Superior Interests.

## 19.    RIGHT OF ENTRY

Tenant shall permit Landlord to erect and maintain pipes and conduits in and through the Demised Premises, provided same are concealed within the walls, floors or ceilings of the Demised Premises, and provided further that same do not reduce the useable area of the Demised Premises, other than to a de minimis extent. Landlord or its agents shall have the rights, at reasonable times and upon reasonable prior notice (except in case of emergency, in which case such entry may be at any time and without notice), which notice may be oral and given the same day access is required: to enter or pass through the Demised Premises at all times, by master key, by reasonable force or otherwise, to examine the same, to exhibit the space to prospective tenants, purchasers, investors and lenders, to make such repairs, installations, improvements, alterations or additions to the Building (whether or not the work to be performed is within the Demised Premises or for their benefit) or the Demised Premises, as may be required by law or as Landlord may deem necessary, to take back an insubstantial portion of the Demised Premises as may be reasonably required for such repairs, installations, improvements, alterations or additions and to take into and store within and upon the Demised Premises all material that may be used in connection with any such repair, installation, improvement, alteration or addition work. Such entry, storage, work or taking back of a portion of the Demised Premises in connection with any such repair, installation, improvement, alteration or addition shall not constitute an eviction (whether actual or constructive) of Tenant in whole or in part or breach of the covenant of quiet enjoyment, shall not be grounds for any abatement of rent, and shall not impose any liability on Landlord to Tenant by reason of inconvenience or injury to Tenant's business or to the Demised Premises. Landlord shall have the right at any time, without the same constituting an actual or constructive eviction, and without incurring any liability to Tenant, to change the name or number by which the Building is known. Notwithstanding anything

29

contained herein to the contrary, Landlord shall use commercially reasonable efforts to minimize any interference with Tenant's business operations in the Demised Premises as a result of any entry or work pursuant to this Article (it being understood and agreed, however, that Landlord may perform such entry or work on Business Days during ordinary business hours). Tenant shall have the right to have a designated representative of Tenant present during such entry or work, if Tenant shall have made such representative available (which shall be at no cost or expense to Landlord), but the presence of such representative shall not be a condition to Landlord's right to perform such entry or work.

**20.    VAULT SPACE**

Anything contained in any plan or blueprint to the contrary notwithstanding, no vault or other space not within the Building property line is demised hereunder. Any use of such space by Tenant shall be deemed to be pursuant to a license, revocable at will by Landlord, without diminution of the rent payable hereunder. If Tenant shall use such vault space, any fees, taxes or charges made by any governmental authority for such space shall be paid by Tenant.

**21.    INDEMNITY**

A.    Except if and to the extent necessitated by the negligence or willful misconduct of any of the Landlord Parties (as hereinafter defined), Tenant shall defend, indemnify and hold harmless Landlord, its members and supervisor, managing agent, other agents, officers, directors, shareholders, partners, principals, employees and tenants in common (whether disclosed or undisclosed) (hereinafter collectively referred to as the "Landlord Parties") from and against any and all claims, demands, liability, losses, damages, costs and expenses (including reasonable attorneys' fees and disbursements) arising from or in connection with: (a) any breach or default by Tenant in the full and prompt payment and performance of Tenant's obligations hereunder; (b) the use or occupancy or manner of use or occupancy of the Demised Premises by Tenant or any person claiming under or through Tenant; (c) any act, omission or negligence of Tenant or any of its Permitted Licensees, subtenants, assignees or licensees or its or their partners, principals, directors, officers, agents, invitees, employees, guests, customers or contractors during the term hereof; (d) any accident, injury or damage occurring in or about the Demised Premises during the term hereof; (e) the performance by Tenant of any alteration or improvement to the Demised Premises including, without limitation, Tenant's failure to obtain any permit, authorization or license or failure to pay in full any contractor, subcontractor or materialmen performing work on such alteration, (f) any mechanics lien filed, claimed or asserted in connection with any alteration or any other work, labor, services or materials done for or supplied to, or claimed to have been done for or supplied to, or claimed to have been done for or supplied to Tenant, or any person claiming through or under Tenant and (g) any certification made by any architect or engineer retained by or on behalf of Tenant to any governmental authority premises (as well as any certification also executed or submitted by Landlord) in connection with any alteration or improvement to the Demised Premises. If any claim, action or proceeding is brought against any of Landlord Parties for a matter covered by this indemnity, Tenant, upon notice from the indemnified person or entity, shall defend such claim, action or proceeding with counsel reasonably satisfactory to Landlord and the indemnified person or entity. The provisions of this Article shall survive the expiration or sooner termination of this Lease.

B.    Except if and to the extent necessitated by the negligence or willful misconduct of any of the Tenant Parties (as hereinafter defined), Landlord shall defend, indemnify and hold harmless Tenant, its members and supervisor, agents, officers, directors, shareholders, partners, principals, and employees (whether disclosed or undisclosed) (hereinafter collectively referred to as the "Tenant Parties") from and against any and all claims, demands, liability, losses, damages, costs and expenses (including reasonable attorneys' fees and disbursements) arising from or in connection with any negligence or willful misconduct of any of Landlord Parties during the term hereof, and any breach or default by Landlord in the prompt performance of Landlord's obligations under this Lease. If any claim, action or proceeding is brought against Tenant for a matter covered by this indemnity, Landlord, upon notice from the indemnified person or entity, shall defend such claim, action or proceeding with counsel reasonably satisfactory to Tenant and the indemnified person or entity (counsel for Landlord's insurance company being deemed reasonably satisfactory for such purposes, except in the case of a conflict of interest). The provisions of this Article shall survive the expiration or sooner termination of this Lease.

30

22.    **LANDLORD'S LIABILITY**

A.    If, by reason of (i) strike, (ii) labor troubles, (iii) governmental pre-emption in connection with a national emergency, (iv) any rule, order or regulation of any governmental agency, (v) conditions of supply or demand, (vi) conditions affected by, or actions (including without limitation any evacuation or closure of the building) taken by Landlord or others reasonably intended to assure the health, security or safety of the Building or any person in response to, war, any act of terrorism or violence (even if not directed at the Building or any occupant thereof), or other national, state or municipal emergency (whether or not officially proclaimed by any governmental authority), (vii) unavailability of power or any disruption of electrical or any other utility service furnished to the Demised Premises, or (viii) any other cause beyond Landlord's control, Landlord does not fulfill any obligation under this Lease or shall be unable to supply any service which Landlord is obligated to supply, this Lease and Tenant's obligation to pay rent hereunder shall in no wise be affected, impaired or excused.  As Landlord shall learn of the happening of any of the foregoing conditions, Landlord shall, within five (5) Business Days after Landlord first becomes aware thereof, notify Tenant of such event and, if ascertainable, its estimated duration, and will proceed promptly and diligently with the fulfillment of its obligations as soon as reasonably possible.

B.    This Lease and the obligations of Tenant hereunder shall in no way be affected because Landlord is unable to fulfill any of its obligations or to supply any service (e.g., heat, electricity, air conditioning, cleaning (if Landlord is obligated hereunder to furnish any of the same), elevators, water), by reason of any of the causes set forth in paragraph A above.  Landlord shall have the right, without incurring any liability to Tenant, to stop any service because of accident or emergency, or for repairs, alterations or improvements, necessary or desirable in the judgment of Landlord to the Building or the Demised Premises, until such repairs, alterations or improvements shall have been completed (which repairs, alterations or improvements shall be completed by Landlord as promptly and diligently as is reasonably practicable), which stoppage of service shall be only at such times and for so long as may be required by reason of such accident, emergency or necessary repairs (as reasonably determined by Landlord). Neither Landlord nor any other Landlord Party shall be liable to Tenant or anyone else, for any loss or damage to person, property or business, unless due to the negligence or willful misconduct of Landlord or its agents, employee or contractors, nor shall Landlord be liable for any latent defect in the Demised Premises or the Building, except if and to the extent Tenant notifies Landlord of any such latent defect within forty-five (45) days after Tenant becomes aware or should have reasonably become aware of same.  Neither Landlord nor any other Landlord Party shall be liable for any damage to property of Tenant or of others entrusted to employees of the Building nor for the loss of or damage to any property of Tenant by theft or otherwise, unless due to the negligence or willful misconduct of Landlord or its agents employees or contractors.  Landlord or its agents shall not be liable for any injury or damage to persons or property resulting from fire, explosion, falling ceilings, falling plaster, steam, gas, electricity, water, rain or snow or leaks from any part of said Building or from the pipes, appliances or plumbing works or from the roof, street or subsurface or from any other place or by dampness or by any other cause of whatsoever nature, including, but not limited to, the making or repairs and improvements, unless caused by or due to the negligence of Landlord, its agents, servants or employees; nor shall Landlord or its agents be liable for any such damage caused by other tenants or persons in said Building or caused by operations in construction of any private, public or quasi-public work.  Tenant shall give immediate notice to Landlord in case of fire or accidents in the Demised Premises or in the Building or of defects therein or in any fixtures or equipment. TENANT AGREES TO LOOK SOLELY TO LANDLORD'S ESTATE AND INTEREST IN THE LAND AND BUILDING, OR THE LEASE OF THE BUILDING OR OF THE LAND AND BUILDING, AND THE DEMISED PREMISES, FOR THE SATISFACTION OF ANY RIGHT OR REMEDY OF TENANT FOR THE COLLECTION OF A JUDGMENT (OR OTHER JUDICIAL PROCESS) REQUIRING THE PAYMENT OF MONEY BY LANDLORD, IN THE EVENT OF ANY LIABILITY BY LANDLORD, AND NO OTHER PROPERTY OR ASSETS OF LANDLORD SHALL BE SUBJECT TO LEVY, EXECUTION OR OTHER ENFORCEMENT PROCEDURE FOR THE SATISFACTION OF TENANT'S REMEDIES UNDER OR WITH RESPECT TO THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT HEREUNDER, OR TENANT'S USE AND OCCUPANCY OF THE DEMISED PREMISES OR ANY OTHER LIABILITY OF LANDLORD TO TENANT (EXCEPT FOR NEGLIGENCE, IN WHICH CASE TENANT MAY ALSO LOOK TO THE PROCEEDS OF ANY INSURANCE CARRIED BY LANDLORD IF NOT PAYABLE UNDER INSURANCE TO BE MAINTAINED BY TENANT PURSUANT TO THE TERMS HEREOF).  IN NO EVENT SHALL TENANT BE ENTITLED TO MAKE, NOR SHALL TENANT MAKE, ANY CLAIM, AND TENANT HEREBY WAIVES ANY CLAIM, FOR MONEY DAMAGES (NOR SHALL TENANT CLAIM ANY MONEY DAMAGES BY WAY OF SET-OFF, COUNTERCLAIM OR DEFENSE) BASED UPON ANY CLAIM OR ASSERTION BY TENANT THAT

31

LANDLORD HAS UNREASONABLY WITHHELD OR UNREASONABLY DELAYED ITS CONSENT OR APPROVAL TO A PROPOSED ASSIGNMENT OR SUBLETTING AS PROVIDED FOR IN THIS LEASE. TENANT'S SOLE REMEDY SHALL BE AN ACTION OR PROCEEDING TO ENFORCE ANY SUCH PROVISION, OR FOR SPECIFIC PERFORMANCE, INJUNCTION OR DECLARATORY JUDGMENT.

C.      LANDLORD AND ITS AGENTS ARE HEREBY RELEASED FROM AND SHALL NOT BE LIABLE FOR ANY DAMAGES TO PERSONS OR PROPERTY RESULTING FROM OR INCIDENTAL TO ANY CRIMINAL ACT OR TERRORIST ATTACK NOTWITHSTANDING ANY ACT OR OMISSION OF ANY ACCESS CONTROL OR SECURITY GUARD PERSONNEL THAT LANDLORD MAY FROM TIME TO TIME EMPLOY IN THE BUILDING TO CONTROL ACCESS TO THE BUILDING OR TO DETER UNLAWFUL ACTIVITY.

**23.     CONDITION OF PREMISES; TENANT'S INITIAL INSTALLATION; ETC.**

A.      (i)      Tenant expressly acknowledges that it has inspected the Demised Premises and is fully familiar with the physical condition thereof. Tenant agrees to accept the Demised Premises and the Roof Space in their "as is" condition, vacant of any tenants or other occupants. Except as otherwise provided in this Lease, Tenant acknowledges that Landlord (i) has made no representation respecting the physical condition of the Demised Premises, including the existence or non-existence of any hazardous substances, any defects or other matters concerning their physical condition, and (ii) shall have no obligation to do any work in and to the Demised Premises in order to make them suitable and ready for occupancy and use by Tenant, except as otherwise expressly set forth in this Lease. Notwithstanding the foregoing, Landlord represents and warrants that, to the best of its knowledge, the Demised Premises are currently in compliance with all applicable laws, orders, rules and regulations, and are free of any violations of record which would prevent Tenant from obtaining a building permit for Tenant's Initial Installation. In the event Tenant is unable to obtain a building permit or any other permit or approval which is required for the performance of the Tenant's Initial Installation, or the use and occupancy of the Demised Premises for the purposes permitted under this Lease, due to the existence of any violation of record which Landlord is responsible to cure hereunder (i.e. such violation does not arise out of Tenant's use of the Demised Premises, or any work being effected by or on behalf of Tenant in the Demised Premises, or by any other act or omission of Tenant, its agents, employees or contractors), then Tenant shall notify Landlord of such fact, and Landlord shall use commercially reasonable efforts to remove such violation as quickly as is reasonably practicable. Notwithstanding the foregoing, if Landlord fails to remove such violation from record within ninety (90) days after Landlord's receipt of such notice, then Tenant, at its election, to be made by notice to Landlord given within thirty (30) days after the end of such ninety (90) day period (time being of the essence), may terminate this Lease. In the event Tenant duly and timely makes such election, this Lease shall be deemed terminated, as of the last day of such thirty (30) day notice period as if such date were the scheduled expiration date of the term of this Lease (unless Landlord removes such violation from record on for before the last day of such thirty (30) day notice period (so that Tenant is able to obtain such permit or approval), in which case Tenant's election to terminate this Lease be deemed null and void, and this Lease shall remain in force and effect in accordance with its terms). Notwithstanding anything contained herein to the contrary, in the event that Landlord reasonably estimates that it will cost in excess of an amount equal to six (6) months of the then current Fixed Annual Rent to cure any violation(s) required to be cured by Landlord hereunder (either individually or in the aggregate), then and in such event, Tenant may either (x) waive Landlord's obligation to remove any of such violations, or (y) elect to terminate this Lease by notice to Tenant given within thirty (30) days after the date that Landlord receives Tenant's notice of such violation(s), which termination shall be effective thirty (30) days after the date of Landlord's notice to Tenant of such election, unless Tenant, within such thirty (30) day period, shall agree, in writing, to cure such violation at its sole cost and expense, in which case, Landlord's election to terminate this Lease shall be deemed null and void, and this Lease shall remain in force and effect in accordance with its terms.

B.      (i)      Tenant shall effect all such alterations and decorations as are needed or desirable in order to make the Demised Premises suitable and ready for occupancy and use by Tenant ("Tenant's Initial Installation"). Landlord may impose such reasonable conditions (as to guarantee of completion, bonding, payment, restoration and otherwise, to insure the completion of Tenant's Initial Installation) as Landlord may reasonably require in connection with the performance of Tenant's Initial installation. It is acknowledged that Tenant's Initial Installation may be effected in multiple phases in connection with Landlord's delivery of the Phase I Premises and the Phase II Premises.

