UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                          Chapter 11

                                                Case No. 23-10738 (JPM)
VICE GROUP HOLDING INC., *et al.*,[1]

                                                (Jointly Administered)

                                    Debtors.   FOR PUBLICATION
------------------------------------------------------------x

# MEMORANDUM OPINION

**APPEARANCES:**

**TOGUT, SEGAL & SEGAL LLP**
*Proposed Counsel for Debtors*
One Penn Plaza, Suite 3335
New York, NY 10119
By:   Kyle J. Ortiz, Esq.
      Brian F. Moore, Esq.
      John C. Gallego, Esq.

**SHEARMAN & STERLING**
*Proposed Counsel for Debtors*
599 Lexington Avenue
New York, NY 10022
By:   Ian Roberts, Esq.
      Noah Bloom, Esq.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Vice Group Holding Inc. (4250); Vice Impact Inc. (9603); Vice Media LLC (5144); Villain LLC (3050); Boy Who Cried Author LLC (6199); Carrot Operations LLC (1596); Carrot Creative LLC (8652); Channel 271 Productions LLC (1637); Clifford Benski, Inc. (9387); Dana Made LLC (1065); Inverness Collective LLC (6542); JT Leroy Holding LLC (7555); PLDM Films LLC (5217); Project Change LLC (2758); R29 Pride, LLC (7011); R29 Productions, LLC (6344); Refinery 29 Inc. (7749); Valvi LLC (6110); Vice Content Development, LLC (5165); Vice Distribution LLC (5515); Vice Europe Holding Limited (N/A);  Vice Europe Pulse Holding Limited (N/A); Vice Food LLC (1693); Vice Holding Inc. (2658); Vice International Holding, Inc. (5669); Vice Music Publishing LLC (3022); Vice Payroll LLC (6626); Vice Productions LLC (5399); Vice Project Services LLC (6473); Virtue Worldwide, LLC (7212); Visur LLC (9336); VTV Productions LLC (6854); and Goldie Films, Inc. (1241). The location of the Debtors' service address for purposes of these chapter 11 cases is:  49 South 2nd Street, Brooklyn, NY 11249.

1

**GIBSON, DUNN & CRUTCHER LLP**
*Counsel for DIP Lenders and Proposed Purchaser*
200 Park Avenue
New York, NY 10166
By:   David M. Feldman, Esq.
      Tommy Scheffer, Esq.
      Michael S. Neumeister, Esq.

**STROOCK & STROOCK & LAVAN LLP**
*Counsel for Paramount Global and Affiliates*
180 Maiden Lane
New York, NY 10038
By:   Stephan E. Hornung, Esq.
      Alex Talesnick, Esq.

**DOSHI LEGAL GROUP**
*Counsel for Oracle America, Inc.*
1979 Marcus Avenue, Suite 210E North
New Hyde Park, NY 11042
By:   Amish R. Doshi, Esq.

**PACHULSKI STANG ZIEHL & JONES LLP**
*Counsel for Official Committee of Unsecured Creditors*
780 Third Avenue, 34th Floor
New York, NY 10017
By:   Robert J. Feinstein, Esq.
      Bradford J. Sandler, Esq.
      Cia H. Mackle, Esq.

**SIMPSON THACHER & BARTLETT LLP**
*Counsel for A&E Television Networks, LLC*
425 Lexington Avenue
New York, NY 10017
By:   Nicholas E. Baker, Esq.
      Sunny Singh, Esq.

**SPIVAK LIPTON LLP**
*Counsel for Writers Guild of America, East*
1040 Avenue of the Americas, 20th Floor
New York, NY 10018
By:   Eric R. Greene, Esq.

**STARK & STARK**
*Counsel for Conopco, Inc. d/b/a Unilever United States, Inc.*
993 Lenox Drive, Building 2
Lawrence Township, NJ 08648
By:     Joseph H. Lemkin, Esq.

