**ACCEPTANCES OR REJECTIONS WITH RESPECT TO THE PLAN WILL BE SOLICITED PURSUANT TO THIS DISCLOSURE STATEMENT, WHICH THE BANKRUPTCY COURT HAS YET TO APPROVE ON A PROVISIONAL BASIS AND WHICH REMAINS SUBJECT TO FINAL APPROVAL AT THE COMBINED HEARING.  THE DEBTORS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT. THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITIATION VERISON AND IS NOT INTENDED FOR SOLICITATION OF VOTES ON THE PLAN.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VENUS LIQUIDATION INC., *et al.* | Case No. 23-10738 (JPM) |
| Debtors.[1] | (Jointly Administered) |

### DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN
### OF LIQUIDATION FOR VENUS LIQUIDATION INC.
### (F/K/A VICE GROUP HOLDING INC.) AND CERTAIN OF ITS AFFILIATES

TOGUT, SEGAL & SEGAL LLP
Frank A. Oswald
Kyle J. Ortiz
Brian F. Moore
John C. Gallego
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000

*Counsel to the Debtors*
*and Debtors in Possession*

Dated: February 8, 2024
        New York, New York

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Venus Liquidation Inc. (f/k/a Vice Group Holding Inc.) (4250); Vice Impact Inc. (9603); Vice Media LLC (5144); Villain LLC (3050); Boy Who Cried Author LLC (6199); Carrot Operations LLC (1596); Carrot Creative LLC (8652); Channel 271 Productions LLC (1637); Clifford Benski, Inc. (9387); Dana Made LLC (1065); Inverness Collective LLC (6542); JT Leroy Holding LLC (7555); PLDM Films LLC (5217); Project Change LLC (2758); R29 Pride, LLC (7011); R29 Productions, LLC (6344); Refinery 29 Inc. (7749); Valvi LLC (6110); Vice Content Development, LLC (5165); Vice Distribution LLC (5515); Vice Europe Holding Limited (N/A); Vice Europe Pulse Holding Limited (N/A); Vice Food LLC (1693); Vice Holding Inc. (2658); Vice International Holding, Inc. (5669); Vice Music Publishing LLC (3022); Vice Payroll LLC (6626); Vice Productions LLC (5399); Vice Project Services LLC (6473); Virtue Worldwide, LLC (7212); Visur LLC (9336); VTV Productions LLC (6854); and Goldie Films, Inc. (1241). The location of the debtors' service address for purposes of these chapter 11 cases is c/o Alix Partners 909 Third Avenue 30th Floor, New York, NY 10022

## INTRODUCTION AND DISCLAIMER

On May 15, 2023 (the "Petition Date"), Venus Liquidation Inc. (f/k/a Vice Group Holding Inc.) ("Vice" or "Vice Parent") and certain of its affiliates, the debtors and debtors in possession (collectively, the "Debtors" and, together with non-Debtor affiliates, the "Company"), commenced the above-captioned cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").[2] The Chapter 11 Cases are being jointly administered under the caption *In re Venus Liquidation Inc.*, Case No. 23-10738 (JPM).

The Debtors submit this Disclosure Statement to all Holders of Claims against the Debtors entitled to vote on the *Chapter 11 Plan of Liquidation for Venus Liquidation Inc. (f/k/a Vice Group Holding, Inc.) and Certain of Its Affiliates*, a copy of which is attached hereto as **Exhibit A** (as it may be amended, supplemented, or otherwise modified from time to time, the "Plan").[3]

The purpose of this Disclosure Statement is to provide Holders of Claims entitled to vote on the Plan with adequate information to make an informed judgment as to whether to vote to accept or reject the Plan. The Debtors are providing you with the information in this Disclosure Statement because you may be a creditor entitled to vote on the Plan. This Disclosure Statement is to be used solely in connection with evaluation of the Plan and not for any other purposes.

To be counted, your Ballot must be duly completed, executed, and actually received by 5:00 p.m. (Eastern Time) on [_____] [__], 2024 (the "Voting Deadline"). Ballots may either be delivered:  (a) via electronic, online transmission by utilizing the eBallot platform on the Debtors' case website (https://cases.stretto.com/vice/), or (b) by paper copy to the Vice Ballot Processing c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602.

The Debtors believe that the Plan is in the best interests of creditors and other stakeholders and is a fair and equitable means of moving these Chapter 11 Cases toward efficient resolution. All creditors entitled to vote on the Plan are urged to vote in favor of it.

THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTORS AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY PROVIDE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN

---

[2]    On May 30, 2023, Debtor Goldie Films, Inc. also commenced a case by filing a voluntary chapter 11 petition with this Court.

[3]    Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.

THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL HOLDERS OF GENERAL UNSECURED CLAIMS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT (INCLUDING EXHIBITS) AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.   PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ATTACHED TO THE PLAN, AND ANY PLAN SUPPLEMENT(S). THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, LITIGATIONS, AND APPEALS, INCLUDING, FOR THE AVOIDANCE OF DOUBT, LITIGATION CLAIMS PENDING AS OF THE FILING OF THESE CHAPTER 11 CASES OR COMMENCED AFTER THE FILING OF THESE CHAPTER 11 CASES, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.   THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING, NOR WILL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS.

Rules of Interpretation

For purposes of this Disclosure Statement, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural;  (b) each pronoun stated in the masculine, feminine, or neuter gender includes the masculine, feminine, and neuter gender;  (c) any reference in this Disclosure Statement to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented;  (d) any reference to an entity as a Holder

of a Claim or Interest includes such Holder's successors and assigns; (e) all references in this Disclosure Statement to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Disclosure Statement;   (f) the words "herein," "hereunder," and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement;  (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Disclosure Statement;  (h) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (i) all references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, unless otherwise stated;  (k) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to this Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day;  (l) unless otherwise specified, all references in this Disclosure Statement to monetary figures shall refer to currency of the United States of America;  (m) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply;  (n) to the extent this Disclosure Statement is inconsistent with the terms of the Plan, the Plan shall control;  and (o) to the extent this Disclosure Statement is inconsistent with the Confirmation Order, the Confirmation Order shall control.

TABLE OF CONTENTS

I.     EXECUTIVE SUMMARY OF THE PLAN OF LIQUIDATION ................................1

II.    THE DEBTORS' BUSINESS AND PREPETITION  CAPITAL STRUCTUREAND
       DEBT OBLIGATIONS.................................................................................................3

       A.     Business Segments and Organizational Structure. ........................................3

       B.     The Funded Debt Obligations........................................................................4

       C.     Trade and Lease Obligations .........................................................................7

       D.     The Preferred Stock .......................................................................................7

III.   CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES .........................9

IV.    THE CHAPTER 11 CASES AND THE POSTPETITION SALE PROCESS............10

       A.     First Day Motions and Appointment of Creditors' Committee ..................10

       B.     The DIP Financing ......................................................................................12

       C.     Postpetition Sale Process ............................................................................13

       D.     Transition Services Agreement....................................................................14

       E.     Estate Professionals ....................................................................................15

       F.     Summary of the Debtors' Assets and Liabilities .........................................15

       G.     Antenna Stipulation and Committee Stipulation with Purchaser...............16

V.     SUMMARY OF THE PLAN OF LIQUIDATION ......................................................17

       A.     Unclassified Claims ....................................................................................18

       B.     Classification and Treatment of Claims and Interests.................................19

       C.     Means For Implementation Of The Plan and The Plan Administrator ......23

       D.     Other Miscellaneous Plan Provisions .........................................................26

       E.     Exculpation and Releases ............................................................................27

       F.     No Discharge................................................................................................32

VI.    SOLICITATION PROCEDURES AND SOLICITATION PACKAGE....................32

       A.     Voting Procedures and Voting Deadline .....................................................33

     B.     Combined Hearing and Deadline for Objections to Final Disclosure
Statement Approval and Plan Confirmation.....................................................34

VII.     REQUIREMENTS FOR CONFIRMATION OF THE PLAN.....................................35

     A.     Requirements of Section 1129(a) of the Bankruptcy Code ...........................35

     B.     Best Interests Test and Liquidation Analysis .................................................36

     C.     Requirements of Section 1129(b) of the Bankruptcy Code ...........................37

VIII.    RISK FACTORS TO BE CONSIDERED........................................................................38

     A.     There May Not Be Recoveries for Holders of Allowed General Unsecured
Claims............................................................................................................38

     B.     Impact of the Governmental Bar Date............................................................39

     C.     Recoveries on Account of Retained Causes of Action are Speculative and
Uncertain........................................................................................................39

     D.     Failure to Identify Litigation Claims or Projected Objections......................39

     E.     Potential Tax Obligations ...............................................................................39

     F.     Tax Consequences ..........................................................................................39

     G.     Risk of Delayed Effective Date ......................................................................40

     H.     No Representation Outside This Disclosure Statement Are Authorized...40

IX.     CONCLUSION AND RECOMMENDATION .........................................................40

## I.    EXECUTIVE SUMMARY OF THE PLAN OF LIQUIDATION[4]

The Plan is premised upon (i) the sale of substantially all of the Debtors' assets (the "Sale") to Vice Acquisition Holdco, LLC (including any Buyer Designee, as that term is defined in the Asset Purchase Agreement, the "Purchaser"), a consortium comprised of affiliates of Fortress Investment Group, Soros Fund Management and Monroe Capital, under section 363 of the Bankruptcy Code and pursuant to an asset purchase agreement attached as Exhibit A to the Bankruptcy Court order dated June 23, 2023 [Docket No. 214] (the "Sale Order") (as such agreement was amended, supplemented, or otherwise modified from time to time, the "Asset Purchase Agreement"), and (ii) the settlement (the "Committee Settlement") embodied in the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, (IV) Granting Adequate Protection to Prepetition Secured Parties, and (V) Granting Related Relief,* which was approved by the Bankruptcy Court on June 13, 2023 [Docket No. 138] (the "DIP Financing Order"), among the Debtors, the official committee of unsecured creditors (the "Creditors' Committee"), Fortress Credit Corp., as administrative agent (in such capacity, the "DIP Administrative Agent"), Wilmington Trust, National Association, as collateral agent (in such capacity, the "DIP Collateral Agent," and together with the DIP Administrative Agent, the "DIP Agents,") on behalf of the lender parties to the DIP Credit Agreement the "DIP Lenders" and DIP Agents, collectively, the "DIP Secured Parties"), and Prepetition Secured Parties (as defined in the Plan).

The Sale was the result of extensive good-faith negotiations among the Debtors, the Creditors' Committee, and the Purchaser.  With the closing of the Sale on July 31, 2023, the Debtors have liquidated their primary tangible assets and satisfied substantially all of their secured debt obligations.

The Debtors are proposing the Plan in form and substance agreeable to the Creditors' Committee.  The Plan shall require that the GUC Cash Reserve, all GUC Reserved Litigation Claims, and any Excluded Assets (as defined herein and the Asset Purchase Agreement) be used to the extent necessary to satisfy the priorities set forth in the Bankruptcy Code, and any remaining cash that is not required to be used to pay administrative expenses, other statutory priority claims, or statutory secured claims, as required under the Bankruptcy Code, in each case, as of the Effective Date of an approved Chapter 11 Plan, shall be distributed for the benefit of general unsecured creditors by a Plan Administrator to be selected by the Creditors' Committee after consultation with the Debtors.  The Plan also provides that the Plan Administrator will continue to liquidate and wind down any remaining assets of the Debtors not sold prior to the Effective Date.