(ii)     In connection with Tenant's Initial Installation, Tenant shall submit to Landlord for Landlord's approval (which approval shall not be unreasonably withheld, conditioned or delayed with respect to non-structural interior alterations to the extent that they do not adversely affect the proper functioning of the plumbing, electrical or other systems of the Building in a manner that will not be reasonably addressed by Tenant's Initial Alteration), a full set of architectural and engineering plans and specifications (including architectural plans and specifications comprised of partition plans, reflected ceiling plans as well as air conditioning, heating and all other mechanical systems and electric plans) in form suitable for filing with the appropriate agencies of the City of New York to obtain such alteration or Building permit to perform Tenant's Initial Installation. Landlord shall respond to Tenant's request for approval within fifteen (15) Business Days after Landlord's receipt thereof. If Landlord withholds its approval of the plans and specifications, Tenant shall make appropriate modifications to the plans and specifications to correct or eliminate the objections specified by Landlord in such disapproval and shall resubmit the modified plans and specifications to Landlord within ten (10) days after they are returned to Tenant unapproved. The terms and provisions set forth in this subparagraph (ii) governing the approval and disapproval of plans and specifications shall apply equally to approving and disapproving revised plans and specifications and all change orders. If Landlord fails to respond to any such request for approval which such fifteen (15) Business Day period (except that, in the case of any resubmission of modified plans, Landlord shall have seven (7) Business Days to respond), then Tenant may send Landlord a second notice of Tenant's request for approval. If Landlord fails to respond to such second notice within five (5) Business Days after the date of Landlord's receipt of the same, then Landlord shall be deemed to have approved such plans and specifications. Tenant agrees that any such second notice shall contain a statement, in bold face type and capital letters, that the subject plans and specifications shall be deemed approved if Landlord fails to respond within such five (5) Business Day period. No work may be performed without Landlord's prior approval (including deemed approval) of the plans and specifications and all contractors and sub-contractors engaged to perform Tenant's Initial Installation (except as otherwise agreed to by Landlord and Tenant [e.g. demolition]). Landlord hereby approves Bar Construction Corp. (the "Approved GC"), 2536 Jackson Avenue, Long Island City, New York 11101, T: (718) 458- 0664, F: (718) 205-4557 to be Tenant's general contractor for the performance of Tenant's Initial Installation, and all subcontractors hired by the Approved GC in connection with such work. No such work shall be commenced without the plans and specifications therefor having been approved (including deemed approval) by Landlord and the appropriate permits and approvals therefor having been issued by the DOB and any other governmental agency having jurisdiction thereof (except as otherwise agreed to by Landlord and Tenant). Approval by Landlord of any plans or specifications shall not be deemed to constitute a warranty or representation that such plans or specifications shall conform to applicable laws and regulations or shall be approved by the DOB or any other governmental agency. Landlord shall use commercially reasonable efforts to cooperate with Tenant in connection with Tenant's Initial Installation, including, without limitation, signing any Alt-1 or Alt-2, permit or approval submitted to the DOB or other governmental agency in connection therewith and preparing, signing and filing of record any easement and/or zoning lot development agreement with the DOB (and causing the landlord under the 285 Kent Lease, an Affiliate of Landlord, to prepare, sign and file).

(iii)     Tenant shall cause Tenant's Initial Installation to be effected, at its own cost and expense, in a good and workerlike manner, in accordance, in all material respects, with Tenant's approved plans and specifications, in accordance with the provisions of this Article, Article 9 and all other applicable provisions of this Lease, and in compliance with all applicable laws, rules and regulations.

(iv)     Notwithstanding anything contained herein to the contrary, Tenant shall maintain, at Tenant's expense, in addition to any other insurance required pursuant to this Lease with respect to alterations, a Builders All Risk insurance policy (Broad Form) covering the full replacement cost of Tenant's Initial Installation and the materials and supplies delivered and stored in the Demised Premises for the purpose of being incorporated in such work.

(v)     Notwithstanding anything herein set forth to the contrary, within thirty (30) days after final completion of Tenant's Initial Installation, Tenant shall deliver to Landlord final record drawings of Tenant's Initial Installation, including, as may be pertinent to the work performed, a reflected ceiling plan, mechanical and electrical drawings, partition plan and any other drawings which may be required to indicate accurately the layout and systems of the Demised Premises. Tenant shall require its architect to load and maintain such record plans on a CADD system and to deliver diskettes or other medium suitable for Landlord's needs and compatible, if feasible, with Landlord's computer applications, so as to enable Landlord to use such CADD-saved plans. Tenant shall move into, and open for business in, the Demised Premises after substantial completion of Tenant's Initial Installation.

33

C.      In connection with any alteration, installation or improvement to by Tenant, Tenant, at its own expense, shall, during the term of this Lease, comply in the Demised Premises with present and future requirements, structural or non-structural, foreseen or unforeseen, under the Americans with Disabilities Act of 1990 and New York City Local Laws No. 58/87, No. 76 and No. 5 or any similar or successor laws, and regulations issued pursuant thereto, and all other applicable laws, orders, rules and regulations.

## 24.    JURY WAIVER; DAMAGES

A.      THE PARTIES HERETO HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF SUCH PARTIES AGAINST THE OTHER WITH RESPECT TO ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE DEMISED PREMISES, OR FOR THE ENFORCEMENT OF ANY REMEDY WHETHER PURSUANT TO STATUTE, IN CONTRACT OR TORT, AND IRRESPECTIVE OF THE NATURE OR BASIS OF THE CLAIM INCLUDING BREACH OF AN OBLIGATION TO MAKE ANY PAYMENT, FRAUD, DECEIT, MISREPRESENTATION OF FACT, FAILURE TO PERFORM ANY ACT, NEGLIGENCE, MISCONDUCT OF ANY NATURE OR VIOLATION OF STATUTE, RULE, REGULATION OR ORDINANCE.  IF LANDLORD COMMENCES AGAINST TENANT ANY SUMMARY PROCEEDING OR OTHER ACTION TO RECOVER POSSESSION OF THE DEMISED PREMISES OR TO RECOVER ANY RENT, TENANT SHALL NOT INTERPOSE ANY COUNTERCLAIM OF WHATEVER NATURE OR DESCRIPTION IN ANY SUCH PROCEEDING OR ACTION.  NO DAMAGES SHALL BE AWARDED AND TENANT HEREBY WAIVES ANY CLAIM FOR DAMAGES (WHETHER ACTUAL, COMPENSATORY, CONSEQUENTIAL, SPECIAL OR PUNITIVE) IN ANY ACTION OR PROCEEDING (WHETHER JUDICIAL OR AN ARBITRATION) RELATING TO LANDLORD'S WITHHOLDING, DELAYING OR CONDITIONING ANY CONSENT OR APPROVAL OR THE REASONABLENESS OF ANY SUCH WITHHOLDING, DELAY OR CONDITION UNLESS IT IS DETERMINED BY A COURT OF COMPETENT JURISDICTION THAT LANDLORD ACTED MALICIOUSLY OR IN BAD FAITH.

B.      Except as otherwise specifically provided in Article 12 of this Lease, Landlord and Tenant each hereby waive any consequential, special, indirect or punitive damages claim against the other in connection with this Lease.

## 25.    NO WAIVER; ETC.

No act or omission of Landlord or its agents shall constitute an actual or constructive partial or total eviction or give rise to a right of Tenant to terminate this Lease or receive an abatement of any portion of its rent, or to be relieved of any other obligation hereunder or to be compensated for any loss or injury suffered by it, except as otherwise explicitly set forth herein.  No act or omission of Landlord or its agents shall constitute acceptance of a surrender of the Demised Premises, except a writing signed by Landlord.  The delivery of keys to Landlord or its agents shall not constitute a termination of this Lease or a surrender of the Demised Premises.  Acceptance by Landlord of less than the rent herein provided shall at Landlord's option be deemed on account of earliest rent remaining unpaid.  No endorsement on any check, or letter accompanying rent, shall be deemed an accord and satisfaction, and such check may be cashed without prejudice to Landlord.  No waiver of any provision of this Lease shall be effective, unless such waiver be in writing signed by Landlord.  This Lease contains the entire agreement between the parties, and no modification thereof shall be binding unless in writing and signed by the party concerned.  Tenant shall comply with the rules and regulations attached hereto and made a part hereof, and any reasonable modifications thereof or additions thereto, provided that, if there is a conflict between this Lease and the rules and regulations, this Lease shall prevail.  Landlord shall not be liable to Tenant for the violation of such rules and regulations by any other tenant.  Failure of Landlord to enforce any provision of this Lease, or any rule or regulation, shall not be construed as the waiver of any subsequent violation of a provision of this Lease, or any rule or regulation.  This Lease shall not be affected by nor shall Landlord in any way be liable for the closing, darkening or bricking up of windows in the Demised Premises, for any reason, including as the result of construction on any property of which the Demised Premises are not a part or by Landlord's own acts, provided same is necessitated by factors outside of Landlord's reasonable control.

34

26.    **SIGNAGE; WIRELESS NETWORK; ETC.**

A.    Tenant shall not obstruct or permit the obstruction of the light, halls, areas, roof, stairway or entrances to the Building, and will not affix, erect or inscribe any signs, projections, awnings, signals or advertisements of any kind to any part of the Demised Premises including the inside or outside of the windows or doors thereof and will not paint the outside of the doors thereof or the inside or outside of the windows thereof unless and until the style, size, color, construction and location thereof have been approved in writing by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed. Landlord shall have the right to require Tenant to remove any such signs, projections, awnings, signals or advertisements erected without Landlord's prior written consent.

B.    Notwithstanding anything contained herein to the contrary, if and so long as Vice Media Inc., or any of its Affiliates, or a Successor Entity: (i) is the tenant under this Lease; (ii) is in occupancy, together with its Affiliates, of at least seventy-five (75%) of the rentable square foot area of the Building; and (iii) is not in default under the Lease, beyond any grace, notice and/or cure period, with respect to any payment amount due Landlord or any other material obligation, Landlord shall, upon its receipt of Tenant's written request, provide Tenant with a location on the exterior of the Building, reasonably designated by Landlord, for the installation and maintenance of an exterior sign bearing Tenant's name and/or logo (and/or that of an Affiliate of Tenant). Such exterior signage shall be subject to Landlord's prior written approval (not to be unreasonably withheld, conditioned or delayed) with respect to size, shape, design, type, materials, manner of installation and all other aspects. Any such exterior sign shall be installed and maintained by Tenant in compliance with all applicable laws, orders, rules and regulations, at its sole cost and expense (including, without limitation, construction, legal, zoning, regulatory, and community board approval costs, if applicable), and shall be kept in good condition and repair (ordinary wear and tear excepted) at all times while it is on the Building. Notwithstanding anything contained herein to the contrary, Tenant's right to install and maintain any such exterior signage shall be subject to all applicable laws, rules and regulations, including, without limitation, zoning requirements and community approval. Upon the expiration or sooner termination of the term of this Lease, and upon the written demand of Landlord, Tenant shall, at its sole cost and expense, remove any such exterior signage and shall repair any damage caused by such removal. Tenant shall reimburse Landlord for any additional insurance costs to Landlord as a result of the installation and maintenance of such signage.

C.    (i)    If Tenant shall install a wireless intranet, Internet, and communications network (also known as "Wi-Fi") within the Demised Premises, such network (the "Network") shall be for the use by and only by Tenant and its employees subject to the terms hereof. Tenant shall not install any antenna inside or on the exterior of the Building without Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed. Tenant agrees that any such antenna shall be a commercially reasonable size, shall conform to all FCC specifications and shall be installed in accordance with all applicable laws, rules and regulations.

(ii)    Tenant shall not solicit, suffer, or permit other tenants or occupants of the Building to use the Network or any other communications service, including, without limitation, any wired or wireless Internet service that passes through, is transmitted through, or emanates from the Demised Premises.

(iii)    Tenant agrees that Tenant's communications equipment and the communications equipment of Tenant's service providers and contractors retained to service the Demised Premises including, without limitation, any antennas, switches, or other equipment (collectively, "Tenant's Communications Equipment") shall be of a type and, if applicable, a frequency that will not cause radio frequency, electromagnetic, or other interference (unless same is de minimis) to any other party or any equipment of any other party including, without limitation, Landlord, other tenants, or occupants of the Building or any other party, in violation of FCC specifications concerning radio frequency interference ("RFI"). In the event that Tenant's Communications Equipment causes or is believed to cause any such prohibited RFI, upon receipt of notice from Landlord of such interference, Tenant will take all steps necessary to correct and eliminate the interference. If the prohibited RFI is not eliminated within 24 hours (or a shorter period if Landlord reasonably believes a shorter period to be appropriate) then, upon request from Landlord, Tenant shall shut down Tenant's Communications Equipment pending resolution of the interference, with the exception of intermittent testing upon prior notice to and with the approval of Landlord. No Wi-Fi, Network, or Tenant's Communication Equipment may be installed in any lobby, corridor, or other Building common area unless such area is within the exclusive control of Tenant.

27.    **NOTICES**

Except as otherwise expressly provided in this Lease, any bills, statements, notices, demands, requests or other communications given or required to be given under this Lease shall be deemed sufficiently given or rendered if in writing, sent by registered or certified mail (return receipt requested) or by nationally recognized overnight courier addressed as follows or to such other address as either Landlord or Tenant may designate as its new address for such purpose by notice given to the others in accordance with the provisions of this Article (provided, however, that any such communications from Landlord to Tenant may also be delivered personally at the Demised Premises):

| | |
|---|---|
| If to Landlord: | 49 South Second Street LLC<br>49 South Second Street<br>Brooklyn, New York 11211<br>Attn: Leo Markowitz |
| with a copy of any default notice, as a matter of courtesy only, to: | Bleckner P.C.<br>350 Fifth Avenue, Suite 6440<br>New York, New York 10118<br>Attn: Ian Lester, Esq. |
| if to Tenant prior to February 1, 2015: | Vice Media Inc.<br>99 North 10th Street<br>Brooklyn, New York 11249<br>Attn: Chief Operating Officer |
| with a copy to: | Vice Media Inc.<br>99 North 10th Street<br>Brooklyn, New York 11249<br>Attn: Chief of Staff |
| if to Tenant on or after February 1, 2015: | Vice Media Inc.<br>49 South Second Street<br>Brooklyn, New York 11249<br>Attn: Chief Operating Officer |
| with a copy to: | Vice Media Inc.<br>49 South Second Street<br>Brooklyn, New York 11249<br>Attn: Chief of Staff |
| with a copy of any default notice, as a matter of courtesy only, to: | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Attn: Barry Langman, Esq. (19685-001) |

or at any place where Tenant or any agent or employee of Tenant may be found if mailed subsequent to Tenant's vacating, deserting, abandoning or surrendering the Demised Premises.  Tenant hereby acknowledges and agrees that any such bill, statement, demand, notice, request or other communication may be given by Landlord's agent on behalf of Landlord. Any such bill, statement, demand, notice, request or other communication shall be deemed to have been rendered or given when received or when delivery is first refused.  Notwithstanding anything contained in this Article to the contrary, bills and statements issued by Landlord may be sent by the method(s) set forth

hereinabove, without copies to any other party. This notice provision has been specifically negotiated between the parties hereto.

## 28.    HEAT; AIR-CONDITIONING; ETC.

A.    During the term of this Lease, Tenant may use any existing air-conditioning equipment located in (or servicing) the Demised Premises, and Tenant, at its sole cost and expense, shall cause any such air-conditioning equipment to be maintained and repaired on an as needed basis by a reputable service contractor reasonably satisfactory to Landlord. Prior to commencing any work at the Demised Premises, such contractor shall deliver to Tenant a certificate of liability insurance in an amount of not less than the amount required to be maintained by Tenant as elsewhere provided in this Lease, naming Landlord and Tenant as additional insureds. Upon request by Landlord, not more often than twice in any calendar year, Tenant shall submit a copy of the service and repair agreement or any renewal thereof, with such contractor to Landlord. Notwithstanding the foregoing, Landlord reserves the right at any time during the term of this Lease, at Tenant's expense, to inspect, maintain, repair and replace as necessary any such air-conditioning equipment and bill Tenant for each such repair and replacement work performed by or on behalf of Landlord at rates that are competitive in the market and Tenant shall pay the same, within ten (10) days after receipt of such bill, as Additional Rent hereunder. All such equipment is and shall remain the property of Landlord. Tenant shall not abuse or use any such equipment, except in accordance with the instructions that may accompany such equipment and the design and performance specifications therefor. Tenant shall reimburse Landlord, within ten (10) days after receipt of such bill, for any damage to such equipment caused by Tenant or any invitee of Tenant and for any replacement equipment made necessary by reason of Tenant's breach of the covenant contained in the preceding sentence. This obligation shall survive the expiration or earlier termination of the term hereof.