**BROWN & CONNERY, LLP**
*Counsel for Concur Technologies, Inc.*
6 North Broad Street
Woodbury, NJ 08096
By:     Donald K. Ludman, Esq.

**CONNOLLY GALLAGHER LLP**
*Counsel for Cigna Health and Life Insurance Company*
1201 North Market Street, 20th Floor
Wilmington, DE 19801
By:     Jeffrey C. Wisler, Esq.

**SHIPMAN GOODWIN, LLP**
*Counsel for Wilmington Trust, N.A.*
One Constitution Plaza
Hartford, CT 06103
By:     Marie C. Pollio, Esq.
        Latonia C. Williams, Esq.

**VORYS, SATER, SEYMOUR AND PEASE LLP**
*Counsel for CNN Productions, Inc. and Home Box Office, Inc.*
52 East Gay Street
Columbus, OH 43215
By:     Tiffany Strelow Cobb, Esq.

**HOLLAND & HART LLP**
*Counsel for Entertainment Industry Employers Association*
800 W. Main Street, Suite 1750
Boise, ID 83702
By:     Robert Faucher, Esq.

**MCGRAIL & BENSINGER LLP**
*Counsel for Entertainment Industry Employers Association*
888-C 8th Avenue, Suite 107
New York, NY 10019
By:     Veronique Urban, Esq.

**WHITE AND WILLIAMS LLP**
*Counsel for Fastly, Inc.*
7 Times Square, Suite 2900
New York, NY 10036
By:   James C. Vandermark, Esq.

**THE LAW OFFICE OF MAGDALENA ZALEWSKI PLLC**
*Counsel for Datasite, LLC*
1250 Broadway, 36th Floor
New York, NY 10001
By:   Magdalena Zalewski, Esq.

**UNITED STATES DEPARTMENT OF JUSTICE**
*Office of the United States Trustee*
One Bowling Green, Suite 534
New York, NY 10004
By:   Andrea Schwartz, Esq.
      Daniel Rudewicz, Esq.

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## INTRODUCTION[2]

Before the Court is the motion (the "Motion") [Docket No. 16] of Debtors Vice Group Holding Inc., *et al.* (the "Debtors") seeking an order approving the assumption of certain leases and assigning those leases to Vice Acquisition Holdco, LLC, the purchaser of substantially all of the Debtors' assets (the "Purchaser"). Debtors also filed four supplemental notices of the contracts to be assumed by Debtors and assigned to Purchaser [Docket Nos. 109, 179, 240, 254]. As of June 29, 2023, the objections of Web Holdings, LLC [Docket No. 117], 49 South Second Street LLC [Docket No. 118], Cigna Health and Life Insurance Company [Docket No. 140], Entertainment Industry Employers Association [Docket No. 141], American Broadcast Companies, Inc. [Docket No. 149], Fastly, Inc. [Docket No. 159], Datasite, LLC [Docket No. 164], GMN Cayman Holdco LLC [Docket No. 167], Concur Technologies, Inc. [Docket No. 169] and A&E Television

---

[2] References to "Docket No. __" are to filings entered on the docket in *In re Vice Group Holding Inc.*, Case No. 23-10738.

Networks, LLC [Docket No. 180] and CNN Productions, Inc. [Docket No. 186] have been settled. The objections of Oracle America Inc. ("Oracle") [Docket No. 160] and Showtime Networks Inc. ("Showtime") [Docket No. 174] remained outstanding.

Debtors filed a response to Showtime on June 29, 2023 [Docket No. 234], along with the Declaration of Frank A. Pometti in Support of Debtors' Reply to Objection and Reservation of Rights of Showtime to Debtors' Sale Motion (the "Pometti Declaration") [Docket No. 238] and the Declaration of Jay Weinberger (the "Weinberger Declaration") [Docket No. 236]. Frank A. Pometti is the Chief Restructuring Officer for Debtors and a partner and managing director of AlixPartners, LLP, and Jay Weinberger is a Managing Director in the Financial Restructuring Group of Houlihan Lokey Capital, Inc., financial advisor to Purchaser's owners. The Court approved the sale of substantially all of Debtors' assets on June 23, 2023 [Docket No. 214] and scheduled a hearing on the outstanding objections for June 29, 2023.