Under the Committee Settlement, any general unsecured deficiency claims of the Prepetition Secured Parties on account of the Prepetition Secured Credit Agreement Claims shall be subordinated in right of payment to other general unsecured creditors entitled to distribution from the Debtors' estates under the Plan.  In

---

[4]    The following is a summary of the Plan and the Committee Settlement.  This Executive Summary is not intended to be comprehensive.  To the extent anything in this Executive Summary is contrary to the terms of the Plan or the Committee Settlement, the Plan or Committee Settlement, as applicable, shall govern and control.

the event that the Plan Administrator, in the aggregate, distributes $12 million of cash or other consideration to the Debtors' general unsecured creditors (the "Sharing Threshold"), then the Prepetition Secured Parties shall have the right to participate as based on the pro rata amount of any general unsecured deficiency claim of the Prepetition Secured Parties on account of the Prepetition Secured Credit Agreement Claims on amounts to be distributed by in excess of the Sharing Threshold. The Plan also provides that the Plan Administrator will continue to liquidate and wind down any remaining assets of the Debtors.

The Plan establishes a Plan Administrator to pursue GUC Reserved Litigation Claims and maximize the value of any remaining estate assets. Under the Plan, Holders of Allowed General Unsecured Claims will receive distributions in accordance with the Plan and the priorities established by the Bankruptcy Code and applicable orders of the Bankruptcy Court. The Plan ensures that at least $500,000 from the GUC Cash Reserve will allow the Plan Administrator to effectively pursue the GUC Reserved Litigation Claims on behalf of the unsecured creditors and to complete the administration of the Chapter 11 Cases. In addition to the GUC Cash Reserve, the Plan establishes two other reserve accounts: (i) the Disputed Claims Reserve, and (ii) the Professional Fee Escrow.

The GUC Cash Reserve will be funded with $500,000 less any amounts that may be used between the Sale Closing Date and the Effective Date to fund the costs of the Chapter 11 Cases, including the satisfaction of Allowed Claims on or prior to the Effective Date in accordance with the terms of the Plan and any orders of the Bankruptcy Court. Following the Effective Date, the funds in the GUC Cash Reserve will be used to pay Allowed Administrative Claims (other than Professional Fee Claims), Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Other Priority Claims that have not otherwise been satisfied as of the Effective Date (collectively, the "Plan Reserve Obligations"). Any funds remaining in the Plan Reserve Account following satisfaction or disallowance of all Plan Reserve Obligations will become cash that can be distributed to creditors.

The Disputed Claims Reserve will be established for the benefit of the Holders of Disputed General Unsecured Claims that subsequently become Allowed Claims.

Finally, the Professional Fee Escrow will be funded with the Professionals' estimated Accrued Professional Compensation through the Effective Date and will be used to pay Professional Fee Claims following final approval of such compensation by the Bankruptcy Court.

The Plan will allow the Debtors to expeditiously conclude the Chapter 11 Cases. Accordingly, the Debtors believe that implementation of the Plan is in the best interests of the Debtors and their stakeholders and is the best possible alternative to maximize value for Holders of Allowed Claims. There can be no guarantee under either an alternative chapter 11 plan or a chapter 7 liquidation that Holders of Allowed General Unsecured Claims would receive any recovery. Other Claims senior to General Unsecured Claims may arise and become Allowed Claims, including claims raised by parties subject to the Governmental Bar Date, and other unforeseeable and potentially

material claims or other necessary costs of administering the estates may arise which may materially impact the distribution to unsecured creditors.  In either case, if the payment of such Claims is necessary to achieve confirmation of an alternative plan, the Creditors' Committee may or may not support such plan.

Confirmation of the Plan will be considered by the Bankruptcy Court at the Combined Hearing (as defined below).  Among other requirements, for the Plan to be confirmed, an impaired Class of Claims, which include, but are not limited to, Class 4 (Prepetition Senior Secured Credit Agreement Claims), Class 5 (JPM Overdraft Facility Claims), Class 6 (Senior Subordinated Notes Claims), Class 7 (Pulse Note Claims), and Class 8 (General Unsecured Claims), must vote to accept the Plan.  An impaired Class of Claims has voted to accept the Plan if Holders of Allowed Claims in such Class that hold at least two-thirds in amount of and more than one-half in number of the Allowed Claims held by Holders of Claims in such Class (excluding insiders) have voted to accept the Plan.

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will not be converted to a liquidation under chapter 7 of the Bankruptcy Code.  While a chapter 7 liquidation would have the same goal, the Plan provides the best source of recovery because: (i) a chapter 7 liquidation may not provide for a timely distribution to Holders of Allowed Claims; and (ii) distributions would likely be smaller due to additional administrative costs, including those of a chapter 7 trustee and its professionals.  Accordingly, if the Plan is not confirmed, it is likely that creditors will realize lower recoveries on account of their Allowed Claims, if any.

**ACCORDINGLY, THE DEBTORS BELIEVE THAT THE TREATMENT BY THE PLAN OF HOLDERS OF CLAIMS IN THE IMPAIRED CLASSES THAT ARE ELIGIBLE TO VOTE WILL YIELD A GREATER RECOVERY FOR SUCH HOLDERS THAN WOULD BE AVAILABLE IN A CHAPTER 7 LIQUIDATION. ACCORDINGLY, THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF HOLDERS OF SUCH CLAIMS.**

For the reasons discussed in this Disclosure Statement, the Debtors urge you to return your Ballot accepting the Plan by the Voting Deadline.

## II.    THE DEBTORS' BUSINESS AND PREPETITION CAPITAL STRUCTUREAND DEBT OBLIGATIONS

### A.    Business Segments and Organizational Structure.

*VICE* traces its roots back to 1994, when Shane Smith, co-founded and launched *Voice of Montreal*, an alternative punk focused magazine, in Montreal, Quebec, Canada.  From those humble beginnings *VICE* expanded into a global, multi-platform media company with a collection of powerful brands, producing premium award-winning content for a highly engaged global youth audience.   The Company was comprised of Vice Parent, and 189 wholly owned subsidiaries, of which 33 are Debtors

in these Chapter 11 Cases. Until the Sale, discussed below, the Company operated globally spanning three primary regions:

- North America which comprised the United States and Canada.

- Europe and Middle East which included offices in Eastern Europe, Western Europe, the Nordic countries, and the Middle East.

- Asia Pacific which includes operations in India, China, Korea, Singapore, Japan and Australia.

*VICE* operated through five primary business segments: (i) the studios group (ii) publishing (iii) *VICE* TV, and (iv) VIRTUE, a creative advertising agency and (v) *VICE* News. As *VICE* had been exploring options to restructure its business operations, it had been evaluating whether to combine certain business segments.

### B. The Funded Debt Obligations

As of the Petition Date, the Debtors' capital structure included, in addition to certain lease obligations and other trade debt obligations, approximately $834 million of obligations under the Debtors funded debt issued or guaranteed by the Debtors (the "<u>Funded Debt Obligations</u>"). The Funded Debt Obligations comprised the following:

| Debt | Amount Outstanding |
|---|---|
| Prepetition Senior Secured Credit Agreement | $474.6 million |
| JPM Overdraft Facility | $9.8 million[5] |
| The Pulse Notes | $20.9 million |
| Senior Subordinated Notes | $328.7 million |
| **Total Funded Debt** | **$834 million** |

### 1. Prepetition Senior Secured Credit Agreement

As of the Petition Date, the Debtors had a total of $474.6 million aggregate principal amount (inclusive of principal, PIK interest, and PIK forbearance fees) of term loans (the "<u>Prepetition Senior Secured Term Loans</u>") outstanding under that certain Amended and Restated

---

[5]    As discussed below, the JPM Overdraft Facility is denominated in British pounds sterling.  The U.S. dollar amounts set forth in this table represent and approximation based upon the conversions of GBP to USD.

Credit and Guaranty Agreement, dated November 4, 2019, as amended from time to time, through Amendment No. 33 to Amended and Restated Credit and Guaranty Agreement, dated as of May 9, 2023 (the "<u>Prepetition Senior Secured Credit Agreement</u>"), by and among Vice Parent, as borrower, certain subsidiaries of Vice Parent from time to time party thereto as guarantors, the lenders thereto (the "<u>Prepetition Term Lenders</u>"), the Prepetition Administrative Agent, and Wilmington Trust, National Association, as collateral agent (in such capacity, the "<u>Prepetition Collateral Agent</u>"). All obligations under the Prepetition Senior Secured Credit Agreement and the guarantees of those obligations were secured by a first-priority security interest in substantially all of the property and assets of the Debtors (the "<u>Prepetition Collateral</u>").

### 2.    JPM Overdraft Facility

Certain of the Debtors had outstanding guarantee obligations under an uncommitted multicurrency overdraft facility pursuant to that certain Uncommitted Overdraft Facility, dated October 17, 2016 (as amended, supplemented, or modified from time to time, the "<u>Overdraft Facility</u>") between Vice Europe Holding Limited ("<u>VEHL</u>") and JPMorgan Chase Bank, N.A. ("<u>JPMC</u>"). JPMC had setoff rights against the Debtors and was secured pursuant to an Assignment of Deposits among Debtor Vice, Debtor Vice Media LLC ("<u>Vice Media</u>") and JPMC, dated May 1, 2019, pledging certain deposit accounts held by Vice Media and its subsidiaries in favor of JPMC as security for costs and expenses incurred by JPMC in connection with the covered bank accounts. The Prepetition Overdraft Facility was also a secured "Cash Management Agreement" under the Prepetition Credit Agreement and was supported by a *pari passu* security interest in the Prepetition Collateral. As of the Petition Date, there were outstanding obligations under the Overdraft Facility of approximately $9.8 million.

### 3.    The Pulse Notes

In connection with the Company's 2016 acquisition of a majority stake in Pulse, Debtor Vice Holding Inc. ("<u>Vice Holding</u>") entered into a shareholders agreement with the original founders and sellers of Pulse (the "<u>Pulse Sellers</u>"), which allowed such sellers to put their shares in Pulse Films to VEHL, such that it would be required to purchase such sellers' shares of Pulse Films (the "<u>Pulse Seller Shares</u>") for an amount determined in accordance with a specified formula (the "<u>Put Option</u>").

In April 2021, the Pulse Sellers exercised their Put Option, which would have obligated the Company to pay $53,240,000 in cash In lieu of paying the obligations due in respect of the Put Option, on December 8, 2021, a wholly owned subsidiary of VEHL, Vice Europe Pulse Holding Limited ("<u>VEPH</u>"), purchased the Pulse Seller Shares by paying a total aggregate amount of $10 million in cash and issuing $43,240,000 of 10% secured and guaranteed redeemable loan notes due 2023 (the "<u>Pulse Notes</u>") to the Pulse Sellers. VEPH's obligations in respect of the Pulse Notes were guaranteed by VEH and Vice Holding. To secure its obligations under the Pulse Notes, VEPH pledged 100% of its equity interests in Pulse Films pursuant to a share charge (the "***Share Charge***"). The rights of the Pulse Sellers to receive payments under the Pulse Notes and to exercise any rights under the Share Charge are fully subordinate to the rights of the lenders under the Prepetition Senior Secured Credit Agreement,

pursuant to the Subordination and Intercreditor Agreement, dated December 8, 2021, among Pulse Sellers, B & C 3, LLC, as the security agent for the holders of the Pulse Notes, the Prepetition Collateral Agent, and Prepetition Administrative Agent (the "Pulse Notes Subordination Agreement").  Under the terms of the Pulse Notes Subordination Agreement, payment to the holders of the Pulse Notes is precluded for so long as an event of default under the Prepetition Senior Secured Credit Agreement remains outstanding, and has been repaid in full, and holders of the Pulse Notes may not exercise rights or remedies in respect of the Pulse Notes absent the prior written consent.  Moreover, pursuant to the Pulse Notes Subordination Agreement, the Pulse Sellers consented to the priming of the Pulse Notes by the debtor-in-possession financing discussed below. As of the Petition Date, the aggregate principal amount of the Pulse Notes is approximately $20.9 million.