B.    Landlord represents that the heating and air-conditioning equipment (collectively, the "Existing HVAC Equipment") existing in the Demised Premises as of the date of this Lease is in good working order. Landlord shall deliver the HVAC Equipment serving each of the Phase I Premises and the Phase II Premises in working order (reasonable wear and tear excepted) as of the Phase I Commencement Date and the Phase II Commencement Date, respectively. Notwithstanding the foregoing, Landlord makes no representations or warranties as to the sufficiency of the Existing HVAC Equipment for Tenant's purposes. Tenant acknowledges and agrees that it will be required, at its sole cost and expense, to install any and all additional heating and air conditioning ("HVAC") equipment necessary or desirable in connection with the operation of Tenant's business in the Demised Premises, including, without limitation, any alterations necessary to distribute the Existing HVAC Equipment. All such HVAC equipment shall be maintained and repaired, as necessary, by Tenant at Tenant's expense, provided that any replacement of such HVAC equipment shall be performed by Landlord, at its sole cost and expense, except if and to the extent necessitated by the negligence or willful misconduct of Tenant or its agents, employees or contractors, or the failure by Tenant to fulfil its obligations hereunder with respect to the maintenance and repair of the HVAC Equipment, in which event same shall be at Tenant's sole cost and expense (which shall be payable as Additional Rent hereunder). Within thirty (30) days after the installation of such HVAC equipment, Tenant shall enter into a written service contract for the HVAC equipment with a vendor reasonably acceptable to Landlord who shall, pursuant to such service contract, regularly service and maintain the HVAC equipment at Tenant's sole cost and expense, including the cost of all electricity and water required to operate same.

## 29.    SECURITY DEPOSIT

A.    Simultaneously with the execution and delivery of this Lease by Tenant, Tenant shall deposit with Landlord the Security Deposit as security for the performance by Tenant of the terms of this Lease. The Security Deposit shall be, at Landlord's option (it being understood and agreed that in the event Landlord requires the Security Deposit to be changed from cash to a letter of credit, or vice versa, Landlord shall provide Tenant with at least thirty (30) days' prior written notice of same, and Landlord shall not exercise such option more than two (2) times during the term of this Lease), in the form of cash or in the form of an unconditional, irrevocable letter of credit in the amount of the Security Deposit, issued or confirmed by either (i) JPMorgan Chase Bank, N.A., (ii) a bank which is a member of the Clearing House Association, or (iii) a banking organization chartered by the United States of America, any of the several States thereof or the District of Columbia and, in any such case, insured by the Federal Deposit Insurance Corporation, whose long-term, unsecured and unsubordinated debt obligations are rated in the highest category by at least two of Fitch Ratings, Ltd, (hereinafter referred to as "Fitch"), Moody's Investors

Service, Inc. (hereinafter referred to as "Moody's") and Standard & Poor's Rating Service (hereinafter referred to as "S&P") (hereinafter referred to collectively as, the "Rating Agencies") or their respective successors (which on the date hereof means AAA from Fitch and S&P and Aaa from Moody's) and has a short-term deposit rating in the highest category from at least two of the aforesaid Rating Agencies (which on the date hereof means F1 from Fitch, P-1 from Moody's and A-1 from S&P), which letter of credit shall automatically renew for periods of at least one (1) year, with a final expiry date no earlier than sixty (60) days after the Expiration Date, shall be freely transferable, and shall require only a sight draft and the original letter of credit to draw upon same (the "LOC Criteria"). Such letter of credit may be presented at a branch located in New York County or Kings County, or elsewhere in the United States by fax, email or overnight courier, and shall be in a form consistent with the applicable terms of this Lease, and otherwise reasonably acceptable to Landlord's counsel. If at any time during the term hereof the banking organization which issued such letter of credit shall cease to satisfy the LOC Criteria or such banking organization shall be declared insolvent by the Comptroller of the Currency, the Federal Reserve Board, the Federal Deposit Insurance Corporation or any applicable State regulatory authority or shall be placed on the Federal Deposit Insurance Corporation's "Watch List," Tenant shall, within ten (10) Business Days after notice from Landlord, replace such letter of credit with another letter of credit issued by a banking organization that satisfies the LOC Criteria and should Tenant fail to do so, Landlord may draw down the then extant letter of credit or if such letter of credit is not honored, require Tenant within ten (10) Business Days after notice of such dishonoring to replace the letter of credit with cash security. Time shall be of the essence with respect to each such ten (10) Business Day period set forth in this paragraph. If Tenant shall default in performing any such obligation under this paragraph after the appropriate notice period pursuant to this paragraph has lapsed, the same shall be deemed a default hereunder neither requiring any further notice for Landlord to terminate the term of this Lease nor susceptible of being cured by Tenant.

B.      Tenant shall pay to Landlord, on demand and as Additional Rent hereunder, all reasonable fees and charges paid by Landlord to the bank issuing the letter of credit or any portion thereof in connection with the transfer of same to any future owner of the Building. In the event of a default by Tenant of any of the terms, provisions or conditions of this Lease beyond any applicable notice, grace and/or cure period, Landlord shall be permitted to draw down the entire amount of the letter of credit or any portion thereof and apply the proceeds (or a portion thereof in accordance with the terms and provisions hereinafter set forth). If Landlord shall, notwithstanding any provision to the contrary, accept (i) a letter of credit the expiration date of which is earlier than the date prescribed in paragraph A hereof or (ii) a letter of credit that provides that it shall be automatically renewed unless the issuer shall advise Landlord that the letter of credit will not be renewed at least forty-five (45) days prior to the then expiring date thereof, then if Landlord shall receive notice of the issuer's election not to renew the letter of credit, Landlord shall have the right to draw down the entire amount of the letter of credit at any time after receipt of such notice. The letter of credit shall be returned to Tenant (pursuant to the provisions of paragraph 29D below) following the expiration of the term of this Lease, provided that no default shall have occurred and be continuing as of such date. If any such default occurs and is continuing, Landlord may draw all or any portion of the letter of credit but no such draw shall work to diminish or limit the damages suffered or recoverable by Landlord, it being agreed that the letter of credit is Landlord's property and its return to Tenant is a reduction of the consideration for this Lease in consideration of Tenant's complete performance of its obligations.

C.      It is agreed that in the event Tenant defaults, beyond any applicable notice, grace and/or cure period, in respect of any of the terms, provisions and conditions of this Lease, including, but not limited to, the payment of Fixed Annual Rent and Additional Rent, Landlord may use, apply or retain the whole or any part of the Security Deposit to the extent required for the payment of any Fixed Annual Rent and Additional Rent or any other sum as to which Tenant is in default or for any sum which Landlord may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, covenants and conditions of this Lease, including, but not limited to, any damages or deficiency in the reletting of the Demised Premises, whether such damages or deficiency accrued before or after summary proceedings or other re-entry by Landlord. The amount of the security deposit or any portion thereof applied to cure any default or reimburse Landlord for any costs or damages shall not be construed as liquidated damages or deemed to limit any damages for which Landlord has a right to recover or otherwise to limit any right or remedy of Landlord at law or in equity. Tenant further covenants that it shall not assign or encumber or attempt to assign or encumber the monies (or letter of credit) deposited or delivered under this Article and that neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance. In the event Landlord applies or retains any portion or all of the Security Deposit, Tenant shall forthwith restore the amount so applied or retained so that at all times the amount

deposited shall be the amount herein above then required to be maintained as the Security Deposit, exclusive of accrued interest. In the event of a sale or lease of the Building containing the Demised Premises, Landlord shall transfer the Security Deposit to the purchaser or tenant, and Landlord shall thereupon be released from all liability for the return of the Security Deposit and Tenant shall look solely to such purchaser or tenant for the return thereof. This provision shall apply to every transfer or assignment of the Security Deposit to a new landlord. Tenant shall have no legal power to assign or encumber the security herein described.

D.      Within sixty (60) days following the expiration or sooner termination of the term if this Lease, Landlord shall return to Tenant the unapplied portion of the security deposit then held by Landlord.

E.      Simultaneously with the execution and delivery of this Lease by Tenant, Tenant is delivering to Landlord a Guarantee (herein referred to as the "Guarantee") in the form annexed hereto and made part hereof as Exhibit B, executed by Tenant's parent company, Vice Holding Inc. (herein referred to as "Guarantor"). Landlord may pursue any remedy under the Guarantee simultaneously with its pursuing any remedy hereunder and Tenant hereby waives any right to defend against any action, proceeding or arbitration prosecuted by Landlord based on any theory or doctrine of election of remedies. Tenant acknowledges that the Guarantee constitutes a material inducement to Landlord to enter into this Lease, and that the failure of Tenant to so deliver to Landlord such fully executed original counterpart of the Guarantee shall be deemed a material and substantial default by Tenant under this Lease.

F.      If and so long as (i) Tenant has completed Tenant's Initial Installation and delivered copies of all final, unconditioned lien waivers in connection with Tenant's Initial Installation to Landlord in connection with same, and (ii) has not defaulted under any monetary or other material provision of this Lease beyond any applicable notice and/or grace period more than once in any 12-month period and is not then in default under this Lease, the amount of the Security Deposit shall be reduced as follows: effective as of the date which is twenty-eight (28) months after Tenant has completed Tenant's Initial Installation and delivered copies of all lien waivers in connection with Tenant's Initial Installation to Landlord in connection with same, the Security Deposit shall be reduced by $323,125.00 to a total of $323,125.00.

**30.     RENT CONTROL**

In the event the Fixed Annual Rent or Additional Rent or any part thereof provided to be paid by Tenant under the provisions of this Lease during the demised term shall become uncollectible or shall be reduced or required to be reduced or refunded by virtue of any Federal, State, County or City law, order or regulation, or by any direction of a public officer or body pursuant to law, or the orders, rules, codes or regulations of any organization or entity formed pursuant to law, whether such organization or entity be public or private, Tenant shall enter into such agreement(s), and take such other steps (without additional expense to Tenant), as Landlord may reasonably request, and as may be legally permissible, to permit Landlord to collect the maximum rents which from time to time during the continuance of such legal rent restriction may be legally permissible (but not in excess of the amounts reserved therefor under this Lease). Upon the termination of such legal rent restriction, (a) the Fixed Annual Rent and/or Additional Rent shall become and thereafter be payable in accordance with the amounts reserved herein for the periods following such termination, and (b) Tenant shall pay to Landlord, promptly upon being billed, to the maximum extent legally permissible, an amount equal to (i) the Fixed Annual Rent and/or Additional Rent which would have been paid pursuant to this Lease with respect to the period during which such legal rent restriction was in effect, but for such legal rent restriction, less (ii) the rents paid by Tenant with respect to the period during which such legal rent restriction was in effect.

**31.     SHORING**

Tenant shall permit any person authorized to make an excavation on land adjacent to the Building containing the Demised Premises to do any work within the Demised Premises necessary to preserve the wall of the Building from injury or damage, and Tenant shall have no claim against Landlord for damages or abatement of rent by reason thereof.

**32.     EFFECT OF CONVEYANCE; ETC**.

If Landlord's interest in the Building shall be sold, transferred or leased, or the lease thereof transferred or sold, Landlord shall be relieved of all future obligations and liabilities hereunder and the purchaser, transferee or tenant of the Building shall be deemed to have assumed and agreed to perform all such obligations and liabilities of Landlord hereunder.  In the event of such sale, transfer or lease, Landlord shall also be relieved of all existing obligations and liabilities hereunder, provided that the purchaser, transferee or tenant of the Building assumes in writing such obligations and liabilities.

**33.    RIGHTS OF SUCCESSORS AND ASSIGNS**

This Lease shall bind and inure to the benefit of the heirs, executors, administrators, successors, and, except as otherwise provided herein, the assigns of the parties hereto.  If any provision of any Article of this Lease or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of that Article, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each provision of said Article and of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**34.    CAPTIONS**

The captions herein are inserted only for convenience, and are in no way to be construed as a part of this Lease or as a limitation of the scope of any provision of this Lease.

**35.    LEASE SUBMISSION; APPLICABLE LAW**

A.    Landlord and Tenant agree that this Lease is submitted to Tenant on the understanding that it shall not be considered an offer and shall not bind Landlord in any way unless and until this Lease is fully executed and delivered to Landlord and Tenant.

B.    If Tenant is a corporation, partnership, limited liability company or other form of organization or association, each individual executing this Lease on behalf of Tenant hereby agrees that by executing this Lease such individual represents and warrants to Landlord that Tenant is a duly formed and validly existing entity and that Tenant has full right and authority to execute and deliver this Lease and that each person signing on behalf of Tenant is authorized to do so.  Landlord represents and warrants to Tenant that Landlord is a duly formed and validly existing entity and that Landlord has the full right and authority to execute and deliver this Lease and that each person signing on behalf of Landlord is authorized to do so.

C.    This Lease shall be deemed to have been made in Kings County, New York, and shall be construed in accordance with the laws of New York.  All actions or proceedings relating, directly or indirectly, to this Lease shall be litigated only in courts located within the County of Kings.  Landlord and Tenant, any guarantor of the performance of Tenant's obligations hereunder and their respective successors and assigns, hereby subject themselves to the jurisdiction of any state or federal court located within such county.  Tenant hereby waives the right to raise any defense based upon inconvenient forum or make any plea or motion seeking to remove any case to another venue.

D.    This Lease may be executed in two or more counterparts and all counterparts so executed shall for all purposes constitute one agreement binding on all of the parties hereto, notwithstanding that all parties shall not have executed the same counterparts.  Facsimile and photocopy signatures on this Lease shall have the same force and effect as originals.

**36.    BROKERAGE**

A.    Tenant represents and warrants that it neither consulted nor negotiated with any broker or finder with regard to the Demised Premises other than Broker.  Tenant agrees to indemnify, defend and save Landlord harmless from and against any claims for fees or commissions (and all costs, expenses and liabilities in connection therewith, including, without limitation, reasonable attorneys' fees and expenses) from anyone other than Broker claiming to have dealt with Tenant in connection with the Demised Premises or this Lease.

40

B.    Landlord represents and warrants that it neither consulted nor negotiated with any broker or finder with regard to the Demised Premises other than Broker. Landlord agrees to indemnify, defend and save Tenant harmless from and against any claims for fees or commissions (and all costs, expenses and liabilities in connection therewith, including, without limitation, reasonable attorneys' fees and expenses) from anyone, including Broker, claiming to have dealt with Landlord in connection with the Demised Premises or this Lease. Landlord agrees to pay any commission or fee owing to Broker pursuant to a separate agreement. Nothing in this Article shall be construed to be a third party beneficiary contract.

## 37.    ARBITRATION

In each case specified in this Lease in which resort to arbitration shall be required, such arbitration (unless otherwise specifically provided in other Articles of this Lease) shall be in Manhattan in accordance with the Commercial Arbitration Rules of the American Arbitration Association and the provisions of this Lease, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. Except as specifically set forth in this Lease, there shall be no right to arbitrate any dispute arising out of this Lease and any other action or proceeding shall be adjudicated in the state or federal courts sitting in Kings County, New York.

## 38.    INSURANCE

The following requirements (collectively, the "Insurance Requirements") shall be complied with by Tenant at all times during the term hereof:

A.    At all times during the term hereof, Tenant shall maintain, at Tenant's expense, the following insurance coverage:

(i)    all risk property insurance, including theft and, if applicable, boiler and machinery coverage, written at replacement cost value in an adequate amount to avoid coinsurance and a replacement cost endorsement insuring Tenant's alterations, installations and improvement in the Demised Premises, and Tenant's trade fixtures, furnishings, equipment and all items of personal property of Tenant and including property of Tenant's customers or clients, as the case may be, located in the Demised Premises;

(ii)    broad form commercial general liability insurance written on a per occurrence basis with a per occurrence limit of not less than $10,000,000 in the aggregate (which may consist of a combination of primary coverage and umbrella coverage) and with other limits reasonably satisfactory to Landlord;

(iii)    business interruption insurance covering risk of loss due to the occurrence of any of the hazards covered by the insurance to be maintained by Tenant described in paragraph A(i) with coverage in a face amount of not less than the aggregate amount, for a period of twelve (12) months following the insured-against peril, of 100% of all Fixed Annual Rent and Additional Rent to be paid by Tenant under this Lease;

(iv)    worker's compensation insurance and employer's liability coverage in statutory limits, and New York State disability insurance as required by law, covering all employees; and

(v)    such other coverage as Landlord may reasonably require with respect to the Demised Premises, its use and occupancy and the conduct or operation of business therein.

Landlord may, from time to time, but not more frequently than twice during the term of this Lease, adjust the minimum limits set forth above.

B.    All insurance policies to be maintained as set forth above (i) shall be issued by companies of recognized responsibility, licensed and admitted to do business in the State of New York, reasonably acceptable to Landlord, and maintaining a rating of A/IX or better in Best's Insurance Reports-Property-Casualty (or an equivalent rating in any successor index adopted by Best's or its successor), (ii) shall endeavor to provide that they may not be canceled or modified unless Landlord and all additional insureds and loss payees thereunder are given at least thirty (30) days prior written notice of such cancellation or modification, (iii) shall name, as additional

insureds, Landlord, the managing agent of the Building and any other person or entity whose name and address shall have been furnished to Tenant and (iv) shall be primary and non-contributory in all respects.