The Court held a hearing on the Motion on June 29, 2023 (the "Hearing"). At the Hearing, Debtors sought to admit the Pometti Declaration and the Weinberger Declaration. Although Showtime did not object to the entry of the declarations into evidence and did not seek to cross-examine the witnesses, it did object to statements made in paragraphs nine and ten of the Pometti Declaration and paragraph thirteen of the Weinberger Declaration. [Hr'g Tr. 39–40, 45–46.] The Court overruled both objections and admitted both the Pometti Declaration and the Weinberger Declaration into evidence in full. [*Id.* at 18, 42: 12–17, 56: 10–14.] At the hearing, Debtors asserted, and Oracle agreed, that the parties' outstanding issues were likely to be resolved, and the Court adjourned the matter to a future date. [*Id.* at 14–15.] Therefore, the only dispute concerns the objection of Showtime (the "Showtime Objection").

5

Pg 6 of 15

Based on the filings before the Court and the record made at the Hearing, the Court GRANTS the Motion and overrules the Showtime Objection.

## FACTUAL BACKGROUND

Debtors and Showtime are parties to an agreement (the "Showtime Contract") for the production and licensing of a television documentary series (the "Vice Series"), which Debtors seek to assume and assign to Purchaser. [Showtime Objection Ex. A; Reply ¶ 1.] Purchaser is an acquisition vehicle formed by three asset management companies: Fortress Credit Advisors LLC, Monroe Capital LLC and Soros Fund Management LLC (the "Prepetition Secured Lenders"). [Weinberger Declaration ¶ 6.] Combined, the Prepetition Secured Lenders had over $60 billion in assets under management as of March 31, 2023. [*Id.* at ¶¶ 7–9.] The Prepetition Secured Lenders lent Debtors $474.6 million under a prepetition secured debt facility, $57 million in new money loans to fund Debtors' operations and $10 million of new money debtor in possession financing. [*Id.* at ¶ 10.] Purchaser is acquiring Debtors' assets as a going concern and anticipates retaining management and key employees. [*Id.* at ¶¶ 11–13.]

The Vice Series is a "weekly newsmagazine docuseries featur[ing] award-winning journalists delivering on-the-ground-reporting on a wide range of pressing global issues." [Showtime Objection ¶ 10.] At the time the parties signed the Showtime Contract, Debtors had already become a notable creator of documentary series, including winning two Emmys. [*Id.*] The Vice Series has continued to win awards since airing on Showtime. [*Id.*]

Under the terms of the Showtime Contract, Debtors were to "produce, deliver, and license . . . a documentary series" up to eight seasons[3] for exhibition on Showtime's premium television

---

[3] The parties' pleadings are inconsistent on this point—Showtime states that the Showtime Contract "provided for an initial season and . . . options for up to five additional seasons," Debtors claim that they "would produce an initial season and grant[] Showtime the option to order the production of six subsequent seasons," and paragraph seven of the Agreed Terms in the Showtime Contract provides for options to order up to "six (6) seasons in addition to the first

network. [Showtime Objection Ex. A.] Showtime agreed to pay Debtors certain, specified amounts for each season of the Vice Series as long as Debtors met the episode minimums. [*Id.*] The Showtime Contract provides that "timely Delivery and the first-class technical quality of the [Vice] Series are of the essence of the [Showtime Contract]." [*Id.*] In performance of their duties under the Showtime Contract, Debtors oversee production activities, "writ[e] and assist[] in the development of ideas and concepts," supply personnel and administer licenses, releases and contracts. [Showtime Objection ¶ 11.] Showtime has approval rights over creative elements and key personnel involved in creating the Vice Series, including "talent, executive producers, showrunner, director, line producer, production accountant, production counsel and department heads." [Showtime Objection Ex. A.] Showtime also has takeover rights if the "approved director of the [Vice] Series shall be incapacitated from performing directing services." [*Id.*] However, the Showtime Contract does not identify specific individuals required to produce the Vice Series. [Pometti Declaration ¶ 4.] Showtime is currently airing the first part of season 4 of the Vice Series, with the second part of season 4 planned to air later this year. [Hr'g Tr. 24: 8–15.]