### 4.    Senior Subordinated Notes

The Debtors have a complex set of Preferred Stock, including the Series A-1 Preferred Stock and the Series A-3 Preferred Stock issued to TPG Virat Holdings 1, L.P. ("TPG") and Sixth Street Virat Holdings 2, LLC ("SSP" and, together with TPG and certain of their respective affiliates, the "Senior Preferred Shareholders").  In conjunction with the Company's entry into the Prepetition Senior Secured Credit Agreement in 2019, Vice Parent amended the certificate of designation governing such preferred stock to permit the issuance, in April 2020, of senior subordinated unsecured notes due 2022 (the "Initial Subordinated Notes") to the Senior Preferred Shareholders, in satisfaction of certain dividends arising under the Series A-1 and A-3 Preferred Stock (as discussed further below) rather than either paying such dividends in cash or increasing the dividend accrual rate to an Incremental Building Default Rate (as defined in the A&R Certificate of Designation discussed below). On each dividend payment date for the Series A-1 and A-3 Preferred Stock, the principal amount of the Initial Subordinated Notes was increased in an amount equal to a specified portion of the dividends then due on the Series A-1 and A-3 Preferred Stock.  Although the Initial Subordinated Notes relieved the Debtors of the burdens of paying accrued dividends on the Series A-1 and A-3 Preferred Stock in cash, it increased the Company's debt-load, which continued to grow through payments in kind of interest on the Initial Subordinated Notes.

Beginning in early 2022, to address cash shortfalls, Vice Parent issued several series of subordinated unsecured notes, as issuer, to the Senior Preferred Shareholders, as purchasers (the "Subsequent Subordinated Notes" and, together with the Initial Subordinated Notes, the "Senior Subordinated Notes").  The Subsequent Subordinated Notes were issued in various series, which respectively were dated February 25, 2022, April 29, 2022, May 27, 2022, June 14, 2022, August 2, 2022, August 12, 2022, August 26, 2022, August 29, 2022, September 13, 2022, November 2, 2022, and November 14, 2022.  Pursuant to subordination agreements entered into for each issuance of the Senior Subordinated Notes, the Senior Subordinated Notes indebtedness and related rights of TPG and SSP are subordinate to the indebtedness and rights of the Prepetition Term Lenders under the Prepetition Senior Secured Credit Agreement. Each Subordinated Note issuance, and the associated principal amount outstanding as of the Petition Date are set forth below:

| Senior Subordinated Notes | Amount as of 5/15/23 |
|---|---|
| Initial Subordinated Notes | $206,671,643.69 |
| Series B, Senior Subordinated Notes issued February 25, 2022 | $29,187,106.95 |
| Series B, Senior Subordinated Notes issued April 29, 2022 | $28,578,558.33 |
| Series C, Senior Subordinated Notes issued May 27, 2022 | $5,663,683.08 |
| Series C, Senior Subordinated Notes issued June 14, 2022 | $5,632,094.30 |
| Series D, Senior Subordinated Notes issued August 2, 2022 | $5,543,822.50 |
| Series E, Senior Subordinated Notes issued August 12, 2022 | $5,525,782.07 |
| Series F, Senior Subordinated Notes issued August 26, 2022 | $3,850,367.84 |
| Series G, Senior Subordinated Notes issued August 29, 2022 | $8,792,181.36 |
| Series G, Senior Subordinated Notes issued September 13, 2022 | $10,939,713.52 |
| Series H, Senior Subordinated Notes issued November 2, 2022 | $10,764,848.07 |
| Series H, Senior Subordinated Notes issued November 14, 2022 | $7,506,039.74 |
| **Total** | **$328,655,841.46** |

## C.    Trade and Lease Obligations

As of the Petition Date, the Debtors estimate that approximately $64.3 million was due and owing to holders of trade Claims.  Certain of these obligations were subsequently paid pursuant to the various "first day" orders (as described below), and approximately $20 million others were assumed by the Purchaser the payment of costs to cure prepetition defaults under the executory contracts and assigned under the Purchase Agreement in connection with the closing of the Sale.  *See* Notices at Docket Nos. 109, 179, 240, 254 and 511.

## D.    The Preferred Stock

As a result of various investments and capital raises through the years, Vice Parent has developed a complex and restrictive equity structure.  Ahead of the common equity of Vice Parent sits 11 series and sub-series of Preferred Stock, a set forth below:

7



As of the Petition Date, Series A-1, Series A-2, Series A-3, Series A-4, Series D, Series E, and Series F Preferred Stock are entitled to receive dividend payments (with Series D, E, and F dividends paid in kind).

The Series A-1, A-2, A-3, and A-4 Preferred Stock (collectively, the "Series-A Preferred Stock") were issued as part of a recapitalization of the Company in 2017. Holders of the Series-A Preferred Stock, which is convertible into common stock at the option of the holder, are entitled to quarterly dividend payments of 12% of the stated value of the Series-A Preferred Stock. Dividends on the Series A-2 and A-4 Preferred Stock is entirely paid-in-kind (*i.e.*, through an increase in the stated value series of Preferred Stock). When initially issued, dividends on the Series A-1 and Series A-3 Preferred Stock were to receive 50% of their quarterly dividends in cash and 50% in stock commencing in 2019; however in accordance with the Fifth Amended and Restated Certificate of Designation of Senior Convertible Preferred Stock, Series A (as amended, supplemented, or supplemented and amended, the "A&R Certificate of Designation") and previous amendments to such certificate of designation, holders of the Series A-1 and A-3 Preferred Stock are no longer entitled to receive a cash dividend, but instead receive 50% of the quarterly dividend PIK and 50% in the issuance of Senior Subordinated Notes. The Series A-1 and Series A-3 Preferred Stock are held entirely by the Senior Preferred Shareholders.

Under the Amended and Restated Investors' Rights Agreement dated February 25, 2022, by and among Vice Parent and the investors named on Schedule A thereto, the Senior Preferred Shareholders (as holders of the Series A-1 and Series A-3 Preferred Stock) also have the right to designate directors with a majority of the voting power of the board of directors of Vice Parent. Pursuant to the Third Amended and Restated Certificate of Incorporation of Vice Parent, if, at any time, the Senior Preferred Shareholders have not appointed the maximum number of directors to which they are

entitled, the voting power of their seated directors would be increased such that they, in the aggregate, would have the full voting as if a majority of directors had been seated.

On March 21, 2023, the Senior Preferred Shareholders, the Prepetition Term Lenders, and the Prepetition Administrative Agent, entered into that certain sharing agreement (the "Proceeds Agreement"). Pursuant to the Proceeds Agreement, the Prepetition Term Lenders, the Prepetition Administrative Agent, and the Senior Preferred Shareholders agreed to share in the proceeds of any kind received for distribution in respect of any claims against Vice Parent or its subsidiaries in accordance with a distribution waterfall distribution set forth therein. Although Vice Parent was not involved in the negotiation of the Proceeds Agreement, it executed the agreement to acknowledge its terms.

## III.    CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES

Over the decade prior to the commencement of these Chapter 11 Cases, *VICE* expanded significantly, acquiring complementary businesses and breaking into new markets, resulting in the need for access to additional capital. This rapid growth and resulting financing activity ultimately contributed to the liquidity challenges the Company experienced over the past five years.

Despite the Debtors' capital raising efforts, the Company continued to struggle to maintain adequate liquidity to meet their financial obligations and were not profitable in 2021 or 2022. As the Company continued to face tightening liquidity, and a looming maturity of the Prepetition Senior Secured Term Loans and its Senior Subordinated Notes, it began to consider and develop wider strategic alternatives.

In the spring of 2022, *VICE* management began working with PJT Partners LP ("PJT") and LionTree Advisor LLC ("LionTree") to assist it in exploring a sale that would maximize value for the benefit of creditors and other stakeholders. With the support of those advisors, *VICE* launched a marketing process for a potential sale of the Company or certain of its business segments. The Company received indications of interest from several prospects, two bids for a whole company transaction, and reached advance stages of negotiation and documentation with one of those bidders. Ultimately, despite a lengthy and protracted process, the Company was unable to conclude a transaction with any of the bidders. When no sale transaction was unable to be completed, the Debtors were able to unable to pay the Prepetition Senior Secured Term Loans at maturity and entered into a series of forbearance agreements with the Prepetition Term Lenders and the Prepetition Administrative Agent, which *inter alia*, resulted in the appointment of a Chief Restructuring Officer. A Special Committee was also constituted in January 2023, which included two new directors designated by the Prepetition Term Lenders.

Following the appointment of the Special Committee, the Debtors' renewed their sale process (the "2023 Marketing Process") until the commencement of these Chapter 11 Cases. In February 2023, GMN CaymanLtd ("GMNC") terminated its agreements with the Debtors relating to the production of VICE World News content. The VICE World News content and related agreements were material for the businesses

in terms of revenue, and the termination had consequences that rippled through the business.

With the assistance of its advisors, the Debtors determined that they needed to implement a number of structural changes to the Company to mitigate the impact of the loss of the VICE World News contract. These changes included focusing resources on the Company's remaining digital businesses as well as certain key third party relationships and implementing significant cost reductions resulting in a leaner news. organization. The Debtors, PJT and LionTree informed counterparties that were more active in the sales process of these developments and provided them with updated diligence and other information reflecting the loss of the VICE World News contract and the actions that the Debtors plan to undertake to mitigate the loss of that contract.

After the Debtors' assets had been marketed extensively through a sale and marketing process that lasted approximately one year, the Debtors pursued a process to sell substantially all of their assets including the Debtors' interests in certain non-Debtor subsidiaries.

To that end, the Debtors negotiated the terms of an asset purchase agreement with the Purchaser, serving as stalking horse bidder ("Stalking Horse Bidder"), with a transaction that would be market tested and implemented through a transparent process under the auspices of Bankruptcy Code upon the commencement of the Chapter 11 Cases. Appreciating their challenging financial condition and the need to complete a sale and exit bankruptcy as soon as possible, the Debtors accomplished as much as possible prior to the commencement of these cases.

Additional facts relating to the Debtors' businesses and capital structure, and the events leading to these Chapter 11 Cases, are set forth in the *Declaration of Frank A. Pometti in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), filed on the Petition Date [Docket No. 2] and incorporated herein by reference.

## IV.    THE CHAPTER 11 CASES AND THE POSTPETITION SALE PROCESS

### A.    First Day Motions and Appointment of Creditors' Committee

To ease their transition into chapter 11, on the Petition Date, the Debtors filed various customary "first day" motions. In particular, the Debtors filed motions requesting permission for administrative relief, including motions directing joint administration for procedural purposes only [Docket No. 2], authorizing the filing of a consolidated creditor list and establishing certain notice procedures [Docket No. 5], and authorizing an extension of time to file schedules and statements [Docket No. 4]. The Bankruptcy Court entered final orders approving these motions on May 17, 2023, May 19, 2023 and June 13, 2023 [Docket Nos. 56, 53, and 133].

Additionally, the Debtors filed motions to continue operating their business, including:

1.  a motion authorizing and approving the appointment of Stretto, Inc. as claims and noticing agent [Docket No. 19] (the "Claims and Noticing Agent Application").  On May 18, 2023 the Bankruptcy Court entered an order granting the Claims and Noticing Agent Application [Docket No. 47];

2.  a motion to pay prepetition wages, compensation, and employee benefits [Docket No. 12] (the "Wage Motion").  On May 19, 2023, the Bankruptcy Court entered an interim order granting the Wage Motion [Docket No. 51], and on June 20, 2023 the court entered a second interim order grating the Wage Motion [Docket No. 188]. On July 5, 2023, the Bankruptcy Court entered a final order granting the Wage Motion [Docket No. 247];

3.  a motion to continue their existing cash management system [Docket No. 9] (the "Cash Management Motion").  On May 18, 2023, the Bankruptcy Court entered an interim order granting the Cash Management Motion [Docket No. 44], and on June 20, 2023 the court entered a second interim order grating the Cash Management Motion [Docket No. 187];

4.  a motion to maintain and renew their insurance policies and programs [Docket No. 10] (the "Insurance Motion").  On May 19, 2023 the Bankruptcy Court entered an interim order granting the Insurance Motion [Docket No. 52], and on June 16, 2023 the Bankruptcy Court entered a final order granting the Insurance Motion [Docket No. 152];

5.  a motion to pay certain free lancers, critical vendors, and foreign vendors [Docket No. 11] (the "Critical Vendor Motion").  On May 18, 2023 the Bankruptcy Court entered an interim order granting the Foreign Vendor Motion [Docket No. 46], and on June 15, 2023, the Bankruptcy Court entered a final order granting the Critical Vendor Motion [Docket No. 150];

6.  a motion to pay prepetition taxes [Docket No. 7] (the "Tax Motion").  On May 18, 2023 the Bankruptcy Court entered an interim order granting the Tax Motion [Docket No. 49], and on June 15, 2023, the Bankruptcy Court entered a final order granting the Tax Motion [Docket No. 154]; and

7.  a motion authorizing the Debtors to establish notice and objection procedures for transfers of equity securities and claims of worthless stock deductions [Docket No. 8] (the "NOL Motion").  On May 18, 2023 the Bankruptcy Court entered an interim order granting the NOL Motion [Docket No. 48].  On December 21, 2023, the

Bankruptcy Court entered a final order granting the NOL Motion [Docket No. 671].