C.      Prior to the Commencement Date, Tenant shall deliver to Landlord certificates of insurance for the insurance coverage required by paragraph A designating such persons or parties as additional insureds, providing for deductibles reasonably satisfactory to Landlord. Tenant shall procure and pay for renewals of such insurance from time to time before the expiration thereof, and Tenant shall deliver to Landlord certificates of renewal at least thirty (30) days before the expiration of any existing policy. If Tenant fails to procure or maintain any insurance required by this Lease and to pay all premiums and charges therefor, Landlord may (but shall not be obligated to) procure and pay the same, and Tenant shall reimburse Landlord, within ten (10) days after demand, for all such sums paid by Landlord. Any such payment shall not cure or waive any default by Tenant in the performance of its obligations hereunder, nor shall the foregoing right of Landlord to make such payment in any way limit, reduce, diminish or impair the rights of Landlord under the terms of this Lease or at law or in equity arising as a result of any such default. Under no circumstances shall Landlord be obligated to advise Tenant of Tenant's failure to procure or maintain any insurance required hereunder.

D.      Tenant shall not carry separate or additional insurance, concurrent in form or contributing in the event of any loss or damage with any insurance required to be obtained by Tenant under this Lease unless the parties required by paragraph B above to be named as additional insureds or loss payees thereunder are so named. Tenant may carry any insurance coverage required of it hereunder pursuant to blanket policies of insurance so long as the coverage afforded Landlord and the other additional insureds or loss payees thereunder, as the case may be, shall not be less than the coverage that would be provided by direct policies.

E.      (i)      Landlord agrees that it will include in its fire insurance policies appropriate clauses pursuant to which the insurance companies (a) waive all right of subrogation against Tenant with respect to losses payable under such policies and/or (b) agree that such policies shall not be invalidated should the insured waive in writing prior to a loss any or all right of recovery against any party for losses covered by such policies. But should any additional premiums be exacted for any such clause or clauses, Landlord shall be released from the obligation hereby imposed unless after notice thereof Tenant shall agree to pay such additional premium.

(ii)      Tenant agrees to include in its fire insurance policy or policies on its furniture, furnishings, fixtures and other property removable by Tenant under the provisions of its lease of space in the Building appropriate clauses pursuant to which the insurance company or companies (a) waive the right of subrogation against Landlord and/or any tenant of space in the Building with respect to losses payable under such policy or policies and/or (b) agree that such policy or policies shall not be invalidated should the insured waive in writing prior to a loss any or all right of recovery against any party for losses covered by such policy or policies. But should any additional premium be exacted for any such clause or clauses, Tenant shall be released from the obligation hereby imposed unless Landlord or the other tenants shall agree to pay such additional premium.

(iii)      Landlord hereby waives any and all right of recovery which it might otherwise have against Tenant, its servants, agents and employees, for loss or damage occurring to the Building and the fixtures, appurtenances and equipment therein, to the extent the same is covered by Landlord's insurance, notwithstanding that such loss or damage may result from the negligence or fault of Tenant, its servants, agents or employees. Tenant hereby waives any and all right of recovery which it might otherwise have against Landlord, its servants, and employees, and against every other tenant in the Building who shall have executed a similar waiver as set forth in this subparagraph E(iii) for loss or damage to, Tenant's furniture, furnishings, fixtures and other property removable by Tenant under the provisions hereof to the extent that same is covered by Tenant's insurance, notwithstanding that such loss or damage may result from the negligence or fault of Landlord, its servants, agents or employees, or such other tenant and the servants, agents or employees thereof.

(iv)      Landlord and Tenant hereby agree to advise the other promptly if the clauses to be included in their respective insurance policies pursuant to subparagraphs E(i) and E(ii) above cannot be obtained. Landlord and Tenant hereby also agree to notify the other promptly of any cancellation or change of the terms of any such policy which would affect such clauses.

F.      Tenant shall first seek recovery under its own insurance policy before proceeding against Landlord for any insured event. If there shall occur an event of loss that is (or would be) compensable under any insurance Tenant maintains or is required to maintain pursuant hereto, Tenant shall look to such insurance for compensation and shall not assert any claim therefor against Landlord, it being agreed further, that if Tenant shall fail to maintain any such insurance Landlord shall not be liable for damages to the extent the required insurance would have otherwise compensated Tenant therefor. Notwithstanding anything herein set forth to the contrary, the self-insured, deductible or retained risk not paid by any such insurance shall be borne exclusively by Tenant. Landlord's failure to procure any insurance or advise Tenant of its failure to procure any insurance shall not reduce or mitigate Tenant's obligations or liabilities to Landlord.

## 39.    LATE CHARGES

If Tenant shall fail to pay all or any part of any installment of Fixed Annual Rent or Additional Rent for more than ten (10) days after the same shall have become due and payable, Tenant shall pay, upon demand, as Additional Rent hereunder to Landlord a late charge of (i) four ($.04) cents for each dollar of the amount of such Fixed Annual Rent or Additional Rent which shall not have been paid to Landlord within such ten (10) day period after becoming due and payable or (ii) interest on such sum from the date when first due at sixteen (16%) percent per annum, whichever is greater. Tenant acknowledges that the payment of rent after the date when first due shall result in loss and injury to Landlord the exact amount of which is not susceptible of reasonable calculation and that the aforesaid amount of late charge represents a reasonable estimate of such losses and injury under the circumstances, especially after taking into account the grace period hereby afforded Tenant before such late charge is to be imposed. The late charge payable pursuant to this Article shall be without prejudice to any of Landlord's rights and remedies hereunder at law and equity for non-payment or late payment of rent or other sums and in addition to any such rights and remedies, including the right to institute and prosecute a proceeding under Article 7 of the Real Property Actions and Proceedings Law. No failure by Landlord to insist upon the strict performance by Tenant of Tenant's obligation to pay late charges as provided in this Article shall constitute a waiver by Landlord of its right to enforce the provisions of this Article in any instance thereafter occurring. The provisions of this Article shall not be construed in any way to extend the grace periods or notice periods provided for elsewhere in this Lease.

## 40.    ENVIRONMENTAL COMPLIANCE

A.      (i)      Tenant shall comply with all federal, state and local environmental protection and regulatory laws applicable to the Demised Premises.

(ii)      Tenant shall not use, generate, manufacture, store or dispose of any hazardous substance on, under or about the Demised Premises or the Building nor transport any hazardous substance thereto, other than ordinary office and cleaning supplies, in ordinary quantities, which shall be used and stored in compliance with all applicable laws at all times during the term of this Lease. Tenant shall immediately advise Landlord, in writing of any and all enforcement, clean-up, remediation, removal or other governmental or regulatory actions instituted, completed or threatened pursuant to any applicable laws relating to any hazardous substances; and all claims made or threatened by any person (including a governmental authority) against the Demised Premises, Tenant or Landlord relating to any damage, injury, costs, remedial action or cost recovery compensation arising out of or due to the existence of any hazardous substance in or about the Demised Premises or the Building.

B.      Tenant shall defend, indemnify and hold Landlord harmless from and against all actions, causes of action, claims, lawsuits, administrative proceedings, hearings, judgments, awards, fines, penalties, costs (including reasonable legal, engineers', experts', investigatory and consulting fees), damages, remediation activities and clean-up costs, liens, and all other liabilities incurred by Landlord whenever incurred, arising out of any Tenant's act or failure to act (where action was required) resulting in (i) the existence or presence (or alleged existence or presence) on or about the Building of any hazardous substance or the release of any hazardous substance into the environment; (ii) any personal injury or property damage resulting from any hazardous substance in or about the Building; (iii) the violation of any federal, state or municipal environmental protection or regulatory law; or (iv) the commencement or prosecution by any governmental authority or private person or entity of any judicial or administrative procedure arising out of any claims under any federal, state or municipal environmental protection or regulatory law or common law cause of action in which Landlord is named a party or in which it may intervene. The obligations of Tenant under this paragraph B shall survive the expiration or earlier termination of the term hereof.

43

Notwithstanding anything contained in this paragraph B to the contrary, the provisions set forth herein shall not be applicable with respect to any hazardous substance existing in the Demised Premises prior to the Commencement Date, except if and to the extent arising out of Tenant's failure to comply with applicable laws, orders, rules and regulations with respect to the treatment and handling thereof (including, without limitation, the obligation to remove or abate asbestos as necessary in connection with any Alteration performed by Tenant hereunder).

C.      "Hazardous substance" means any hazardous substance as defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 *et seq.*, as amended by the Superfund Amendments and Reauthorization Act of 1986; hazardous waste as defined in the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901 *et seq.*, as any of the foregoing may be amended or superseded; oil; petroleum product, derivative, compound or mixture; mineral, including asbestos; chemical; gas; medical waste; polychlorinated biphenyls (pcb's); methane; radon; radioactive material; volatile hydrocarbons; or other material, whether naturally occurring, man-made or the by-product of any process, which is toxic, harmful or hazardous or acutely hazardous to the environment or public health or safety; or any other substance the existence of which on or at any property would be the basis for a claim for damages, clean-up costs or remediation costs, fine, penalty or lien under any federal, state or municipal environmental protection or regulatory law or applicable common law.

**41.      LEASE FULLY NEGOTIATED**

In construing this Lease, it shall be deemed to be a document fully negotiated and drafted jointly by counsel to Landlord and counsel to Tenant and the authorship of any term or provision hereof shall not be deemed germane to its meaning. The existence or non-existence in any prior draft hereof of any term or provision whether included herein or not shall not be relevant to the establishment of the intent of the parties hereto or the meaning of any term or provision hereof and may not be used as evidence to establish any such intent or meaning.

**42.      USE RESTRICTIONS**

A.      Notwithstanding anything contained herein to the contrary, it is expressly understood that no portion of the Demised Premises shall be used as, by or for (a) retail operations of any bank, trust company, savings bank, industrial bank, savings and loan association, credit union or personal loan association or other form of entity, (b) a public stenographer or typist, (c) a barber shop, or beauty shop, beauty parlor, (d) telephone or telegraph agency, (e) a telephone, court reporting, stenographic or secretarial service, (f) a messenger service, (g) a travel or tourist agency, (h) an employment agency, (i) a restaurant or bar, (j) a commercial document reproduction or offset printing service, (k) a public vending machines operation, (l) a retail, wholesale or discount shop for the on-premises sale of books, magazines, audio or video tapes, CD ROM, DVD ROM or other devices for the recording or transmitting of audio or visual signals, images, music or speech, electronic equipment and accessories or any other merchandise (it being agreed that the sale of such items online is permitted), (m) a retail service shop, (n) a labor union, (o) a school or classroom (it being understood and agreed, however, that training for employees of Tenant or other permitted occupants of the Demised Premises shall be permitted hereunder), (p) a governmental or *quasi-*governmental bureau, department or agency, including an autonomous governmental corporation, embassy or consular office of any country or other *quasi-*autonomous or sovereign organization, whether or not subject to the Foreign Sovereign Immunities Act of 1976, as from time to time amended, or any successor statute, (q) intentionally deleted, (r) a firm whose principal business is real estate brokerage, (s) a company engaged in the business of renting office or desk space, (t) any person, organization, association, corporation, company, partnership entity or other agency immune from service or suit in the courts of the State of New York or the assets of which may be exempt from execution by Landlord in any action for damages, (u) a factory of any kind, (v) any use to which increased security costs or insurance premiums payable by Landlord may be attributed, (w) a payroll office or check cashing operation, (x) a medical, psychological, psychiatric or drug clinic or (y) any illegal purpose.

B.      The smoking of cigarettes, cigars, other tobacco products or any other substances and the use of pipes and other paraphernalia for such purposes shall be prohibited in the Demised Premises and in the Building. Without limiting Landlord's rights under the preceding sentence, Tenant shall enforce within the Demised Premises the provisions of Local Law 5 of 1995. The failure by Tenant to comply with the provisions of this Article shall be deemed a material and substantial default by Tenant under this Lease.

C.     Tenant agrees that the value of the Demised Premises and the reputation of Landlord will be seriously injured if the Demised Premises are used for any obscene or pornographic purposes or any sort of commercial sex establishment.  Tenant agrees that Tenant will not bring or permit any obscene or pornographic material on the Demise Premises, and shall not permit or conduct any obscene, nude or semi-nude live performances on the Demised Premises, nor permit use of the Demised Premises for nude modeling, rap sessions, or as a so called rubber goods shop, or as a sex club or any sort, or as a "massage parlor".  Tenant agrees further that Tenant will not permit any of these uses by any sublessee or assignee of the Demised Premises.  This Article shall directly bind any successors in interest to Tenant.  Tenant agrees that if at any time Tenant violates any of the provisions of this Article, such violation shall be deemed a breach of the substantial obligation of the terms of this Lease and objectionable conduct.  Pornographic material is defined for purposes of this Article as any written or pictorial matter with prurient appeal, or any objects or instrument that are primarily concerned with lewd or prurient sexual activity.  Obscene material is defined here as it is in Penal Law §235.00.  The parties understand and agree that the foregoing prohibitions and requirements are not intended to be limited to matters deemed "pornographic" within the meaning of applicable law, but rather are intended to preserve the character and dignity of the Building.

**43.     ANTI-TERRORISM REQUIREMENTS**

A.     Tenant represents and warrants that (i) neither Tenant nor any person, group or entity who owns any direct or indirect beneficial interest in Tenant or any of them, is listed on the list maintained by the United States Department of the Treasury, Office of Foreign Assets Control (commonly known as the OFAC List) or otherwise qualifies as a terrorist, Specially Designated National and Blocked Person or a person with whom business by a United States citizen or resident is prohibited (each a "Prohibited Person"); (ii) neither Tenant nor any person, group or entity who owns any direct or indirect beneficial interest in Tenant or any of them is in violation of any anti-money laundering or anti-terrorism statute, including, without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, U.S. Public Law 107-56 (commonly known as the USA PATRIOT Act), and the related regulations issued thereunder, including temporary regulations, and Executive Orders (including, without limitation, Executive Order 13224) issued in connection therewith, all as amended from time to time; and (iii) neither Tenant nor any person, group or entity who owns any direct or indirect interest in Tenant is acting on behalf of a Prohibited Person.  Tenant shall indemnify and hold Landlord harmless from and against all claims, damages, losses, risks, liabilities and costs (including fines, penalties and legal costs) arising from any misrepresentation in this paragraph or Landlord's reliance thereon.  Tenant's obligations under this paragraph shall survive the expiration or sooner termination of the term of this Lease.

B.     Landlord represents and warrants that (i) neither Landlord nor any person, group or entity who owns any direct or indirect beneficial interest in Landlord or any of them, is listed on the list maintained by the United States Department of the Treasury, Office of Foreign Assets Control (commonly known as the OFAC List) or otherwise qualifies as a terrorist, Specially Designated National and Blocked Person or a person with whom business by a United States citizen or resident is prohibited (each a "Prohibited Person"); (ii) neither Landlord nor any person, group or entity who owns any direct or indirect beneficial interest in Landlord or any of them is in violation of any anti-money laundering or anti-terrorism statute, including, without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, U.S. Public Law 107-56 (commonly known as the USA PATRIOT Act), and the related regulations issued thereunder, including temporary regulations, and Executive Orders (including, without limitation, Executive Order 13224) issued in connection therewith, all as amended from time to time; and (iii) neither Landlord nor any person, group or entity who owns any direct or indirect interest in Landlord is acting on behalf of a Prohibited Person.  Landlord shall indemnify and hold Tenant harmless from and against all claims, damages, losses, risks, liabilities and costs (including fines, penalties and legal costs) arising from any misrepresentation in this paragraph or Tenant's reliance thereon.  Landlord's obligations under this paragraph shall survive the expiration or sooner termination of the term of this Lease.