## LEGAL STANDARD

Under 11 U.S.C. § 365(a), a debtor in possession may, "subject to the court's approval . . . assume or reject any executory contract or unexpired lease of the debtor." In determining whether a contract is executory, most courts look to the Countryman test, which defines an executory contract as "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *In re Times Square JV LLC*, 648 B.R. 277,

---

two seasons." [Showtime Objection ¶ 12; Reply ¶ 4; Showtime Objection Ex. A.] The Court need not identify the exact number of seasons in order to resolve the issue at hand, as the parties agree that Showtime ordered third and fourth seasons of the Vice Series. [Showtime Objection ¶ 13; Reply ¶ 4.]

23-10738-jpm    Doc 256    Filed 07/09/23    Entered 07/09/23 16:10:35    Main Document
                                    Pg 8 of 15

284 (Bankr. S.D.N.Y. 2023) (citing *In re Penn Traffic Co.*, 524 F.3d 373, 379 (2d Cir. 2008) (quoting Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973))). However, if performance only remains due on one side, the contract is not executory. *In re Hawker Beechcraft, Inc.*, 486 B.R. 264, 276 (Bankr. S.D.N.Y. 2013). According to the legislative history of 11 U.S.C. § 365, executory contracts "generally include[] contracts on which performance remains due to some extent on both sides." H.R. Rep. No. 95–595, at 347 (1977), 1978 U.S.C.C.A.N. 5963, 6303; S. Rep. No. 95–989, at 58 (1978), 1978 U.S.C.C.A.N. 5787, 5844; *accord NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6 (1984).

Under 11 U.S.C. § 365(c)(1), a debtor in possession may not assume or assign an executory contract if

> applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and such party does not consent to such assumption or assignment.

Exceptions to assignability under 11 U.S.C. § 365(c)(1) are narrowly construed, as executory contracts can be valuable assets for the debtor's estate. *In re Grove Rich Realty Corp.*, 200 B.R. 502, 506–07 (Bankr. E.D.N.Y. 1996). The Showtime Contract is governed by California law, which prevents the assignment of contracts for personal services. *Superbrace, Inc. v. Tidwell*, 21 Cal. Rptr. 3d 404, 415–16 (Cal. Ct. App. 2004) (citing *Gribling v. Bohan*, 148 P. 530, 531 (Cal. Dist. Ct. App. 1915); [Showtime Objection Ex. A.] Courts make the determination of whether a contract is for personal services under state law in consideration of all facts and circumstances. *In re Health Plan of the Redwoods*, 286 B.R. 407, 409 (Bankr. N.D. Cal. 2002) (citing *In re Headquarters Dodge, Inc.*, 13 F.3d 674, 683 (3d Cir. 1993)). A "personal services" contract is one in which a special relationship exists between the parties or the skill possessed by the performing

8

party is specialized or unique such that no replacement performance could satisfy the contractual requirements. *Id.* Contracts to serve as a general manager and artist recording contracts are contracts for personal services, while franchise agreements and contracts for physician services are not. *Compare id.* (holding that seventeen "essentially identical" physician contracts were not contracts for personal services), *and Husain v. McDonald's Corp.*, 140 Cal. Rptr. 3d 370, 378–79 (Cal. Ct. App. 2012) (holding that a franchising and licensing agreement was not a personal services contract), *with Rautenberg v. Westland*, 38 Cal. Rptr. 797, 801 (Cal. Dist. Ct. App. 1964) (holding that an agreement to serve as a general manager was a contract for personal services), *and Beverly Glen Music, Inc. v. Warner Commc'ns, Inc.*, 224 Cal. Rptr. 260, 261–62 (Cal. Ct. App. 1986) (holding that an artist's recording contract was a contract for personal services). Courts applying California law have found the fact that a party contracted with a corporation as evidence that a contract is not for personal services. *See Lauter v. Rosenblatt*, 2020 WL 3545733, at *3 (C.D. Cal. June 30, 2020); *Haldor, Inc. v. Beebe*, 164 P.2d 568, 572–73 (Cal. Dist. Ct. App. 1945). "These services are not assignable by the party under obligation to perform without the consent of the other contracting party." *In re Rooster, Inc.*, 100 B.R. 228, 232 (Bankr. E.D. Pa. 1989).