On May 23, 2023, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Creditors' Committee [Docket No. 66].

**B.    The DIP Financing**

Also on the Petition Date, the Debtors filed a motion [Docket No. 13] (the "DIP Financing Motion") to approve a senior secured postpetition financing facility from the DIP Secured Parties as lender (the "DIP Lender"), authorizing Vice Group Holding Inc., in its capacity as borrower (the "DIP Borrower"), to obtain postpetition financing, and for each of the other Debtors to guarantee unconditionally (the "DIP Guarantors"), on a joint and several basis, the DIP Borrower's obligations in connection with a senior secured superpriority debtor-in-possession multi-draw term loan facility (the "DIP Facility") consisting of a multi-draw credit loan facility in an aggregate principal amount of up to $60 million, of which (a) $5 million (the "Initial New Money DIP Loans") was made available to the Debtors in a single new money draw and another (b) $25 million in a roll-up of Prepetition Senior Secured Term Loans in accordance with the terms and conditions set forth in the DIP Credit Agreement (the "Initial Roll-Up DIP Loans") on an interim basis pursuant to a Bankruptcy Court order dated May 17, 2023 [Docket No. 40] (the "Interim DIP Financing Order").

The Debtors, DIP Lender and the Creditors' Committee proceeded to consensually resolve informal objections and concerns raised by the Committee pursuant to the Committee Settlement, and on June 13, 2023 the Bankruptcy Court entered DIP Financing Order approving the DIP Financing Motion on a final basis.

Under the DIP Financing Order the new money draws of the remaining principal amount of $5 million, subject to increase pursuant to the terms to fund the GUC Cash Reserve in accordance with the terms Committee Settlement and the DIP Credit Agreement (together with the Initial New Money DIP Loans, the "New Money DIP Loans"), and (ii) in a roll-up of approximately $25 million in outstanding Prepetition Senior Secured Term Loans in accordance with the terms and conditions set forth in the Committee Settlement and the DIP Credit Agreement (such loans with the Initial Roll-Up DIP Loans, the "Roll-Up DIP Loans," and such New Money DIP Loans and the Roll-Up DIP Loans, the "DIP Loans").

The DIP Financing was secured by a first-priority lien on and security interest in substantially all of the Debtors' unencumbered assets, but excluding, among other things, all GUC Reserved Litigation Claims under the Committee Settlement (the "DIP Liens").

In connection with the sale process, the following was also agreed to as part of the Committee Settlement:

- the Debtors and Purchaser would enter into Amendment No. 1 to Asset and Equity Purchase Agreement, filed with the Court at

Docket No. 130 ("APA Amendment No. 1"), which Amendment No. 1 shall be deemed effective in accordance with its terms to provide for the establishment of a GUC Cash Reserve, GUC Reserved Litigation Claims, and

- The Creditor's Committee agreed to waive any objections to, and support, the Asset Purchase Agreement and the terms, conditions, and transactions provided or contemplated thereby (an "Approved Sale Transaction"), subject only to the right of the Creditors' Committee to support any higher or better bids that provide a purchase price that exceeds, in the aggregate, the Purchase Price (as defined in the Asset Purchase Agreement).

The outstanding balance under the DIP Loans was deemed satisfied effective as of the closing of the Sale.

### C.    Postpetition Sale Process

Additionally, on the Petition Date, the Debtors filed the *Motion for Entry of an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Authorizing and Approving the Debtors' Entry Into the Stalking Horse Agreement, (III) Approving the Sale of Substantially all of the Debtors' Assets and (IV) Granting Related Relief* [Docket No. 16] (the "Sale Motion"), which sought approval of bidding procedures and the sale of substantially all of the Debtors' assets free and clear of all liens, claims, interests and encumbrances, to one or more successful bidders.

On May 19, 2023, the Debtors filed that certain executed Asset and Equity Purchase Agreement [Docket No. 58] (as amended from time to time, the "Asset Purchase Agreement") by and among the Purchaser and the Debtors.

On May 30, 2023 the Bankruptcy Court entered an order granting the procedures component (the "Bidding Procedures") of the Sale Motion [Docket No. 80].

The marketing process for sale of the Debtors' assets and business, which was a continuation of a process that began prepetition, was comprehensive, and the Debtors' investment bankers PJT and LionTree reached out to approximately 113 parties to generate and solicit interest in bidding on the Debtors assets pursuant to section 363 of the Bankruptcy Code and the court-approved Bidding Procedures.

Of the 113 parties contacted, 38 parties confirmed interest in evaluating the opportunity to submit a bid and 37 parties executed confidentiality agreements. All parties that executed confidentiality agreements were promptly granted access to an electronic data room containing comprehensive information pertaining to, among other things, the Company and its assets, along with a draft asset and equity purchase agreement for bidders to mark-up as authorized by the Bidding Procedures.

PJT and LionTree collectively fielded and responded to over 500 questions and inquiries from potential bidders regarding the Company's business segments and information contained in the data room in an effort to continue driving the diligence

process.  All parties contacted received a process letter outlining the proposed bidding procedures and requirements, along with key dates and deadlines, including:

- June 20, 2023 – the Bid Deadline;

- June 21, 2023 – the Qualified Bid Designation Date;

- June 22, 2023 – the Auction, if necessary; and

- July 7, 2023 – the anticipated Closing of the Sale.

By the Bid Deadline, the Debtors received ten non-binding bids, five of which were for the entire Company and five of which were for a single Business Segment or combination of other assets.

On June 21, 2023, the Purchaser increased their bid to $350 million, which was detailed in the *Notice of Filing of Amendment No. 2 to the Asset and Equity Purchase Agreement* [Docket No. 204].

Ultimately, in consultation with the Creditors' Committee, the Debtors determined that none of the bids received, other than the Stalking Horse Bid, qualified as a Qualified Bid in accordance with the Bidding Procedures or were otherwise higher or better than the Stalking Horse Bid.  Accordingly, the auction was cancelled in accordance with the Bidding Procedures.

On June 23, 2023, the Court entered the Sale Order which, among other things, approved the Sale to the Purchaser and authorized the Debtors to enter into, execute, and perform all obligations under a transition services agreement (the "TSA") with the Purchaser.

The Debtors closed the Sale on July 31, 2023.  *See Notice of (1) Closing of the Sale and (2) Filing of the Transition Services Agreement* [Docket No. 337].

**D.    Transition Services Agreement**

To effectuate the smooth transition of the Debtors' assets and business operations to the Purchaser as part of the Sale Closing, the Purchaser and Debtors entered into the TSA for a three-month period expiring September 30, 2023, whereby the Debtors would remain "revenue neutral" though agreed upon reimbursements for costs in exchange for providing certain agreed upon "Seller Services" to the Purchasers relating to, *inter alia*:

1.    CFO and treasury function support;

2.    bank account maintenance; and

3.    certain payroll services and benefits for Deferred Transferring Employees (as defined in the Asset Purchase Agreement) who were to become employed by the Purchaser.

An additional payment under the TSA (the "Additional TSA Payment") in the amount of $2,750,000 was to be earned released upon completion of the TSA. In connection therewith, the Debtors and Purchaser executed an escrow agreement with Ankura Trust Company, LLC as escrow agent to hold the Additional TSA Payment.

On September 29, 2023, in connection with the expiration of the TSA Agreement and with the completion of the Seller Services, the Debtors filed notices for the assignment of contracts to the Purchaser [Docket No. 511], as well as rejection notices for contracts no longer required by the Debtors, effective as of September 30, 2023 [Docket No. 514]. As result, the Additional TSA Payment in the amount of $2,750,000 was released to the Debtors.

### E.    Estate Professionals

On August 22, 2023, the Court entered the *Order (I) Authorizing the Retention of AP Services, LLC, (II) Authorizing the Designation of Frank Pometti as Chief Financial Officer and Mark Del Priore as Chief Financial Officer Effective as of the Petition Date, and (III) Granting Related Relief* [Docket No. 403].

Pursuant to orders of the Bankruptcy Court, the Debtors and the Creditors' Committee have retained certain professionals pursuant to sections 327 and 328 of the Bankruptcy Code (collectively, the "Estate Professionals").

The Debtors' Estate Professionals are: (a) Togut, Segal & Segal LLP, as bankruptcy counsel [Docket No. 382]; (b) Shearman & Sterling, co-counsel for the Debtors [Docket No. 512]; (c) LionTree [Docket No. 390] and PJT [Docket No. 402] as co-investment bankers, and (d) Stretto, Inc., as administrative advisor [Docket No. 406], as well as Katten Muchin Rosenman LLP, as special counsel for Debtor Vice Group Holding Inc., on behalf of and at the sole direction of the independent directors [Docket No. 674].

The Creditors' Committee's counsel is Pachulski Stang Ziehl & Jones LLP [Docket No. 539], and financial advisor is Alvarez & Marsal [Docket No. 611].

Debtors also filed a motion to employ and pay ordinary course professionals, [Docket No. 85], which was approved by the Bankruptcy Court on July 12, 2022 [Docket No. 297].

Pursuant to the Court's *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals*, entered on _____ [Docket No. ___] (the "Interim Compensation Order"), the Debtors were authorized to pay certain of the Professionals' fees and expenses during the Chapter 11 Cases.

### F.    Summary of the Debtors' Assets and Liabilities

On July 10, 2023 , the Debtors filed their schedules of assets and liabilities and statement of financial affairs [Docket Nos. 257 and 258 of the chapter 11 case of Vice Group Holding Inc. and Docket Nos. 6 and 7 of each other Debtor's case] (the "Schedules and Statements").

15

By order dated October 21, 2023 [Docket No. 534], the Bankruptcy Court established November 24, 2023 at 5:00 p.m. (Eastern Time) as the general bar date (the "General Bar Date") and January 16, 2024 at 5:00 p.m. (Eastern Time) as the Governmental Bar Date.

By order dated November 2, 2023 [Docket No. 576], the Bankruptcy Court established November 27, 2023 at 5:00 p.m. (Eastern Time) as an interim administrative bar date for administrative expense claims arising from the Petition Date through and including October 26, 2023 (the "Interim Administrative Bar Date").

In addition to the Prepetition Senior Secured Credit Agreement Claims that are subject to the Sharing Threshold, the Debtors estimate that Allowed General Unsecured Claims could range from approximately $47.7 million to an amount to be determined, which could be significantly in excess of that amount as a result of contingent, unliquidated and disputed claims, which include, but are not limited to litigation claims, for which the Debtors may be determined to be liable, in part or otherwise.

Currently, the Debtors have no positive net income and no secured debt. The Debtors' significant assets consist of the (a) GUC Cash Reserve of $500,000, (b) approximately $6.5 million in cash on hand (as of January 30, 2023), which includes the Additional TSA Payment and an amount to be funded to the Professional Fee Escrow and (c) GUC Reserved Litigation Claims, which include potential claims and causes of action that are not being released under the Plan, including causes of action arising under chapter 5 of the Bankruptcy Code.