**44.     ADDITIONAL DEFINITIONS**

The words "herein," "hereof," "hereto," "hereunder" and similar words shall be interpreted as being references to this Lease as a whole and not merely the clause, paragraph, Section or Article in which such word appears.  The terms "Demised Premises" and "demised premises" are used interchangeably with the term "premises".  The words "shall" and "will" are interchangeable, each imposing a mandatory obligation upon the party

to whom such verb applies. The words ""include" and "including" shall be interpreted to mean "including, without limitation." The word "control" and the variations thereof used in this Lease shall have the meanings ascribed to them under the Securities Act of 1933, as amended, and the regulations promulgated under it.    Whenever in this Lease the word "default" is used, it is acknowledged and agreed that such term shall mean the failure to perform an obligation on or before a designated date, whether or not (i) a default notice has been sent, (ii) performance of the obligation by Tenant is accepted after the designated date, (iii) this Lease may be terminated for failure of timely performance, or (iv) any other remedy or right accrues to Landlord by reason of such late performance.  Wherever appropriate in this Lease, personal pronouns shall be deemed to include the other genders and the singular or plural of any defined term or other word shall, as the context may require, be deemed to include, as the case may be, either the singular or the plural.  All Article and paragraph and subparagraph references set forth herein shall, unless the context otherwise specifically requires, be deemed references to the Articles, paragraphs and subparagraphs of this Lease.    Wherever herein Tenant is required to comply with laws, orders and regulations of any governmental authority having or asserting jurisdiction over the Demised Premises, such laws, orders and regulations shall include, as and where applicable to the Demised Premises:  the Americans with Disabilities Act of 1990, Local Law 5/1973, Local Laws 16/1984, and 16/1987, Local Law 58/1987, Local Law 76/1985 and Local Law 80/1985, as each may be amended and any successor statutes of like or similar import.  References to Landlord as having no liability to Tenant or being without liability to Tenant shall mean that, except as otherwise provided in this Lease, Tenant is not entitled to terminate this Lease, or to claim actual or constructive eviction, partial or total, or to receive any abatement or diminution of rent, or to be relieved in any manner of any of its other obligations hereunder, or to be compensated for loss or injury suffered or to enforce any other kind of liability whatsoever against Landlord under or with respect to this Lease or with respect to tenant's use or occupancy of the Demised Premises.

## 45.    RENEWAL OPTION

A.    Tenant shall have the option to extend and renew the term of this Lease with respect to the then existing Demised Premises thereunder, in their then "as is" condition, for one (1) additional period of one (1) year, commencing on July 1, 2022 and ending on June 30, 2023 (the "Renewal Term"), upon the same terms and conditions as contained in this Lease (unless changed or modified by mutual agreement) except that (x) the Fixed Annual Rental rate (subject to real estate tax escalation Additional Rent) for the Renewal Term shall be a sum equal to ninety percent (90%) of the fair and reasonable annual market rental rate for the Demised Premises as of the first day of the Renewal Term, taking into account the rentals at which leases are being concluded in comparable buildings in the same rental area as the Building and all other relevant factors; and (y) this Lease, as extended for the Renewal Term, shall contain no further renewal option.    The exercise of such option shall only be effective upon, and in strict compliance with, the following terms and conditions:

(i)    Written notice of the exercise of such option shall be given by Tenant to Landlord not later than twelve (12) months prior to the Expiration Date of the initial term of this Lease (the "Initial Term").  Time shall be of the essence in connection with any exercise of such option by Tenant hereunder.

(ii)    Tenant elects to exercise its option to extend and renew the term of the 285 Kent Lease, and does so in accordance with the terms and conditions set forth in such lease (i.e., it being understood and agreed that in no event shall Tenant's exercise of its rights under the provisions of this Article be effective unless Tenant also elects to extend and renew the term of the 285 Kent Lease).

(iii)    (a)    The fair and reasonable annual market rental rate for the Demised Premises effective as of the commencement of the Renewal Term shall take into account, also, the one (1) year term of the renewal, and it shall be determined, as aforesaid, during the last twelve (12) months of the Initial Term.  Landlord and Tenant shall seek to agree as to the amount of such fair and reasonable annual market rental rate for the Demised Premises.  If they shall not agree as to such rate by the start of the last ten (10) months of the Initial Term, then and in such event said fair and reasonable annual market rental rate shall be determined by appraisal as hereinafter in this Article provided.

(b)    If at the commencement date of the Renewal Term, the amount of the Fixed Annual Rental rate payable during said term in accordance with the foregoing paragraphs of this Article shall not have been determined, then, pending such determination, Tenant shall pay Fixed Annual Rent at a rate equal to 105% of the Fixed Annual Rental rate payable hereunder as of the last month of the Initial Term (the "Temporary

Rate"). After the determination by appraisal of the fair and reasonable annual market rental rate for the Demised Premises, if the Fixed Annual Rental rate payable pursuant to this Article is greater than the Temporary Rate, Tenant shall promptly pay to Landlord the difference between the rent theretofore paid at the Temporary Rate and the greater rental rate determined after the appraisal; and the greater Fixed Annual Rental rate so determined after the appraisal shall be payable during the Renewal Term; however, if the Fixed Annual Rental rate payable pursuant to this Article is less than the Temporary Rate, Landlord shall promptly pay to Tenant the difference between the rent theretofore paid at the Temporary Rate and the lesser rental rate determined after the appraisal (or, at Landlord's option, Tenant shall be entitled to a rent credit in such amount, to be applied, until fully depleted, against the next rent due under this Lease); and the lesser Fixed Annual Rental rate so determined after the appraisal shall be payable during the Renewal Term.

(iv)    Upon determination of the Fixed Annual Rent for the Renewal Term, Landlord and Tenant shall execute, acknowledge and deliver to each other an agreement specifying the amount of the Fixed Annual Rental rate for the Renewal Term (but any failure to execute such an agreement shall not affect Tenant's obligation to pay and Landlord's right to receive such Fixed Annual Rent).

(v)    Tenant shall not be in default beyond any applicable notice, grace and/or cure period under any of the terms, covenants and conditions of this Lease (a) at the time Tenant gives written notice to Landlord of its election to extend the term of this Lease; or (b) at the commencement date of the Renewal Term.

(vi)    If Landlord and Tenant shall be unable to agree as to the fair and reasonable annual market rental rate by the date hereinabove set forth, then and in such event said fair and reasonable annual market rental rent for the Demised Premises shall be determined as follows:

(a)    Either party shall give a notice to the other, stating the name and address of an impartial person to act as appraiser hereunder, and within thirty (30) days after the receipt of such notice, the other party shall give notice to the sender of the first-mentioned notice, likewise, stating the name and address of an impartial person to act as appraiser hereunder.

(b)    The appraisers so specified in such notices shall be licensed real estate brokers doing business in Brooklyn, each having not less than fifteen (15) years active experience as real estate brokers specializing in the leasing of office space in said Borough.

(c)    In making their determinations, the appraisers shall consider and follow the directions set forth in this Article.

(d)    Before proceeding to determine the fair and reasonable annual market rental rate for the demised premises (the "rate"), as aforedescribed, the appraisers so appointed shall subscribe and swear to an oath fairly and impartially to determine such rate. If, within thirty (30) days following the appointment of the latter of said appraisers, said two appraisers shall be unable to agree upon the said rate, the said appraisers shall appoint, by an instrument in writing, as third appraiser, an impartial person, similarly qualified, who upon taking a similar oath, shall proceed with the two appraisers first appointed to determine the said rate. The written decision of any two of the appraisers so appointed, fixing such rate, shall be binding and conclusive on the parties.

(e)    If, within forty-five (45) days following the appointment of the third appraiser, any two of the appraisers have not by written decision fixed such rate, then the third appraiser shall find as correct the rate that was determined by either the appraiser specified by Landlord or the appraiser specified by Tenant (and no other rate) and render a written decision fixing such rate as the fair and reasonable annual market rental rate for the Demised Premises, which written decision shall be binding and conclusive on the parties.

(f)    If, after notice of the appointment of an appraiser, the other party shall fail, within the above specified period of thirty (30) days, to appoint an appraiser, such appointment of a similarly qualified appraiser may be made, upon application without notice by the person who shall have been appointed an appraiser, by the then President of the Real Estate Board of New York, Inc., or such successor body hereafter constituted exercising similar functions (or if there be no Real Estate Board or its successor, or if its President will not so act, then such appointment shall be made by a Justice of the Supreme Court, Kings County, then presiding in

Special Term, Part II thereof, or the equivalent of said Part II). If the two appraisers aforesaid shall be unable to agree, within thirty (30) days following the appointment of the latter of said appraisers, upon such rate and shall fail to appoint in writing a third appraiser within fifteen (15) days thereafter, the necessary appraiser shall be appointed by said President (or by said Justice). If any appraiser appointed as aforesaid by either of the parties, by said President, by said Justice, or by the two appraisers so appointed, shall die, be disqualified or incapacitated or shall fail or refuse to act, before such rate shall have been determined, the necessary appraiser shall be promptly appointed by the person or persons who appointed the appraiser who shall have died, become disqualified or incapacitated, or who shall have failed or refused to act, as aforesaid.

(g)    Landlord and Tenant shall each pay the fees of the person acting as appraiser hereunder for Landlord and Tenant, respectively, and Landlord and Tenant shall each pay one-half (1/2) of the fees of any third appraiser appointed pursuant to the above provisions.

B.    The provisions of this Article are intended to be personal to the named tenant hereunder (i.e., Vice Media Inc.), any Affiliate or Successor Entity to such named tenant, and may only be exercised by said named tenant, Affiliate or Successor Entity, as the case may be, if and so long as it is the tenant under this Lease and is in occupancy of the entire Demised Premises.

## 46.    ROOF USE

If and so long as this Lease is in full force and effect, Landlord hereby grants to Tenant a license to use, on an exclusive basis, consistent with the Permitted Use of the Premises, certain space (the "Roof Space", as more particularly depicted on Exhibit A-1 attached hereto and made a part hereof), on the roof of the Building, and any outdoor deck thereon. Landlord does not grant any right to Tenant to use, and Tenant shall not use, all or any portion of any roof(s), decks, ledges and the like of any building or structure adjacent to the Demised Premises or the Building, except as otherwise provided in the 285 Kent Lease. In connection with Tenant's use of the Roof Space, Tenant shall: (i) indemnify Landlord from and against any claim, damage or expense in connection with such use (including, without limitation, any claims by any invitee of Tenant), except if and to the extent arising from the gross negligence or willful misconduct of Landlord or its agents, employees or contractors; (ii) not effect any alterations on such roof or deck without Landlord's written approval, which approval shall not be unreasonably withheld, conditioned or delayed; (iii) obtain and maintain adequate insurance (in accordance with the provisions of this Lease) in connection with its use of the Roof Space; (iv) maintain and make repairs (structural and non-structural) to the Roof Space, at Tenant's sole cost and expense, in accordance with the provisions of Article 11A of this Lease (including, without limitation, installing, maintaining and repairing, at Tenant's sole cost and expense, any safety features required by law or which would be installed by a reasonably prudent owner of such space); and (v) comply, at Tenant's sole cost and expense, with all applicable laws, orders, rules and regulations with respect to the Roof Space, in accordance with the provisions of Article 15A of this Lease. Notwithstanding the foregoing, Tenant shall not, without first obtaining the prior written consent of Landlord in each instance, which consent shall not be unreasonably withheld, conditioned or delayed, host, organize or permit any party, event, gathering, concert, stage show or the like to be held on a Roof Space which is attended by more than one hundred (100) persons (other than Tenant's employees). Landlord shall have no liability or responsibility whatsoever for the activities of Tenant or its invitees on the Roof Space. Landlord makes no representations or warranties with regard to the permissible use of the Roof Space. It is acknowledged that the Roof Space is not part of the Demised Premises. Landlord hereby authorizes Tenant to remove (or to cause to be removed) any property located on the Roof Space so long as such property is not connected to any Building systems.

## 47.    RIGHT OF FIRST OFFER

A.    If, at any time during the term of this Lease, Landlord intends to sell or otherwise transfer Landlord's fee interest in the Building (the "Fee Interest"), then (subject to the provisions of paragraph C below) Landlord shall not sell or otherwise transfer the Fee Interest without first offering to Tenant the right to acquire the Fee Interest by serving written notice to Tenant ("Landlord's ROFO Notice") including a term sheet setting forth the material terms and conditions upon which Landlord intends to offer the Building for sale ("ROFO Term Sheet"). Tenant shall have the right ("Tenant's ROFO") to purchase the Fee Interest upon such terms and conditions as are set forth in the ROFO Term Sheet by giving notice thereof to Landlord ("Tenant's Acceptance Notice") within fifteen (15) Business Days following the date Landlord gives Tenant Landlord's ROFO Notice, time being deemed

of the essence. If Tenant shall timely give Tenant's Acceptance Notice, then Landlord and Tenant shall use commercially reasonable, good faith efforts to negotiate a contract (reasonable and customary in form and substance) reflecting the terms of the ROFO Term Sheet (the "ROFO Contract").

B.        If Tenant (i) fails to deliver Tenant's Acceptance Notice within said fifteen (15) Business Day period, or (ii) notifies Landlord that Tenant elects not to purchase the Fee Interest, or (iii) is in default under any of the monetary or other material terms of this Lease beyond the expiration of any applicable notice, grace and/or cure periods, at the time of Landlord's ROFO Notice, or (iv) defaults under any of its obligations under the ROFO Contract beyond the expiration of any applicable notice, grace and cure periods, or (v) is unable to come to agreement with Landlord on the form of ROFO Contract (with each party acting reasonably and in good faith), then in any such event Tenant's right to acquire the Fee Interest shall be deemed waived and Landlord shall be free to offer the Fee Interest to any third party on terms consistent with those set forth in the ROFO Term Sheet. Notwithstanding the foregoing, if, after the date Landlord gives Tenant Landlord's ROFO Notice, Landlord markets (through a broker or otherwise) to sell the Fee Interest to a prospective purchaser for a purchase price which is more than ten percent (10%) below that which is set forth in Landlord's ROFO Notice ("New Terms"), then in such event Landlord must once again first offer to Tenant the right to acquire the Fee Interest, but upon the New Terms, and the time frame within which Tenant must indicate its acceptance of the revised offer shall be the same time frame set forth in paragraph A hereof with respect to the initial Landlord's ROFO Notice. It is understood and agreed that the foregoing sentence shall only apply with regard to the initial marketing to sell the Fee Interest under the New Terms, and that in the event, for any of the reasons set forth in (i) through (v) above, Landlord and Tenant do not come to agreement on the sale of the Fee Interest, including, without limitation, in the event that the final price (notwithstanding Landlord's marketing price) that Landlord negotiates with regard to the sale of the Fee Interest to a prospective purchaser is more than ten (10%) below that which is set forth in Landlord's ROFO Notice, Tenant's rights under this Article 47 shall not apply. In the event that Tenant is unable to come to agreement with Landlord on the form of ROFO Contract (with each party acting reasonably and in good faith), then in any such event Tenant's right to acquire the Fee Interest shall be deemed waived and Tenant shall have no further right to acquire the Fee Interest pursuant to the terms of this Article.

C.        Notwithstanding anything contained in this Article 47 to the contrary, Tenant's ROFO shall not extend to (i) a bona fide financing transaction, or (ii) a sale or other transfer of the Fee Interest (or any part thereof) to the extent that such sale or other transfer is to an entity that is controlled by, with or under common control of Landlord or any of its current members, and/or to any current members of landlord, their immediate family members (e.g., spouse, child, grandchild or sibling), the estates of the foregoing persons and/or trusts for the benefit of the foregoing persons.

D.        The provisions of this Article are intended to be personal to the named tenant hereunder (i.e., Vice Media Inc.), any Affiliate or Successor Entity to such named tenant, and may only be exercised by said named tenant, Affiliate or Successor Entity, as the case may be, if and so long as it is the tenant under this Lease and is in occupancy of the entire Combined Premises (except for any portions of the Combined Premises (to the extent not exceeding twenty-five (25%) percent of the total square foot area of the Combined Premises) that have been subleased in accordance with the applicable provisions of this Lease).

**REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGE FOLLOWS**

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease as of the day and year first above written.

LANDLORD:
49 SOUTH SECOND STREET LLC

By: _____
   Name: Lipa Markowitz
   Title: Member

TENANT:
VICE MEDIA INC.

By: _____
   Name:
   Title:

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease as of the day and year first above written.

LANDLORD:
49 SOUTH SECOND STREET LLC

By: _____
   Name:
   Title:

TENANT:
VICE MEDIA INC.