Under 11 U.S.C. § 365(f)(2)(B), a debtor in possession "may assign an executory contract or unexpired lease . . . only if adequate assurance of future performance by the assignee of such contract or lease is provided." "Adequate assurance of future performance" is not defined in the Bankruptcy Code, and the term is given a "pragmatic construction" based on the facts of the case. *In re Bygaph, Inc.*, 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986). Adequate assurance of future performance does not require insurance of success or profit. *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985). The primary focus is the assignee's ability to provide the counterparty with the full benefit of its bargain, including an analysis of assignee's financial

9

condition and ability to meet financial obligations. *Matter of U.L. Radio Corp.*, 19 B.R. 537, 541–42 (Bankr. S.D.N.Y. 1982). However, the assignee is not required to literally comply with each term of the contract. *Id.* at 544. As noted *supra*, exceptions to a debtor in possession's ability to assume and assign executory contracts are construed narrowly.

## **DISCUSSION**

At the Hearing, Debtors asserted, and Showtime did not dispute, that Debtors are current on their obligations under the Showtime Contract and no cure amount exists.[4] [Hr'g Tr. 21: 2–5.] The parties also do not dispute that the Showtime Contract is executory in nature. The remaining issues are (i) whether the Showtime Contract is a contract for personal services and therefore unassumable and unassignable and (ii) whether Purchaser has provided adequate assurance of future performance of the Showtime Contract as required for assignment under 11 U.S.C. § 365(f)(2)(B). The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1) and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

### A. **The Showtime Contract Is Not a Contract for Personal Services**

Showtime alleges that California law, which governs the contract, prohibits the assignment of personal services contracts, such as the Showtime Contract, absent Showtime's consent pursuant to 11 U.S.C. § 365(c). [Showtime Objection ¶ 14.] As the production of the Vice Series involves "a personal relation of confidence that is reliant on Vice Media's specialized skills and knowledge," Showtime argues that the Showtime Contract is a "quintessential personal services contract." [*Id.* at ¶ 17.] Showtime notes that Debtors have unique skills that have resulted in award-

---

[4] Debtors assert that Showtime has thus far failed to remit payment for the production and delivery of part of season 4 of the Vice Series, which Debtors claim was due on June 16, 2023. [Reply ¶¶ 27–29.] Showtime disputes owing Debtors this payment. [Hr'g Tr. 46: 20–25.]

10

winning documentary productions. [*Id.*] Furthermore, Showtime expresses concern that Purchaser will not retain the key personnel and creative talent involved with the Vice Series. [*Id.* at ¶ 19.] As evidence that Showtime bargained for the personal services of specific individuals, Showtime points to language in the Showtime Contract that provides for Showtime to have approval rights over key personnel and replacement of the director. [*Id.* at ¶ 18.] Showtime also contends that, while anti-assignment clauses are not typically honored in bankruptcy, they are honored where "specified personal services are required by the contract." [*Id.* at ¶ 20.] Ultimately, Showtime states that it "bargained for Vice News produced by Vice, not Vice by Fortress." [Hr'g Tr. 41: 21–22.]