### G.    Antenna Stipulation and Committee Stipulation with Purchaser

On February [__], 2024, the Bankruptcy Court entered an order [Docket No. __] (the "Omnibus 9019 Order"), pursuant to Bankruptcy Rule 9019, approving the *Stipulation Resolving Claims Among and Between the Debtors, the Buyer Entities, and the Antenna Entities* [Docket No. 768] (the "Antenna Stipulation") by and among the Debtors, the Purchaser (together with its affiliates and indirect subsidiaries), and Antenna Group B.V., Antenna TV S.A., and Antenna Internet Ventures B.V. (collectively, the "Antenna Entities") and Vice Antenna B.V. (the "Joint Venture"), which, among other things, implements the wind down of the Debtors' interest in the non-debtor Joint Venture with the Antenna Entities, and the Debtors' conveyance of its 51% interest in such Joint Venture to the Antenna Entities, in exchange for the payment of €937,875 pursuant to a deed of transfer and the exchange of mutual releases among the Debtors, the Purchaser and the Antenna Entities.

The Omnibus 9019 Order also approved a settlement, pursuant to Bankruptcy Rule 9019 (the "Committee Stipulation"), by and among the Debtors, the Purchaser and Creditors' Committee which resolved, among other things, a dispute with respect to Purchaser advisors fees under the DIP Financing Order, as well as exchange of releases with respect to certain claims among the Creditors' Committee Debtors and Purchaser in connection with DIP Financing Order, the Sale, and the TSA.

In light of the proceeds realized from the Antenna Stipulation and the agreement and releases obtained as result of the Committee Stipulation, and following extensive good faith and arm's-length negotiations with the Creditors' Committee, the Debtors have proposed this Plan, which it believes is in the best interests of the estates, creditors, and other stakeholders.

### H. Miscellaneous

By order dated October 20, 2023 [Docket No. 532], the Debtors have the exclusive right to propose a chapter 11 plan and solicit votes with respect thereto until December 12, 2023 and February 9, 2024, respectively. Currently pending is a motion filed by the Debtors to extend the exclusive period to solicit votes on the Plan through and including April 24, 2024 [Docket No. 772].

On November 3, 2023 [Docket No. 581], an order was entered in these Chapter 11 Cases directing that the caption of the lead case be changed, in accordance with the corporate name change of Vice Group Holding Inc. to Venus Liquidation Inc.

If the Plan is not confirmed, there is a risk that the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code and/or that distributions to creditors will be less than that proposed under the Plan. In addition, distributions will likely be delayed and there is no guarantee that any distributions will be made at all.

## V. <u>SUMMARY OF THE PLAN OF LIQUIDATION</u>

**THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN PROVISIONS OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>). IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL.**

The Plan (including, but not limited to, Sections 2 and 3 of the Plan) provides for the procedural consolidation of the Debtors for plan purposes only and shall serve as a motion by the Debtors for entry of an order of the Bankruptcy Court granting such relief. The Debtors propose procedural consolidation to avoid the inefficiency of proposing, voting on, and making Distributions in respect of entity-specific claims. Accordingly, on the Effective Date, all of the Debtors and their Estates shall, for purposes of the Plan only, be treated as though they were merged and (a) all Assets and liabilities of the Debtors shall, for purposes of the Plan only, be treated as though they were merged, (b) all guarantees of the Debtors of payment, performance, or collection of obligations of any other Debtors shall be eliminated and canceled, (c) all joint or duplicate obligations of two or more Debtors, and all multiple Claims against such Entities on account of such joint or duplicate obligations, shall be considered a single claim against the Debtors (including for purposes of Distributions and reserves) without the need for further action by the Debtors or the Wind Down Officer and (d) any Claim filed in the Chapter 11 Cases shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date. Unless otherwise set forth herein, such consolidation shall not (other than for voting, treatment, and distribution purposes under the Plan) affect (i) the legal and

corporate structures of the Debtors or (ii) the substantive rights of any creditor. If any party in interest challenges the proposed procedural consolidation, the Debtors reserve the right to establish at the Combined Hearing the ability to confirm the Plan on an entity-by-entity basis.

**A.    Unclassified Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims and Priority Tax Claims) are not classified and are not entitled to vote on the Plan.

*1.    Administrative Claims*

On or as soon as reasonably practicable after the earlier of (a) the Effective Date or (b) the first Business Day after the date that is thirty (30) calendar days after the date on which an Allowed Administrative Claim becomes Allowed or payable under any agreement related thereto, unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Plan Administrator, as applicable, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, and release, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim.

To the extent not required to be filed by the Interim Administrative Claims Bar Date of November 27, 2023 established by the Bankruptcy Court, all requests for payment of Administrative Claims (other than Professional Fee Claims, and Administrative Claims that have been Allowed on or before the Effective Date) **must be in writing and filed with the Bankruptcy Court and served on the Debtors, the Creditors' Committee,  and the U.S. Trustee so as to be received by 5:00 p.m. (Eastern Time) on the date that is thirty (30) days after the service of notice of occurrence of the Effective Date (the "Administrative Claims Bar Date")**.  Such request for payment must include at a minimum:  (A) the name of the holder of the asserted Administrative Claim;  (B) the amount of the Administrative Claim;  (C) the basis of the Administrative Claim;  and (D) supporting documentation for the Administrative Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND RELEASED AND THE HOLDER THEREOF SHALL BE ENJOINED FROM COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OF PROCESS OR ACT TO COLLECT, OFFSET, OR RECOVER SUCH ADMINISTRATIVE CLAIM.**

*2.    U.S. Trustee Fees*

On the Effective Date, the Debtors shall pay all accrued and outstanding U.S. Trustee Fees, if any.  Following the Effective Date, the Liquidating Trust shall remain obligated to pay quarterly fees to the U.S. Trustee on behalf of the Estates, if any, in accordance with Section 12.1 of the Plan.

3. *Professional Fee Claims*

To the extent not filed prior to the Effective Date, Professionals shall submit final fee applications seeking approval of all Professional Fee Claims by the Bankruptcy Court no later than thirty (30) days after the Notice of the Effective Date. These applications remain subject to Bankruptcy Court approval under the standards established by the Bankruptcy Code, including the requirements of sections 327, 328, 330, 331, 363, 503(b), and 1103 of the Bankruptcy Code, as applicable.

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash equal to the Professional Fee Escrow Amount, and no Liens, Claims, or interests shall encumber the Professional Fee Escrow in any way. The Professional Fee Escrow (including the funds held therein) (x) shall not be and shall not be deemed property of the Debtors Trust and (y) shall be held in trust for Professionals; *provided, that* any funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims, subject to any agreed-upon voluntary reduction of fees by a Professional in connection with achieving a confirmable Plan, have been irrevocably paid in full shall become available for distribution by the Plan Administrator.

4. *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

5. *DIP Facility Claims*

Except as otherwise set forth in Amendment No. 3 to the Asset Purchase Agreement, dated as of July 31, 2023 [Docket No. 334], the outstanding balance under the DIP Credit Agreement was deemed satisfied effective as of the closing of the Sale. DIP Facility Claims were paid in full (other than certain claims for professional fees and expenses provided for under the DIP Credit Agreement and DIP Financing Order, which will be paid pursuant to the Committee Stipulation, prior to the Effective Date). Accordingly, holders of Claim relating to the DIP Facility will not receive any distributions under the Plan.

**B.    Classification and Treatment of Claims and Interests**

The Classes of Claims entitled to vote on the Plan are Classes 4 (Prepetition Senior Secured Credit Agreement Claims), 5 (JPM Overdraft Facility Claims), 6 (Senior Subordinated Notes Claims), 7 (Pulse Notes Claims) and 8 (General Unsecured Claims). Classes 1 (Secured Tax Claims), 2 (Other Secured Claims) and 3 (Other Priority Claims) are Unimpaired under the Plan, which means such Classes are not entitled to vote and are deemed to have accepted the Plan. Class 9 (Interests) is Impaired under the Plan and will not receive or retain any property under the Plan. Accordingly, Class 9 is not entitled to vote and is deemed to have rejected the Plan. The

proposed treatment of each Class of Claims and Interests is set forth in Section 3.4 of the Plan.

The following table summarizes the classification and treatment of all Claims against and Interests in the Debtors.

| Class and Estimated Amount | Summary of Treatment | Estimated Recovery | Entitled to Vote |
|---|---|---|---|
| **Secured Tax Claims (Class 1)** | Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to different, less favorable treatment, each Holder of an Allowed Secured Tax Claim will receive, in full and final satisfaction, settlement, and in exchange for such Allowed Secured Tax Claim, Cash in an amount equal to the Allowed amount of such Allowed Secured Tax Claim on the earlier of (x) the Effective Date and (y) as soon as practicable after its Secured Tax Claim becomes Allowed. | **100%** **Unimpaired** | **No – Deemed to Accept** |
| **Other Secured Claims (Class 2)** | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to different, less favorable treatment each Holder of an Allowed Other Secured Claim will receive, in full and final satisfaction, settlement, and in exchange for such Allowed Other Secured Claim, Cash in an amount equal to the Allowed amount of such Other Secured Claim on the earlier of (x) the Effective Date and (y) as soon as practicable after its Other Secured Claim becomes Allowed. | **100%** **Unimpaired** | **No – Deemed to Accept** |
| **Other Priority Claims (Class 3)** | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a different, less favorable treatment, each Holder of an Allowed Other Priority Claim will receive, in full and final satisfaction, settlement, and in exchange for such Allowed Claim, Cash in an amount equal to such Holder's Allowed Other Priority Claim on the earlier of (x) the Effective Date and (y) as soon as practicable after its Other Priority Claim becomes Allowed. | **100%** **Unimpaired** | **No – Deemed to Accept** |

| Class and Estimated Amount | Summary of Treatment | Estimated Recovery | Entitled to Vote |
|---|---|---|---|
| **Prepetition Senior Secured Credit Agreement Claims (Class 4)** | Except to the extent that a Holder of an Allowed Prepetition Senior Secured Credit Agreement Claim agrees to different, less favorable treatment, each Holder of an Allowed Prepetition Senior Secured Credit Agreement Claim will receive, upon and after the satisfaction of the Sharing Threshold under the Committee Settlement, a Pro Rata share of the Plan Administrator Net Recovery available for Distribution to the extent available on each such Distribution Date, in full and final satisfaction, settlement, and in exchange for such Allowed Prepetition Senior Secured Credit Agreement Claim. Until satisfaction of the Sharing Threshold under the Committee Settlement, any portion of the Plan Administrator Net Recovery that would otherwise be distributed on account of the Prepetition Senior Secured Credit Agreement Claims, including as a result of the enforcement of the Turnover Provisions with respect to the Senior Subordinated Notes Claims and Pulse Notes Claims, shall be made available for Distribution to Holders of General Unsecured Claims.  Any Distribution actually received by a Holder of an Allowed Prepetition Senior Secured Credit Agreement Claim (which shall not include any Distribution up to the Sharing Threshold made available for Holders of Allowed General Unsecured Claims pursuant to this Section 3.4(d)(ii)) shall be subject to the Proceeds Sharing Agreement. | **0%**<br><br>**Impaired** | **Yes** |
| **JPM Overdraft Facility Claims (Class 5)** | Except to the extent that a Holder of an Allowed JPM Overdraft Facility Claims agrees to different, less favorable treatment (including, without limitation, pursuant to the Asset Purchase Agreement, the Committee Settlement, and/or the Sale Order, or such other recovery as is necessary to satisfy section 1129 of the Bankruptcy Code), each Holder of an Allowed JPM Overdraft Facility Claim agrees it will receive, in full and final satisfaction, settlement, and in exchange for such Allowed Claim, the treatment and terms it has agreed to with the Purchaser, including without limitation the novation of certain account agreements. | **0%**<br><br>**Impaired** | **Yes** |