By: _____
   Name: Andrew Creighton
   Title: President, VICE

**EXHIBIT A**

to Lease

between

49 South Second Street LLC, Landlord

and

Vice Media Inc., Tenant

<u>Diagram of Demised Premises</u>



Floor 3



7,500 Sq Ft

Floor 2



SOUTH 2

8,500 Sq Ft

Floor 1



7,500 Sq Ft

**EXHIBIT A-1**

to Lease

between

49 South Second Street LLC, Landlord

and

Vice Media Inc., Tenant

<u>Diagrams of Roof Space</u>

**49 South Second St Roof**

**EXHIBIT B**

to Lease

between

49 South Second Street LLC, Landlord

and

Vice Media Inc., Tenant

Guarantee

# GUARANTEE

GUARANTEE ("Guarantee") made this 1st day of July, 2014, by Vice Holding Inc., a Delaware corporation, with an office at 99 North 10th Street, Brooklyn, New York 11249 (hereinafter referred to as "Guarantor").

## W I T N E S S E T H :

49 South Second Street LLC ("Landlord") and Vice Media Inc. ("Tenant") entered into that certain lease, of even date herewith (the "Lease"). As an inducement to Landlord's agreeing to enter into such Lease, Guarantor agreed to execute this Guarantee of the Lease.

NOW, THEREFORE, in consideration of the premises herein contained and for other good and valuable consideration receipt of which is hereby acknowledged by Guarantor, Guarantor covenants, agrees, represents and warrants to Landlord as follows:

*1.* *Definitions.*

*1.1.* *Basic Terms.* The following capitalized terms shall have the meanings hereinafter ascribed to them:

(a) "Demised Premises" means the demised premises as designated in the Lease.

(b) "Guarantor" means Guarantor as defined in the preamble first set forth above.

(c) "Landlord" means Landlord as defined in the first "WITNESSETH" paragraph set forth above.

(d) "Lease" means the Lease as defined in the first "WITNESSETH" paragraph set forth above.

(e) "Tenant" means Tenant as defined in the first "WITNESSETH" paragraph set forth above.

*1.2* *Other Terms.* As used in this Guarantee, the words include and including will be read as "including, without limitation." As used in this Guarantee, words such as "hereby," "herein," "hereinafter," "hereof," hereto" and "hereunder" are to be read as referring to this Guarantee as a whole and not merely the clause, sentence, paragraph, section or article in which such word appears. As used in this Guarantee, words such as "control," and "controlled" have the meanings ascribed to them under the Securities Act of 1933, as amended, and the rules promulgated pursuant thereto.

1.3 *Number and Gender.* Whenever and wherever herein the singular number is used, this will also include the plural, and *vice versa* as the context may require. The use of the masculine or neuter form of any third person pronoun includes, as the case may be, the masculine, feminine or neuter genders as well.

*2.* *Representations and Warranties.*

2.1 *Representations and Warranties of Guarantor.* Guarantor represents and warrants to Landlord, that:

(a) Guarantor has power to enter into and perform this Guarantee.

(b) Neither this Guarantee nor the execution, delivery and performance hereof shall violate any statute, ordinance, regulation, court order or decree or order or decree of any other governmental authority or agency or any other agreement to which Guarantor is subject.

(c) Guarantor is not and by the execution and delivery hereof shall not then become insolvent as defined under Section 101(32) of the United States Bankruptcy Code (11 U.S.C. §101(32)) nor under any foreign bankruptcy or insolvency law.

(d) This Guarantee constitutes a valid and binding obligation of Guarantor and is enforceable in accordance with its terms.

(e) No governmental approvals or consents are required to be obtained to authorize the execution, delivery or performance of Guarantor's obligations pursuant to this Guarantee.

(f) Guarantor owns all of the outstanding and issued capital stock or other equity interests in any non-corporate tenant) of Tenant or controls Tenant.

(g) All representations and warranties made to Landlord herein are factually correct and there has been no omission of any fact which by its inclusion in any representation or warranty would materially alter the accuracy, truthfulness or meaning of any such representation or warranty.

   **2.2    Materiality of Representations and Warranties.**    Each of the representations and warranties made by Guarantor herein is deemed to be material to inducing Landlord to enter into the Lease and to perform Landlord's obligations thereunder. Guarantor acknowledges that Landlord by virtue of entering into the Lease and performing its obligations thereunder has acted and changed and shall hereafter act and change its position in reliance of this Guarantee and Guarantor's representations and warranties made herein.

   **3.      Guarantee of Tenant's Obligations.**

   **3.1      Obligations Guaranteed.**    (a) Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Landlord the full and timely payment when due of all fixed annual rent, additional rent and other payments due by Tenant to Landlord pursuant to the Lease.

(b) Without limiting Guarantor's obligations pursuant to paragraph (a) of this Section 3.1, Guarantor further irrevocably, absolutely and unconditionally guarantees to Landlord the full and timely performance of all of Tenant's other obligations under the Lease.

(c) Each and every default in the payment of any of the fixed annual rent, additional rent or other payments due under the Lease or in the performance of any other obligation on Tenant's part to be performed pursuant to the Lease shall give rise to a separate cause of action hereunder, and separate suits may be brought hereunder as each cause of action arises.

(d) Landlord may enforce all or any of its rights and remedies hereunder without having first to initiate, pursue or exhaust any remedies under the Lease against Tenant (except notice) and without having first to apply any security deposit under the Lease.

   **3.2      Guaranty Unconditional, Irrevocable, Absolute and Continuing.**    The obligations of Guarantor under this Guarantee shall be unconditional, irrevocable and absolute and shall continue and remain in full force and effect until all of Tenant's obligations under the Lease, including the payment of all fixed annual rent, additional rent and other payments due under the Lease, have been satisfied in their entirety and all other sums due to Landlord pursuant to this Guarantee have been paid in full.

   **3.3      Continued Validity of this Guarantee.**    To the fullest extent permitted by law, the obligations of Guarantor hereunder shall be valid and enforceable under all circumstances whatsoever and in furtherance but not in limitation thereof, shall not be affected, modified, released, or impaired by any state of facts or the happening from time to time of any event, including any one or more of the following whether or not with notice to or the consent of Guarantor:

(a) The irregularity, illegality or unenforceability of, or any defect in the Lease.

2

(b)  Any present or future law or order of any government (*de jure* or *de facto*) or of any agency thereof purporting to reduce, amend or otherwise affect the Lease.

(c)  The compromise, settlement, release, extension, indulgence, change, modification, amendment (including any increase in rent or extension of the term thereof) of any or all of the obligations, covenants or agreements of Tenant pursuant to the Lease.

(d)  The failure to give notice to Guarantor of the occurrence of any default under the terms and provisions of the Lease.

(e)  The actual or purported assignment of any of the obligations, covenants and agreements contained in this Guarantee, except an assignment consented to by Landlord.

(f)  The waiver of the payment, performance or observance by Tenant of any of the obligations, conditions, covenants or agreements or any or all of them contained in the Lease, including the obligation to pay fixed annual rent, additional rent or any other sum due under the Lease.

(g)  The receipt and acceptance by Landlord of any sum on account of fixed annual rent, additional rent or other payments due under the Lease irrespective of any dispute which may then be or theretofore had been ensuing between Landlord and Tenant.

(h)  The extension of the time for payment of any fixed annual rent, additional rent or other payments due under the Lease.

(i)  Any failure, omission, delay or lack of action on the part of Landlord or any other person to enforce, assert or exercise any right, power or remedy conferred upon it under the Lease.

(j)  The voluntary commencement or the existence of an involuntary case or proceeding under the United States Bankruptcy Code or under any state or foreign bankruptcy, insolvency or similar statute affecting Tenant; the liquidation, dissolution, merger, consolidation, sale or other disposition of all or substantially all the assets of Tenant; the marshaling of assets and liabilities; any receivership, insolvency, assignment for the benefit of creditors, reorganization, arrangement, composition with creditors or readjustment of debts in respect of Tenant in its capacity as a debtor or obligor; or other similar events or proceedings affecting Tenant or any allegation or contest of the validity of this Guarantee or the Lease in any such proceeding; it being specifically understood, consented and agreed to that this Guarantee shall remain and continue in full force and effect and shall be enforceable against Guarantor to the same extent and with the same force and effect as if such events and proceedings had not been instituted; and it is the intent and purpose of this Guarantee that Guarantor shall and does hereby waive all rights and benefits which might accrue to Guarantor by reason of any such proceedings.

(k)  Any impairment, whether by negligence or otherwise, of any rights of subrogation of Guarantor which may be found to exist.

(l)  The release, substitution or replacement, whether or not in accordance with the terms of the Lease, of any property subject thereto or any re-delivery, repossession, surrender or destruction of any such property, in whole or in part.

(m)  Any failure of Landlord to mitigate damages resulting from any default by Tenant under the Lease.

(n)  The lawful termination of the Lease by act of Landlord due to a default thereunder by Tenant or by operation of law or the exercise of any other right or remedy under the Lease by Landlord.

(o)  The assignment and/or modification of the Lease and/or the sublease of all or a portion of the demised premises.

**3.4** *Waiver of Notice of Acceptance.* Guarantor hereby expressly waives notice from Landlord of its acceptance and reliance on this Guarantee. This Guarantee shall become effective immediately upon delivery of an executed counterpart hereof to Landlord.

**4.** *Waivers and Restrictions Imposed Upon Guarantor.*

**4.1** *Waiver of Trial by Jury.* **GUARANTOR HEREBY WAIVES THE RIGHT TO TRIAL BY JURY IN THE EVENT OF ANY LITIGATION BETWEEN LANDLORD AND GUARANTOR OR AMONG LANDLORD, TENANT AND GUARANTOR IN RESPECT OF ANY MATTER ARISING OUT OF THIS GUARANTEE OR OUT OF THE LEASE.**

**4.2** *Restrictions on Guarantor.* Guarantor agrees not to dispose of any, all or substantially all of Guarantor's property, business or assets remaining after the execution and delivery of this Guarantee without receiving fair consideration.

**5.** *Provisions.*

**5.1** *Preferences, etc.* If after receipt of any payment hereunder applied (or intended to be applied) to the payment of, all or any part of any sums guaranteed hereunder, Landlord is compelled to surrender such payment or proceeds to any person because such payment or application of proceeds is or may be avoided, invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, fraudulent conveyance, impermissible set off or a diversion of trust funds, then the obligations or part thereof intended to be satisfied shall be reinstated and continue and this Guarantee shall continue in full force as if such payment or proceeds had not been received by Landlord, notwithstanding any revocation thereof or the cancellation of the Lease, any note or other instrument evidencing any obligation of Tenant or otherwise; and Guarantor shall be liable to pay to Landlord, and hereby does indemnify Landlord and hold Landlord harmless for, the amount of such payment or proceeds so surrendered and all expenses (including all reasonable attorneys' fees, court costs and expenses attributable thereto) incurred by Landlord in the defense of any claim made against Landlord that any payment or proceeds received by Landlord in respect of all or any part of such sums guaranteed hereunder must be surrendered, unless Tenant pays to Landlord the amount which Landlord is compelled to surrender and such payment is not similarly subject to being avoided, invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, fraudulent conveyance, impermissible set off or a diversion of trust funds and Landlord is not compelled to surrender the amount of Tenant's payment. The provisions of this Section 5.1 shall survive the termination of this Guarantee, and any satisfaction and discharge of Tenant by virtue of any payment, court order or any federal or state law.

**5.2** *Expenses.* Guarantor shall pay all reasonable costs, fees, commissions and expenses (including, without limitation, all reasonable attorneys' fees and disbursements) which may be incurred by Landlord in enforcing or attempting to enforce (i) any rights or remedies under the Lease or (ii) under this Guarantee following any default on the part of Guarantor hereunder, whether the same shall be enforced by suit or otherwise.

**5.3** *Remedies Not Exclusive.* No remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other available remedy given under this Guarantee or hereafter existing at law or in equity. No delay or failure to exercise any right or power accruing upon any default, omission or failure of performance hereunder shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient.

**5.4** *No Oral Amendment or Termination.* The liability of Guarantor hereunder shall be unconditional and shall not be in any manner affected by any indulgence whatsoever granted or consented to by the holder hereof, including, but not limited to any extension of time, renewal, waiver or other modification. Any failure of Landlord to exercise any right hereunder shall not be construed as a waiver of the right to exercise the same or any other right at any time and from time to time thereafter. Landlord or any holder may accept partial payments, even though marked "payment in full" or containing words of similar import or other conditions, without waiving any of its rights. No amendment, modification or waiver of any provision of this Guarantee nor consent to any departure by any Guarantor therefrom shall be effective, irrespective of any course of dealing, unless the same shall be in writing and signed by Landlord, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. This Guarantee cannot be changed or terminated orally or by

estoppel or waiver or by any alleged oral modification regardless of any claimed partial performance referable thereto.

>    **5.5**    *Severability.*  The invalidity or unenforceability of any one or more phrases, sentences, clauses or Sections of this Guarantee shall not affect the validity or enforceability of the remaining portions of this Guarantee, or any part thereof.

>    **5.6**    *Applicable Law.*  This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles.

>    **5.7**    *Waiver of Certain Defenses and Claims.*  **GUARANTOR HEREBY WAIVES THE RIGHT TO INTERPOSE ANY DEFENSE BASED UPON ANY CLAIMS OF LACHES OR SET OFF OR COUNTERCLAIM OF ANY NATURE OR DESCRIPTION, ANY OBJECTION BASED ON *FORUM NON CONVENIENS* OR VENUE, AND ANY CLAIM FOR CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES.  GUARANTOR HEREBY WAIVES ANY RIGHT TO BE SUBROGATED TO THE RIGHTS OF LANDLORD AGAINST THE TENANT IF GUARANTOR SHALL PAY ANY FIXED ANNUAL RENT, ADDITIONAL RENT OR OTHER SUM TO LANDLORD OR PERFORM ANY OTHER OBLIGATION OF TENANT PURSUANT TO THE LEASE.**

>    **5.8**    *Consent to Jurisdiction*.  Guarantor irrevocably and unconditionally (a) agrees that any suit, action or other legal proceeding arising out of this Guarantee may be brought in the courts of record of the State of New York, Kings County or the courts of the United States, Southern District of New York and that such courts shall have *in personam* jurisdiction of Guarantor in any such suit, action or other legal proceeding; (b) consents to the jurisdiction of such court in any such suit, or other legal action.

>    **5.9**    *Successors and Assigns*.  This Guarantee shall be binding upon, and be enforceable against Guarantor and Guarantor's heirs and legal representatives, successors and assigns and shall inure to the benefit of Landlord, its successors or assigns.

>    **5.10**    *Headings and Captions.*  The existence herein of article and section headings or captions is for convenience only and no such headings or captions will be used for the purposes of interpreting or construing the meaning of any term or provision hereof.

>    **5.11**    *Entire Agreement.*  This Guarantee sets forth the entire agreement and obligations of Guarantor to Landlord and supersedes any and all other understandings (whether oral or written) between them.

**REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGE FOLLOWS**

IN WITNESS WHEREOF, Guarantor has executed this Guarantee as of the date first above written.

**GUARANTOR:**
VICE HOLDING INC.

By: _____

    Name:

    Title:

**EIN #:** 06-1562658

## SCHEDULE A

## RULES AND REGULATIONS
## REFERRED TO IN THIS LEASE

1.  No animals (other than service animals), birds or vehicles (other than bicycles) shall be brought into or kept in the Demised Premises. The Demised Premises shall not be used for manufacturing or commercial repairing or for sale or display or merchandise or as a lodging place, or for any immoral or illegal purpose, nor shall the premises be used for a public stenographer or typist; barber or beauty shop; telephone, secretarial or messenger service; employment, travel or tourist agency; school or classroom; commercial document reproduction; or for any business other than specifically provided for in the tenant's lease. Tenant shall not cause or permit in the Demised Premises any disturbing noises which may interfere with occupants of this or neighboring building, any cooking or objectionable odors, or any nuisance of any kind, or any inflammable or explosive fluid, chemical or substance. Canvassing, soliciting and peddling in the Building are prohibited, and each tenant shall cooperate so as to prevent the same.

2.  The toilet rooms and other water apparatus shall not be used for any purposes other than those, for which they were constructed, and no sweepings, rags, ink, chemicals or other unsuitable substances shall be thrown therein. Tenant shall not throw anything out of doors, windows or skylights or into hallways, stairways or elevator, nor place food or objects on outside windowsills. Tenant shall not obstruct or cover the halls, stairways and elevator, or use them for any purpose other than ingress and egress to or from Tenant's Demised Premises, nor shall skylights, windows, doors and transoms that reflect or admit light into the Building be covered or obstructed n any way.