While Debtors agree that personal services contracts cannot be assigned absent consent under California law, Debtors dispute Showtime's characterization of the Showtime Contract and contend that it is not a contract for personal services. [*Id.* at 21: 11–20.] Debtors argue that the Showtime Contract does not identify specific individual performances for which Showtime bargained. [Reply ¶ 11.] Moreover, Debtors state that Showtime will suffer no harm if the Showtime Contract is assigned, since Purchaser plans on retaining "existing management and the key employees" that currently produce the Vice Series. [*Id.* at ¶ 17.] As the same staff would produce the Vice Series regardless of owner, Debtors contend that Showtime would be in the same position whether the Showtime Contract is assigned to Purchaser or assumed by Debtors. [*Id.* at ¶¶ 19–21.]

The Court finds that the Showtime Contract is not a contract for personal services, and, therefore, the Showtime Contract is not excepted from assumption and assignment under 11 U.S.C. § 365(c)(1). Showtime contracted with a corporate entity rather than an individual, which is evidence that the contract is not one for personal services. *See Lauter v. Rosenblatt*, 2020 WL

11

3545733, at *3; [Showtime Objection Ex. A.] The Showtime Contract requires Debtors to "produce, deliver, and license" the Vice Series to Showtime, requirements Purchaser asserts it can meet. [Showtime Objection Ex. A; Weinberger Declaration ¶¶ 11–14; Hr'g Tr. 48: 2–18.] "Timely Delivery" and "first-class technical quality" are "of the essence" of the Showtime Contract. [Showtime Objection Ex. A.] These requirements are not sufficiently specific to qualify as personal services, and Showtime would be able to receive the benefit of its bargain from Purchaser. *See In re Health Plan of the Redwoods*, 286 B.R. at 409–10. Although the Showtime Contract gives Showtime some control over key personnel, the contract does not identify specific individuals to be involved in the creation of the Vice Series. [Pometti Declaration ¶ 4.] Showtime relies on Debtors to furnish the services of "basically every single person that is involved in making the show, from the on-air talent, to the camera operator, to the editors after filming has wrapped." [Hr'g Tr. 34: 23–25.] The inclusion of a provision allowing Showtime control over key personnel, including "the right to require Producer to dismiss or replace any such key personnel," demonstrates that the parties anticipated the replacement of at least some employees. [Showtime Objection Ex. A.] Additionally, Debtor is transferring its assets to Purchaser as a going concern, ensuring continuity in the production of the Vice Series. [Pometti Declaration ¶ 10; Weinberger Declaration ¶ 13.]

Showtime relies on a California appellate case, *Woolley v. Embassy Suites, Inc.*, for the proposition that, under California law, a personal services contract exists where the contract "call[s] for a series of complex and delicate business decisions and require[s] mutual cooperation and trust." *Woolley v. Embassy Suites, Inc.*, 278 Cal. Rptr. 719, 727 (Cal. Ct. App. 1991); [Showtime Objection ¶ 21.] The *Woolley* decision concerned different circumstances than the instant issue before the Court, as the *Woolley* defendant opposed plaintiffs' request for a judicial

declaration that a contract for management services could be terminated. *Woolley*, 278 Cal. Rptr. at 721–22. The *Woolley* court found that, under California's Civil Code and the Thirteenth Amendment, the defendant could not compel the plaintiffs to perform under the management contract because it was a personal services contract. *Id.* at 727. Here, Showtime seeks to prevent the assignment of the Showtime Contract to another party rather than a declaration that the Showtime Contract can be terminated. [Showtime Objection ¶ 1.] Unlike *Woolley*, the present case does not implicate prohibitions on ordering specific performance of personal services contracts.