| Class and Estimated Amount | Summary of Treatment | Estimated Recovery | Entitled to Vote |
|---|---|---|---|
| **Senior Subordinated Notes Claims (Class 6)** | Pursuant to section 510(a) of the Bankruptcy Code, except to the extent that a Holder of an Allowed Senior Subordinated Notes Claim agrees to different, less favorable treatment, each Holder of an Allowed Senior Subordinated Notes Claim shall receive such Holder's Pro Rata share of the Plan Administrator Net Recovery available for Distribution on each such Distribution Date as provided under the Plan and the Plan Administrator Agreement in full and final satisfaction, settlement, and in exchange for such Allowed Senior Subordinated Notes Claim; *provided* that until such time as the Allowed Prepetition Senior Secured Credit Agreement Claim has been repaid in full, any Distribution on account of an Allowed Senior Subordinated Notes Claim, pursuant to the Turnover Provisions, shall be distributed to Holders of the Allowed Prepetition Senior Secured Credit Agreement Claim subject to the treatment provided under Section 3.4(d)(ii) hereof; *provided further* that any Distribution actually received by a Holder of an Allowed Prepetition Senior Secured Credit Agreement Claim (which shall not include any Distribution up to the Sharing Threshold made available for Holders of Allowed General Unsecured Claims pursuant to Section 3.4(d)(ii)) shall be subject to the Proceeding Sharing Agreement and, for the avoidance of doubt, any portion of such Distribution transferred to any Senior Preferred Shareholder pursuant to the Proceeds Sharing Agreement may be retained by such Senior Preferred Shareholder consistent with the Proceeds Sharing Agreement notwithstanding the previous proviso. | 0%<br><br>**Impaired** | **Yes** |

| Class and Estimated Amount | Summary of Treatment | Estimated Recovery | Entitled to Vote |
|---|---|---|---|
| **Pulse Notes Claims (Class 7)** | Pursuant to section 510(a) of the Bankruptcy Code, except to the extent that a Holder of an Allowed Pulse Notes Claim accepts different, less favorable treatment, each Holder of an Allowed Pulse Notes Claim shall receive such Holder's Pro Rata share of the Plan Administrator Net Recovery available for Distribution on each such Distribution Date as provided under the Plan and the Plan Administrator Agreement; *provided* that until such time as the Allowed Prepetition Senior Secured Credit Agreement Claim has been repaid in full, any Distribution on account of an Allowed Pulse Notes Claim, pursuant to the Turnover Provisions, shall be distributed to Holders of the Allowed Prepetition Senior Secured Credit Agreement Claim subject to the treatment provided under Section 3.4(d)(ii) hereof; *provided further,* that after the Allowed Prepetition Senior Secured Credit Agreement Claim has been repaid in full, except to the extent that a Holder of an Allowed Pulse Notes Claim agrees to different, less favorable treatment, each Holder of an Allowed Pulse Notes Claim will receive a Pro Rata share of the Plan Administrator Net Recovery available for Distribution to the extent available on each such Distribution Date, in full and final satisfaction, settlement, and in exchange for such Allowed Claim. | **0%**<br><br>**Impaired** | **Yes** |
| **General Unsecured Claims (Class 8)**<br><br>**(between approximately $47.7 million and an amount TBD)** | Subject to the Committee Settlement and the Sharing Threshold therein, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to different, less favorable treatment, in full and final satisfaction, settlement, and release of, and in exchange for, all such Allowed Claims, each Holder of an Allowed General Unsecured Claim shall receive such Holder's Pro Rata share of the Plan Administrator Net Recovery available for Distribution on each such Distribution Date as provided under the Plan and the Plan Administrator Agreement. | **1% to 2% Recovery**<br><br>**Impaired** | **Yes** |
| **Interests (Class 9)**<br><br>**N/A** | On the Effective Date, all Interests shall be eliminated, and Holders of Interests shall not receive or retain any property under the Plan on account of such Interests. | **0%**<br><br>**Impaired** | **No – Deemed to Reject** |

## C.    Means For Implementation Of The Plan and The Plan Administrator

On and after the Effective Date, the Plan will be implemented by the Plan Administrator, in a manner consistent with the terms and conditions set forth in the Plan, Plan Administrator Agreement and the Confirmation Order.

The primary source of funding the Distributions and payments required to be made under the Plan shall be the net proceeds as determined by the Plan Administrator with respect to (a) the GUC Cash Reserve of $500,000, (b) Net Available Cash and (c) recoveries resulting from the possible prosecution of the GUC Reserved Litigation Claims by the Plan Administrator, as the case may be, on behalf of the Debtors' estates ("Plan Administrator Net Recovery").

The Confirmation Order shall provide for the appointment of the Plan Administrator.  The compensation of the Plan Administrator shall be as set forth in the Plan Supplement.  The Plan Administrator shall be deemed the estates representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified under sections 704 and 1106 of the Bankruptcy Code. Upon the distribution of all assets pursuant to the Plan and the filing by the Plan Administrator of a certification to that effect with the Bankruptcy Court (which may be included in the application for the entry of the final decree), the Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith, provided, however, that the Debtors may, but will not be required to, take appropriate action to dissolve under applicable law.

Following the Effective Date, the Debtors shall not engage in any business or take any actions, except those necessary to consummate the Plan and wind down their affairs, including as necessary, the wind down, dissolution or abandonment of the non-debtor affiliates and subsidiaries of the Debtors, under applicable law free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than the restrictions imposed by the Plan or the Confirmation Order.

The Plan Administrator may act for the Debtors and their estates in a fiduciary capacity, subject to the provisions of the Plan.  On the Effective Date, if appointed, the Plan Administrator shall succeed to all of the rights of the Debtors with respect to the Assets of the Estates.  The powers and duties of the Plan Administrator, shall include, without further order of the Bankruptcy Court, except where expressly stated otherwise, the following rights or obligations:

(i)     to take such steps as may be necessary or otherwise desirable to administer and close any and all of the transactions as may be contemplated by the terms of the Sale, the Committee Settlement, or the Plan, as well as the Committee Stipulation or the Antenna Stipulation;

(ii)    to invest Cash and withdraw and make Distributions of Cash to holders of Allowed Claims and to pay taxes and other obligations owed by the Estates or incurred by the Debtors or the Plan Administrator in connection with the wind-down of the Estates in accordance with the Plan;

(iii)   to receive, manage, invest, supervise, and protect the Assets, including paying taxes or other obligations incurred in connection with administering the Assets;

(iv)    to engage attorneys, consultants, agents, employees, and all professional persons, to assist with respect to the Plan Administrator's responsibilities;

(v)    to pay the fees and expenses for the attorneys, consultants, agents, employees and professional persons engaged by the Plan Administrator and to pay all other expenses in connection with administering the Plan and for winding down the affairs of the Estates in accordance with the Plan;

(vi)    to satisfy any liabilities, expenses, and other Claims incurred by the Debtors and/or Plan Administrator in the ordinary course of business and without further order of the Court;

(vii)    to execute and deliver all documents, and take all actions, necessary to consummate the Plan and close the Chapter 11 Cases;

(viii)    to dispose of, abandon or deliver title to others of, or otherwise realize the value of, all the remaining Assets in accordance with the terms provided for herein;

(ix)    to oversee compliance with the Estates' accounting, finance, and reporting obligations;

(x)    to prepare such periodic reports as may be required by the U.S. Trustee;

(xi)    except as otherwise provided for in the Plan, to object to Claims against the Debtors' Estates;

(xii)    except as otherwise provided for in the Plan, to compromise and settle Claims against the Debtors' Estates;

(xiii)    to implement and/or enforce all provisions of the Plan;

(xiv)    to implement and/or enforce all agreements entered into prior to the Effective Date;

(xv)    to perform the duties, exercise the powers, and assert the rights of a trustee under sections 704 and 1106 of the Bankruptcy Code, including, without limitation, enforcing contracts, and asserting claims, defenses, offsets, and privileges;

(xvi)    to investigate, prosecute, settle and collect upon GUC Reserved Litigation Claims; and

(xvii)    to use such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan or order of the

Bankruptcy Court or as may be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator shall make Distributions to Holders of Allowed Claims in accordance with Article III of the Plan on, or as soon as reasonably practicable after, the Effective Date.  From time to time, Plan Administrator, as applicable, shall make Pro Rata Distributions to holders of Allowed Claims in accordance with Article III of the Plan.

Notwithstanding Section 6.1(a) of the Plan, the Plan Administrator may retain such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the estate during the winding up and closing of the Chapter 11 Cases, (ii) to pay reasonable administrative expenses (including the costs and expenses of the Plan Administrator and the fees, costs and expenses of all professionals retained by the Plan Administrator, and any taxes imposed in respect of the assets), (iii) to satisfy other liabilities to which the assets are otherwise subject, in accordance with the Plan, and (iv) to establish any necessary reserve.  All Distributions to the holders of Allowed Claims shall be made in accordance with the Plan.  The Plan Administrator may withhold from amounts distributable to any person any and all amounts determined in the Plan Administrator's reasonable sole discretion to be required by any law, regulation, rule, ruling, directive or other governmental requirement.  Holders of Allowed Claims shall, as a condition to receiving Distributions, provide such information and take such steps as the Plan Administrator may reasonably require to ensure compliance with withholding and reporting requirements and to enable them to obtain certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law.  In the event that a holder of an Allowed Claim does not comply with the Plan Administrator's requests in the preceding sentence within thirty (30) calendar days, no Distribution shall be made on account of such Allowed Claim, such holder shall have forfeited its right to Distributions under the Plan, and the Plan Administrator shall reallocate such Distribution for the benefit of all other holders of Allowed Claims as the case maybe, in accordance with the Plan.

### D.    Other Miscellaneous Plan Provisions

The Plan also contains various provisions relating to:

- the wind-down and governance of the Debtors after the Effective Date (*see* Article V);

- procedures for making Distributions from the Debtors and the rights and powers of the Disbursing Agent (*see* Article VI);

- procedures for the reconciliation of Claims and Proofs of Claim and related matters, such as objections and estimation for any Disputed Claims (*see* Article VII);

- the treatment of Executory Contracts (*see* Article VIII);  and

- the effect of Confirmation, the Bankruptcy Court's retention of jurisdiction with respect to certain matters, and miscellaneous other implementation and effectuating provisions (*see* Articles X, XI, & XII).