3.  Tenant shall not place a load upon any floor of the Demised Premises in excess of the load per square foot, which such floor was designed to carry and which is allowed by law. Landlord reserves the right to prescribe the weight and position of all safes in the Demised Premises. Business machines and mechanical equipment shall be placed and maintained by Tenant, at Tenant's expense, only with Landlord's consent and in settings approved by Landlord to control weight, vibration, noise and annoyance. Smoking or carrying lighted cigars, pipes or cigarettes in the elevator is prohibited. Tenant at its expense shall keep the sidewalks and curb in front of the Demised Premises clean and free from ice, snow, dirt and rubbish.

4.  Tenant shall not move any heavy or bulky materials into or out of the Building without Landlord's prior written consent, and then only during such hours and in such manner as Landlord shall approve. If any material or equipment requires special handling, Tenant shall employ only persons holding a Master Rigger's License to do such work, and all such work shall comply with all legal requirements. Landlord reserves the right to inspect all freight to be brought into the Building, and to exclude any freight which violates any rule, regulation or other provision of this Lease.

5.  No sign, advertisement, notice or thing shall be inscribed, painted or affixed on any part of the Building, without the prior written consent of Landlord. Landlord may remove anything installed in violation of this provision, and Tenant shall pay the cost of such removal. Interior signs on doors and directories shall be inscribed or affixed by Landlord at Tenant's expense. Landlord shall control the color, size, style and location of all signs, advertisement and notices. No advertising of any kind by Tenant shall refer to the Building, unless first approved in writing by Landlord.

6.  No article shall be fastened to, or holes drilled or nails or screws driven into, the ceilings, walls, doors or other portions of the Demised Premises, nor shall any part of the Demised Premises be painted, papered or otherwise covered, or in any way marked or broken, without the prior written consent of Landlord, not to be unreasonably withheld, conditioned or delayed. The foregoing shall not prohibit Tenant from hanging ordinary artwork and other wall decorations.

7.  No existing locks shall be changed, nor shall any additional locks or bolts of any kind be placed upon any door or window by Tenant, without the prior written consent of Landlord. At the termination of this Lease, Tenant shall deliver to Landlord all keys for any portion of the Demised Premises or the Building. Before leaving the Demised Premises at any time, Tenant shall close all windows and close and lock all doors.

8.  Any necessary exterminating work in the Demised Premises shall be done at Tenant's expenses, at such times, in such manner and by such company as Landlord shall reasonably require.

9.  Whenever Tenant shall submit to Landlord any plan, agreement or other document for Landlord's consent or approval, Tenant agrees to pay Landlord as Additional Rent, on demand, and administrative fee equal to the sum of the reasonable fees of any architect, engineer or attorney employed by Landlord review said plan, agreement or document and Landlord's administrative costs for same.

10. The use in the Demised Premises of auxiliary heating devices, such as portable electric heaters, heat lamps or other devices whose principal function at the time of operation is to produce space heating, is prohibited.

In case of any conflict or inconsistency between any provisions of this Lease and any of the rules and regulations as originally or as hereafter adopted, the provisions of this Lease shall control.

33241.2

## FIRST AMENDMENT OF LEASE

THIS FIRST AMENDMENT OF LEASE, made as of the __3rd__ day of __September__, 2021 (this "Amendment"), by and between 49 SOUTH SECOND STREET LLC, a New York limited liability company, having an office at 49 South Second Street, Brooklyn, New York 11211 ("Landlord"), and VICE MEDIA LLC, a Delaware limited liability company, having an office at 49 South Second Street, Brooklyn, New York 11249 ("Tenant").

W I T N E S S E T H:

WHEREAS, by Agreement of Lease, dated as of July 1, 2014 (the "Lease"), by and between Landlord and Tenant, as successor-in-interest to Vice Media Inc., the original tenant, Landlord did demise and let unto Tenant and Tenant did hire and take from Landlord, the entire rentable area of the building known as and by the street address of 49 South Second Street, Brooklyn, New York (the "Building"), as more particularly described therein (the "Premises");

WHEREAS, the term of the Lease is scheduled to expire on June 30, 2022; and

WHEREAS, Landlord and Tenant desire to extend the term of the Lease, and to otherwise modify the Lease as set forth herein, in accordance with the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, the parties hereto, for themselves, their legal representatives, successors and assigns, hereby agree as follows:

1.    Recitals; Definitions.  The recitals set forth above are true and correct and by this reference are incorporated herein in their entirety.  All capitalized terms used herein shall have the meanings ascribed to them in the Lease, unless otherwise defined herein.

2.    Lease Term.   The term of the Lease (the "Term") is hereby extended on all of the same terms and conditions set forth in the Lease, as hereinafter modified, so that the Term shall expire at 11:59 PM on December 31, 2022 (the "Extended Expiration Date"), unless it shall sooner terminate pursuant to any of the terms, covenants or conditions of the Lease, as amended by this Amendment, or pursuant to law. The period commencing on July 1, 2022 (the "Extension Effective Date") and ending on the Extended Expiration Date is hereinafter called the "Extension Term". During the Extension Term, the Premises shall continue to be leased to Tenant pursuant to all of the applicable terms, covenants and conditions of the Lease, except as modified hereby. Accordingly, the Extended Expiration Date, for all purposes of the Lease, as amended hereby, shall be deemed to be the scheduled expiration date of the Term for all purposes under the Lease.

3.    Modification of Lease from and after Extension Effective Date.  From and after the Extension Effective Date, the Lease shall be deemed to be, and hereby is, modified and amended as follows:

(A)    During the Extension Term, Tenant shall pay Fixed Annual Rent (as such term is defined in Article 3.A of the Lease) to Landlord in an amount equal to One Million Five Hundred Seventy-Four Thousand Seven Hundred Eighty-Five Dollars and Sixty-Eight Cents ($1,574,785.68) per annum ($131,232.14 per month), payable in advance in equal monthly installments at the times and in the manner provided in the Lease.

(B)    For the avoidance of doubt, during the Extension Term, Tenant shall continue to pay all items of Additional Rent (as such term is defined in Article 3 of the Lease) and any and all other sums and charges due and payable under the Lease with respect to the Premises.

4.    Security; Guarantee Confirmation.

(A)    It is acknowledged and agreed that Landlord is currently holding the sum of $323,125.00 as security pursuant to Article 29 of the Lease, as amended through the date hereof.  Landlord shall continue to hold such security during the remainder of the Term. It is acknowledged that no additional security deposit shall be required in connection with the extension of the Term hereunder.

(B)    Simultaneously with the execution and delivery of this Amendment by Tenant, and as a material inducement for Landlord's agreement to the terms hereof, Tenant shall cause Vice Holding Inc. to execute, in agreement with the terms thereof, the statement in this Amendment that immediately follows Tenant's signature block.

5.    Condition of Premises.    Tenant acknowledges that Landlord has made no representations to Tenant with respect to the condition of the Premises.  Tenant acknowledges that it is currently occupying the Premises and agrees to remain in possession of the same "as is" in the condition existing on the date hereof and that, notwithstanding anything to the contrary contained in the Lease, as amended by this Amendment, Landlord shall have no obligation to perform any work, provide any work allowance or rent credit, alter, improve, decorate, or otherwise prepare the Premises for Tenant's continued occupancy and use.

6.    Liability of Landlord.  The Landlord Parties (as hereinafter defined) other than Landlord shall not be liable for the performance of Landlord's obligations under the Lease, as amended by this Amendment.  The term "Landlord Parties" shall mean collectively, Landlord, Landlord's managing agent, each holder of a Superior Interest and each of their respective partners, members, managers, officers, directors, employees, principals, trustees and agents. Tenant shall look solely to Landlord to enforce Landlord's obligations under the Lease, as amended by this Amendment and shall not seek any damages against any of the other Landlord Parties.  The liability of Landlord for Landlord's obligations under the Lease, as amended by this Amendment, shall be limited to Landlord's interest in the Building and the proceeds thereof. Tenant shall not look to any property or assets of Landlord (other than Landlord's interest in the Building and the proceeds thereof) in seeking either to enforce Landlord's obligations under the Lease, as amended hereby, or to satisfy a judgment for Landlord's failure to perform such obligations.

7.    Brokerage.

(A)    Tenant represents and warrants to Landlord that it has not dealt with any broker, finder or like agent in connection with this Amendment other than Lee & Associates NYC LLC and Savills Inc. (collectively, "Broker").  Tenant does hereby indemnify and hold Landlord harmless of and from any and all loss, costs, damage or expense (including, without limitation, attorneys' fees and disbursements) incurred by Landlord by reason of any claim of or liability to any broker, finder or like agent other than Broker who shall claim to have dealt with Tenant in connection herewith.

(B)    Landlord represents and warrants to Tenant that it has not dealt with any broker, finder or like agent in connection with this Amendment other than Broker. Landlord does hereby indemnify and hold Tenant harmless of and from any and all loss, costs, damage or expense (including, without limitation, attorneys' fees and disbursements) incurred by Tenant by reason of any claim of or liability to any broker, finder or like agent, including Broker, who shall claim to have dealt with Landlord in connection herewith.

(C)    The provisions of this Paragraph 7 shall survive the expiration or termination of the Lease, as amended by this Amendment.

8.    Lease Amendments.  The following provisions of the Lease shall be deemed to be, and hereby are, deleted from the Lease and of no further force and effect: (i) Article 45 (Renewal Option); and (ii) Article 47 (Right of First Offer).

9.    Authorization.  Tenant represents and warrants to Landlord that its execution and delivery of this Amendment has been duly authorized and that the person executing this Amendment on behalf of Tenant has been duly authorized to do so, and that no other action or approval is required with respect to this transaction.  Landlord represents and warrants to Tenant that its execution and delivery of this Amendment has been duly authorized and that the person executing this Amendment on behalf of Landlord has been duly authorized to do so, and that no other action or approval is required with respect to this transaction.  Landlord represents that it does not need its lender's approval to enter into this Amendment or has obtained such approval.

10.    Full Force and Effect of Lease.  Except as modified by this Amendment, the Lease and all covenants, agreements, terms and conditions thereof shall remain in full force and effect and are hereby in all respects ratified and confirmed.

11.    Entire Agreement.    The Lease, as amended by this Amendment, constitutes the entire understanding between the parties hereto with respect to the Premises thereunder and may not be changed orally but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

12.    Enforceability.  This Amendment shall not be binding upon or enforceable against either Landlord or Tenant unless, and until, Landlord and Tenant, each in its sole

discretion, shall have executed and unconditionally delivered to the other an executed counterpart of this Amendment.

13. <u>Invalidity</u>.  If any of the provisions of the Lease, as amended hereby, or the application thereof to any person or circumstance, shall, to any extent, be invalid or unenforceable, the remainder of the Lease, as amended hereby, or the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable shall not be affected thereby, and every provision of the Lease, as amended hereby, shall be valid and enforceable to the fullest extent permitted by law.

14. <u>Binding Affect</u>.  The covenants, agreements, terms and conditions contained in this Amendment shall bind and inure to the benefit of the parties hereto and their respective successors, and (except as otherwise provided in the Lease, as hereby supplemented) their respective assigns.

15. <u>Captions</u>.  The captions herein are inserted only for convenience and are in no way to be construed as a part of this Amendment or as a limitation of the scope of any provision of this Amendment.

16. <u>Counterparts</u>.  This Amendment may be executed in one or more counterparts each of which when taken together shall constitute but one original. Delivery of an executed counterpart of this Amendment by electronic transmission in a Portable Document Format ("<u>PDF</u>"), by DocuSign or other digital format acceptable to Landlord shall be equally effective as manual delivery of an executed counterpart of this Amendment, and each such counterpart, whether delivered manually, or by PDF or such other digital format shall be deemed an original.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGE FOLLOWS THIS PAGE.]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

LANDLORD:

49 SOUTH SECOND STREET LLC

By: _____
      Name:
      Title:

TENANT:

VICE MEDIA LLC

By: _____
      Name:
      Title:

CONFIRMATION OF GUARANTEE

VICE HOLDING INC., as Guarantor, under that certain Guarantee, dated as of July 1, 2014, relating to the Lease, hereby consents to this Amendment and agrees that said Guarantee shall remain in full force and effect with respect to the Lease, as amended by this Amendment.

VICE HOLDING INC.

By: _____
      Name:
      Title:

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

LANDLORD:

49 SOUTH SECOND STREET LLC

By: _____
     Name:
     Title:

TENANT:

VICE MEDIA LLC

By: _____
    Ramin Arani (Aug 3, 2021 18:09 EDT)
     Name: Ramin Arani
     Title: Cfoxfo

CONFIRMATION OF GUARANTEE

VICE HOLDING INC., as Guarantor, under that certain Guarantee, dated as of July 1, 2014, relating to the Lease, hereby consents to this Amendment and agrees that said Guarantee shall remain in full force and effect with respect to the Lease, as amended by this Amendment.

VICE HOLDING INC.

By: _____
    Ramin Arani (Aug 3, 2021 18:09 EDT)
     Name: Ramin Arani
     Title: Cfoxfo

SECOND AMENDMENT OF LEASE

THIS SECOND AMENDMENT OF LEASE, made as of the 29th day of April, 2022 (this "Amendment"), by and between 49 SOUTH SECOND STREET LLC, a New York limited liability company, having an office at 49 South Second Street, Brooklyn, New York 11211 ("Landlord"), and VICE MEDIA LLC, a Delaware limited liability company, having an office at 49 South Second Street, Brooklyn, New York 11249 ("Tenant").

W I T N E S S E T H:

WHEREAS, by Agreement of Lease, dated as of July 1, 2014, as amended by the First Amendment of Lease dated as of September 3, 2021 (collectively, the "Lease"), by and between Landlord and Tenant, as successor-in-interest to Vice Media Inc., the original tenant, Landlord did demise and let unto Tenant and Tenant did hire and take from Landlord, the entire rentable area of the building known as and by the street address of 49 South Second Street, Brooklyn, New York (the "Building"), as more particularly described therein (the "Premises");

WHEREAS, the term of the Lease is scheduled to expire on December 31, 2022; and

WHEREAS, Landlord and Tenant desire to extend the term of the Lease, and to otherwise modify the Lease as set forth herein, in accordance with the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, the parties hereto, for themselves, their legal representatives, successors and assigns, hereby agree as follows:

1.    Recitals; Definitions.  The recitals set forth above are true and correct and by this reference are incorporated herein in their entirety.  All capitalized terms used herein shall have the meanings ascribed to them in the Lease, unless otherwise defined herein.

2.    Lease Term.  The term of the Lease (the "Term") is hereby extended on all of the same terms and conditions set forth in the Lease, as hereinafter modified, so that the Term shall expire at 11:59 PM on December 31, 2026 (the "Second Extended Expiration Date"), unless it shall sooner terminate pursuant to any of the terms, covenants or conditions of the Lease, as amended by this Amendment, or pursuant to law. The period commencing on January 1, 2023 (the "Second Extension Effective Date") and ending on the Second Extended Expiration Date is hereinafter called the "Second Extension Term". During the Second Extension Term, the Premises shall continue to be leased to Tenant pursuant to all of the applicable terms, covenants and conditions of the Lease, except as modified hereby. Accordingly, the Second Extended Expiration Date, for all purposes of the Lease, as amended hereby, shall be deemed to be the scheduled expiration date of the Term for all purposes under the Lease.

3.    Modification of Lease.

    (i)    From and after the Second Extension Effective Date, the Lease shall be deemed to be, and hereby is, modified and amended as follows:

    (A)    During the Second Extension Term, Tenant shall pay Fixed Annual Rent (as such term is defined in Article 3.A of the Lease) to Landlord in such amounts as are identified in Exhibit A of this Amendment, payable in advance in equal monthly installments at the times and in the manner provided in the Lease.

    (B)    For the avoidance of doubt, during the Second Extension Term, Tenant shall continue to pay all items of Additional Rent (as such term is defined in Article 3 of the Lease) and any and all other sums and charges due and payable under the Lease with respect to the Premises.

    (ii)    From and after the date of this Amendment first set forth above the Lease shall be deemed to be, and hereby is, modified and amended as follows:

    (A)    Section F of Article 29 of the Lease is hereby deleted.

    4.    <u>Security; Guarantee Confirmation</u>.