Furthermore, the court in *Woolley* found the contract at issue a personal services contract because the contract was managerial in nature, relying on Corbin on Contracts. *Woolley*, 278 Cal. Rptr. at 727. Corbin on Contracts lists "the contracts of actors and artists, managers, sales agents, school-teachers, mechanics, cooks, and contracts for the furnishing of personal care and support" as examples of personal services contracts. 5A Corbin on Contracts § 1204 (1964 ed.). Unlike the contract in *Woolley*, the Showtime Contract is not a management contract. The first paragraph of the Showtime Contract's Agreement provides that Debtors "shall produce, deliver, and license" the Vice Series to Showtime. [Showtime Objection Ex. A.] The second and third paragraphs of the Agreed Terms in the Showtime Contract states that Showtime will pay Debtors for each season of the Vice Series produced and set a delivery date for the first season. [*Id.*] The Showtime Contract also provided Showtime with the option to order additional seasons of the Vice Series, rather than an extension for a certain time period. [*Id.*] These provisions are indicative of a contract for the creation and delivery of a product rather than the management of a project. Moreover, the Showtime Contract does not evidence the "mutual confidence" and "degree of close cooperation" demonstrated by the *Woolley* plaintiffs. According to Showtime, Debtors are required to produce the Vice Series, which "requires everything . . . includ[ing] writing and assisting in the

13

development of ideas and concepts for the [Vice Series]; entering into and administering all required licenses, releases and contracts; [and] furnishing the services of all below-the-line and above-the-line personnel." [H'rg Tr. 34: 17–22.] Although Showtime exercises some control over key personnel, Showtime also stated at the Hearing that it "trust[s] [Debtors] to choose the right employees." [*Id.* at 41: 15–22.] The language of the Showtime Contract and the arguments made at the Hearing demonstrate that Showtime contracted for the production, delivery and licensing of a finished product rather than a partnership requiring close cooperation. Therefore, the Court finds *Woolley* distinguishable from the present case.[5]

### B. Purchaser Has Provided Adequate Assurance of Future Performance

Showtime also argues that Debtors and Purchaser have not provided adequate assurance of future performance as required by 11 U.S.C. § 365(f)(2)(B). [Showtime Objection ¶ 22.] Showtime further states that it has not received an adequate assurance package and reserves all rights until it receives "adequate information to make an informed decision." [*Id.*] Debtors respond that payment for the first part of season 4 of the Vice Series will be applied toward production of the second part of season 4, Purchaser will not be encumbered by the significant debt that currently burdens Debtors and Purchaser will retain the staff necessary to produce the second part of season 4 of the Vice Series. [Reply ¶ 26.]

The Court finds that Purchaser has provided adequate assurance of future performance pursuant to 11 U.S.C. § 365(f)(2)(B). Both the Pometti Declaration and the Weinberger Declaration aver that the deleveraging of the Debtors' assets will leave the Purchaser in a stronger financial position than Debtors. [Pometti Declaration ¶ 15; Weinberger Declaration ¶ 12.]

---

[5] As noted *supra*, *In re Health Plan of the Redwoods*, cited by the Showtime Objection, found that the contracts of seventeen medical doctors, which required those doctors to provide physician services to members and make arrangements to ensure continuity of care when the doctors were unavailable, were not contracts for personal services. 286 B.R. at 409; [Showtime Objection ¶ 16.]

14

Furthermore, the Prepetition Secured Lenders, owners of the Purchaser, have advanced $57 million in new money loans and $10 million in new money debtor in possession financing. [Weinberger Declaration ¶ 10.] According to the Pometti Declaration and the Weinberger Declaration, Purchaser has agreed to utilize the same team that produced the first part of season 4 of the Vice Series to produce the second part of season 4. [*Id.* at ¶ 14; Pometti Declaration ¶ 10.] Considering the Prepetition Secured Lender's financial commitments to Debtor and Purchaser's plans to retain management and creative talent, the Court finds that Purchaser is likely to be able to perform under the Showtime Contract and has provided adequate assurance of its ability to do so.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the Debtors' Motion to assume and assign the Showtime Contract and overrules the Showtime Objection. Debtors shall submit a proposed order consistent with the findings in this decision.

Dated: July 7, 2023
      New York, New York

                              /s/John P. Mastando III
                              HON. JOHN P. MASTANDO III
                              UNITED STATES BANKRUPTCY JUDGE