### E.    Exculpation and Releases

On the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, the Estates, the Plan Administrator, all present and former Holders of Claims and Interests, whether or not such Holders voted in favor of the Plan, and their respective successors and assigns.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the release, set forth below, by the Debtors pursuant to Bankruptcy Rule 9019, and further, shall constitute the Bankruptcy Court's finding that the release is:  (1) essential to the Confirmation of the Plan; (2) an exercise of the Debtors' business judgment; (3) in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (4) a good-faith settlement and compromise of the Claims and Causes of Action released by such release; (5) in the best interests of the Debtors and all Holders of Claims and Interests; (6) fair, equitable, and reasonable;  and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases by the Debtors:

*Release by the Debtors.*  **WITHOUT LIMITING ANY OTHER APPLICABLE PROVISIONS OF, OR RELEASES CONTAINED IN, THE PLAN, THE SALE ORDER, AND SALE DOCUMENTS, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AS OF THE EFFECTIVE DATE, THE DEBTORS, THEIR ESTATES, THE PLAN ADMINISTRATOR, AND ANY OTHER PERSON OR ENTITY SEEKING TO EXERCISE THE RIGHTS OF THE ESTATES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED, AND WAIVED ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE THAT SUCH PERSON OR ENTITY SEEKING TO EXERCISE THE RIGHTS THE ESTATES HAS, HAD, OR MAY HAVE AGAINST THE RELEASED PARTIES BASED ON OR RELATING TO THE DEBTORS, THE ESTATES, THE CHAPTER 11 CASES, ANY PREPETITION FINANCING ARRANGEMENTS, THE DEBTORS' FINANCIAL STATEMENTS, THE DEBTOR-IN-POSSESSION FINANCING, THE SALE OR TRANSFER OF ANY AND ALL ASSETS OF THE DEBTORS (INCLUDING THE SALE), THE TRANSITION SERVICES AGREEMENT, THE NEGOTIATION, CONSIDERATION, FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION, OR CONSUMMATION OF THE PLAN, THE PLAN SUPPLEMENT AND EXHIBITS, THE DISCLOSURE STATEMENT, ANY AMENDMENTS THEREOF OR**

**SUPPLEMENTS THERETO, OR ANY OTHER TRANSACTIONS IN CONNECTION WITH THESE CHAPTER 11 CASES OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION THEREWITH OR IN CONNECTION WITH ANY OTHER OBLIGATION ARISING UNDER THE PLAN OR THE OBLIGATIONS ASSUMED HEREUNDER (INCLUDING ANY CLAIM BASED ON THEORIES OF ALLEGED NEGLIGENCE, MISREPRESENTATION, NON-DISCLOSURE, OR BREACH OF FIDUCIARY DUTY). NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE:  (I) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PERSON OR ENTITY UNDER THE PLAN, THE TRANSITION SERVICES AGREEMENT, THE SALE ORDER, OR THE SALE DOCUMENTS, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN; OR (II) THE LIABILITY OF ANY RELEASED PARTY THAT WOULD OTHERWISE RESULT FROM ANY ACT OR OMISSION OF SUCH RELEASED PARTY TO THE EXTENT THAT SUCH ACT OR OMISSION IS DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD).  FOR THE AVOIDANCE OF DOUBT, NOTHING IN THE PLAN, PLAN SUPPLEMENT, CONFIRMATION ORDER, OR ANY RELATED DOCUMENTS SHALL IMPAIR, RELEASE, MODIFY, DISCHARGE, LIMIT, WAIVE, EXCULPATE, OR ENJOIN ANY CLAIMS OR CAUSES OF ACTION AGAINST THE RELEASED PARTIES ARISING FROM FACTS THAT OCCUR AFTER THE EFFECTIVE DATE BASED ON A BREACH OR AN ALLEGED BREACH OF THE STANDARDS AND PRACTICES APPLICABLE TO THE RELEASED PARTIES ARISING FROM OR RELATED TO THE OWNERSHIP, CUSTODIANSHIP, PRESERVATION, AND/OR RETENTION OF THE DEBTORS' DOCUMENTS (INCLUDING, BUT NOT LIMITED TO, WRITTEN DOCUMENTS AND COMMUNICATIONS, ELECTRONICALLY STORED DOCUMENTS, EMAILS, BANKING AND OTHER FINANCIAL RECORDS, EMPLOYEE FILES, COMPENSATION RECORDS, TAX DOCUMENTS, AND ANY AND ALL ELECTRONIC SERVERS AND/OR OTHER MEDIA CONTAINING ANY OF THE FOREGOING).  NOTHING IN THE PLAN RELEASES ACTIONS AGAINST THE RELEASED PARTIES UNDER SECTIONS 542 AND 543 OF THE BANKRUPTCY CODE.**

The Plan also provides for releases by third parties (the "Third-Party Release").  The Releasing Parties include the following parties solely to the extent acting in their respective capacities as such:  any Holder of a Claim (i) entitled to vote on the Plan that does not opt out of Third Party Release on its Ballot as may be approved by the Bankruptcy Court to the maximum extent permitted by law, or (ii) that is presumed

to accept the Plan and does not opt out of the release provisions in the Plan on the Combined Hearing Notice (as defined in the Solicitation Procedures Order).

Holders of General Unsecured Claims may affirmatively elect not to participate in the Third-Party Release by indicating their desire to do so by following the procedures set forth on their Ballot(s) and selecting the "opt out" box.

When evaluating third party releases under chapter 11 plans in the Second Circuit, courts currently consider the following factors:   1) there is an identity of interest between the debtor and the released parties; (2) the claims against the debtor and released parties are factually and legally intertwined; (3) the scope of the releases is appropriate; (4) the releases are essential to the reorganization; (5) the non-debtors will contribute substantial assets to the reorganization; (6) the impacted class of creditors has overwhelmingly voted in support of the plan; and (7) the plan calls for fair payment of the enjoined claims. *In re Purdue Pharma L.P.*, 69 F.4th 45 (2d Cir. 2023), *cert, granted*, ___ S.Ct. ___, 2023 WL 5116031; *see also In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) (citations omitted).

**IF YOU DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD PARTY RELEASE PROVISIONS IN THE PLAN BY PROPERLY AND TIMELY SUBMITTING THE OPT OUT ELECTION, YOU WILL BE DEEMED, AS OF THE EFFECTIVE DATE, TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND ALL CAUSES OF ACTION (AS SET FORTH IN THE PLAN AND AS PERMITTED BY APPLICABLE LAW) AGAINST THE RELEASED PARTIES (AS DEFINED IN THE PLAN).**

With respect to these Third-Party Release, Section 10.2(b) of the Plan provides as follows:

> ***Releases by the Releasing Parties.* TO THE GREATEST EXTENT PERMISSIBLE AND WITHOUT LIMITING ANY OTHER APPLICABLE PROVISIONS OF, OR RELEASES CONTAINED IN, THE PLAN, THE DIP FINANCING ORDER, THE SALE ORDER, AND SALE DOCUMENTS, AS OF THE EFFECTIVE DATE, IN CONSIDERATION FOR THE OBLIGATIONS OF THE DEBTORS UNDER THE PLAN, AND THE CONSIDERATION AND OTHER WAIVERS, CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS, OR DOCUMENTS TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THE PLAN, EACH RELEASING PARTY SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED, AND WAIVED ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT SUCH RELEASING PARTY HAS, HAD, OR MAY HAVE AGAINST ANY RELEASED PARTY BASED ON OR RELATING TO THE DEBTORS, THE ESTATES, THE CHAPTER 11 CASES, ANY**

**PREPETITION FINANCING ARRANGEMENTS, THE DEBTORS' FINANCIAL STATEMENTS, THE DEBTOR IN POSSESSION FINANCING, THE SALE OR TRANSFER OF ANY AND ALL ASSETS OF THE DEBTORS (INCLUDING THE SALE), THE TRANSITION SERVICES AGREEMENT, THE NEGOTIATION, CONSIDERATION, FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION, OR CONSUMMATION OF THE PLAN, THE PLAN SUPPLEMENT AND EXHIBITS, THE DISCLOSURE STATEMENT, ANY AMENDMENTS THEREOF, OR SUPPLEMENTS THERETO, OR ANY OTHER TRANSACTION IN CONNECTION WITH THESE CHAPTER 11 CASES OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION THEREWITH OR IN CONNECTION WITH ANY OTHER OBLIGATIONS ARISING UNDER THE PLAN AND THE OBLIGATIONS ASSUMED HEREUNDER (INCLUDING ANY CLAIM BASED ON THEORIES OF ALLEGED NEGLIGENCE, MISREPRESENTATION, NON-DISCLOSURE, OR BREACH OF FIDUCIARY DUTY).  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE:  (I) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PERSON OR ENTITY UNDER THE PLAN, THE TRANSITION SERVICES AGREEMENT, THE SALE ORDER, OR THE SALE DOCUMENTS, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN; OR (II) THE LIABILITY OF ANY RELEASED PARTY THAT WOULD OTHERWISE RESULT FROM ANY ACT OR OMISSION OF SUCH RELEASED PARTY TO THE EXTENT THAT SUCH ACT OR OMISSION IS DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD).**

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third-Party Release, set forth above which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (1) essential to the Confirmation of the Plan; (2) given in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (3) a good-faith settlement and compromise of the Claims released by the Third-Party Release; (4) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; (7) consensual as to the Holders of Claims that do not opt out of the Third-Party Release on their Ballots; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release:

**Waiver of Statutory Limitation on Releases.**  Without limiting any other applicable provisions of, or releases contained in, the Plan, each Releasing Party in each

of the releases contained in the Plan (including under this Section) expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in his favor, which if known by it may have materially affected its settlement with the party released, it has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Parties. The releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

**The above provisions describe the releases the Debtors will seek at the hearing before the Bankruptcy Court to confirm the Plan. This language has not yet been considered or approved by the Bankruptcy Court and remains subject to consideration at the Combined Hearing (as defined below).**

The Plan also contains the customary exculpation provision set forth below. The Exculpated Parties are (a) the Debtors; (b) the Creditors' Committee and its members (each in their capacities as such); (c) the Plan Administrator; and (d) with respect to each of the foregoing persons in clauses (a) through (c), each of their Related Parties.

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, EFFECTIVE AS OF THE EFFECTIVE DATE, TO THE EXTENT PERMITTED UNDER SECTION 1125(e) OF THE BANKRUPTCY CODE AND PROFESSIONAL RULES OF CONDUCT, THE EXCULPATED PARTIES SHALL NOT HAVE OR INCUR ANY LIABILITY FOR ANY ACT OR OMISSION TAKEN OR NOT TAKEN IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THE CHAPTER 11 CASES, THE NEGOTIATION AND FILING OF THE DISCLOSURE STATEMENT, THE PLAN OR ANY DOCUMENT IMPLEMENTING THE PLAN, THE PLAN ADMINISTRATOR AGREEMENT, THE PLAN SUPPLEMENT, THE TRANSITION SERVICES AGREEMENT, THE SALE DOCUMENTS, THE DIP FINANCING ORDER, THE FILING OF THE CHAPTER 11 CASES, THE SETTLEMENT OF CLAIMS OR RENEGOTIATION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN, OR THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, EXCEPT FOR ACTS OR OMISSIONS THAT ARE DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD), OR CLAIMS FOR LEGAL MALPRACTICE, RELEASE OF WHICH IS PROHIBITED BY RULE 1.8(H) OF THE NEW YORK RULES OF PROFESSIONAL**

**CONDUCT (22 N.Y.C.R.R. 1200, OR ANY OBLIGATIONS THAT THEY HAVE UNDER OR IN CONNECTION WITH THE PLAN OR THE TRANSACTIONS CONTEMPLATED IN THE PLAN, AND IN ALL RESPECTS SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND OBLIGATIONS UNDER THE PLAN.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE EXCULPATION SET FORTH ABOVE DOES NOT EXCULPATE ANY OF THE EXCULPATED PARTIES' POST-EFFECTIVE DATE OBLIGATIONS UNDER THE PLAN, THE SALE ORDER, OR THE SALE DOCUMENTS, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING, BUT NOT LIMITED TO, THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.**

> **F.    No Discharge**

Because the Debtors are liquidating, they are not entitled to a discharge of obligations pursuant to section 1141 of the Bankruptcy Code.

## VI.    SOLICITATION PROCEDURES AND SOLICITATION PACKAGE

The Debtors are causing packages (the "Solicitation Packages") to be distributed to Holders of Claims in Class 4 (Prepetition Senior Secured Credit Agreement Claims), Class 5 (JPM Overdraft Facility Claims), Class 6 (Senior Subordinated Notes Claims), Class 7 (Pulse Notes Claims), and Class 8 (General Unsecured Claims), which are entitled to vote on the Plan (the "Voting Classes").  Such Solicitation Packages include:

>    a.    a notice of the hearing (the "Combined Hearing") to consider approval of this Disclosure Statement on a final basis and Confirmation of the Plan (the "Combined Hearing Notice");

>    b.    the order of the Bankruptcy Court entered on [_____] [__], 2024 [Docket No. ____] (the "Solicitation Procedures Order"), excluding the exhibits attached thereto, approving the procedures for soliciting votes with respect to the Plan and dates and deadlines related to the Bankruptcy Court's approval of the Plan (referred to as "Confirmation");

>    c.    instructions detailing how to access copies of this Disclosure Statement and Plan on the Voting Agent's (defined below) website (https://cases.stretto.com/vice/) and how to request hard copies of the Disclosure Statement and Plan, which the Voting Agent will send a copy to the requesting party at the Debtors' expense;  and

>    d.    a ballot to cast a vote on the Plan (each, a "Ballot").