    (A)    (i)    It is acknowledged and agreed that Landlord is currently holding the sum of $323,125.00 (the "Existing Security") as security pursuant to Article 29 of the Lease, as amended through the date hereof. Tenant shall provide to Landlord, on or before the Second Extension Effective Date, TIME BEING OF THE ESSENCE, replacement security in the form of a letter of credit complying with the provisions of said Article 29 with a value of $753,958.33 (the "Security Amount"). Upon provision of such replacement security, Landlord shall return the Existing Security to Tenant within sixty (60) days. Notwithstanding anything to the contrary contained herein, in the event Tenant, despite its commercially reasonable efforts, is unable to procure a letter of credit complying with the foregoing on commercially reasonable terms approved by its investors and lenders on or before the Second Extension Effective Date, Tenant shall pay to Landlord the balance of the Security Amount (i.e., $430,833.33) in cash to be held with the Existing Security as security pursuant to Article 29 in lieu of the letter of credit no later than the Second Extension Effective Date, TIME BEING OF THE ESSENCE. Tenant acknowledges and agrees that Tenant's failure to deliver to Landlord the replacement security in the form of a letter of credit complying with said Article 29 or the balance of the Security Amount in cash on or before the Second Extension Effective Date shall be a material breach of the Lease. Except as specifically provided in this Amendment, Landlord shall have no right to require that the Security Deposit be changed from cash to a letter of credit, or vice versa, pursuant to Section A of Article 29 of the Lease.

    (ii)    In the event that, on or before the Second Extension Effective Date, Tenant has not delivered to Landlord the replacement security in the form of a letter of credit for the Security Amount or sufficient cash such that Landlord is then holding the entire Security Amount, it is understood and agreed that, commencing on the Second Extension Effective Date and ending on the day preceding the date that Tenant delivers to Landlord the

-2-

replacement security in the form of a letter of credit for the Security Amount or sufficient cash such that Landlord is then holding the entire Security Amount, Tenant shall pay to Landlord, upon demand, as Additional Rent under the Lease, as modified hereby, interest equal to the following: (i) for the first thirty (30) days following the Second Extension Effective Date, the lesser of (a) twelve (12%) percent per annum or (b) the maximum lawful rate for each dollar of such Security Amount which is not then held by Landlord in the form of a letter of credit or cash on the Second Extension Date; and (ii) for each day after such 30-day period, the lesser of (a) eighteen (18%) percent per annum or (b) the maximum lawful rate for each dollar of such Security Amount which is not then held by Landlord in the form of a letter of credit or cash. Tenant acknowledges that the timely delivery of the entire Security Deposit to Landlord is a material inducement for Landlord to enter into this Agreement, and that the failure to timely deliver such amount to Landlord shall result in loss and injury to Landlord the exact amount of which is not susceptible of reasonable calculation and that the aforesaid amount of interest represents a reasonable estimate of such losses and injury under the circumstances. The interest payable pursuant to this paragraph shall be without prejudice to any of Landlord's rights and remedies either (x) under the Lease, as modified hereby, or (y) at law and in equity for late payment of Additional Rent or other sums. Tenant acknowledges and agrees that any failure by Landlord to insist upon the strict performance by Tenant of Tenant's obligation to pay the interest as provided in this paragraph shall not constitute a waiver by Landlord of its right to enforce any other provision of the Lease, as modified hereby, and the provisions of this paragraph shall not be construed in any way to extend the grace periods or notice periods provided for elsewhere in the Lease, as modified hereby.

(B)    Simultaneously with the execution and delivery of this Amendment by Tenant, and as a material inducement for Landlord's agreement to the terms hereof, Tenant shall cause Vice Holding Inc. to execute, in agreement with the terms thereof, the statement in this Amendment that immediately follows Tenant's signature block.

5.    Condition of Premises.  Tenant acknowledges that Landlord has made no representations to Tenant with respect to the condition of the Premises.  Tenant acknowledges that it is currently occupying the Premises and agrees to remain in possession of the same "as is" in the condition existing on the date hereof and that, notwithstanding anything to the contrary contained in the Lease, as amended by this Amendment, Landlord shall have no obligation to perform any work, provide any work allowance or rent credit, alter, improve, decorate, or otherwise prepare the Premises for Tenant's continued occupancy and use.

6.    Liability of Landlord.  The Landlord Parties (as hereinafter defined) other than Landlord shall not be liable for the performance of Landlord's obligations under the Lease, as amended by this Amendment.  The term "Landlord Parties" shall mean collectively, Landlord, Landlord's managing agent, each holder of a Superior Interest and each of their respective partners, members, managers, officers, directors, employees, principals, trustees and agents. Tenant shall look solely to Landlord to enforce Landlord's obligations under the Lease, as amended by this Amendment and shall not seek any damages against any of the other Landlord Parties.  The liability of Landlord for Landlord's obligations under the Lease, as amended by this Amendment, shall be limited to Landlord's interest in the Building and the proceeds thereof. Tenant shall not look to any property or assets of Landlord (other than Landlord's interest in the

- 3 -

Building and the proceeds thereof) in seeking either to enforce Landlord's obligations under the Lease, as amended hereby, or to satisfy a judgment for Landlord's failure to perform such obligations.

   7.    Brokerage.

      (A)    Tenant represents and warrants to Landlord that it has not dealt with any broker, finder or like agent in connection with this Amendment other than Lee & Associates NYC LLC and Savills Inc. (collectively, "Broker"). Tenant does hereby indemnify and hold Landlord harmless of and from any and all loss, costs, damage or expense (including, without limitation, attorneys' fees and disbursements) incurred by Landlord by reason of any claim of or liability to any broker, finder or like agent other than Broker who shall claim to have dealt with Tenant in connection herewith.

      (B)    Landlord represents and warrants to Tenant that it has not dealt with any broker, finder or like agent in connection with this Amendment other than Broker. Landlord does hereby indemnify and hold Tenant harmless of and from any and all loss, costs, damage or expense (including, without limitation, attorneys' fees and disbursements) incurred by Tenant by reason of any claim of or liability to any broker, finder or like agent, including Broker, who shall claim to have dealt with Landlord in connection herewith. Landlord shall pay the commission due Broker in connection with this Amendment pursuant to a separate agreement.

      (C)    The provisions of this Paragraph 7 shall survive the expiration or termination of the Lease, as amended by this Amendment.

   8.    Authorization.    Tenant represents and warrants to Landlord that its execution and delivery of this Amendment has been duly authorized and that the person executing this Amendment on behalf of Tenant has been duly authorized to do so, and that no other action or approval is required with respect to this transaction. Landlord represents and warrants to Tenant that its execution and delivery of this Amendment has been duly authorized and that the person executing this Amendment on behalf of Landlord has been duly authorized to do so, and that no other action or approval is required with respect to this transaction. Landlord represents that it does not need its lender's approval to enter into this Amendment or has obtained such approval.

   9.    Full Force and Effect of Lease.    Except as modified by this Amendment, the Lease and all covenants, agreements, terms and conditions thereof shall remain in full force and effect and are hereby in all respects ratified and confirmed.

   10.    Entire Agreement.    The Lease, as amended by this Amendment, constitutes the entire understanding between the parties hereto with respect to the Premises thereunder and may not be changed orally but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

   11.    Enforceability. This Amendment shall not be binding upon or enforceable against either Landlord or Tenant unless, and until, Landlord and Tenant, each in its sole

discretion, shall have executed and unconditionally delivered to the other an executed counterpart of this Amendment.

12. <u>Invalidity</u>. If any of the provisions of the Lease, as amended hereby, or the application thereof to any person or circumstance, shall, to any extent, be invalid or unenforceable, the remainder of the Lease, as amended hereby, or the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable shall not be affected thereby, and every provision of the Lease, as amended hereby, shall be valid and enforceable to the fullest extent permitted by law.

13. <u>Binding Affect</u>. The covenants, agreements, terms and conditions contained in this Amendment shall bind and inure to the benefit of the parties hereto and their respective successors, and (except as otherwise provided in the Lease, as hereby supplemented) their respective assigns.

14. <u>Captions</u>. The captions herein are inserted only for convenience and are in no way to be construed as a part of this Amendment or as a limitation of the scope of any provision of this Amendment.

15. <u>Counterparts</u>. This Amendment may be executed in one or more counterparts each of which when taken together shall constitute but one original. Delivery of an executed counterpart of this Amendment by electronic transmission in a Portable Document Format ("<u>PDF</u>"), by DocuSign or other digital format acceptable to Landlord shall be equally effective as manual delivery of an executed counterpart of this Amendment, and each such counterpart, whether delivered manually, or by PDF or such other digital format shall be deemed an original.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGE FOLLOWS THIS PAGE.]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

LANDLORD:

49 SOUTH SECOND STREET LLC

By: _____
Name:    Leo Markowitz
Title:    Member


TENANT:

VICE MEDIA LLC

*BDixon*
By: BDixon (Apr 29, 2022 16:27 GMT+1)
_____
Name:    Bruce Dixon
Title:    Chief Financial Officer


## CONFIRMATION OF GUARANTEE

VICE HOLDING INC., as Guarantor, under that certain Guarantee, dated as of July 1, 2014, relating to the Lease, hereby consents to this Amendment and agrees that said Guarantee shall remain in full force and effect with respect to the Lease, as amended by this Amendment.


VICE HOLDING INC.

*BDixon*
By: BDixon (Apr 29, 2022 16:27 GMT+1)
_____
Name:    Bruce Dixon
Title:    Chief Financial Officer


- 6 -

**EXHIBIT A**
Rent

| Calendar Year | Fixed Annual Rent |
|---|---|
| 2023 | $1,809,500.00 ($150,791.67 per month) |
| 2024 | $1,863,785.00 ($155,315.42 per month) |
| 2025 | $1,919,698.55 ($159,974.88 per month) |
| 2026 | $1,977,289.51 ($164,774.13 per month) |

Exhibit B

# Invoice

**49 South 2nd Street LLC**

**36 Taaffe Pl**
**Brooklyn, NY 11205**

| Date | Invoice # |
|------|-----------|
| 3/9/2023 | 185 |

| Bill To |
|---------|
| **Vice Media**<br>**49 South 2nd St**<br>**Brooklyln, NY 11249** |

| Quantity | Item Code | Description | Price Each | Amount |
|----------|-----------|-------------|-----------|--------|
| | Legal Fees | | 2,182.50 | 2,182.50 |
| | | | **Balance** | $3.75 |

**Please remit payment to: 49 South 2nd Street, Brooklyn, NY 11249**
**Wire Details: ATT: 49 South 2nd St LLC. - CTBC Bank ABA #: 121040350, Acct #: 3800583054**

# Invoice

**49 South 2nd Street LLC**

**36 Taaffe Pl**
**Brooklyn, NY 11205**

| Date | Invoice # |
|------|-----------|
| 4/1/2023 | 186 |

| Bill To |
|---------|
| **Vice Media**<br>**49 South 2nd St**<br>**Brooklyln, NY 11249** |

| Quantity | Item Code | Description | Price Each | Amount |
|----------|-----------|-------------|-----------:|-------:|
| | **Rent** | | 150,791.67 | 150,791.67 |
| | **Late Fee** | **Late Payment Fee** | 6,031.67 | 6,031.67 |

| | **Total** | $156,823.34 |
|---|---|---|

**Please remit payment to: 49 South 2nd Street, Brooklyn, NY 11249**
**Wire Details: ATT: 49 South 2nd St LLC. - CTBC Bank ABA #: 121040350, Acct #: 3800583054**

# Invoice

**49 South 2nd Street LLC**

**36 Taaffe Pl**
**Brooklyn, NY 11205**

| Date | Invoice # |
|------|-----------|
| 4/1/2023 | 187 |

| Bill To |
|---------|
| **Vice Media**<br>**49 South 2nd St**<br>**Brooklyln, NY 11249** |

| Quantity | Item Code | Description | Price Each | Amount |
|----------|-----------|-------------|-----------|--------|
|  | Tax Escalation | Tax Increase | 15,103.78 | 15,103.78 |
|  |  |  | **Total** | $15,103.78 |

**Please remit payment to: 49 South 2nd Street, Brooklyn, NY 11249**
**Wire Details: ATT: 49 South 2nd St LLC. - CTBC Bank ABA #: 121040350, Acct #: 3800583054**

# Invoice

**49 South 2nd Street LLC**

**36 Taaffe Pl**
**Brooklyn, NY 11205**

| Date | Invoice # |
|------|-----------|
| 5/1/2023 | 188 |

| **Bill To** |
|---|
| **Vice Media**<br>**49 South 2nd St**<br>**Brooklyln, NY 11249** |

| Quantity | Item Code | Description | Price Each | Amount |
|----------|-----------|-------------|-----------:|-------:|
| | **Rent** | | **150,791.67** | **150,791.67** |
| | **Late Fee** | **Late Payment Fee** | **6,031.67** | **6,031.67** |
| | | | **Total** | $156,823.34 |

**Please remit payment to: 49 South 2nd Street, Brooklyn, NY 11249**
**Wire Details: ATT: 49 South 2nd St LLC. - CTBC Bank ABA #: 121040350, Acct #: 3800583054**

# Invoice

**49 South 2nd Street LLC**

**36 Taaffe Pl**
**Brooklyn, NY 11205**

| Date | Invoice # |
|------|-----------|
| 5/1/2023 | 189 |

| Bill To |
|---------|
| **Vice Media**<br>**49 South 2nd St**<br>**Brooklyln, NY 11249** |

| Quantity | Item Code | Description | Price Each | Amount |
|----------|-----------|-------------|------------|--------|
| | Tax Escalation | Tax Increase | 15,103.78 | 15,103.78 |
| | | | **Total** | $15,103.78 |

**Please remit payment to: 49 South 2nd Street, Brooklyn, NY 11249**
**Wire Details: ATT: 49 South 2nd St LLC. - CTBC Bank ABA #: 121040350, Acct #: 3800583054**

# Invoice

**49 South 2nd Street LLC**

**36 Taaffe Pl**
**Brooklyn, NY 11205**

| Date | Invoice # |
|------|-----------|
| 5/2/2023 | 190 |

| Bill To |
|---------|
| Vice Media<br>49 South 2nd St<br>Brooklyln, NY 11249 |

| Quantity | Item Code | Description | Price Each | Amount |
|----------|-----------|-------------|------------|--------|
| | Violations | Universal Elevator 709163792 | 101.00 | 101.00 |
| | Violations | NYC DOB CPY017104533 | 5,000.00 | 5,000.00 |
| | Violations | Universal Elevator 25644 | 201.42 | 201.42 |
| | Violations | NYC DOB CPY016955406 | 1,000.00 | 1,000.00 |
| | Violations | NYC DOB CPY016955361 | 1,000.00 | 1,000.00 |
| | Violations | NYC DOB CPY016953440 | 598.77 | 598.77 |
| | Violations | Solve It Inc 11468 | 200.00 | 200.00 |
| | | | **Total** | $8,101.19 |

**Please remit payment to: 49 South 2nd Street, Brooklyn, NY 11249**
**Wire Details: ATT: 49 South 2nd St LLC. - CTBC Bank ABA #: 121040350, Acct #: 3800583054**

# Invoice

**49 South 2nd Street LLC**

**36 Taaffe Pl**
**Brooklyn, NY 11205**

| Date | Invoice # |
|------|-----------|
| 6/1/2023 | 191 |

**Bill To**

**Vice Media**
**49 South 2nd St**
**Brooklyln, NY 11249**

| Quantity | Item Code | Description | Price Each | Amount |
|----------|-----------|-------------|------------|--------|
| | Rent | | 150,791.67 | 150,791.67 |
| | | | **Total** | $150,791.67 |

**Please remit payment to: 49 South 2nd Street, Brooklyn, NY 11249**
**Wire Details: ATT: 49 South 2nd St LLC. - CTBC Bank ABA #: 121040350, Acct #: 3800583054**

# Invoice

**49 South 2nd Street LLC**

**36 Taaffe Pl**
**Brooklyn, NY 11205**

| Date | Invoice # |
|---|---|
| 6/1/2023 | 192 |

| Bill To |
|---|
| **Vice Media**<br>**49 South 2nd St**<br>**Brooklyln, NY 11249** |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| | Tax Escalation | Tax Increase | 15,103.78 | 15,103.78 |
| | | | **Total** | $15,103.78 |

**Please remit payment to: 49 South 2nd Street, Brooklyn, NY 11249**
**Wire Details: ATT: 49 South 2nd St LLC. - CTBC Bank ABA #: 121040350, Acct #: 3800583054**