Holders of Claims and Interests in Class 1 (Secured Tax claims), class 2 (Other Secured Claims), Class 3 (Other Priority Claims), and Class 9 (Interests), which

not entitled to vote on the Plan (the "Non-Voting Classes") will receive only the Combined Hearing Notice which will provide them, among other things, notice of such holder's non-voting status.

Members of the Voting Classes and Non-Voting Classes are entitled to obtain copies of the Disclosure Statement and the Plan, as well as the exhibits thereto, free of charge (a) at the Debtors' case website maintained by the Voting Agent at http://www.cases.stretto.com/vice/).; (b) in writing at Vice Ballot Processing c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602, (c) by calling (855) 620-5725 (U.S.) or (949) 620-1618 (International), or (d) via email at viceinquiries@stretto.com.

## A.     Voting Procedures and Voting Deadline

The rules, requirements, and procedures regarding the submission of your Ballot is set forth in the Solicitation Procedures Order and the Ballot and summarized below for your convenience.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of (*i.e.*, to accept) or against the Plan (*i.e.*, to reject) on the Ballot.  **To be counted, your Ballot must be duly completed, executed, and actually received by Stretto, Inc. (the "Voting Agent") by 5:00 p.m. (Eastern Time) on the Voting Deadline ([_____] [___], 2024).  Ballots may either be delivered (a) via electronic, online transmission by utilizing the eBallot platform on the Debtors' case website (https://cases.stretto.com/vice/), or (b) by paper copy to the Vice Ballot Processing c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602.**

BALLOTS MUST BE DELIVERED BY MAIL, COURIER, OR DELIVERY SERVICES OR ELECTRONICALLY VIA THE CASE WEBSITE.  FACSIMILE BALLOTS WILL NOT BE ACCEPTED.  ANY COMPLETED BALLOTS THAT DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR THAT CONTAIN BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN, WILL NOT BE COUNTED.

Ballots not timely submitted by the Voting Deadline (or such other deadline as ordered by the Bankruptcy Court or agreed to by the Debtors, in their sole discretion) may be considered invalid.

If you have any questions about how to vote, the Solicitation Package you receive, or the amount of your Claim, or if you wish to receive additional copies of the Plan, this Disclosure Statement, or any Exhibits thereto or hereto, please contact:

| Email: | viceinquiries@stretto.com |
|--------|---------------------------|
| Phone: | (855) 620-5725 (U.S.) or (949) 620-1618 (International) |

**B.      Combined Hearing and Deadline for Objections to Final Disclosure Statement Approval and Plan Confirmation**

The Debtors intend to seek the Bankruptcy Court's Confirmation of the Plan. The Bankruptcy Court has scheduled the Combined Hearing for **11:00 a.m. (Prevailing Eastern Time) on [_____] [__], 2024**. The Debtors may adjourn the Combined Hearing by filing a notice on the docket of the Chapter 11 Cases or by announcing an adjournment on the record of a hearing or status conference held with the Bankruptcy Court.

Any objections to the adequacy of the Disclosure Statement or Confirmation of the Plan must be filed with the Bankruptcy Court and served on the parties indicated in the box immediately below by no later than **4:00 p.m. (Eastern Time) on [_____] [__], 2024 at 4:00 p.m. (Prevailing Eastern Time) (the "Objection Deadline")**. Unless such an objection is timely filed and served, such objection may not be considered by the Bankruptcy Court at the Combined Hearing. Such objection must be filed with the Bankruptcy Court and served so that it is __actually received__ by the Bankruptcy Court and the following parties by no later than the Objection Deadline:

| | |
|---|---|
| Counsel for the Debtors | TOGUT, SEGAL & SEGAL LLP<br>One Penn Plaza, Suite 3335<br>New York, New York 10119<br>Attn: Frank A. Oswald, Esq. (frankoswald@teamtogut.com), Brian F. Moore, Esq. (bmoore@teamtogut.com), and John C. Gallego, Esq. (jgallego@teamtogut.com) |
| Counsel for the Creditors' Committee | PACHULSKI, STANG, ZIEHL & JONES LLP<br>780 Third Avenue, 34th Floor, New York, New York 10017<br>Attn: Bradford J. Sandler, Esq. (bsandler@pszjlaw.com), Robert J. Feinstein (rfeinstein@pszjlaw.com) |
| The U.S. Trustee | Office of the United States Trustee<br>One Bowling Green, Suite 534, New York, New York 10004<br>Attn.: Andrea B. Schwartz, Esq. (Andrea.B.Schwartz@usdoj.gov) |

> **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## VII.    REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### A.    Requirements of Section 1129(a) of the Bankruptcy Code

At the Combined Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(i)    The Plan complies with the applicable provisions of the Bankruptcy Code.

(ii)    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(iii)    The Plan has been proposed in good faith and not by any means proscribed by law.

(iv)    Payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved or is subject to the approval of the Bankruptcy Court as reasonable.

(v)    The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in a joint plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy.

(vi)    With respect to each Class of Claims or Interests, each Holder of an Impaired Claim or Impaired Interest either has accepted the Plan or will receive or retain under the Plan on account of such Holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. *See* discussion of "Best Interests Test" below.

(vii)    Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan.

(viii)   Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims will be paid in full on the Effective Date.

(ix)   At least one class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

(x)   Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

(xi)   All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

## B.   Best Interests Test and Liquidation Analysis

As noted above, the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  This requirement is referred to as the "best interests test."

The best interests test requires the Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a hypothetical liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all Holders of Impaired Claims and Interests will receive property with a value not less than the value such Holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Plan already provides for the liquidation of the Debtors.  Liquidation under chapter 7 of the Bankruptcy Code would only increase administrative costs in the form of statutory chapter 7 trustee's fees and other professional fees, all to the detriment of recoveries for creditors.

Thus, the Debtors submit that the Plan is in the best interests of creditors and all creditors are receiving value greater than or at least equal to the value, as of the Effective Date, of the Distribution that each such Holder would receive were the Debtors liquidated under chapter 7 of the Bankruptcy Code.

### C.      Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a Class of Claims or Interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class.

#### 1.      No Unfair Discrimination

The "no unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan.  A chapter 11 plan of reorganization does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its claims or equity interests.  This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe that, under the Plan, all Impaired Classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other Classes of Claims and Interests having the same priority.  Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

#### 2.      Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class.  In order to demonstrate that a plan is "fair and equitable," the plan proponent must demonstrate the following:

(i)      *Secured Creditors*.  With respect to a class of impaired secured claims, a proposed plan must provide the following:  (A) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estates' interest in such property, or (B) for the sale, subject to section 363 of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (A) or (C) of this paragraph, or (C) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim.

The Debtors believe that the Plan satisfies the "fair and equitable" test with respect to all secured Claims.

(ii)      *Unsecured Creditors***.**  With respect to a class of impaired unsecured claims, a proposed plan must provide the following:  either (A) each holder of an

impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (B) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

The Debtors believe that the Plan satisfies the "fair and equitable" test with respect to all unsecured Claims.

(iii)    *Holders of Interests*.  With respect to a class of equity interests, a proposed plan must provide the following:  (A) that each holder of an equity interest receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest or (B) that the holder of any interest that is junior to the interests of the class of equity interests will not receive or retain under the Plan on account of such junior interest any property.

The Debtors believe that the proposed treatment of Interests under the Plan meets the "fair and equitable" test with respect to all Interests.

## VIII.    RISK FACTORS TO BE CONSIDERED

Holders of General Unsecured Claims should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement and the Plan and their respective Exhibits, before deciding whether to vote to accept or to reject the Plan.  This information, however, does not describe the only risks involved in connection with the Plan and its implementation.

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement except as may be required by applicable law.

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice, and nothing contained in the Plan will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Interests.  Each Holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine whether to vote to accept the Plan.

### A.    There May Not Be Recoveries for Holders of Allowed General Unsecured Claims

There can be no assurances of actual recoveries to Holders of Allowed General Unsecured Claims in light of the potential claims that could be asserted against the Debtors. These claims currently include unliquidated litigation claims that have been asserted both by individual creditors and on behalf of purported class action claimants.  The amount of the Debtors' ultimate exposure to these claims is inherently unknowable, and the Debtors currently dispute any liability in these

litigations.  Ultimately, however, these claims must be liquidated—including to $0—before the Debtors can make a distribution to Holder of Allowed General Unsecured Claims.  Accordingly, there is no guarantee that Holders of Allowed General Unsecured Claims will receive any recovery.

**B.    Impact of the Governmental Bar Date**

The Governmental Bar Date is not until January 16, 2024.  Other Claims, including claims that can be asserted by governmental agencies, including, but not limited to priority tax claims, that are senior in priority to General Unsecured Claims may arise and become Allowed Claims.

**C.    Recoveries on Account of Retained Causes of Action are Speculative and Uncertain**

The ultimate recoveries, if any, that could be obtained by the Liquidating Trustee are premised on account of Retained Causes of Action.  Recoveries on account of any of the Retained Causes of Action are speculative and uncertain due to the risk of success on the merits and the potential difficulties of collection and enforcement of any judgments. Moreover, there may be limitations on the ability Debtors to recover proceeds under applicable insurance policies.

**D.    Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular claim or Cause of Action or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement.  The Liquidating Trustee may seek to investigate, file, and prosecute claims and Causes of Action, and may object to Claims, after the Effective Date irrespective of whether this Disclosure Statement, the Plan, the Exhibits hereto or thereto, or the Plan Supplement identifies such Causes of Action or objections to such Claims.

**E.    Potential Tax Obligations**

The Debtors have filed federal and state tax returns through 2022, The Debtors will also need to file for 2023.  Accordingly tax liability could be assessed once returns are filed.  Recoveries to Holders of Allowed General Unsecured Claims could be materially impacted in light of the potential tax obligations.

**F.    Tax Consequences**

The federal income tax consequences of the implementation of the Plan to the Holders of Allowed Claims will depend, among other things, on the consideration to be received by the holder, whether the holder reports income on the accrual or cash method, whether the holder's claim is allowed or disputed on the Effective Date, and whether the holder has taken a bad debt deduction or a worthless security deduction with respect to its claim.  It is possible that additional issues may exist that could affect the federal income tax consequences of the Plan or other federal income tax matters discussed herein and this discussion does not consider or provide any conclusions with

respect to any such issues.  Each taxpayer is strongly urged to seek advice based on the taxpayer's particular circumstances from such taxpayer's independent tax advisor.

### G.    Risk of Delayed Effective Date

There can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.  If the Plan is not consummated, there can be no assurance that the Chapter 11 Cases would not be converted to chapter 7 liquidation cases or that any alternative chapter 11 plan would be as favorable to Holders of General Unsecured Claims as the current Plan.  Either outcome may materially reduce or eliminate distributions to Holders of Allowed General Unsecured Claims.

Although in the process of winding down, the Debtors continue to incur administrative costs.  Any material delay in confirming the Plan may result in insufficient funds to consummate the Plan.

### H.    No Representation Outside This Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

## IX.    <u>CONCLUSION AND RECOMMENDATION</u>

The Debtors believe that Confirmation and implementation of the Plan is preferable to any other alternative.  The Debtors urge all Holders of General Unsecured Claims entitled to vote to cast their Ballots to accept the Plan in accordance with the instructions provided herein and in the Solicitation Packages.

Dated: February 8, 2024
        New York, New York


                                VENUS LIQUIDATION INC.
                                (F/K/A VICE GROUP HOLDING INC.), *ET AL.*


                        By:     */s/ Frank Pometti*
                                Name:  Frank Pometti
                                Title:    Chief Restructuring Officer

## EXHIBIT A

Chapter 11 Plan of Liquidation for Venus Liquidation Inc.
(f/k/a Vice Group Holding Inc.) and Certain of Its Affiliates

**Previously filed at ECF Docket No. 664**