<u>**EXHIBIT 1**</u>

**Solicitation Version of Disclosure Statement**

> **ACCEPTANCES OR REJECTIONS WITH RESPECT TO THE PLAN WILL BE SOLICITED PURSUANT TO THIS DISCLOSURE STATEMENT, WHICH THE BANKRUPTCY COURT HAS APPROVED ON A PROVISIONAL BASIS AND WHICH REMAINS SUBJECT TO FINAL APPROVAL AT THE COMBINED HEARING. THE DEBTORS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT. THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITIATION VERISON AND IS NOT INTENDED FOR SOLICITATION OF VOTES ON THE PLAN.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VENUS LIQUIDATION INC., *et al.* | Case No. 23-10738 (JPM) |
| Debtors.[1] | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF LIQUIDATION FOR VENUS LIQUIDATION INC. (F/K/A VICE GROUP HOLDING INC.) AND CERTAIN OF ITS AFFILIATES

TOGUT, SEGAL & SEGAL LLP
Frank A. Oswald
Kyle J. Ortiz
Brian F. Moore
John C. Gallego
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000

*Counsel to the Debtors*
*and Debtors in Possession*

Dated: March 5, 2024
New York, New York

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Venus Liquidation Inc. (f/k/a Vice Group Holding Inc.) (4250); Vice Impact Inc. (9603); Vice Media LLC (5144); Villain LLC (3050); Boy Who Cried Author LLC (6199); Carrot Operations LLC (1596); Carrot Creative LLC (8652); Channel 271 Productions LLC (1637); Clifford Benski, Inc. (9387); Dana Made LLC (1065); Inverness Collective LLC (6542); JT Leroy Holding LLC (7555); PLDM Films LLC (5217); Project Change LLC (2758); R29 Pride, LLC (7011); R29 Productions, LLC (6344); Refinery 29 Inc. (7749); Valvi LLC (6110); Vice Content Development, LLC (5165); Vice Distribution LLC (5515); Vice Europe Holding Limited (N/A); Vice Europe Pulse Holding Limited (N/A); Vice Food LLC (1693); Vice Holding Inc. (2658); Vice International Holding, Inc. (5669); Vice Music Publishing LLC (3022); Vice Payroll LLC (6626); Vice Productions LLC (5399); Vice Project Services LLC (6473); Virtue Worldwide, LLC (7212); Visur LLC (9336); VTV Productions LLC (6854); and Goldie Films, Inc. (1241). The location of the debtors' service address for purposes of these chapter 11 cases is c/o Alix Partners 909 Third Avenue 30th Floor, New York, NY 10022

# INTRODUCTION AND DISCLAIMER

On May 15, 2023 (the "Petition Date"), Venus Liquidation Inc. (f/k/a Vice Group Holding Inc.) ("Vice" or "Vice Parent") and certain of its affiliates, the debtors and debtors in possession (collectively, the "Debtors" and, together with non-Debtor affiliates, the "Company"), commenced the above-captioned cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").[2]  The Chapter 11 Cases are being jointly administered under the caption *In re Venus Liquidation Inc.*, Case No. 23-10738 (JPM).

The Debtors submit this Disclosure Statement to all Holders of Claims against the Debtors entitled to vote on the *Chapter 11 Plan of Liquidation for Venus Liquidation Inc. (f/k/a Vice Group Holding, Inc.) and Certain of Its Affiliates*, a copy of which is attached hereto as **Exhibit A** (as it may be amended, supplemented, or otherwise modified from time to time, the "Plan").[3]

The purpose of this Disclosure Statement is to provide Holders of Claims entitled to vote on the Plan with adequate information to make an informed judgment as to whether to vote to accept or reject the Plan.  The Debtors are providing you with the information in this Disclosure Statement because you may be a creditor entitled to vote on the Plan.  This Disclosure Statement is to be used solely in connection with evaluation of the Plan and not for any other purposes.

To be counted, your Ballot must be duly completed, executed, and actually received by 5:00 p.m. (Eastern Time) on March 29, 2024 (the "Voting Deadline").  Ballots may either be delivered:  (a) via electronic, online transmission by utilizing the eBallot platform on the Debtors' case website (https://cases.stretto.com/vice/), or (b) by paper copy to the Vice Ballot Processing c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602.

The Debtors believe that the Plan is in the best interests of creditors and other stakeholders and is a fair and equitable means of moving these Chapter 11 Cases toward efficient resolution.  All creditors entitled to vote on the Plan are urged to vote in favor of it.

THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTORS AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY PROVIDE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN

---

[2]   On May 30, 2023, Debtor Goldie Films, Inc. also commenced a case by filing a voluntary chapter 11 petition with this Court.

[3]   Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.

THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL HOLDERS OF GENERAL UNSECURED CLAIMS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT (INCLUDING EXHIBITS) AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ATTACHED TO THE PLAN, AND ANY PLAN SUPPLEMENT(S).  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, LITIGATIONS, AND APPEALS, INCLUDING, FOR THE AVOIDANCE OF DOUBT, LITIGATION CLAIMS PENDING AS OF THE FILING OF THESE CHAPTER 11 CASES OR COMMENCED AFTER THE FILING OF THESE CHAPTER 11 CASES, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING, NOR WILL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS.

Rules of Interpretation

For purposes of this Disclosure Statement, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural;  (b) each pronoun stated in the masculine, feminine, or neuter gender includes the masculine, feminine, and neuter gender;  (c) any reference in this Disclosure Statement to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented;  (d) any reference to an entity as a Holder

of a Claim or Interest includes such Holder's successors and assigns; (e) all references in this Disclosure Statement to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Disclosure Statement; (f) the words "herein," "hereunder," and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Disclosure Statement; (h) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (i) all references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, unless otherwise stated; (k) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to this Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; (l) unless otherwise specified, all references in this Disclosure Statement to monetary figures shall refer to currency of the United States of America; (m) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (n) to the extent this Disclosure Statement is inconsistent with the terms of the Plan, the Plan shall control; and (o) to the extent this Disclosure Statement is inconsistent with the Confirmation Order, the Confirmation Order shall control.

## TABLE OF CONTENTS

I.    EXECUTIVE SUMMARY OF THE PLAN OF LIQUIDATION ............................... 1

II.    THE DEBTORS' BUSINESS AND PREPETITION  CAPITAL STRUCTUREAND
       DEBT OBLIGATIONS ...................................................................................... 3

    A.    Business Segments and Organizational Structure. ........................................ 3

    B.    The Funded Debt Obligations ............................................................. 4

    C.    Trade and Lease Obligations ............................................................... 7

    D.    The Preferred Stock .......................................................................... 7

III.    CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES ......................... 9

IV.    THE CHAPTER 11 CASES AND THE POSTPETITION SALE PROCESS ........... 10

    A.    First Day Motions and Appointment of Creditors' Committee ................. 10

    B.    The DIP Financing .......................................................................... 12

    C.    Postpetition Sale Process ................................................................... 13

    D.    Transition Services Agreement ........................................................... 14

    E.    Estate Professionals ......................................................................... 15

    F.    Summary of the Debtors' Assets and Liabilities ............................................. 15

    G.    Antenna Stipulation and Committee Stipulation with Purchaser ............. 16

V.    SUMMARY OF THE PLAN OF LIQUIDATION ..................................................... 17

    A.    Unclassified Claims ......................................................................... 18

    B.    Classification and Treatment of Claims and Interests ................................. 19

    C.    Means For Implementation Of The Plan and The Plan Administrator ...... 23

    D.    Other Miscellaneous Plan Provisions ................................................. 26

    E.    Exculpation and Releases .................................................................. 27

    F.    No Discharge ................................................................................... 32

VI.    SOLICITATION PROCEDURES AND SOLICITATION PACKAGE ................... 32

    A.    Voting Procedures and Voting Deadline ............................................. 33

|  | B. | Combined Hearing and Deadline for Objections to Final Disclosure Statement Approval and Plan Confirmation | 34 |
| VII. |  | REQUIREMENTS FOR CONFIRMATION OF THE PLAN | 35 |
|  | A. | Requirements of Section 1129(a) of the Bankruptcy Code | 35 |
|  | B. | Best Interests Test and Liquidation Analysis | 36 |
|  | C. | Requirements of Section 1129(b) of the Bankruptcy Code | 37 |
| VIII. |  | RISK FACTORS TO BE CONSIDERED | 38 |
|  | A. | There May Not Be Recoveries for Holders of Allowed General Unsecured Claims | 38 |
|  | B. | Impact of the Governmental Bar Date | 39 |
|  | C. | Recoveries on Account of Retained Causes of Action are Speculative and Uncertain | 39 |
|  | D. | Failure to Identify Litigation Claims or Projected Objections | 39 |
|  | E. | Potential Tax Obligations | 39 |
|  | F. | Tax Consequences | 39 |
|  | G. | Risk of Delayed Effective Date | 40 |
|  | H. | No Representation Outside This Disclosure Statement Are Authorized | 40 |
| IX. |  | CONCLUSION AND RECOMMENDATION | 40 |

I.  **EXECUTIVE SUMMARY OF THE PLAN OF LIQUIDATION**[4]

The Plan is premised upon (i) the sale of substantially all of the Debtors' assets (the "<u>Sale</u>") to Vice Acquisition Holdco, LLC (including any Buyer Designee, as that term is defined in the Asset Purchase Agreement, the "<u>Purchaser</u>"), a consortium comprised of affiliates of Fortress Investment Group, Soros Fund Management and Monroe Capital, under section 363 of the Bankruptcy Code and pursuant to an asset purchase agreement attached as <u>Exhibit A</u> to the Bankruptcy Court order dated June 23, 2023 [Docket No. 214] (the "<u>Sale Order</u>") (as such agreement was amended, supplemented, or otherwise modified from time to time, the "<u>Asset Purchase Agreement</u>"), and (ii) the settlement (the "<u>Committee Settlement</u>") embodied in the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, (IV) Granting Adequate Protection to Prepetition Secured Parties, and (V) Granting Related Relief,* which was approved by the Bankruptcy Court on June 13, 2023 [Docket No. 138] (the "<u>DIP Financing Order</u>"), among the Debtors, the official committee of unsecured creditors (the "<u>Creditors' Committee</u>"), Fortress Credit Corp., as administrative agent (in such capacity, the "<u>DIP Administrative Agent</u>"), Wilmington Trust, National Association, as collateral agent (in such capacity, the "<u>DIP Collateral Agent</u>," and together with the DIP Administrative Agent, the "<u>DIP Agents</u>,") on behalf of the lender parties to the DIP Credit Agreement the "<u>DIP Lenders</u>" and DIP Agents, collectively, the "<u>DIP Secured Parties</u>"), and Prepetition Secured Parties (as defined in the Plan).

The Sale was the result of extensive good-faith negotiations among the Debtors, the Creditors' Committee, and the Purchaser. With the closing of the Sale on July 31, 2023, the Debtors have liquidated their primary tangible assets and satisfied substantially all of their secured debt obligations.

The Debtors are proposing the Plan in form and substance agreeable to the Creditors' Committee. The Plan shall require that the GUC Cash Reserve, all GUC Reserved Litigation Claims, and any Excluded Assets (as defined herein and the Asset Purchase Agreement) be used to the extent necessary to satisfy the priorities set forth in the Bankruptcy Code, and any remaining cash that is not required to be used to pay administrative expenses, other statutory priority claims, or statutory secured claims, as required under the Bankruptcy Code, in each case, as of the Effective Date of an approved Chapter 11 Plan, shall be distributed for the benefit of general unsecured creditors by a Plan Administrator to be selected by the Creditors' Committee after consultation with the Debtors. The Plan also provides that the Plan Administrator will continue to liquidate and wind down any remaining assets of the Debtors not sold prior to the Effective Date.

Under the Committee Settlement, any general unsecured deficiency claims of the Prepetition Secured Parties on account of the Prepetition Secured Credit Agreement Claims shall be subordinated in right of payment to other general unsecured creditors entitled to distribution from the Debtors' estates under the Plan. In

---

[4]    The following is a summary of the Plan and the Committee Settlement. This Executive Summary is not intended to be comprehensive. To the extent anything in this Executive Summary is contrary to the terms of the Plan or the Committee Settlement, the Plan or Committee Settlement, as applicable, shall govern and control.

the event that the Plan Administrator, in the aggregate, distributes $12 million of cash or other consideration to the Debtors' general unsecured creditors (the "Sharing Threshold"), then the Prepetition Secured Parties shall have the right to participate as based on the pro rata amount of any general unsecured deficiency claim of the Prepetition Secured Parties on account of the Prepetition Secured Credit Agreement Claims on amounts to be distributed by in excess of the Sharing Threshold. The Plan also provides that the Plan Administrator will continue to liquidate and wind down any remaining assets of the Debtors.

The Plan establishes a Plan Administrator to pursue GUC Reserved Litigation Claims and maximize the value of any remaining estate assets. Under the Plan, Holders of Allowed General Unsecured Claims will receive distributions in accordance with the Plan and the priorities established by the Bankruptcy Code and applicable orders of the Bankruptcy Court. The Plan ensures that at least $500,000 from the GUC Cash Reserve will allow the Plan Administrator to effectively pursue the GUC Reserved Litigation Claims on behalf of the unsecured creditors and to complete the administration of the Chapter 11 Cases. In addition to the GUC Cash Reserve, the Plan establishes two other reserve accounts: (i) the Disputed Claims Reserve, and (ii) the Professional Fee Escrow.

The GUC Cash Reserve will be funded with $500,000 less any amounts that may be used between the Sale Closing Date and the Effective Date to fund the costs of the Chapter 11 Cases, including the satisfaction of Allowed Claims on or prior to the Effective Date in accordance with the terms of the Plan and any orders of the Bankruptcy Court. Following the Effective Date, the funds in the GUC Cash Reserve will be used to pay Allowed Administrative Claims (other than Professional Fee Claims), Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Other Priority Claims that have not otherwise been satisfied as of the Effective Date (collectively, the "Plan Reserve Obligations"). Any funds remaining in the Plan Reserve Account following satisfaction or disallowance of all Plan Reserve Obligations will become cash that can be distributed to creditors.

The Disputed Claims Reserve will be established for the benefit of the Holders of Disputed General Unsecured Claims that subsequently become Allowed Claims.

Finally, the Professional Fee Escrow will be funded with the Professionals' estimated Accrued Professional Compensation through the Effective Date and will be used to pay Professional Fee Claims following final approval of such compensation by the Bankruptcy Court.

The Plan will allow the Debtors to expeditiously conclude the Chapter 11 Cases. Accordingly, the Debtors believe that implementation of the Plan is in the best interests of the Debtors and their stakeholders and is the best possible alternative to maximize value for Holders of Allowed Claims. There can be no guarantee under either an alternative chapter 11 plan or a chapter 7 liquidation that Holders of Allowed General Unsecured Claims would receive any recovery. Other Claims senior to General Unsecured Claims may arise and become Allowed Claims, including claims raised by parties subject to the Governmental Bar Date, and other unforeseeable and potentially

material claims or other necessary costs of administering the estates may arise which may materially impact the distribution to unsecured creditors.  In either case, if the payment of such Claims is necessary to achieve confirmation of an alternative plan, the Creditors' Committee may or may not support such plan.

Confirmation of the Plan will be considered by the Bankruptcy Court at the Combined Hearing (as defined below).  Among other requirements, for the Plan to be confirmed, an impaired Class of Claims, which include, but are not limited to, Class 4 (Prepetition Senior Secured Credit Agreement Claims), Class 5 (JPM Overdraft Facility Claims), Class 6 (Senior Subordinated Notes Claims), Class 7 (Pulse Note Claims), and Class 8 (General Unsecured Claims), must vote to accept the Plan.  An impaired Class of Claims has voted to accept the Plan if Holders of Allowed Claims in such Class that hold at least two-thirds in amount of and more than one-half in number of the Allowed Claims held by Holders of Claims in such Class (excluding insiders) have voted to accept the Plan.

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will not be converted to a liquidation under chapter 7 of the Bankruptcy Code.  While a chapter 7 liquidation would have the same goal, the Plan provides the best source of recovery because: (i) a chapter 7 liquidation may not provide for a timely distribution to Holders of Allowed Claims; and (ii) distributions would likely be smaller due to additional administrative costs, including those of a chapter 7 trustee and its professionals.  Accordingly, if the Plan is not confirmed, it is likely that creditors will realize lower recoveries on account of their Allowed Claims, if any.

**<u>ACCORDINGLY, THE DEBTORS BELIEVE THAT THE TREATMENT BY THE PLAN OF HOLDERS OF CLAIMS IN THE IMPAIRED CLASSES THAT ARE ELIGIBLE TO VOTE WILL YIELD A GREATER RECOVERY FOR SUCH HOLDERS THAN WOULD BE AVAILABLE IN A CHAPTER 7 LIQUIDATION. ACCORDINGLY, THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF HOLDERS OF SUCH CLAIMS.</u>**

For the reasons discussed in this Disclosure Statement, the Debtors urge you to return your Ballot accepting the Plan by the Voting Deadline.

## II.    THE DEBTORS' BUSINESS AND PREPETITION CAPITAL STRUCTURE AND DEBT OBLIGATIONS

### A.    Business Segments and Organizational Structure.

*VICE* traces its roots back to 1994, when Shane Smith, co-founded and launched *Voice of Montreal*, an alternative punk focused magazine, in Montreal, Quebec, Canada.  From those humble beginnings *VICE* expanded into a global, multi-platform media company with a collection of powerful brands, producing premium award-winning content for a highly engaged global youth audience.   The Company was comprised of Vice Parent, and 189 wholly owned subsidiaries, of which 33 are Debtors

in these Chapter 11 Cases. Until the Sale, discussed below, the Company operated globally spanning three primary regions:

- North America which comprised the United States and Canada.

- Europe and Middle East which included offices in Eastern Europe, Western Europe, the Nordic countries, and the Middle East.

- Asia Pacific which includes operations in India, China, Korea, Singapore, Japan and Australia.

*VICE* operated through five primary business segments: (i) the studios group (ii) publishing (iii) *VICE* TV, and (iv) VIRTUE, a creative advertising agency and (v) *VICE* News. As *VICE* had been exploring options to restructure its business operations, it had been evaluating whether to combine certain business segments.

### B.    The Funded Debt Obligations

As of the Petition Date, the Debtors' capital structure included, in addition to certain lease obligations and other trade debt obligations, approximately $834 million of obligations under the Debtors funded debt issued or guaranteed by the Debtors (the "Funded Debt Obligations"). The Funded Debt Obligations comprised the following:

| Debt | Amount Outstanding |
|---|---|
| Prepetition Senior Secured Credit Agreement | $474.6 million |
| JPM Overdraft Facility | $9.8 million[5] |
| The Pulse Notes | $20.9 million |
| Senior Subordinated Notes | $328.7 million |
| **Total Funded Debt** | **$834 million** |

### 1.    Prepetition Senior Secured Credit Agreement

As of the Petition Date, the Debtors had a total of $474.6 million aggregate principal amount (inclusive of principal, PIK interest, and PIK forbearance fees) of term loans (the "Prepetition Senior Secured Term Loans") outstanding under that certain Amended and Restated

---

[5]    As discussed below, the JPM Overdraft Facility is denominated in British pounds sterling.  The U.S. dollar amounts set forth in this table represent and approximation based upon the conversions of GBP to USD.

4

Credit and Guaranty Agreement, dated November 4, 2019, as amended from time to time, through Amendment No. 33 to Amended and Restated Credit and Guaranty Agreement, dated as of May 9, 2023 (the "Prepetition Senior Secured Credit Agreement"), by and among Vice Parent, as borrower, certain subsidiaries of Vice Parent from time to time party thereto as guarantors, the lenders thereto (the "Prepetition Term Lenders"), the Prepetition Administrative Agent, and Wilmington Trust, National Association, as collateral agent (in such capacity, the "Prepetition Collateral Agent"). All obligations under the Prepetition Senior Secured Credit Agreement and the guarantees of those obligations were secured by a first-priority security interest in substantially all of the property and assets of the Debtors (the "Prepetition Collateral").

### 2.        JPM Overdraft Facility

Certain of the Debtors had outstanding guarantee obligations under an uncommitted multicurrency overdraft facility pursuant to that certain Uncommitted Overdraft Facility, dated October 17, 2016 (as amended, supplemented, or modified from time to time, the "Overdraft Facility") between Vice Europe Holding Limited ("VEHL") and JPMorgan Chase Bank, N.A. ("JPMC"). JPMC had setoff rights against the Debtors and was secured pursuant to an Assignment of Deposits among Debtor Vice, Debtor Vice Media LLC ("Vice Media") and JPMC, dated May 1, 2019, pledging certain deposit accounts held by Vice Media and its subsidiaries in favor of JPMC as security for costs and expenses incurred by JPMC in connection with the covered bank accounts. The Prepetition Overdraft Facility was also a secured "Cash Management Agreement" under the Prepetition Credit Agreement and was supported by a *pari passu* security interest in the Prepetition Collateral. As of the Petition Date, there were outstanding obligations under the Overdraft Facility of approximately $9.8 million.

### 3.        The Pulse Notes

In connection with the Company's 2016 acquisition of a majority stake in Pulse, Debtor Vice Holding Inc. ("Vice Holding") entered into a shareholders agreement with the original founders and sellers of Pulse (the "Pulse Sellers"), which allowed such sellers to put their shares in Pulse Films to VEHL, such that it would be required to purchase such sellers' shares of Pulse Films (the "Pulse Seller Shares") for an amount determined in accordance with a specified formula (the "Put Option").

In April 2021, the Pulse Sellers exercised their Put Option, which would have obligated the Company to pay $53,240,000 in cash  In lieu of paying the obligations due in respect of the Put Option, on December 8, 2021, a wholly owned subsidiary of VEHL, Vice Europe Pulse Holding Limited ("VEPH"), purchased the Pulse Seller Shares by paying a total aggregate amount of $10 million in cash and issuing $43,240,000 of 10% secured and guaranteed redeemable loan notes due 2023 (the "Pulse Notes") to the Pulse Sellers. VEPH's obligations in respect of the Pulse Notes were guaranteed by VEH and Vice Holding. To secure its obligations under the Pulse Notes, VEPH pledged 100% of its equity interests in Pulse Films pursuant to a share charge (the "*Share Charge*"). The rights of the Pulse Sellers to receive payments under the Pulse Notes and to exercise any rights under the Share Charge are fully subordinate to the rights of the lenders under the Prepetition Senior Secured Credit Agreement,

pursuant to the Subordination and Intercreditor Agreement, dated December 8, 2021, among Pulse Sellers, B & C 3, LLC, as the security agent for the holders of the Pulse Notes, the Prepetition Collateral Agent, and Prepetition Administrative Agent (the "Pulse Notes Subordination Agreement").  Under the terms of the Pulse Notes Subordination Agreement, payment to the holders of the Pulse Notes is precluded for so long as an event of default under the Prepetition Senior Secured Credit Agreement remains outstanding, and has been repaid in full, and holders of the Pulse Notes may not exercise rights or remedies in respect of the Pulse Notes absent the prior written consent.  Moreover, pursuant to the Pulse Notes Subordination Agreement, the Pulse Sellers consented to the priming of the Pulse Notes by the debtor-in-possession financing discussed below. As of the Petition Date, the aggregate principal amount of the Pulse Notes is approximately $20.9 million.

### 4.    Senior Subordinated Notes

The Debtors have a complex set of Preferred Stock, including the Series A-1 Preferred Stock and the Series A-3 Preferred Stock issued to TPG Virat Holdings 1, L.P. ("TPG") and Sixth Street Virat Holdings 2, LLC ("SSP" and, together with TPG and certain of their respective affiliates, the "Senior Preferred Shareholders").  In conjunction with the Company's entry into the Prepetition Senior Secured Credit Agreement in 2019, Vice Parent amended the certificate of designation governing such preferred stock to permit the issuance, in April 2020, of senior subordinated unsecured notes due 2022 (the "Initial Subordinated Notes") to the Senior Preferred Shareholders, in satisfaction of certain dividends arising under the Series A-1 and A-3 Preferred Stock (as discussed further below) rather than either paying such dividends in cash or increasing the dividend accrual rate to an Incremental Building Default Rate (as defined in the A&R Certificate of Designation discussed below). On each dividend payment date for the Series A-1 and A-3 Preferred Stock, the principal amount of the Initial Subordinated Notes was increased in an amount equal to a specified portion of the dividends then due on the Series A-1 and A-3 Preferred Stock.  Although the Initial Subordinated Notes relieved the Debtors of the burdens of paying accrued dividends on the Series A-1 and A-3 Preferred Stock in cash, it increased the Company's debt-load, which continued to grow through payments in kind of interest on the Initial Subordinated Notes.

Beginning in early 2022, to address cash shortfalls, Vice Parent issued several series of subordinated unsecured notes, as issuer, to the Senior Preferred Shareholders, as purchasers (the "Subsequent Subordinated Notes" and, together with the Initial Subordinated Notes, the "Senior Subordinated Notes").  The Subsequent Subordinated Notes were issued in various series, which respectively were dated February 25, 2022, April 29, 2022, May 27, 2022, June 14, 2022, August 2, 2022, August 12, 2022, August 26, 2022, August 29, 2022, September 13, 2022, November 2, 2022, and November 14, 2022.  Pursuant to subordination agreements entered into for each issuance of the Senior Subordinated Notes, the Senior Subordinated Notes indebtedness and related rights of TPG and SSP are subordinate to the indebtedness and rights of the Prepetition Term Lenders under the Prepetition Senior Secured Credit Agreement. Each Subordinated Note issuance, and the associated principal amount outstanding as of the Petition Date are set forth below:

| Senior Subordinated Notes | Amount as of 5/15/23 |
|---|---|
| Initial Subordinated Notes | $206,671,643.69 |
| Series B, Senior Subordinated Notes issued February 25, 2022 | $29,187,106.95 |
| Series B, Senior Subordinated Notes issued April 29, 2022 | $28,578,558.33 |
| Series C, Senior Subordinated Notes issued May 27, 2022 | $5,663,683.08 |
| Series C, Senior Subordinated Notes issued June 14, 2022 | $5,632,094.30 |
| Series D, Senior Subordinated Notes issued August 2, 2022 | $5,543,822.50 |
| Series E, Senior Subordinated Notes issued August 12, 2022 | $5,525,782.07 |
| Series F, Senior Subordinated Notes issued August 26, 2022 | $3,850,367.84 |
| Series G, Senior Subordinated Notes issued August 29, 2022 | $8,792,181.36 |
| Series G, Senior Subordinated Notes issued September 13, 2022 | $10,939,713.52 |
| Series H, Senior Subordinated Notes issued November 2, 2022 | $10,764,848.07 |
| Series H, Senior Subordinated Notes issued November 14, 2022 | $7,506,039.74 |
| **Total** | **$328,655,841.46** |

## C.      Trade and Lease Obligations

As of the Petition Date, the Debtors estimate that approximately $64.3 million was due and owing to holders of trade Claims.  Certain of these obligations were subsequently paid pursuant to the various "first day" orders (as described below), and approximately $20 million others were assumed by the Purchaser the payment of costs to cure prepetition defaults under the executory contracts and assigned under the Purchase Agreement in connection with the closing of the Sale.  *See* Notices at Docket Nos. 109, 179, 240, 254 and 511.

## D.      The Preferred Stock

As a result of various investments and capital raises through the years, Vice Parent has developed a complex and restrictive equity structure.  Ahead of the common equity of Vice Parent sits 11 series and sub-series of Preferred Stock, a set forth below:



As of the Petition Date, Series A-1, Series A-2, Series A-3, Series A-4, Series D, Series E, and Series F Preferred Stock are entitled to receive dividend payments (with Series D, E, and F dividends paid in kind).

       The Series A-1, A-2, A-3, and A-4 Preferred Stock (collectively, the "Series-A Preferred Stock") were issued as part of a recapitalization of the Company in 2017. Holders of the Series-A Preferred Stock, which is convertible into common stock at the option of the holder, are entitled to quarterly dividend payments of 12% of the stated value of the Series-A Preferred Stock. Dividends on the Series A-2 and A-4 Preferred Stock is entirely paid-in-kind (*i.e.*, through an increase in the stated value series of Preferred Stock). When initially issued, dividends on the Series A-1 and Series A-3 Preferred Stock were to receive 50% of their quarterly dividends in cash and 50% in stock commencing in 2019; however in accordance with the Fifth Amended and Restated Certificate of Designation of Senior Convertible Preferred Stock, Series A (as amended, supplemented, or supplemented and amended, the "A&R Certificate of Designation") and previous amendments to such certificate of designation, holders of the Series A-1 and A-3 Preferred Stock are no longer entitled to receive a cash dividend, but instead receive 50% of the quarterly dividend PIK and 50% in the issuance of Senior Subordinated Notes. The Series A-1 and Series A-3 Preferred Stock are held entirely by the Senior Preferred Shareholders.

       Under the Amended and Restated Investors' Rights Agreement dated February 25, 2022, by and among Vice Parent and the investors named on Schedule A thereto, the Senior Preferred Shareholders (as holders of the Series A-1 and Series A-3 Preferred Stock) also have the right to designate directors with a majority of the voting power of the board of directors of Vice Parent. Pursuant to the Third Amended and Restated Certificate of Incorporation of Vice Parent, if, at any time, the Senior Preferred Shareholders have not appointed the maximum number of directors to which they are

entitled, the voting power of their seated directors would be increased such that they, in the aggregate, would have the full voting as if a majority of directors had been seated.

On March 21, 2023, the Senior Preferred Shareholders, the Prepetition Term Lenders, and the Prepetition Administrative Agent, entered into that certain sharing agreement (the "Proceeds Agreement").  Pursuant to the Proceeds Agreement, the Prepetition Term Lenders, the Prepetition Administrative Agent, and the Senior Preferred Shareholders agreed to share in the proceeds of any kind received for distribution in respect of any claims against Vice Parent or its subsidiaries in accordance with a distribution waterfall distribution set forth therein.  Although Vice Parent was not involved in the negotiation of the Proceeds Agreement, it executed the agreement to acknowledge its terms.

## III.    CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES

Over the decade prior to the commencement of these Chapter 11 Cases, *VICE* expanded significantly, acquiring complementary businesses and breaking into new markets, resulting in the need for access to additional capital.  This rapid growth and resulting financing activity ultimately contributed to the liquidity challenges the Company experienced over the past five years.

Despite the Debtors' capital raising efforts, the Company continued to struggle to maintain adequate liquidity to meet their financial obligations and were not profitable in 2021 or 2022.  As the Company continued to face tightening liquidity, and a looming maturity of the Prepetition Senior Secured Term Loans and its Senior Subordinated Notes, it began to consider and develop wider strategic alternatives.

In the spring of 2022, *VICE* management began working with PJT Partners LP ("PJT") and LionTree Advisor LLC ("LionTree") to assist it in exploring a sale that would maximize value for the benefit of creditors and other stakeholders.  With the support of those advisors, *VICE* launched a marketing process for a potential sale of the Company or certain of its business segments.  The Company received indications of interest from several prospects, two bids for a whole company transaction, and reached advance stages of negotiation and documentation with one of those bidders.  Ultimately, despite a lengthy and protracted process, the Company was unable to conclude a transaction with any of the bidders.  When no sale transaction was unable to be completed, the Debtors were able to unable to pay the Prepetition Senior Secured Term Loans at maturity and entered into a series of forbearance agreements with the Prepetition Term Lenders and the Prepetition Administrative Agent, which *inter alia*, resulted in the appointment of a Chief Restructuring Officer.  A Special Committee was also constituted in January 2023, which included two new directors designated by the Prepetition Term Lenders.

Following the appointment of the Special Committee, the Debtors' renewed their sale process (the "2023 Marketing Process") until the commencement of these Chapter 11 Cases. In February 2023, GMN CaymanLtd ("GMNC") terminated its agreements with the Debtors relating to the production of VICE World News content. The VICE World News content and related agreements were material for the businesses

in terms of revenue, and the termination had consequences that rippled through the business.

With the assistance of its advisors, the Debtors determined that they needed to implement a number of structural changes to the Company to mitigate the impact of the loss of the VICE World News contract.  These changes included focusing resources on the Company's remaining digital businesses as well as certain key third party relationships and implementing significant cost reductions resulting in a leaner news. organization. The Debtors, PJT and LionTree informed counterparties that were more active in the sales process of these developments and provided them with updated diligence and other information reflecting the loss of the VICE World News contract and the actions that the Debtors plan to undertake to mitigate the loss of that contract.

After the Debtors' assets had been marketed extensively through a sale and marketing process that lasted approximately one year, the Debtors pursued a process to sell substantially all of their assets including the Debtors' interests in certain non-Debtor subsidiaries.

To that end, the Debtors negotiated the terms of an asset purchase agreement with the Purchaser, serving as stalking horse bidder ("Stalking Horse Bidder"), with a transaction that would be market tested and implemented through a transparent process under the auspices of Bankruptcy Code upon the commencement of the Chapter 11 Cases.  Appreciating their challenging financial condition and the need to complete a sale and exit bankruptcy as soon as possible, the Debtors accomplished as much as possible prior to the commencement of these cases.

Additional facts relating to the Debtors' businesses and capital structure, and the events leading to these Chapter 11 Cases, are set forth in the *Declaration of Frank A. Pometti in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), filed on the Petition Date [Docket No. 2] and incorporated herein by reference.

## IV.    THE CHAPTER 11 CASES AND THE POSTPETITION SALE PROCESS

### A.    First Day Motions and Appointment of Creditors' Committee

To ease their transition into chapter 11, on the Petition Date, the Debtors filed various customary "first day" motions.  In particular, the Debtors filed motions requesting permission for administrative relief, including motions directing joint administration for procedural purposes only [Docket No. 2], authorizing the filing of a consolidated creditor list and establishing certain notice procedures [Docket No. 5], and authorizing an extension of time to file schedules and statements [Docket No. 4].  The Bankruptcy Court entered final orders approving these motions on May 17, 2023, May 19, 2023 and June 13, 2023 [Docket Nos. 56, 53, and 133].

Additionally, the Debtors filed motions to continue operating their business, including:

1.      a motion authorizing and approving the appointment of Stretto, Inc. as claims and noticing agent [Docket No. 19] (the "Claims and Noticing Agent Application").  On May 18, 2023 the Bankruptcy Court entered an order granting the Claims and Noticing Agent Application [Docket No. 47];

2.      a motion to pay prepetition wages, compensation, and employee benefits [Docket No. 12] (the "Wage Motion").  On May 19, 2023, the Bankruptcy Court entered an interim order granting the Wage Motion [Docket No. 51], and on June 20, 2023 the court entered a second interim order grating the Wage Motion [Docket No. 188].  On July 5, 2023, the Bankruptcy Court entered a final order granting the Wage Motion [Docket No. 247];

3.      a motion to continue their existing cash management system [Docket No. 9] (the "Cash Management Motion").  On May 18, 2023, the Bankruptcy Court entered an interim order granting the Cash Management Motion [Docket No. 44], and on June 20, 2023 the court entered a second interim order grating the Cash Management Motion [Docket No. 187];

4.      a motion to maintain and renew their insurance policies and programs [Docket No. 10] (the "Insurance Motion").  On May 19, 2023 the Bankruptcy Court entered an interim order granting the Insurance Motion [Docket No. 52], and on June 16, 2023 the Bankruptcy Court entered a final order granting the Insurance Motion [Docket No. 152];

5.      a motion to pay certain free lancers, critical vendors, and foreign vendors [Docket No. 11] (the "Critical Vendor Motion").  On May 18, 2023 the Bankruptcy Court entered an interim order granting the Foreign Vendor Motion [Docket No. 46], and on June 15, 2023, the Bankruptcy Court entered a final order granting the Critical Vendor Motion [Docket No. 150];

6.      a motion to pay prepetition taxes [Docket No. 7] (the "Tax Motion").  On May 18, 2023 the Bankruptcy Court entered an interim order granting the Tax Motion [Docket No. 49], and on June 15, 2023, the Bankruptcy Court entered a final order granting the Tax Motion [Docket No. 154]; and

7.      a motion authorizing the Debtors to establish notice and objection procedures for transfers of equity securities and claims of worthless stock deductions [Docket No. 8] (the "NOL Motion").  On May 18, 2023 the Bankruptcy Court entered an interim order granting the NOL Motion [Docket No. 48].  On December 21, 2023, the

Bankruptcy Court entered a final order granting the NOL Motion [Docket No. 671].

On May 23, 2023, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Creditors' Committee [Docket No. 66].

## B.    The DIP Financing

Also on the Petition Date, the Debtors filed a motion [Docket No. 13] (the "DIP Financing Motion") to approve a senior secured postpetition financing facility from the DIP Secured Parties as lender (the "DIP Lender"), authorizing Vice Group Holding Inc., in its capacity as borrower (the "DIP Borrower"), to obtain postpetition financing, and for each of the other Debtors to guarantee unconditionally (the "DIP Guarantors"), on a joint and several basis, the DIP Borrower's obligations in connection with a senior secured superpriority debtor-in-possession multi-draw term loan facility (the "DIP Facility") consisting of a multi-draw credit loan facility in an aggregate principal amount of up to $60 million, of which (a) $5 million (the "Initial New Money DIP Loans") was made available to the Debtors in a single new money draw and another (b) $25 million in a roll-up of Prepetition Senior Secured Term Loans in accordance with the terms and conditions set forth in the DIP Credit Agreement (the "Initial Roll-Up DIP Loans") on an interim basis pursuant to a Bankruptcy Court order dated May 17, 2023 [Docket No. 40] (the "Interim DIP Financing Order").

The Debtors, DIP Lender and the Creditors' Committee proceeded to consensually resolve informal objections and concerns raised by the Committee pursuant to the Committee Settlement, and on June 13, 2023 the Bankruptcy Court entered DIP Financing Order approving the DIP Financing Motion on a final basis.

Under the DIP Financing Order the new money draws of the remaining principal amount of $5 million, subject to increase pursuant to the terms to fund the GUC Cash Reserve in accordance with the terms Committee Settlement and the DIP Credit Agreement (together with the Initial New Money DIP Loans, the "New Money DIP Loans"), and (ii) in a roll-up of approximately $25 million in outstanding Prepetition Senior Secured Term Loans in accordance with the terms and conditions set forth in the Committee Settlement and the DIP Credit Agreement (such loans with the Initial Roll-Up DIP Loans, the "Roll-Up DIP Loans," and such New Money DIP Loans and the Roll-Up DIP Loans, the "DIP Loans").

The DIP Financing was secured by a first-priority lien on and security interest in substantially all of the Debtors' unencumbered assets, but excluding, among other things, all GUC Reserved Litigation Claims under the Committee Settlement (the "DIP Liens").

In connection with the sale process, the following was also agreed to as part of the Committee Settlement:

- the Debtors and Purchaser would enter into Amendment No. 1 to Asset and Equity Purchase Agreement, filed with the Court at

Docket No. 130 ("APA Amendment No. 1"), which Amendment No. 1 shall be deemed effective in accordance with its terms to provide for the establishment of a GUC Cash Reserve, GUC Reserved Litigation Claims, and

- The Creditor's Committee agreed to waive any objections to, and support, the Asset Purchase Agreement and the terms, conditions, and transactions provided or contemplated thereby (an "Approved Sale Transaction"), subject only to the right of the Creditors' Committee to support any higher or better bids that provide a purchase price that exceeds, in the aggregate, the Purchase Price (as defined in the Asset Purchase Agreement).

The outstanding balance under the DIP Loans was deemed satisfied effective as of the closing of the Sale.

C.    **Postpetition Sale Process**

Additionally, on the Petition Date, the Debtors filed the *Motion for Entry of an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Authorizing and Approving the Debtors' Entry Into the Stalking Horse Agreement, (III) Approving the Sale of Substantially all of the Debtors' Assets and (IV) Granting Related Relief* [Docket No. 16] (the "Sale Motion"), which sought approval of bidding procedures and the sale of substantially all of the Debtors' assets free and clear of all liens, claims, interests and encumbrances, to one or more successful bidders.

On May 19, 2023, the Debtors filed that certain executed Asset and Equity Purchase Agreement [Docket No. 58] (as amended from time to time, the "Asset Purchase Agreement") by and among the Purchaser and the Debtors.

On May 30, 2023 the Bankruptcy Court entered an order granting the procedures component (the "Bidding Procedures") of the Sale Motion [Docket No. 80].

The marketing process for sale of the Debtors' assets and business, which was a continuation of a process that began prepetition, was comprehensive, and the Debtors' investment bankers PJT and LionTree reached out to approximately 113 parties to generate and solicit interest in bidding on the Debtors assets pursuant to section 363 of the Bankruptcy Code and the court-approved Bidding Procedures.

Of the 113 parties contacted, 38 parties confirmed interest in evaluating the opportunity to submit a bid and 37 parties executed confidentiality agreements. All parties that executed confidentiality agreements were promptly granted access to an electronic data room containing comprehensive information pertaining to, among other things, the Company and its assets, along with a draft asset and equity purchase agreement for bidders to mark-up as authorized by the Bidding Procedures.

PJT and LionTree collectively fielded and responded to over 500 questions and inquiries from potential bidders regarding the Company's business segments and information contained in the data room in an effort to continue driving the diligence

process.  All parties contacted received a process letter outlining the proposed bidding procedures and requirements, along with key dates and deadlines, including:

- June 20, 2023 – the Bid Deadline;

- June 21, 2023 – the Qualified Bid Designation Date;

- June 22, 2023 – the Auction, if necessary; and

- July 7, 2023 – the anticipated Closing of the Sale.

By the Bid Deadline, the Debtors received ten non-binding bids, five of which were for the entire Company and five of which were for a single Business Segment or combination of other assets.

On June 21, 2023, the Purchaser increased their bid to $350 million, which was detailed in the *Notice of Filing of Amendment No. 2 to the Asset and Equity Purchase Agreement* [Docket No. 204].

Ultimately, in consultation with the Creditors' Committee, the Debtors determined that none of the bids received, other than the Stalking Horse Bid, qualified as a Qualified Bid in accordance with the Bidding Procedures or were otherwise higher or better than the Stalking Horse Bid.  Accordingly, the auction was cancelled in accordance with the Bidding Procedures.

On June 23, 2023, the Court entered the Sale Order which, among other things, approved the Sale to the Purchaser and authorized the Debtors to enter into, execute, and perform all obligations under a transition services agreement (the "TSA") with the Purchaser.

The Debtors closed the Sale on July 31, 2023.  *See Notice of (1) Closing of the Sale and (2) Filing of the Transition Services Agreement* [Docket No. 337].

### D.    Transition Services Agreement

To effectuate the smooth transition of the Debtors' assets and business operations to the Purchaser as part of the Sale Closing, the Purchaser and Debtors entered into the TSA for a three-month period expiring September 30, 2023, whereby the Debtors would remain "revenue neutral" though agreed upon reimbursements for costs in exchange for providing certain agreed upon "Seller Services" to the Purchasers relating to, *inter alia*:

1.    CFO and treasury function support;

2.    bank account maintenance; and

3.    certain payroll services and benefits for Deferred Transferring Employees (as defined in the Asset Purchase Agreement) who were to become employed by the Purchaser.

14

An additional payment under the TSA (the "Additional TSA Payment") in the amount of $2,750,000 was to be earned released upon completion of the TSA. In connection therewith, the Debtors and Purchaser executed an escrow agreement with Ankura Trust Company, LLC as escrow agent to hold the Additional TSA Payment.

On September 29, 2023, in connection with the expiration of the TSA Agreement and with the completion of the Seller Services, the Debtors filed notices for the assignment of contracts to the Purchaser [Docket No. 511], as well as rejection notices for contracts no longer required by the Debtors, effective as of September 30, 2023 [Docket No. 514]. As result, the Additional TSA Payment in the amount of $2,750,000 was released to the Debtors.

### E.    Estate Professionals

On August 22, 2023, the Court entered the *Order (I) Authorizing the Retention of AP Services, LLC, (II) Authorizing the Designation of Frank Pometti as Chief Financial Officer and Mark Del Priore as Chief Financial Officer Effective as of the Petition Date, and (III) Granting Related Relief* [Docket No. 403].

Pursuant to orders of the Bankruptcy Court, the Debtors and the Creditors' Committee have retained certain professionals pursuant to sections 327 and 328 of the Bankruptcy Code (collectively, the "Estate Professionals").

The Debtors' Estate Professionals are: (a) Togut, Segal & Segal LLP, as bankruptcy counsel [Docket No. 382]; (b) Shearman & Sterling, co-counsel for the Debtors [Docket No. 512]; (c) LionTree [Docket No. 390] and PJT [Docket No. 402] as co-investment bankers, and (d) Stretto, Inc., as administrative advisor [Docket No. 406], as well as Katten Muchin Rosenman LLP, as special counsel for Debtor Vice Group Holding Inc., on behalf of and at the sole direction of the independent directors [Docket No. 674].

The Creditors' Committee's counsel is Pachulski Stang Ziehl & Jones LLP [Docket No. 539], and financial advisor is Alvarez & Marsal [Docket No. 611].

Debtors also filed a motion to employ and pay ordinary course professionals, [Docket No. 85], which was approved by the Bankruptcy Court on July 12, 2022 [Docket No. 297].

Pursuant to the Court's *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals*, entered on February 12, 2024 [Docket No. 782] (the "Interim Compensation Order"), the Debtors were authorized to pay certain of the Professionals' fees and expenses during the Chapter 11 Cases.

### F.    Summary of the Debtors' Assets and Liabilities

On July 10, 2023 , the Debtors filed their schedules of assets and liabilities and statement of financial affairs [Docket Nos. 257 and 258 of the chapter 11 case of Vice Group Holding Inc. and Docket Nos. 6 and 7 of each other Debtor's case] (the "Schedules and Statements").

By order dated October 21, 2023 [Docket No. 534], the Bankruptcy Court established November 24, 2023 at 5:00 p.m. (Eastern Time) as the general bar date (the "General Bar Date") and January 16, 2024 at 5:00 p.m. (Eastern Time) as the Governmental Bar Date.

By order dated November 2, 2023 [Docket No. 576], the Bankruptcy Court established November 27, 2023 at 5:00 p.m. (Eastern Time) as an interim administrative bar date for administrative expense claims arising from the Petition Date through and including October 26, 2023 (the "Interim Administrative Bar Date").

In addition to the Prepetition Senior Secured Credit Agreement Claims that are subject to the Sharing Threshold, the Debtors estimate that Allowed General Unsecured Claims could range from approximately $47.7 million to an amount to be determined, which could be significantly in excess of that amount as a result of contingent, unliquidated and disputed claims, which include, but are not limited to litigation claims, for which the Debtors may be determined to be liable, in part or otherwise.

Currently, the Debtors have no positive net income and no secured debt. The Debtors' significant assets consist of the (a) GUC Cash Reserve of $500,000, (b) approximately $4.55 million in cash on hand (as of February 29, 2024), which includes the Additional TSA Payment and an amount to be funded to the Professional Fee Escrow and (c) GUC Reserved Litigation Claims, which include potential claims and causes of action that are not being released under the Plan, including causes of action arising under chapter 5 of the Bankruptcy Code.

### G.    Antenna Stipulation and Committee Stipulation with Purchaser

On March 1, 2024, the Bankruptcy Court entered an order [Docket No. 833] (the "Omnibus 9019 Order"), pursuant to Bankruptcy Rule 9019, approving the *Stipulation Resolving Claims Among and Between the Debtors, the Buyer Entities, and the Antenna Entities* [Docket No. 768] (the "Antenna Stipulation") by and among the Debtors, the Purchaser (together with its affiliates and indirect subsidiaries), and Antenna Group B.V., Antenna TV S.A., and Antenna Internet Ventures B.V. (collectively, the "Antenna Entities") and Vice Antenna B.V. (the "Joint Venture"), which, among other things, implements the wind down of the Debtors' interest in the non-debtor Joint Venture with the Antenna Entities, and the Debtors' conveyance of its 51% interest in such Joint Venture to the Antenna Entities, in exchange for the payment of €937,875 pursuant a deed of transfer and the exchange of mutual releases among the Debtors, the Purchaser and the Antenna Entities.

The Omnibus 9019 Order also approved a settlement, pursuant to Bankruptcy Rule 9019 (the "Committee Stipulation"), by and among the Debtors, the Purchaser and Creditors' Committee which resolved, among other things, a dispute with respect to Purchaser advisors fees under the DIP Financing Order, as well as exchange of releases with respect to certain claims among the Creditors' Committee Debtors and Purchaser in connection with DIP Financing Order, the Sale, and the TSA.

In light of the proceeds realized from the Antenna Stipulation and the agreement and releases obtained as result of the Committee Stipulation, and following extensive good faith and arm's-length negotiations with the Creditors' Committee, the Debtors have proposed this Plan, which it believes is in the best interests of the estates, creditors, and other stakeholders.

### H.    Miscellaneous

By order dated October 20, 2023 [Docket No. 532], the Debtors have the exclusive right to propose a chapter 11 plan and solicit votes with respect thereto until December 12, 2023 and February 9, 2024, respectively.  An order was entered extending the exclusive period to solicit votes on the Plan through and including April 24, 2024 [Docket No. 791].

On November 3, 2023 [Docket No. 581], an order was entered in these Chapter 11 Cases directing that the caption of the lead case be changed, in accordance with the corporate name change of Vice Group Holding Inc. to Venus Liquidation Inc.

If the Plan is not confirmed, there is a risk that the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code and/or that distributions to creditors will be less than that proposed under the Plan.  In addition, distributions will likely be delayed and there is no guarantee that any distributions will be made at all.

## V.    SUMMARY OF THE PLAN OF LIQUIDATION

**THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN PROVISIONS OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>).  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL.**

The Plan (including, but not limited to, Sections 2 and 3 of the Plan) provides for the procedural consolidation of the Debtors for plan purposes only and shall serve as a motion by the Debtors for entry of an order of the Bankruptcy Court granting such relief. The Debtors propose procedural consolidation to avoid the inefficiency of proposing, voting on, and making Distributions in respect of entity-specific claims. Accordingly, on the Effective Date, all of the Debtors and their Estates shall, for purposes of the Plan only, be treated as though they were merged and (a) all Assets and liabilities of the Debtors shall, for purposes of the Plan only, be treated as though they were merged, (b) all guarantees of the Debtors of payment, performance, or collection of obligations of any other Debtors shall be eliminated and canceled, (c) all joint or duplicate obligations of two or more Debtors, and all multiple Claims against such Entities on account of such joint or duplicate obligations, shall be considered a single claim against the Debtors (including for purposes of Distributions and reserves) without the need for further action by the Debtors or the Wind Down Officer and (d) any Claim filed in the Chapter 11 Cases shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date. Unless otherwise set forth herein, such consolidation shall not (other than for voting, treatment, and distribution purposes under the Plan) affect (i) the legal and

corporate structures of the Debtors or (ii) the substantive rights of any creditor. If any party in interest challenges the proposed procedural consolidation, the Debtors reserve the right to establish at the Combined Hearing the ability to confirm the Plan on an entity-by-entity basis.

### A.    Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims and Priority Tax Claims) are not classified and are not entitled to vote on the Plan.

#### 1.    *Administrative Claims*

On or as soon as reasonably practicable after the earlier of (a) the Effective Date or (b) the first Business Day after the date that is thirty (30) calendar days after the date on which an Allowed Administrative Claim becomes Allowed or payable under any agreement related thereto, unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Plan Administrator, as applicable, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, and release, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim.

To the extent not required to be filed by the Interim Administrative Claims Bar Date of November 27, 2023 established by the Bankruptcy Court, all requests for payment of Administrative Claims (other than Professional Fee Claims, and Administrative Claims that have been Allowed on or before the Effective Date) **must be in writing and filed with the Bankruptcy Court and served on the Debtors, the Creditors' Committee,  and the U.S. Trustee so as to be received by 5:00 p.m. (Eastern Time) on the date that is thirty (30) days after the service of notice of occurrence of the Effective Date (the "Administrative Claims Bar Date")**.  Such request for payment must include at a minimum:  (A) the name of the holder of the asserted Administrative Claim;  (B) the amount of the Administrative Claim;  (C) the basis of the Administrative Claim;  and (D) supporting documentation for the Administrative Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND RELEASED AND THE HOLDER THEREOF SHALL BE ENJOINED FROM COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OF PROCESS OR ACT TO COLLECT, OFFSET, OR RECOVER SUCH ADMINISTRATIVE CLAIM.**

#### 2.    *U.S. Trustee Fees*

On the Effective Date, the Debtors shall pay all accrued and outstanding U.S. Trustee Fees, if any.  Following the Effective Date, the Liquidating Trust shall remain obligated to pay quarterly fees to the U.S. Trustee on behalf of the Estates, if any, in accordance with Section 12.1 of the Plan.

3.      *Professional Fee Claims*

To the extent not filed prior to the Effective Date, Professionals shall submit final fee applications seeking approval of all Professional Fee Claims by the Bankruptcy Court no later than thirty (30) days after the Notice of the Effective Date. These applications remain subject to Bankruptcy Court approval under the standards established by the Bankruptcy Code, including the requirements of sections 327, 328, 330, 331, 363, 503(b), and 1103 of the Bankruptcy Code, as applicable.

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash equal to the Professional Fee Escrow Amount, and no Liens, Claims, or interests shall encumber the Professional Fee Escrow in any way.  The Professional Fee Escrow (including the funds held therein) (x) shall not be and shall not be deemed property of the Debtors Trust and (y) shall be held in trust for Professionals; *provided, that* any funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims, subject to any agreed-upon voluntary reduction of fees by a Professional in connection with achieving a confirmable Plan, have been irrevocably paid in full shall become available for distribution by the Plan Administrator.

4.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

5.      *DIP Facility Claims*

Except as otherwise set forth in Amendment No. 3 to the Asset Purchase Agreement, dated as of July 31, 2023 [Docket No. 334], the outstanding balance under the DIP Credit Agreement was deemed satisfied effective as of the closing of the Sale. DIP Facility Claims were paid in full (other than certain claims for professional fees and expenses provided for under the DIP Credit Agreement and DIP Financing Order, which will be paid pursuant to the Committee Stipulation, prior to the Effective Date). Accordingly, holders of Claim relating to the DIP Facility will not receive any distributions under the Plan.

**B.      Classification and Treatment of Claims and Interests**

The Classes of Claims entitled to vote on the Plan are Classes 4 (Prepetition Senior Secured Credit Agreement Claims), 5 (JPM Overdraft Facility Claims), 6 (Senior Subordinated Notes Claims), 7 (Pulse Notes Claims) and 8 (General Unsecured Claims).  Classes 1 (Secured Tax Claims), 2 (Other Secured Claims) and 3 (Other Priority Claims) are Unimpaired under the Plan, which means such Classes are not entitled to vote and are deemed to have accepted the Plan.  Class 9 (Interests) is Impaired under the Plan and will not receive or retain any property under the Plan. Accordingly, Class 9 is not entitled to vote and is deemed to have rejected the Plan.  The

proposed treatment of each Class of Claims and Interests is set forth in Section 3.4 of the Plan.

The following table summarizes the classification and treatment of all Claims against and Interests in the Debtors.

| Class and Estimated Amount | Summary of Treatment | Estimated Recovery | Entitled to Vote |
|---|---|---|---|
| **Secured Tax Claims (Class 1)** | Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to different, less favorable treatment, each Holder of an Allowed Secured Tax Claim will receive, in full and final satisfaction, settlement, and in exchange for such Allowed Secured Tax Claim, Cash in an amount equal to the Allowed amount of such Allowed Secured Tax Claim on the earlier of (x) the Effective Date and (y) as soon as practicable after its Secured Tax Claim becomes Allowed. | **100% Unimpaired** | **No – Deemed to Accept** |
| **Other Secured Claims (Class 2)** | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to different, less favorable treatment each Holder of an Allowed Other Secured Claim will receive, in full and final satisfaction, settlement, and in exchange for such Allowed Other Secured Claim, Cash in an amount equal to the Allowed amount of such Other Secured Claim on the earlier of (x) the Effective Date and (y) as soon as practicable after its Other Secured Claim becomes Allowed. | **100% Unimpaired** | **No – Deemed to Accept** |
| **Other Priority Claims (Class 3)** | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a different, less favorable treatment, each Holder of an Allowed Other Priority Claim will receive, in full and final satisfaction, settlement, and in exchange for such Allowed Claim, Cash in an amount equal to such Holder's Allowed Other Priority Claim on the earlier of (x) the Effective Date and (y) as soon as practicable after its Other Priority Claim becomes Allowed. | **100% Unimpaired** | **No – Deemed to Accept** |

| Class and Estimated Amount | Summary of Treatment | Estimated Recovery | Entitled to Vote |
|---|---|---|---|
| **Prepetition Senior Secured Credit Agreement Claims (Class 4)** | Except to the extent that a Holder of an Allowed Prepetition Senior Secured Credit Agreement Claim agrees to different, less favorable treatment, each Holder of an Allowed Prepetition Senior Secured Credit Agreement Claim will receive, upon and after the satisfaction of the Sharing Threshold under the Committee Settlement, a Pro Rata share of the Plan Administrator Net Recovery available for Distribution to the extent available on each such Distribution Date, in full and final satisfaction, settlement, and in exchange for such Allowed Prepetition Senior Secured Credit Agreement Claim. Until satisfaction of the Sharing Threshold under the Committee Settlement, any portion of the Plan Administrator Net Recovery that would otherwise be distributed on account of the Prepetition Senior Secured Credit Agreement Claims, including as a result of the enforcement of the Turnover Provisions with respect to the Senior Subordinated Notes Claims and Pulse Notes Claims, shall be made available for Distribution to Holders of General Unsecured Claims.  Any Distribution actually received by a Holder of an Allowed Prepetition Senior Secured Credit Agreement Claim (which shall not include any Distribution up to the Sharing Threshold made available for Holders of Allowed General Unsecured Claims pursuant to this Section 3.4(d)(ii)) shall be subject to the Proceeds Sharing Agreement. | **0%** <br><br> **Impaired** | **Yes** |
| **JPM Overdraft Facility Claims (Class 5)** | Except to the extent that a Holder of an Allowed JPM Overdraft Facility Claims agrees to different, less favorable treatment (including, without limitation, pursuant to the Asset Purchase Agreement, the Committee Settlement, and/or the Sale Order, or such other recovery as is necessary to satisfy section 1129 of the Bankruptcy Code), each Holder of an Allowed JPM Overdraft Facility Claim agrees it will receive, in full and final satisfaction, settlement, and in exchange for such Allowed Claim, the treatment and terms it has agreed to with the Purchaser, including without limitation the novation of certain account agreements. | **0%** <br><br> **Impaired** | **Yes** |

| Class and Estimated Amount | Summary of Treatment | Estimated Recovery | Entitled to Vote |
|---|---|---|---|
| **Senior Subordinated Notes Claims (Class 6)** | Pursuant to section 510(a) of the Bankruptcy Code, except to the extent that a Holder of an Allowed Senior Subordinated Notes Claim agrees to different, less favorable treatment, each Holder of an Allowed Senior Subordinated Notes Claim shall receive such Holder's Pro Rata share of the Plan Administrator Net Recovery available for Distribution on each such Distribution Date as provided under the Plan and the Plan Administrator Agreement in full and final satisfaction, settlement, and in exchange for such Allowed Senior Subordinated Notes Claim; *provided* that until such time as the Allowed Prepetition Senior Secured Credit Agreement Claim has been repaid in full, any Distribution on account of an Allowed Senior Subordinated Notes Claim, pursuant to the Turnover Provisions, shall be distributed to Holders of the Allowed Prepetition Senior Secured Credit Agreement Claim subject to the treatment provided under Section 3.4(d)(ii) hereof; *provided further* that any Distribution actually received by a Holder of an Allowed Prepetition Senior Secured Credit Agreement Claim (which shall not include any Distribution up to the Sharing Threshold made available for Holders of Allowed General Unsecured Claims pursuant to Section 3.4(d)(ii)) shall be subject to the Proceeding Sharing Agreement and, for the avoidance of doubt, any portion of such Distribution transferred to any Senior Preferred Shareholder pursuant to the Proceeds Sharing Agreement may be retained by such Senior Preferred Shareholder consistent with the Proceeds Sharing Agreement notwithstanding the previous proviso. | **0%**<br><br>**Impaired** | **Yes** |

| Class and Estimated Amount | Summary of Treatment | Estimated Recovery | Entitled to Vote |
|---|---|---|---|
| **Pulse Notes Claims (Class 7)** | Pursuant to section 510(a) of the Bankruptcy Code, except to the extent that a Holder of an Allowed Pulse Notes Claim accepts different, less favorable treatment, each Holder of an Allowed Pulse Notes Claim shall receive such Holder's Pro Rata share of the Plan Administrator Net Recovery available for Distribution on each such Distribution Date as provided under the Plan and the Plan Administrator Agreement; *provided* that until such time as the Allowed Prepetition Senior Secured Credit Agreement Claim has been repaid in full, any Distribution on account of an Allowed Pulse Notes Claim, pursuant to the Turnover Provisions, shall be distributed to Holders of the Allowed Prepetition Senior Secured Credit Agreement Claim subject to the treatment provided under Section 3.4(d)(ii) hereof; *provided further*, that after the Allowed Prepetition Senior Secured Credit Agreement Claim has been repaid in full, except to the extent that a Holder of an Allowed Pulse Notes Claim agrees to different, less favorable treatment, each Holder of an Allowed Pulse Notes Claim will receive a Pro Rata share of the Plan Administrator Net Recovery available for Distribution to the extent available on each such Distribution Date, in full and final satisfaction, settlement, and in exchange for such Allowed Claim. | **0%**<br><br>**Impaired** | **Yes** |
| **General Unsecured Claims (Class 8)**<br><br>**(between approximately $47.7 million and an amount TBD)** | Subject to the Committee Settlement and the Sharing Threshold therein, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to different, less favorable treatment, in full and final satisfaction, settlement, and release of, and in exchange for, all such Allowed Claims, each Holder of an Allowed General Unsecured Claim shall receive such Holder's Pro Rata share of the Plan Administrator Net Recovery available for Distribution on each such Distribution Date as provided under the Plan and the Plan Administrator Agreement. | **1% to 2% Recovery**<br><br>**Impaired** | **Yes** |
| **Interests (Class 9)**<br><br>**N/A** | On the Effective Date, all Interests shall be eliminated, and Holders of Interests shall not receive or retain any property under the Plan on account of such Interests. | **0%**<br><br>**Impaired** | **No – Deemed to Reject** |

### C.    Means For Implementation Of The Plan and The Plan Administrator

On and after the Effective Date, the Plan will be implemented by the Plan Administrator, in a manner consistent with the terms and conditions set forth in the Plan, Plan Administrator Agreement and the Confirmation Order.

The primary source of funding the Distributions and payments required to be made under the Plan shall be the net proceeds as determined by the Plan Administrator with respect to (a) the GUC Cash Reserve of $500,000, (b) Net Available Cash and (c) recoveries resulting from the possible prosecution of the GUC Reserved Litigation Claims by the Plan Administrator, as the case may be, on behalf of the Debtors' estates ("Plan Administrator Net Recovery").

The Confirmation Order shall provide for the appointment of the Plan Administrator. The compensation of the Plan Administrator shall be as set forth in the Plan Supplement. The Plan Administrator shall be deemed the estates representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified under sections 704 and 1106 of the Bankruptcy Code. Upon the distribution of all assets pursuant to the Plan and the filing by the Plan Administrator of a certification to that effect with the Bankruptcy Court (which may be included in the application for the entry of the final decree), the Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith, provided, however, that the Debtors may, but will not be required to, take appropriate action to dissolve under applicable law.

Following the Effective Date, the Debtors shall not engage in any business or take any actions, except those necessary to consummate the Plan and wind down their affairs, including, as necessary, the wind down, dissolution or abandonment of the non-debtor affiliates and subsidiaries of the Debtors, under applicable law free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than the restrictions imposed by the Plan or the Confirmation Order.

The Plan Administrator may act for the Debtors and their estates in a fiduciary capacity, subject to the provisions of the Plan. On the Effective Date, if appointed, the Plan Administrator shall succeed to all of the rights of the Debtors with respect to the Assets of the Estates. The powers and duties of the Plan Administrator, shall include, without further order of the Bankruptcy Court, except where expressly stated otherwise, the following rights or obligations:

(i)     to take such steps as may be necessary or otherwise desirable to administer and close any and all of the transactions as may be contemplated by the terms of the Sale, the Committee Settlement, or the Plan, as well as the Committee Stipulation or the Antenna Stipulation;

(ii)    to invest Cash and withdraw and make Distributions of Cash to holders of Allowed Claims and to pay taxes and other obligations owed by the Estates or incurred by the Debtors or the Plan Administrator in connection with the wind-down of the Estates in accordance with the Plan;

(iii)   to receive, manage, invest, supervise, and protect the Assets, including paying taxes or other obligations incurred in connection with administering the Assets;

(iv)    to engage attorneys, consultants, agents, employees, and all professional persons, to assist with respect to the Plan Administrator's responsibilities;

(v)    to pay the fees and expenses for the attorneys, consultants, agents, employees and professional persons engaged by the Plan Administrator and to pay all other expenses in connection with administering the Plan and for winding down the affairs of the Estates in accordance with the Plan;

(vi)    to satisfy any liabilities, expenses, and other Claims incurred by the Debtors and/or Plan Administrator in the ordinary course of business and without further order of the Court;

(vii)    to execute and deliver all documents, and take all actions, necessary to consummate the Plan and close the Chapter 11 Cases;

(viii)    to dispose of, abandon or deliver title to others of, or otherwise realize the value of, all the remaining Assets in accordance with the terms provided for herein;

(ix)    to oversee compliance with the Estates' accounting, finance, and reporting obligations;

(x)    to prepare such periodic reports as may be required by the U.S. Trustee;

(xi)    except as otherwise provided for in the Plan, to object to Claims against the Debtors' Estates;

(xii)    except as otherwise provided for in the Plan, to compromise and settle Claims against the Debtors' Estates;

(xiii)    to implement and/or enforce all provisions of the Plan;

(xiv)    to implement and/or enforce all agreements entered into prior to the Effective Date;

(xv)    to perform the duties, exercise the powers, and assert the rights of a trustee under sections 704 and 1106 of the Bankruptcy Code, including, without limitation, enforcing contracts, and asserting claims, defenses, offsets, and privileges;

(xvi)    to investigate, prosecute, settle and collect upon GUC Reserved Litigation Claims; and

(xvii)    to use such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan or order of the

Bankruptcy Court or as may be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator shall make Distributions to Holders of Allowed Claims in accordance with Article III of the Plan on, or as soon as reasonably practicable after, the Effective Date.  From time to time, Plan Administrator, as applicable, shall make Pro Rata Distributions to holders of Allowed Claims in accordance with Article III of the Plan.

Notwithstanding Section 6.1(a) of the Plan, the Plan Administrator may retain such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the estate during the winding up and closing of the Chapter 11 Cases, (ii) to pay reasonable administrative expenses (including the costs and expenses of the Plan Administrator and the fees, costs and expenses of all professionals retained by the Plan Administrator, and any taxes imposed in respect of the assets), (iii) to satisfy other liabilities to which the assets are otherwise subject, in accordance with the Plan, and (iv) to establish any necessary reserve.  All Distributions to the holders of Allowed Claims shall be made in accordance with the Plan.  The Plan Administrator may withhold from amounts distributable to any person any and all amounts determined in the Plan Administrator's reasonable sole discretion to be required by any law, regulation, rule, ruling, directive or other governmental requirement.  Holders of Allowed Claims shall, as a condition to receiving Distributions, provide such information and take such steps as the Plan Administrator may reasonably require to ensure compliance with withholding and reporting requirements and to enable them to obtain certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law.  In the event that a holder of an Allowed Claim does not comply with the Plan Administrator's requests in the preceding sentence within thirty (30) calendar days, no Distribution shall be made on account of such Allowed Claim, such holder shall have forfeited its right to Distributions under the Plan, and the Plan Administrator shall reallocate such Distribution for the benefit of all other holders of Allowed Claims as the case maybe, in accordance with the Plan.

**D.    Other Miscellaneous Plan Provisions**

The Plan also contains various provisions relating to:

- the wind-down and governance of the Debtors after the Effective Date (*see* Article V);

- procedures for making Distributions from the Debtors and the rights and powers of the Disbursing Agent (*see* Article VI);

- procedures for the reconciliation of Claims and Proofs of Claim and related matters, such as objections and estimation for any Disputed Claims (*see* Article VII);

- the treatment of Executory Contracts (*see* Article VIII);  and

- the effect of Confirmation, the Bankruptcy Court's retention of jurisdiction with respect to certain matters, and miscellaneous other implementation and effectuating provisions (*see* Articles X, XI, & XII).

**E.    Exculpation and Releases**

On the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, the Estates, the Plan Administrator, all present and former Holders of Claims and Interests, whether or not such Holders voted in favor of the Plan, and their respective successors and assigns.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the release, set forth below, by the Debtors pursuant to Bankruptcy Rule 9019, and further, shall constitute the Bankruptcy Court's finding that the release is:  (1) essential to the Confirmation of the Plan; (2) an exercise of the Debtors' business judgment; (3) in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (4) a good-faith settlement and compromise of the Claims and Causes of Action released by such release; (5) in the best interests of the Debtors and all Holders of Claims and Interests; (6) fair, equitable, and reasonable;  and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases by the Debtors:

*Release by the Debtors.*  **WITHOUT LIMITING ANY OTHER APPLICABLE PROVISIONS OF, OR RELEASES CONTAINED IN, THE PLAN, THE SALE ORDER, AND SALE DOCUMENTS, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AS OF THE EFFECTIVE DATE, THE DEBTORS, THEIR ESTATES, THE PLAN ADMINISTRATOR, AND ANY OTHER PERSON OR ENTITY SEEKING TO EXERCISE THE RIGHTS OF THE ESTATES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED, AND WAIVED ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE THAT SUCH PERSON OR ENTITY SEEKING TO EXERCISE THE RIGHTS THE ESTATES HAS, HAD, OR MAY HAVE AGAINST THE RELEASED PARTIES BASED ON OR RELATING TO THE DEBTORS, THE ESTATES, THE CHAPTER 11 CASES, ANY PREPETITION FINANCING ARRANGEMENTS, THE DEBTORS' FINANCIAL STATEMENTS, THE DEBTOR-IN-POSSESSION FINANCING, THE SALE OR TRANSFER OF ANY AND ALL ASSETS OF THE DEBTORS (INCLUDING THE SALE), THE TRANSITION SERVICES AGREEMENT, THE NEGOTIATION, CONSIDERATION, FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION, OR CONSUMMATION OF THE PLAN, THE PLAN SUPPLEMENT AND EXHIBITS, THE DISCLOSURE STATEMENT, ANY AMENDMENTS THEREOF OR**

**SUPPLEMENTS THERETO, OR ANY OTHER TRANSACTIONS IN CONNECTION WITH THESE CHAPTER 11 CASES OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION THEREWITH OR IN CONNECTION WITH ANY OTHER OBLIGATION ARISING UNDER THE PLAN OR THE OBLIGATIONS ASSUMED HEREUNDER (INCLUDING ANY CLAIM BASED ON THEORIES OF ALLEGED NEGLIGENCE, MISREPRESENTATION, NON-DISCLOSURE, OR BREACH OF FIDUCIARY DUTY). NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE:  (I) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PERSON OR ENTITY UNDER THE PLAN, THE TRANSITION SERVICES AGREEMENT, THE SALE ORDER, OR THE SALE DOCUMENTS, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN; OR (II) THE LIABILITY OF ANY RELEASED PARTY THAT WOULD OTHERWISE RESULT FROM ANY ACT OR OMISSION OF SUCH RELEASED PARTY TO THE EXTENT THAT SUCH ACT OR OMISSION IS DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD).  FOR THE AVOIDANCE OF DOUBT, NOTHING IN THE PLAN, PLAN SUPPLEMENT, CONFIRMATION ORDER, OR ANY RELATED DOCUMENTS SHALL IMPAIR, RELEASE, MODIFY, DISCHARGE, LIMIT, WAIVE, EXCULPATE, OR ENJOIN ANY CLAIMS OR CAUSES OF ACTION AGAINST THE RELEASED PARTIES ARISING FROM FACTS THAT OCCUR AFTER THE EFFECTIVE DATE BASED ON A BREACH OR AN ALLEGED BREACH OF THE STANDARDS AND PRACTICES APPLICABLE TO THE RELEASED PARTIES ARISING FROM OR RELATED TO THE OWNERSHIP, CUSTODIANSHIP, PRESERVATION, AND/OR RETENTION OF THE DEBTORS' DOCUMENTS (INCLUDING, BUT NOT LIMITED TO, WRITTEN DOCUMENTS AND COMMUNICATIONS, ELECTRONICALLY STORED DOCUMENTS, EMAILS, BANKING AND OTHER FINANCIAL RECORDS, EMPLOYEE FILES, COMPENSATION RECORDS, TAX DOCUMENTS, AND ANY AND ALL ELECTRONIC SERVERS AND/OR OTHER MEDIA CONTAINING ANY OF THE FOREGOING).  NOTHING IN THE PLAN RELEASES ACTIONS AGAINST THE RELEASED PARTIES UNDER SECTIONS 542 AND 543 OF THE BANKRUPTCY CODE.**

The Plan also provides for releases by third parties (the "Third-Party Release").  The Releasing Parties include the following parties solely to the extent acting in their respective capabilities as such:  any Holder of a Claim (i) entitled to vote on the Plan that does not opt out of Third Party Release on its Ballot as may be approved by the Bankruptcy Court to the maximum extent permitted by law, or (ii) that is presumed

to accept the Plan and does not opt out of the release provisions in the Plan on the Combined Hearing Notice (as defined in the Solicitation Procedures Order).

Holders of General Unsecured Claims may affirmatively elect not to participate in the Third-Party Release by indicating their desire to do so by following the procedures set forth on their Ballot(s) and selecting the "opt out" box.

When evaluating third party releases under chapter 11 plans in the Second Circuit, courts currently consider the following factors:   1) there is an identity of interest between the debtor and the released parties; (2) the claims against the debtor and released parties are factually and legally intertwined; (3) the scope of the releases is appropriate; (4) the releases are essential to the reorganization; (5) the non-debtors will contribute substantial assets to the reorganization; (6) the impacted class of creditors has overwhelmingly voted in support of the plan; and (7) the plan calls for fair payment of the enjoined claims. *In re Purdue Pharma L.P.*, 69 F.4th 45 (2d Cir. 2023), *cert, granted,* ___ S.Ct. ___, 2023 WL 5116031; *see also In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) (citations omitted).

**IF YOU DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD PARTY RELEASE PROVISIONS IN THE PLAN BY PROPERLY AND TIMELY SUBMITTING THE OPT OUT ELECTION, YOU WILL BE DEEMED, AS OF THE EFFECTIVE DATE, TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND ALL CAUSES OF ACTION (AS SET FORTH IN THE PLAN AND AS PERMITTED BY APPLICABLE LAW) AGAINST THE RELEASED PARTIES (AS DEFINED IN THE PLAN).**

With respect to these Third-Party Release, Section 10.2(b) of the Plan provides as follows:

***Releases by the Releasing Parties.*  TO THE GREATEST EXTENT PERMISSIBLE AND WITHOUT LIMITING ANY OTHER APPLICABLE PROVISIONS OF, OR RELEASES CONTAINED IN, THE PLAN, THE DIP FINANCING ORDER, THE SALE ORDER, AND SALE DOCUMENTS, AS OF THE EFFECTIVE DATE, IN CONSIDERATION FOR THE OBLIGATIONS OF THE DEBTORS UNDER THE PLAN, AND THE CONSIDERATION AND OTHER WAIVERS, CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS, OR DOCUMENTS TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THE PLAN, EACH RELEASING PARTY SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED, AND WAIVED ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT SUCH RELEASING PARTY HAS, HAD, OR MAY HAVE AGAINST ANY RELEASED PARTY BASED ON OR RELATING TO THE DEBTORS, THE ESTATES, THE CHAPTER 11 CASES, ANY**

29

**PREPETITION FINANCING ARRANGEMENTS, THE DEBTORS' FINANCIAL STATEMENTS, THE DEBTOR IN POSSESSION FINANCING, THE SALE OR TRANSFER OF ANY AND ALL ASSETS OF THE DEBTORS (INCLUDING THE SALE), THE TRANSITION SERVICES AGREEMENT, THE NEGOTIATION, CONSIDERATION, FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION, OR CONSUMMATION OF THE PLAN, THE PLAN SUPPLEMENT AND EXHIBITS, THE DISCLOSURE STATEMENT, ANY AMENDMENTS THEREOF, OR SUPPLEMENTS THERETO, OR ANY OTHER TRANSACTION IN CONNECTION WITH THESE CHAPTER 11 CASES OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION THEREWITH OR IN CONNECTION WITH ANY OTHER OBLIGATIONS ARISING UNDER THE PLAN AND THE OBLIGATIONS ASSUMED HEREUNDER (INCLUDING ANY CLAIM BASED ON THEORIES OF ALLEGED NEGLIGENCE, MISREPRESENTATION, NON-DISCLOSURE, OR BREACH OF FIDUCIARY DUTY).  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE:  (I) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PERSON OR ENTITY UNDER THE PLAN, THE TRANSITION SERVICES AGREEMENT, THE SALE ORDER, OR THE SALE DOCUMENTS, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN; OR (II) THE LIABILITY OF ANY RELEASED PARTY THAT WOULD OTHERWISE RESULT FROM ANY ACT OR OMISSION OF SUCH RELEASED PARTY TO THE EXTENT THAT SUCH ACT OR OMISSION IS DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD).**

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third-Party Release, set forth above which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (1) essential to the Confirmation of the Plan; (2) given in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (3) a good-faith settlement and compromise of the Claims released by the Third-Party Release; (4) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; (7) consensual as to the Holders of Claims that do not opt out of the Third-Party Release on their Ballots; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release:

**Waiver of Statutory Limitation on Releases.**  Without limiting any other applicable provisions of, or releases contained in, the Plan, each Releasing Party in each

30

of the releases contained in the Plan (including under this Section) expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in his favor, which if known by it may have materially affected its settlement with the party released, it has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Parties.  The releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

**The above provisions describe the releases the Debtors will seek at the hearing before the Bankruptcy Court to confirm the Plan.  This language has not yet been considered or approved by the Bankruptcy Court and remains subject to consideration at the Combined Hearing (as defined below).**

The Plan also contains the customary exculpation provision set forth below.  The Exculpated Parties are (a) the Debtors; (b) the Creditors' Committee and its members (each in their capacities as such); (c) the Plan Administrator; and (d) with respect to each of the foregoing persons in clauses (a) through (c), each of their Related Parties.

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, EFFECTIVE AS OF THE EFFECTIVE DATE, TO THE EXTENT PERMITTED UNDER SECTION 1125(e) OF THE BANKRUPTCY CODE AND PROFESSIONAL RULES OF CONDUCT, THE EXCULPATED PARTIES SHALL NOT HAVE OR INCUR ANY LIABILITY FOR ANY ACT OR OMISSION TAKEN OR NOT TAKEN IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THE CHAPTER 11 CASES, THE NEGOTIATION AND FILING OF THE DISCLOSURE STATEMENT, THE PLAN OR ANY DOCUMENT IMPLEMENTING THE PLAN, THE PLAN ADMINISTRATOR AGREEMENT, THE PLAN SUPPLEMENT, THE TRANSITION SERVICES AGREEMENT, THE SALE DOCUMENTS, THE DIP FINANCING ORDER, THE FILING OF THE CHAPTER 11 CASES, THE SETTLEMENT OF CLAIMS OR RENEGOTIATION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN, OR THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, EXCEPT FOR ACTS OR OMISSIONS THAT ARE DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD), OR CLAIMS FOR LEGAL MALPRACTICE, RELEASE OF WHICH IS PROHIBITED BY RULE 1.8(H) OF THE NEW YORK RULES OF PROFESSIONAL**

**CONDUCT (22 N.Y.C.R.R. 1200, OR ANY OBLIGATIONS THAT THEY HAVE UNDER OR IN CONNECTION WITH THE PLAN OR THE TRANSACTIONS CONTEMPLATED IN THE PLAN, AND IN ALL RESPECTS SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND OBLIGATIONS UNDER THE PLAN.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE EXCULPATION SET FORTH ABOVE DOES NOT EXCULPATE ANY OF THE EXCULPATED PARTIES' POST-EFFECTIVE DATE OBLIGATIONS UNDER THE PLAN, THE SALE ORDER, OR THE SALE DOCUMENTS, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING, BUT NOT LIMITED TO, THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.**

> **F.    No Discharge**

Because the Debtors are liquidating, they are not entitled to a discharge of obligations pursuant to section 1141 of the Bankruptcy Code.

## VI.    SOLICITATION PROCEDURES AND SOLICITATION PACKAGE

The Debtors are causing packages (the "Solicitation Packages") to be distributed to Holders of Claims in Class 4 (Prepetition Senior Secured Credit Agreement Claims), Class 5 (JPM Overdraft Facility Claims), Class 6 (Senior Subordinated Notes Claims), Class 7 (Pulse Notes Claims), and Class 8 (General Unsecured Claims), which are entitled to vote on the Plan (the "Voting Classes").  Such Solicitation Packages include:

> a.    a notice of the hearing (the "Combined Hearing") to consider approval of this Disclosure Statement on a final basis and Confirmation of the Plan (the "Combined Hearing Notice");
>
> b.    the order of the Bankruptcy Court entered on February 27, 2024 [Docket No. 798] (the "Solicitation Procedures Order"), excluding the exhibits attached thereto, approving the procedures for soliciting votes with respect to the Plan and dates and deadlines related to the Bankruptcy Court's approval of the Plan (referred to as "Confirmation");
>
> c.    instructions detailing how to access copies of this Disclosure Statement and Plan on the Voting Agent's (defined below) website (https://cases.stretto.com/vice/) and how to request hard copies of the Disclosure Statement and Plan, which the Voting Agent will send a copy to the requesting party at the Debtors' expense;  and
>
> d.    a ballot to cast a vote on the Plan (each, a "Ballot").

Holders of Claims and Interests in Class 1 (Secured Tax claims), class 2 (Other Secured Claims), Class 3 (Other Priority Claims), and Class 9 (Interests), which not entitled to vote on the Plan (the "Non-Voting Classes") will receive only the

Combined Hearing Notice which will provide them, among other things, notice of such holder's non-voting status.

Members of the Voting Classes and Non-Voting Classes are entitled to obtain copies of the Disclosure Statement and the Plan, as well as the exhibits thereto, free of charge (a) at the Debtors' case website maintained by the Voting Agent at http://www.cases.stretto.com/vice/).; (b) in writing at Vice Ballot Processing c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602, (c) by calling (855) 620-5725 (U.S.) or (949) 620-1618 (International), or (d) via email at viceinquiries@stretto.com.

## A.    Voting Procedures and Voting Deadline

The rules, requirements, and procedures regarding the submission of your Ballot is set forth in the Solicitation Procedures Order and the Ballot and summarized below for your convenience.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of the Plan by voting in favor of the Plan (*i.e.*, to accept) or against the Plan (*i.e.*, to reject) on the Ballot.  **To be counted, your Ballot must be duly completed, executed, and actually received by Stretto, Inc. (the "<u>Voting Agent</u>") by 5:00 p.m. (Eastern Time) on the Voting Deadline (March 29, 2024).  Ballots may either be delivered (a) via electronic, online transmission by utilizing the eBallot platform on the Debtors' case website (https://cases.stretto.com/vice/), or (b) by paper copy to the Vice Ballot Processing c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602.**

BALLOTS MUST BE DELIVERED BY MAIL, COURIER, OR DELIVERY SERVICES OR ELECTRONICALLY VIA THE CASE WEBSITE.  FACSIMILE BALLOTS <u>WILL NOT</u> BE ACCEPTED.  ANY COMPLETED BALLOTS THAT DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR THAT CONTAIN BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN, WILL NOT BE COUNTED.

Ballots not timely submitted by the Voting Deadline (or such other deadline as ordered by the Bankruptcy Court or agreed to by the Debtors, in their sole discretion) may be considered invalid.

If you have any questions about how to vote, the Solicitation Package you receive, or the amount of your Claim, or if you wish to receive additional copies of the Plan, this Disclosure Statement, or any Exhibits thereto or hereto, please contact:

| Email: | viceinquiries@stretto.com |
|---|---|
| Phone: | (855) 620-5725 (U.S.) or (949) 620-1618 (International) |

**B.    Combined Hearing and Deadline for Objections to Final Disclosure Statement Approval and Plan Confirmation**

The Debtors intend to seek the Bankruptcy Court's Confirmation of the Plan.  The Bankruptcy Court has scheduled the Combined Hearing for **11:00 a.m. (Prevailing Eastern Time) on April 11, 2024**.  The Debtors may adjourn the Combined Hearing by filing a notice on the docket of the Chapter 11 Cases or by announcing an adjournment on the record of a hearing or status conference held with the Bankruptcy Court.

Any objections to the adequacy of the Disclosure Statement or Confirmation of the Plan must be filed with the Bankruptcy Court and served on the parties indicated in the box immediately below by no later than **4:00 p.m. (Eastern Time) on April 4, 2024 at 4:00 p.m. (Prevailing Eastern Time) (the "Objection Deadline")**.  Unless such an objection is timely filed and served, such objection may not be considered by the Bankruptcy Court at the Combined Hearing.  Such objection must be filed with the Bankruptcy Court and served so that it is **<u>actually received</u>** by the Bankruptcy Court and the following parties by no later than the Objection Deadline:

| | |
|---|---|
| Counsel for the Debtors | TOGUT, SEGAL & SEGAL LLP<br>One Penn Plaza, Suite 3335<br>New York, New York 10119<br>Attn:  Frank A. Oswald, Esq. (frankoswald@teamtogut.com), Brian F. Moore, Esq. (bmoore@teamtogut.com), and John C. Gallego, Esq. (jgallego@teamtogut.com) |
| Counsel for the Creditors' Committee | PACHULSKI, STANG, ZIEHL & JONES LLP<br>780 Third Avenue, 34th Floor,<br>New York, New York 10017<br>Attn: Bradford J. Sandler, Esq. (<u>bsandler@pszjlaw.com</u>), Robert J. Feinstein (<u>rfeinstein@pszjlaw.com</u>) |
| The U.S. Trustee | Office of the United States Trustee<br>One Bowling Green, Suite 534,<br>New York, New York 10004<br>Attn.: Andrea B. Schwartz, Esq. (<u>Andrea.B.Schwartz@usdoj.gov</u>) |

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## VII.    REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### A.    Requirements of Section 1129(a) of the Bankruptcy Code

At the Combined Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(i)    The Plan complies with the applicable provisions of the Bankruptcy Code.

(ii)    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(iii)    The Plan has been proposed in good faith and not by any means proscribed by law.

(iv)    Payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved or is subject to the approval of the Bankruptcy Court as reasonable.

(v)    The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in a joint plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy.

(vi)    With respect to each Class of Claims or Interests, each Holder of an Impaired Claim or Impaired Interest either has accepted the Plan or will receive or retain under the Plan on account of such Holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. *See* discussion of "Best Interests Test" below.

(vii)    Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan.

(viii)    Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims will be paid in full on the Effective Date.

(ix)    At least one class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

(x)    Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

(xi)    All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

## B.    Best Interests Test and Liquidation Analysis

As noted above, the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  This requirement is referred to as the "best interests test."

The best interests test requires the Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a hypothetical liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all Holders of Impaired Claims and Interests will receive property with a value not less than the value such Holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Plan already provides for the liquidation of the Debtors.  Liquidation under chapter 7 of the Bankruptcy Code would only increase administrative costs in the form of statutory chapter 7 trustee's fees and other professional fees, all to the detriment of recoveries for creditors.

Thus, the Debtors submit that the Plan is in the best interests of creditors and all creditors are receiving value greater than or at least equal to the value, as of the Effective Date, of the Distribution that each such Holder would receive were the Debtors liquidated under chapter 7 of the Bankruptcy Code.

## C.    Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a Class of Claims or Interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class.

### 1.    No Unfair Discrimination

The "no unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan. A chapter 11 plan of reorganization does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its claims or equity interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe that, under the Plan, all Impaired Classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other Classes of Claims and Interests having the same priority. Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

### 2.    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class. In order to demonstrate that a plan is "fair and equitable," the plan proponent must demonstrate the following:

(i)    *Secured Creditors*. With respect to a class of impaired secured claims, a proposed plan must provide the following: (A) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estates' interest in such property, or (B) for the sale, subject to section 363 of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (A) or (C) of this paragraph, or (C) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim.

The Debtors believe that the Plan satisfies the "fair and equitable" test with respect to all secured Claims.

(ii)    *Unsecured Creditors*. With respect to a class of impaired unsecured claims, a proposed plan must provide the following: either (A) each holder of an

impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (B) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

The Debtors believe that the Plan satisfies the "fair and equitable" test with respect to all unsecured Claims.

(iii)    *Holders of Interests*.  With respect to a class of equity interests, a proposed plan must provide the following:  (A) that each holder of an equity interest receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest or (B) that the holder of any interest that is junior to the interests of the class of equity interests will not receive or retain under the Plan on account of such junior interest any property.

The Debtors believe that the proposed treatment of Interests under the Plan meets the "fair and equitable" test with respect to all Interests.

## VIII.    RISK FACTORS TO BE CONSIDERED

Holders of General Unsecured Claims should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement and the Plan and their respective Exhibits, before deciding whether to vote to accept or to reject the Plan.  This information, however, does not describe the only risks involved in connection with the Plan and its implementation.

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement except as may be required by applicable law.

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice, and nothing contained in the Plan will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Interests.  Each Holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine whether to vote to accept the Plan.

### A.    There May Not Be Recoveries for Holders of Allowed General Unsecured Claims

There can be no assurances of actual recoveries to Holders of Allowed General Unsecured Claims in light of the potential claims that could be asserted against the Debtors. These claims currently include unliquidated litigation claims that have been asserted both by individual creditors and on behalf of purported class action claimants.  The amount of the Debtors' ultimate exposure to these claims is inherently unknowable, and the Debtors currently dispute any liability in these

litigations.  Ultimately, however, these claims must be liquidated—including to $0—
before the Debtors can make a distribution to Holder of Allowed General Unsecured
Claims.  Accordingly, there is no guarantee that Holders of Allowed General Unsecured
Claims will receive any recovery.

### B.    Impact of the Governmental Bar Date

The Governmental Bar Date is not until January 16, 2024.  Other Claims,
including claims that can be asserted by governmental agencies, including, but not
limited to priority tax claims, that are senior in priority to General Unsecured Claims
may arise and become Allowed Claims.

### C.    Recoveries on Account of Retained Causes of Action are Speculative and Uncertain

The ultimate recoveries, if any, that could be obtained by the Liquidating
Trustee are premised on account of Retained Causes of Action.  Recoveries on account
of any of the Retained Causes of Action are speculative and uncertain due to the risk of
success on the merits and the potential difficulties of collection and enforcement of any
judgments. Moreover, there may be limitations on the ability Debtors to recover
proceeds under applicable insurance policies.

### D.    Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular claim or Cause of
Action or projected objection to a particular Claim is, or is not, identified in this
Disclosure Statement.  The Liquidating Trustee may seek to investigate, file, and
prosecute claims and Causes of Action, and may object to Claims, after the Effective
Date irrespective of whether this Disclosure Statement, the Plan, the Exhibits hereto or
thereto, or the Plan Supplement identifies such Causes of Action or objections to such
Claims.

### E.    Potential Tax Obligations

The Debtors have filed federal and state tax returns through 2022, The
Debtors will also need to file for 2023.  Accordingly tax liability could be assessed once
returns are filed.  Recoveries to Holders of Allowed General Unsecured Claims could be
materially impacted in light of the potential tax obligations.

### F.    Tax Consequences

The federal income tax consequences of the implementation of the Plan to
the Holders of Allowed Claims will depend, among other things, on the consideration
to be received by the holder, whether the holder reports income on the accrual or cash
method, whether the holder's claim is allowed or disputed on the Effective Date, and
whether the holder has taken a bad debt deduction or a worthless security deduction
with respect to its claim.  It is possible that additional issues may exist that could affect
the federal income tax consequences of the Plan or other federal income tax matters
discussed herein and this discussion does not consider or provide any conclusions with

respect to any such issues.  Each taxpayer is strongly urged to seek advice based on the taxpayer's particular circumstances from such taxpayer's independent tax advisor.

### G.    Risk of Delayed Effective Date

There can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.  If the Plan is not consummated, there can be no assurance that the Chapter 11 Cases would not be converted to chapter 7 liquidation cases or that any alternative chapter 11 plan would be as favorable to Holders of General Unsecured Claims as the current Plan.  Either outcome may materially reduce or eliminate distributions to Holders of Allowed General Unsecured Claims.

Although in the process of winding down, the Debtors continue to incur administrative costs.  Any material delay in confirming the Plan may result in insufficient funds to consummate the Plan.

### H.    No Representation Outside This Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

## IX.    CONCLUSION AND RECOMMENDATION

The Debtors believe that Confirmation and implementation of the Plan is preferable to any other alternative.  The Debtors urge all Holders of General Unsecured Claims entitled to vote to cast their Ballots to accept the Plan in accordance with the instructions provided herein and in the Solicitation Packages.

Dated: March 5, 2024
       New York, New York


                                    VENUS LIQUIDATION INC.
                                    (F/K/A VICE GROUP HOLDING INC.), *ET AL.*


                          By:    */s/ Frank Pometti*
                                    Name:  Frank Pometti
                                    Title:    Chief Restructuring Officer

## EXHIBIT A

Chapter 11 Plan of Liquidation for Venus Liquidation Inc.
(f/k/a Vice Group Holding Inc.) and Certain of Its Affiliates

**Filed at ECF Docket No. 834-1**

NOTHING CONTAINED IN THIS CHAPTER 11 PLAN OF LIQUIDATION IS AN OFFER, ACCEPTANCE, OR A LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST.  THE PLAN IS SUBJECT TO BANKRUPTCY COURT APPROVAL AND CERTAIN OTHER CONDITIONS.  THE PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.  ACCEPTANCES OR REJECTIONS WITH RESPECT TO THE PLAN ARE BEING SOLICITED PURSUANT TO THE FORTHCOMING DISCLOSURE STATEMENT ONCE THE BANKRUPTCY COURT HAS APPROVED SUCH DISCLOSURE STATEMENT ON A PROVISIONAL BASIS, SUBJECT TO FINAL APPROVAL AT THE CONFIRMATION HEARING. ANY SOLICITATION OF THE PLAN WILL ONLY OCCUR IN COMPLIANCE WITH APPLICABLE LAW.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VENUS LIQUIDATION INC., *et al.* | Case No. 23-10738 (JPM) |
| Debtors.[1] | (Jointly Administered) |

## CHAPTER 11 PLAN OF LIQUIDATION FOR VENUS LIQUIDATION INC. (F/K/A VICE GROUP HOLDING, INC.) AND CERTAIN OF ITS AFFILIATES

TOGUT, SEGAL & SEGAL LLP
Frank A. Oswald
Kyle J. Ortiz
Brian F. Moore
John C. Gallego
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000

*Counsel to the Debtors*
*and Debtors in Possession*

Dated:   March 5, 2024
            New York, New York

---

[1]     The location of the Debtors' service address for purposes of these chapter 11 cases is:  c/o Alix Partners, 909 Third Avenue, 30th Floor, New York, New York 10022.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION ............................ 1

ARTICLE II UNCLASSIFIED CLAIMS ............................................................... 17

2.1    ADMINISTRATIVE CLAIMS. ................................................................... 17

2.2    PAYMENT OF U.S. TRUSTEE FEES. ......................................................... 18

2.3    PROFESSIONAL FEE CLAIMS ................................................................. 18

2.4    PRIORITY TAX CLAIMS. ........................................................................ 19

2.5    DIP FACILITY CLAIMS. ......................................................................... 19

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS
       19

3.1    CLASSIFICATION IN GENERAL ............................................................... 19

3.2    FORMATION OF DEBTOR GROUP FOR CONVENIENCE ONLY. ................. 19

3.3    SUMMARY OF CLASSIFICATION ............................................................ 19

3.4    TREATMENT OF CLASSES ...................................................................... 20

3.5    ALTERNATIVE TREATMENT .................................................................... 24

3.6    SPECIAL PROVISION REGARDING UNIMPAIRED CLAIMS ........................ 24

3.7    CONTROVERSY CONCERNING IMPAIRMENT ........................................... 24

ARTICLE IV ACCEPTANCE OR REJECTION OF THE PLAN .................................... 25

4.1    ACCEPTANCE BY CLASS ENTITLED TO VOTE .......................................... 25

4.2    PRESUMED ACCEPTANCE OF THE PLAN .................................................. 25

4.3    PRESUMED REJECTION OF THE PLAN.............................................................25

4.4    ELIMINATION OF CLASSES. ........................................................................25

4.5    CRAMDOWN...................................................................................................25

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN.................................25

5.1    IMPLEMENTATION OF THE PLAN. .............................................................25

5.2    VESTING OF ASSETS. ...................................................................................25

5.3    CONSOLIDATION OF THE DEBTORS FOR PLAN PURPOSES ONLY .........26

5.4    FUNDING OF PLAN. ......................................................................................26

5.5    POWERS AND OBLIGATIONS OF THE PLAN ADMINISTRATOR...............27

5.6    PRESERVATION OF CAUSES OF ACTION....................................................29

5.7    TERMINATION OF CURRENT OFFICERS, DIRECTORS, EMPLOYEES AND
PROFESSIONALS. ....................................................................................................29

5.8    COMPLIANCE WITH ASSET PURCHASE AGREEMENT AND ANTENNA
STIPULATION. . ........................................................................................................29

5.9    FURTHER AUTHORIZATION. .......................................................................29

5.10    PRESERVATION OF INSURANCE. ................................................................30

5.11    DISSOLUTION OF THE DEBTORS. ...............................................................30

5.12    SUBORDINATED CLAIMS.............................................................................30

ARTICLE VI DISTRIBUTIONS ..................................................................................30

6.1    DISBURSING AGENT.....................................................................................30

6.2    NO POSTPETITION INTEREST ON CLAIMS.................................................30

6.3    DATE OF DISTRIBUTIONS ...........................................................................31

6.4     DISTRIBUTION RECORD DATE ................................................................. 31

6.5     BOOKS AND RECORDS ........................................................................... 31

6.6     DELIVERY OF DISTRIBUTIONS ............................................................ 31

6.7     REVERSION ............................................................................................... 32

6.8     MANNER OF PAYMENT UNDER PLAN ................................................ 32

6.9     DE MINIMIS CASH DISTRIBUTIONS.................................................... 32

6.10    NO DISTRIBUTION IN EXCESS OF AMOUNT OF ALLOWED CLAIM ........ 32

6.11    ALLOCATION OF DISTRIBUTIONS BETWEEN PRINCIPAL AND INTEREST
        32

6.12    SETOFFS AND RECOUPMENTS............................................................ 32

6.13    RIGHTS AND POWERS OF DISBURSING AGENT ............................. 33

6.14    WITHHOLDING AND REPORTING REQUIREMENTS..................... 33

6.15    CLAIMS PAID OR PAYABLE BY THIRD PARTIES ............................ 34

6.16    DISTRIBUTIONS ON DISPUTED CLAIMS. .......................................... 35

ARTICLE VII PROCEDURES FOR DISPUTED CLAIMS ................................. 36

7.1     ALLOWANCE OF CLAIMS...................................................................... 36

7.2     OBJECTIONS TO CLAIMS...................................................................... 36

7.3     ESTIMATION OF DISPUTED CLAIMS ................................................ 36

7.4     RESOLUTION OF CLAIMS ..................................................................... 37

7.5     DISALLOWED CLAIMS........................................................................... 37

ARTICLE VIII TREATMENT OF EXECUTORY CONTRACTS ..................... 37

8.1     REJECTION OF EXECUTORY CONTRACTS ........................................................ 37

8.2     CLAIMS BASED ON REJECTION OF EXECUTORY CONTRACTS ................. 38

8.3     RESERVATION OF RIGHTS ................................................................................. 38

ARTICLE IX CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ...................... 38

9.1     CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ................................. 38

9.2     WAIVER OF CONDITIONS PRECEDENT ........................................................... 39

ARTICLE X EFFECT OF PLAN CONFIRMATION ........................................................ 40

10.1    BINDING EFFECT ................................................................................................. 40

10.2    RELEASES AND RELATED MATTERS .............................................................. 40

10.3    WAIVER OF STATUTORY LIMITATION ON RELEASES ................................ 42

10.4    EXCULPATION AND LIMITATION OF LIABILITY. ........................................ 43

10.5    NO DISCHARGE .................................................................................................... 43

10.6    TERM OF BANKRUPTCY INJUNCTION OR STAYS. ...................................... 43

10.7    POST-EFFECTIVE DATE RETENTION OF PROFESSIONALS ......................... 44

ARTICLE XI RETENTION OF JURISDICTION ............................................................... 44

11.1    RETENTION OF JURISDICTION. ....................................................................... 44

11.2    NO LIMITATION ON ENFORCEMENT BY SEC OR THE U.S. ATTORNEY'S
OFFICE ON NON-DEBTORS. ......................................................................................... 45

ARTICLE XII MISCELLANEOUS PROVISIONS ............................................................ 46

12.1    PAYMENT OF STATUTORY FEES ..................................................................... 46

12.2    DISSOLUTION OF THE CREDITORS' COMMITTEE ....................................... 46

12.3    AMENDMENT OR MODIFICATION OF THE PLAN .......................................... 46

12.4    SUBSTANTIAL CONSUMMATION ........................................................ 46

12.5    SEVERABILITY OF PLAN PROVISIONS ................................................ 47

12.6    REVOCATION, WITHDRAWAL, OR NON-CONSUMMATION .................... 47

12.7    GOVERNING LAW ................................................................................ 47

12.8    TIME ................................................................................................. 47

12.9    NOTICE OF EFFECTIVE DATE. .............................................................. 47

12.10   IMMEDIATE BINDING EFFECT ............................................................ 47

12.11   ENTIRE AGREEMENT ........................................................................ 48

12.12   NOTICE ............................................................................................. 48

ARTICLE XIII CONFIRMATION REQUEST ..................................................... 49

# INTRODUCTION

Venus Liquidation Inc. (f/k/a Vice Group Holding Inc.) and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases, propose the following joint plan of liquidation for the resolution of the outstanding Claims against and Interests in the Debtors. Subject to Section 12.6 of the Plan, certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, and Bankruptcy Rule 3019, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan prior to its substantial consummation (as such term is defined in section 1101 of the Bankruptcy Code).

Holders of Claims and Interests should refer to the Disclosure Statement for information concerning, among other things, (a) the Debtors' history, assets, and liabilities, and (b) the Plan and related matters.

NO SOLICITATION MATERIALS OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREWITH AND APPROVED BY THE BANKRUPTCY COURT HAVE BEEN AUTHORIZED FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN.

# ARTICLE I

## DEFINED TERMS AND RULES OF INTERPRETATION

*Defined Terms.* As used herein, capitalized terms shall have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1     *Accrued Professional Compensation* means, at any date, and regardless of whether such amounts are billed or unbilled, all of a Professional's accrued and unpaid fees (including success fees) and reimbursable expenses for services rendered in the Chapter 11 Cases through and including such date, whether or not such Professional has filed a fee application for payment of such fees and expenses, (a) all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount) and (b) after applying any retainer that has been provided by the Debtors to such Professional and not previously applied. No amount of a Professional's fees and expenses denied under a Final Order shall constitute Accrued Professional Compensation.

1.2     *Administrative Claim* means a Claim for costs and expenses of administration of the Chapter 11 Cases under sections 328, 330, 363, 364(c)(1), 365, 503(b), or 507(b) of the Bankruptcy Code, including, but not limited to:  (a) any actual and necessary costs and expenses, incurred on or after the Petition Date and through the Effective Date, of preserving the Estates and operating the business of the Debtors, including for wages, salaries, or commissions for services, and payments for goods and other services and leased premises to the extent such indebtedness or obligations provided a benefit to the Estates; (b) Professional Fee Claims; and (c) all other Claims entitled to Administrative Claim status pursuant to an order of the Bankruptcy Court.

1.3    *Administrative Claims Bar Date* shall have the meaning set forth in Section 2.1.

1.4    *Affiliate* means, with respect to any Person, "affiliate" as defined in section 101(2) of the Bankruptcy Code.

1.5    *Allowed* means, with respect to a Claim against any Debtor, except as otherwise provided herein, (a) a Claim that is (i) listed in the Schedules as of the Effective Date as neither disputed, contingent, nor unliquidated, and for which no Proof of Claim has been timely filed, and as to which the Debtors, Creditors' Committee, Plan Administrator, or other parties in interest have not filed an objection by the Claims Objection Deadline, or (ii) evidenced by a valid Proof of Claim or request for payment of Administrative Claim, as applicable, filed by the applicable Bar Date, and as to which the Debtors, Creditors' Committee, Plan Administrator, or other parties in interest have not filed an objection to the allowance thereof by the Claims Objection Deadline, or (b) a Claim that is Allowed under the Plan or any stipulation or settlement approved by, or Final Order of, the Bankruptcy Court; *provided*, *however*, that any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court will not be considered "Allowed Claims" under the Plan. Notwithstanding the foregoing, a Claim shall not be Allowed and shall not be entitled to a Distribution under the Plan to the extent it has been satisfied prior to the Effective Date.  If a Claim is Allowed only in part, references to Allowed Claims include and are limited to the Allowed portion of such Claim.  Notwithstanding anything to the contrary herein, any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed and for which no Proof of Claim has been timely filed and any Claim that is disallowed in accordance with Bankruptcy Rule 3003 or section 502(d) of the Bankruptcy Code is not considered Allowed and each such Claim shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

1.6    *Antenna Stipulation* means that *Stipulation and Agreed Order Resolving Claims Among and Between the Debtors, the Buyer Entities, and the Antenna Entities* [Docket No. 768].

1.7    *Asset Purchase Agreement* means that certain Asset Purchase Agreement among the Debtors and the Purchaser, as it may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, including pursuant to the Sale Order.

1.8    *Assumed Contracts* means those Executory Contracts, if any, to be assumed by the Debtors pursuant to the Plan, as set forth on the Schedule of Assumed and Assigned Executory Contracts filed with the Plan Supplement.

1.9    *Avoidance Action* means any claim or Cause of Action of the Estates to recover or avoid transfers or to avoid liens under chapter 5 of the Bankruptcy Code or applicable state law or otherwise, including, but not limited to, sections 502, 506, 510, 522, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, and the proceeds thereof, or otherwise to exercise the avoidance powers provided under the Bankruptcy Code, including any of the Debtors' or the Estates'

2

claim, counterclaim, setoff, or offset rights, regardless of whether or not such action has been commenced prior to the Effective Date.

       1.10    ***Ballot*** means each of the ballot forms distributed to each Holder of a Claim that is entitled to vote to accept or reject the Plan and on which the Holder is to indicate acceptance or rejection of the Plan.

       1.11    ***Bankruptcy Code*** means title 11 of the United States Code, as now in effect or hereafter amended, to the extent such amendments apply to the Chapter 11 Cases.

       1.12    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York.

       1.13    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

       1.14    ***Bar Date*** means, as applicable:  (a) the General Bar Date; (b) the later of (i) the General Bar Date and (ii) 5:00 p.m. (Eastern Time) on the date that is thirty (30) days after entry of a Bankruptcy Court order pursuant to which Executory Contracts are rejected for Claims arising from such rejected agreements; (c) the later of (i) the General Bar Date and (ii) 5:00 p.m. (Eastern Time) on the date that is thirty (30) days after the date that notice of any applicable amendment or supplement to the Schedules is served on a claimant for those Claims affected by any such amendment or supplement to the Schedules; (d) January 16, 2024 at 5:00 p.m. (Eastern Time) for Governmental Units; and (e) the Administrative Claims Bar Date (as defined in Section 2.1(a)).

       1.15    ***Business Day*** means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

       1.16    ***Cash*** means legal tender of the United States of America and equivalents thereof.

       1.17    ***Cause of Action*** means any action, proceeding, cause of action, controversy, demand, debt, right, action, Avoidance Action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, setoff, recoupment, cross-claim, counterclaim, third-party claim, indemnity claim, contribution claim, or any other claim, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether pending in litigation or otherwise, in contract or in tort, in law or in equity, or pursuant to any other theory of law, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date.  "*Cause of Action*" includes:  (a) any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law, or breach of any duty imposed by law or in equity, including securities laws,

negligence, and gross negligence; (c) Avoidance Actions; (d) the right to object to
Claims; (e) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and
(f) any claim or defense, including fraud, mistake, duress, and usury, and any other
defenses set forth in section 558 of the Bankruptcy Code; and (g) any state or foreign
law fraudulent transfer or similar claim.  Notwithstanding anything herein to the
contrary, the term Cause of Action shall not include any Purchased Assets under the
Asset Purchase Agreement.

1.18    *Chapter 11 Cases* means the bankruptcy cases of the Debtors jointly
administered under case number 23-10738 (JPM) in the Bankruptcy Court.

1.19    *Claim* means a "claim" against one or more of the Debtors as
defined in section 101(5) of the Bankruptcy Code.

1.20    *Claims Objection Deadline* means for all Claims (other than
Professional Fee Claims), the later of:  (a) 180 days after the Effective Date, subject to
extension by order of the Bankruptcy Court; and (b) such other objection deadline as
may be specifically fixed by the Plan, the Confirmation Order, the Bankruptcy Rules, or
a Final Order.  For the avoidance of doubt, the Claims Objection Deadline may be
extended one or more times by the Bankruptcy Court upon the filing of a notice by the
Debtors or the Plan Administrator, as applicable.

1.21    *Claims Register* means the official register of Claims maintained by
the clerk of the Bankruptcy Court.

1.22    *Class* means a category of Claims or Interests, as described in
Article III hereof.

1.23    *Committee Settlement* means the settlement embodied in the DIP
Financing Order among the Committee Settlement Parties.

1.24    *Committee Settlement Parties* means the Debtors, the Creditors'
Committee, the DIP Secured Parties, and the Prepetition Secured Parties.

1.25    *Committee Stipulation* means that *Stipulation and Agreed Order
Resolving Claims Among and Between the Debtors, Vice Acquisition Holdco, LLC, and the
Committee* [Docket No. 768].

1.26    *Confirmation* means the confirmation of the Plan by the
Bankruptcy Court under section 1129 of the Bankruptcy Code.

1.27    *Confirmation Date* means the date on which the Bankruptcy Court
enters the Confirmation Order on the docket of the Bankruptcy Court.

1.28    *Confirmation Hearing* means the hearing or hearings held by the
Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider
confirmation of the Plan, as such hearing(s) may be adjourned or continued from time
to time.

1.29    ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance satisfactory to the Debtors, the Creditors' Committee, the DIP Agents, and the Prepetition Term Agents.

1.30    ***Creditor*** shall have the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

1.31    ***Creditors' Committee*** means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

1.32    ***Cure Amount*** means all costs required of the Debtors to cure any and all monetary defaults, including pecuniary losses, pursuant to Bankruptcy Code section 365, arising under any Assumed Contract.

1.33    ***D&O Policies*** means the insurance policies and contracts for directors' and officers' liability maintained by the Debtors, including any directors' and officers' "tail policy".

1.34    ***Debtors*** means Venus Liquidation Inc., f/k/a Vice Group Holding Inc., Vice Impact Inc.; Vice Media LLC; Villain LLC; Boy Who Cried Author LLC; Carrot Operations LLC; Carrot Creative LLC; Channel 271 Productions LLC; Clifford Benski, Inc.; Dana Made LLC; Inverness Collective LLC; JT Leroy Holding LLC; PLDM Films LLC; Project Change LLC; R29 Pride, LLC; R29 Productions, LLC; Refinery 29 Inc.; Valvi LLC; Vice Content Development, LLC; Vice Distribution LLC; Vice Europe Holding Limited; Vice Europe Pulse Holding Limited; Vice Food LLC; Vice Holding Inc.; Vice International Holding, Inc.; Vice Music Publishing LLC; Vice Payroll LLC; Vice Productions LLC; Vice Project Services LLC; Virtue Worldwide, LLC; Visur LLC; VTV Productions LLC; and Goldie Films, Inc.

1.35    ***DIP Agents*** means (i) Fortress Credit Corp. as administrative agent under the DIP Credit Agreement and (ii) Wilmington Trust, National Association, as collateral agent under the DIP Credit Agreement.

1.36    ***DIP Credit Agreement*** means that certain Senior Secured Super-Priority Term Loan Debtor-in-Possession Credit and Guaranty Agreement, dated as of May 19, 2023 [Docket No. 57], as may be amended, restated, supplemented, waived, or otherwise modified from time to time.

1.37    ***DIP Facility Claims*** means any and all claims arising under the DIP Credit Agreement.

1.38    ***DIP Financing Order*** means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, (IV) Granting Adequate Protection to Prepetition Secured Parties, and (V) Granting Related Relief* entered by the Bankruptcy Court on June 13, 2023 [Docket No. 138].

1.39    ***DIP Lenders*** means the lenders party to the DIP Credit Agreement.

1.40    ***DIP Secured Parties*** means the DIP Lenders and the DIP Agents.

1.41    ***Disallowed*** means all or such part of a Claim or interest (a) that is disallowed by a Final Order of the Bankruptcy Court or other court of competent jurisdiction; (b) for reimbursement or contribution of an entity that is co-liable with any Debtor on the Claim of a Creditor and such Claim is contingent on the Confirmation Date, pursuant to section 502(e)(1)(B) of the Bankruptcy Code; or (c) proof of which was required to be filed but as to which a Proof of Claim was not timely or properly filed; unless Allowed by a Final Order of the Bankruptcy Court or other court of competent jurisdiction.

1.42    ***Disbursing Agent*** means the Plan Administrator or the Entity or Entities selected by the Plan Administrator to make or facilitate Distributions contemplated under the Plan after the Effective Date.

1.43    ***Disclosure Statement*** means the disclosure statement (including all exhibits and schedules thereto) relating to the Plan, as amended, modified, or supplemented from time to time.

1.44    ***Disputed Claim*** means (a) any Claim as to which the Debtors, the Creditors' Committee, the Plan Administrator, or other party in interest has interposed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any Claim otherwise disputed by the Debtors, the Creditors' Committee, the Plan Administrator, or other party in interest in accordance with applicable law, which objection has not been withdrawn, or determined by a Final Order; (b) any Claim scheduled by the Debtors as contingent, unliquidated, or disputed; (c) any Claim which amends a claim scheduled by the Debtors as contingent, unliquidated, or disputed; or (d) any Claim prior to it having become an Allowed Claim. For the avoidance of doubt, if no Proof of Claim has been filed by the applicable Bar Date and the Claim is not listed on the Schedules or has been or hereafter is listed on the Schedules as $0.00, Disputed, Contingent, or unliquidated, such Claim shall be a Disallowed Claim and shall be expunged from the Claims Register without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

1.45    ***Disputed Claims Reserve*** means an account to be established and administered by the Plan Administrator for the payment of Disputed Unsecured Claims that become Allowed Unsecured Claims after the Effective Date. For the avoidance of doubt, the amount retained on account of a Disputed Claim shall be the lesser of the amount of such Claim as (i) asserted by the holder of such Claim against the Debtor, or (ii) estimated for the purposes of the Plan by Final Order of the Bankruptcy Court; *provided, however*, the Plan Administrator shall not be required to retain any amount on account of contingent or unliquidated Claims. Any portion of a Disputed Claim that is disallowed by Final Order of the Bankruptcy Court, or waived by the holder of such Claim, shall be distributed in accordance with the terms and conditions of the Plan.

1.46    *Distribution* means any transfer under the Plan of Cash or other property to a Holder of an Allowed Claim, as provided for under the Plan and the Plan Administrator Agreement.

1.47    *Distribution Date* means a date or dates, including the Initial Distribution Date as determined by the Disbursing Agent in accordance with the terms of the Plan, on which the Disbursing Agent makes a Distribution to Holders of Allowed Claims.

1.48    *Distribution Record Date* means the record date for purposes of determining which Holders of Allowed Claims are eligible to received Distributions, which date shall be the first day of the Confirmation Hearing or such other date as designated in a Final Order of the Bankruptcy Court.

1.49    *Effective Date* means the Business Day the Plan becomes effective as provided in Article IX hereof.

1.50    *Effective Date Notice* means the notice of the Effective Date.

1.51    *Entity* means "entity" as defined in section 101(15) of the Bankruptcy Code.

1.52    *Estates* means the chapter 11 estates of the Debtors created by the commencement of the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

1.53    *Exchange Act* means the Securities Exchange Act of 1934, as now in effect or hereafter amended.

1.54    *Excluded Assets* has the meaning set forth in the Asset Purchase Agreement.

1.55    *Exculpated Parties* means the following parties in their respective capacities as such: (a) the Debtors; (b) the Creditors' Committee and its members (each in their capacities as such); (c) the Plan Administrator; (d) the DIP Secured Parties; (e) the Purchaser; (f) the Prepetition Secured Parties; and (g) with respect to each of the foregoing persons in clauses (a) through (f), each of their Related Parties.

1.56    *Executory Contract* means a contract or lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.57    *Exhibit* means an exhibit either annexed to, or contained in a supplement to, the Plan or the Disclosure Statement, as amended, modified, or supplemented from time to time.

1.58    *Federal Judgment Rate* means the federal judgment rate, 28 U.S.C. § 1961, in effect as of the Petition Date, compounded annually.

1.59    ***Final Order*** means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof), (a) the time to appeal, seek certiorari, or request re-argument or further review or rehearing has expired and no appeal, petition for certiorari, or request for re-argument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for re-argument, further review, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal, petition for certiorari, or request for re-argument, further review, or rehearing has been or can be taken or granted.

1.60    ***General Bar Date*** means November 24, 2023 at 5:00 p.m. (Eastern Time), the date by which each Holder of a Claim against the Debtors must have filed a Proof of Claim unless such Claim falls within one of the exceptions set forth in the Bankruptcy Court order establishing the Bar Date [Docket No. 534], or such later date as agreed by the Debtors.

1.61    ***General Unsecured Claim*** means any Claim against the Debtors other than an Administrative Claim, a Secured Tax Claim, an Other Secured Claim, an Other Priority Claim, a Priority Tax Claim, Prepetition Senior Secured Credit Agreement Claim, Subordinated Senior Note Claim, or Pulse Note Claim.

1.62    ***Governmental Unit*** has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.63    ***GUC Cash Reserve*** means $500,000 established under the Committee Settlement.

1.64    ***GUC Reserved Litigation Claims*** means in connection with Committee Settlement, all of the Sellers' avoidance claims or avoidance causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law, and all of the Group Companies' (as defined in the Asset Purchase Agreement) commercial tort claims (as defined under Article 9 of New York State's Uniform Commercial Code), in each case based on acts or omissions prior to the Petition Date; provided that, notwithstanding anything herein to the contrary, GUC Reserved Litigation Claims shall not include any claims or causes of action (a) against (i) the DIP Secured Parties, Prepetition Secured Parties or Purchaser (as applicable), (ii) the Debtors' officers or directors, in each case as of the Petition Date, or Transferred Employees (as defined in the Asset Purchase Agreement), or (iii) parties to the Purchased Contracts (as defined in the Asset Purchase Agreement), or (iv) any Affiliates of the Persons listed in subsections (i)–(iii) hereof, or (b) related to the GMN Cayman Dispute (including any rights under that certain GMN Cayman Termination Deed) (each as defined in the Asset Purchase Agreement).

1.65    ***Holder*** means a holder of a Claim or Interest as applicable.

1.66    *Impaired* means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.67    *Initial Distribution Date* means the date or dates on which the Disbursing Agent makes the first Distribution to Holders of Allowed Claims pursuant to the terms of the Plan, which date shall be after the Claims Objection Deadline has passed and all Plan Reserve Obligations have been satisfied in full or otherwise Disallowed.

1.68    *Interest* means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership or profits interests of the Debtors, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any of the Debtors, whether or not arising under or in connection with any employment agreement, and whether or not certificated, transferable, preferred, common, voting, or denominated "stock," or similar security, that existed immediately before the Effective Date.

1.69    *Interim Administrative Claims Bar Date* means November 27, 2023, the date established by the Bankruptcy Court [Docket No. 576] by which certain Administrative Claims arising from the Petition Date through and including October 26, 2023 were to be made in writing or filed against the Debtors, or such later date as agreed by the Debtors.  The Interim Administrative Claims Bar Date does not apply to the following persons or entities: (a) any party that has already properly filed an Administrative Claim which clearly sets forth the Debtor against which the party asserts an Administrative Claim; (b) any holder of a Claim that heretofore has been allowed by order of the Bankruptcy Court; (c) any person or entity whose claim has been paid in full by the Debtors or the Purchaser;  (d) any holder of a Claim for which specific deadlines have previously been fixed by the Bankruptcy Court (including, for the avoidance of doubt, any holder of a claim arising under section 503(b)(9) of the Bankruptcy Code); and (e) Professionals retained by order of the Bankruptcy Court seeking interim or final compensation.

1.70    *IRC* means the Internal Revenue Code of 1986, as now in effect or hereafter amended.

1.71    *IRS* means the Internal Revenue Service.

1.72    *JPM Overdraft Facility Claims* mean any claim relating to obligations under an uncommitted multicurrency overdraft facility pursuant to that certain Uncommitted Overdraft Facility, dated October 17, 2016 (as amended, supplemented, or modified from time to time, the "*Overdraft Facility*") between Vice Europe Holding Limited ("*VEHL*") and JPMorgan Chase Bank, N.A. )

("*JPMC*"), guaranteed by several affiliates of VEHL, including Debtors
Vice Group Holding Inc. (n/k/a Venus Liquidation Inc.) and Vice Media LLC.

1.73     *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.74     *Net Available Cash* means the Debtors' cash less such amounts needed by the Plan Administrator to satisfy or otherwise fund (i) the Plan Reserve; (ii) the Professional Fee Escrow; and (iii) the Post-Effective Date Reserve.

1.75     *Other Priority Claim* means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

1.76     *Other Secured Claim* means any Secured Claim that is not a DIP Facility Claim, Secured Tax Claim, a Prepetition Senior Secured Credit Agreement Claim, a JPM Overdraft Facility Claim, a Senior Subordinated Notes Claim or a Pulse Notes Claim.

1.77     *Plan Administrator* means the Person or Entity selected by the Creditors' Committee and approved by the Court as Plan Administrator pursuant to Article V of the Plan.

1.78     *Plan Administrator Agreement* means that certain agreement establishing and delineating the retention, terms and duties of the Plan Administrator, substantially in the form to be filed as part of the Plan Supplement.

1.79     *Plan Administrator Disclosure* means a written disclosure to be filed with the Bankruptcy Court at least seven (7) days prior to the Voting Deadline disclosing the identity of the Plan Administrator, the Plan Administrator's credentials, and any and all relevant affiliations, connections, or actual or potential conflicts of interest.

1.80     *Person* means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

1.81     *Petition Date* means May 15, 2023, the date on which the Debtors filed their respective voluntary chapter 11 petitions commencing the Chapter 11 Cases.

1.82     *Plan* means this chapter 11 plan of reorganization, including the Exhibits and all supplements, appendices, and schedules hereto, either in its current form or as the same may be altered, amended, supplemented, or modified from time to time, which shall be in form and substance satisfactory to the Debtors and the Creditors' Committee.

1.83     *Plan Administrator Net Recovery* means the net proceeds for Distributions and payments required to be made under the Plan determined by the Plan Administrator with respect to (a) the GUC Cash Reserve of $500,000, (b) Net Available Cash and (c) recoveries resulting from the possible prosecution of the GUC Reserved

Litigation Claims by the Plan Administrator, as the case may be, on behalf of the Debtors' estates.

1.84    ***Plan Reserve Account*** means an account to be funded by the Debtors with the Plan Reserve Amount, which shall be used solely to pay the Plan Reserve Obligations until such Plan Reserve Obligations are satisfied in full or otherwise Disallowed, at which time any remaining amounts will become Plan Administrator Assets.

1.85    ***Plan Reserve Amount*** means the amount necessary to satisfy the Plan Reserve Obligations.

1.86    ***Plan Reserve Obligations*** means the Allowed Administrative Claims (other than Professional Fee Claims), Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims that are not satisfied as of the Effective Date.

1.87    ***Plan Supplement*** means any supplement to the Plan, and the compilation of documents, forms of documents, and Exhibits to the Plan or Disclosure Statement, as amended, modified, or supplemented from time to time, which may be filed in draft or substantially final or non-final form, in form and substance satisfactory to the applicable parties as provided in the Plan, which shall be filed by the Debtors no later than seven (7) calendar days prior to the Voting Deadline, and including the following, without limitation:  (a) the Plan Administrator Agreement, (b) the Plan Administrator Disclosure, (c) a non-exhaustive list of the GUC Reserved Litigation Claims, (d) the Schedule of Assumed and Assigned Executory Contracts, if any, and (e) any other necessary documentation related to the Plan.

1.88    ***Post-Effective Date Expenses*** means all voluntary and involuntary, costs, expenses, charges, obligations, or liabilities of any kind or nature, whether unmatured, contingent or unliquidated (collectively, the "***Expenses***") incurred or reasonably anticipated to be incurred by the Plan Administrator after the Effective Date in connection with the implementation of the Plan, the administration of the post-Effective Date Estates, and the implementation of the Plan Administrator, including, but not limited to:  (a) the Plan Administrator's Expenses in connection with administering and implementing the Plan, including any taxes incurred by the Plan Administrator Assets and accrued on or after the Effective Date, (b) U.S. Trustee Fees, if any, which accrued after the Effective Date, (c) the Plan Administrator's Expenses in making the Distributions required by the Plan, including Allowed Administrative Claims, paying taxes, and filing tax returns, (d) any Expenses incurred by the Plan Administrator, (e) the Expenses of independent contractors and professionals (including, without limitation, attorneys, advisors, accountants, brokers, consultants, experts, professionals, and other Persons) providing services to the Plan Administrator, and (f) the fees and expenses of the Disbursing Agent in making Distributions.

1.89    ***Post-Effective Date Reserve*** means the account to be established by the Plan Administrator for the purpose of satisfying Post-Effective Date Expenses, which account shall be funded with any additional Cash after paying Allowed Administrative Claims, Allowed Priority Claims, and any other Allowed Claims to be

paid on the Effective Date under the Plan (excluding, for the avoidance of doubt, any amounts funded into escrow in accordance with this Plan).

1.90   *Prepetition Secured Parties* means the Prepetition Term Lenders and the Prepetition Term Agents.

1.91   *Prepetition Senior Secured Credit Agreement* means that certain Amended and Restated Credit and Guaranty Agreement, dated as of November 4, 2019, as amended, restated, or otherwise modified from time to time, under which $474,572,920 in principal amount was outstanding as of the Petition Date, as stipulated in the DIP Financing Order.

1.92   *Prepetition Senior Secured Credit Agreement Claims* means any outstanding Claim arising from or related to the Prepetition Senior Secured Credit Agreement, which shall be Allowed in the total aggregate amount of $144,975,581.

1.93   *Prepetition Term Agents* means (a) Fortress Credit Corp. as administrative agent under the Prepetition Senior Secured Credit Agreement and (b) Wilmington Trust, National Association as collateral agent under the Prepetition Senior Secured Credit Agreement ("Collateral Agent").

1.94   *Prepetition Term Lenders* means the lenders party to the Prepetition Senior Secured Credit Agreement.

1.95   *Priority Tax Claim* means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

1.96   *Pro Rata* means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims within such Class.

1.97   *Proceeds Sharing Agreement* means that certain Proceeds Agreement dated as of March 21, 2023, as amended, restated or otherwise modified from time to time, by and among the Prepetition Term Lenders, the Senior Preferred Shareholders, and Fortress Credit Corp., in its capacity as the administrative agent under the Prepetition Senior Secured Credit Agreement and acknowledged by Vice Group Holding Inc. (n/k/a Venus Liquidation Inc.), for itself and its subsidiaries.

1.98   *Professional* means any professional employed in the Chapter 11 Cases pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code or otherwise.

1.99   *Professional Fee Claim* means an Administrative Claim of a Professional for compensation for services rendered and reimbursement of costs incurred prior to and including the Effective Date.

1.100   *Professional Fee Escrow* means an escrow account to be funded with the Professional Fee Escrow Amount on the Effective Date.

1.101   *Professional Fee Escrow Amount* means the aggregate Accrued Professional Compensation incurred, or estimated to be incurred, through the Effective Date as estimated by the Professionals in accordance with Section 2.3.

1.102    *Proof of Claim* means a written proof of Claim filed against the Debtors in the Chapter 11 Cases.

1.103    *Provisionally Allowed* means a Disputed Claim (a) that has been deemed temporarily allowed for voting purposes pursuant to Bankruptcy Rule 3018, or (b) the maximum amount of which has been estimated pursuant to Bankruptcy Code section 502(c) and the procedures set forth in Section 7 of the Plan; *provided, however,* that, if a Claim has been subject to multiple such estimation or temporary allowance proceedings, the Provisionally Allowed amount shall refer to the lowest amount established in any such proceedings, unless the Bankruptcy Court orders otherwise.

1.104    *Pulse Notes Claims* means any claim on account of or relating to the $43,240,000 of 10% secured and guaranteed redeemable loan notes due 2023, issued by Vice Europe Pulse Holding Limited, and guaranteed by Vice Europe Holding Limited and Vice Holding Inc., which is subordinate in all respects to the rights and prior recovery of the lenders under the Prepetition Senior Secured Credit Agreement, pursuant to the Pulse Notes Subordination Agreement and section 510(a) of the Bankruptcy Code.

1.105    *Pulse Notes Subordination Agreement* means the Subordination and Intercreditor Agreement, dated December 8, 2021, by and among Thomas Benski, Marisa Clifford, B & C 3, LLC, the Prepetition Term Lenders, and the Prepetition Term Agents.

1.106    *Purchased Assets* has the meaning set forth in the Asset Purchase Agreement.

1.107    *Purchaser* means Vice Acquisition Holdco, LLC in its capacity as purchaser under the Asset Purchase Agreement, or any Buyer Designee (as defined in the Asset Purchase Agreement).

1.108    *Related Parties* with respect to any Released Party or Exculpated Party, an Entity's predecessors, successors and assigns, managed accounts or funds, and all of their respective current and former officers, managers, directors, principals, members, employees, agents, independent contractors, management companies, investment advisors, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives and other professionals, and such Persons' respective heirs, executors, estates, servants, and nominees, in each case solely to the extent such parties are acting in such capacity.

1.109    *Released Parties* means the following parties solely to the extent acting in their respective capabilities as such: (a) the Committee Settlement Parties; (b) the Purchaser; and (c) with respect to each of the foregoing persons in clauses (a) and (b), each of their Related Parties.

1.110    *Releasing Parties* means the means the following parties solely to the extent acting in their respective capabilities as such: any Holder of a Claim (i) entitled to vote on the Plan that does not opt out of Third Party Release on its Ballot as may be approved by the Bankruptcy Court to the maximum extent permitted by law, or

13

(ii) is presumed to accept the Plan and does not opt out of the release provisions in the Plan on the Combined Hearing Notice (as defined in the Solicitation Procedures Order).

1.111    *Sale* means the Debtors' sale of the Purchased Assets (as defined in the Asset Purchase Agreement) to the Purchaser pursuant to the Sale Documents as approved by the Sale Order.

1.112    *Sale Closing* means July 31, 2023.

1.113    *Sale Documents* means the Asset Purchase Agreement, together with the schedules and/or exhibits and all related documents, as they may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

1.114    *Sale Order* means that certain order of the Bankruptcy Court, entered on June 23, 2023 [Docket No. 214] approving the Sale, as supplemented by that *Supplemental Order (A) Approving the Asset and Equity Purchase Agreement, (B) Authorizing the Sale of Assets, (C) Authorizing the Assumption and Assignment of Contracts and Leases, and (D) Granting Related Relief* [Docket No. 323].

1.115    *Schedule of Assumed and Assigned Executory Contracts* means a schedule that may be filed as part of the Plan Supplement of all Executory Contracts that the Debtors intend to assume or assume and assign pursuant to the Plan.

1.116    *Schedules* means the Debtors' schedules of assets and liabilities and statements of financial affairs, filed under section 521 of the Bankruptcy Code and the Bankruptcy Rules, as amended, supplemented, or modified.

1.117    *SEC* means the U.S. Securities and Exchange Commission.

1.118    *Sellers* has the meaning set forth in the Asset Purchase Agreement.

1.119    *Securities Act* means the Securities Act of 1933, as now in effect or hereafter amended.

1.120    *Secured Claim* means a Claim that is secured by a Lien on property in which the Estates have an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

1.121    *Senior Note Subordination Agreements* means the subordination agreements (as amended, restated or otherwise modified from time to time) entered into by, among others, any or all of the Senior Preferred Shareholders and Fortress Credit Corp., in its capacity as the administrative agent under the Prepetition Senior Secured Credit Agreement, in connection with the issuance of the Senior Subordinated Notes, pursuant to which any claims evidenced by the Senior Subordinated Notes are subordinated to the claims  under the Prepetition Senior Secured Credit Agreement and

certain related documents in accordance with the terms of such subordination agreements.  Notwithstanding anything to the contrary set forth herein or otherwise, the Proceeds Sharing Agreement does not constitute a Senior Note Subordination Agreement.

1.122   *Senior Subordinated Notes* means unsecured senior subordinated notes issued by Vice Group Holding Inc. (n/k/a Venus Liquidation Inc.), as issuer, to (a) TPG Virat Holdings 1, L.P. ("*TPG*") and (b) Sixth Street Virat Holdings 2, LLC or Sixth Street Virat Holdings 3, LLC (collectively, "*SSP*" and, together with TPG and certain of their respective affiliates, the "*Senior Preferred Shareholders*")  as of January 18, 2022 (amending, restating, replacing and superseding those unsecured senior subordinated notes issued as of April 30, 2020, July 15, 2020 and April 15, 2021), February 25, 2022, April 29, 2022, May 27, 2022, June 14, 2022, August 2, 2022, August 12, 2022, August 26, 2022, August 29, 2022, September 13, 2022, November 2, 2022, and November 14, 2022, in each case as amended, restated or otherwise modified from time to time.

1.123   *Senior Subordinated Notes Claims* means any claims on account of or relating to the Senior Subordinated Notes, which are subordinate to the claims of the Prepetition Secured Credit Parties under the Prepetition Senior Secured Credit Agreement pursuant to the Proceeds Sharing Agreement and the Senior Note Subordination Agreements and section 510(a) of the Bankruptcy Code, which shall be Allowed in the total aggregate amount of $328,655,841.46.

1.124   *Secured Tax Claim* means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitation therein and including any related Secured Claim for penalties).

1.125   *Sharing Threshold* means $12 million of Cash or other consideration distributed to Holders of General Unsecured Claims (excluding, for the avoidance of doubt, any Prepetition Senior Secured Credit Agreement Claims) in connection with the Committee Settlement.

1.126   *Third-Party Release* means the release set forth in Section 10.2(b).

1.127   *Transition Services Agreement* means that certain *Transition Services Agreement* dated as of July 31, 2023 by and among the Debtors and the Purchaser.

1.128   *Turnover Provisions* means any right of the Prepetition Secured Parties to receipt or turnover of any distributions that might otherwise be made to or on account of the Senior Subordinated Notes Claims or the Pulse Notes Claims set forth in (i) the Proceeds Sharing Agreement and the Senior Note Subordination Agreements and (ii) the Pulse Notes Subordination Agreement, as may have been amended, restated, supplemented, or modified from time to time.  Notwithstanding anything to the contrary set forth herein or otherwise, no right of any Senior Preferred Shareholder to receipt or turnover of any distributions that might otherwise be made to or on account of the Prepetition Senior Secured Credit Agreement Claims set forth in the Proceeds Sharing Agreement shall constitute a Turnover Provision.

1.129    ***Unclaimed Distribution*** means any Distribution under the Plan on account of an Allowed Claim that has not: (i) accepted a particular Distribution or, in the case of a Distribution made by check, negotiated such check, (ii) given written notice to the Disbursing Agent of an intent to accept a particular Distribution, (iii) responded in writing to the request of the Disbursing Agent for information necessary to facilitate a particular Distribution, or (iv) taken any other action necessary to facilitate such Distribution.

1.130    ***U.S. Attorney's Office*** means the Office of the United States Attorney.

1.131    ***U.S. Trustee*** means the Office of the United States Trustee for the Southern District of New York.

1.132    ***U.S. Trustee Fees*** means all fees, interest, and charges assessed against the Estates by the U.S. Trustee pursuant to 28 U.S.C. § 1930 and 31 U.S.C. § 3717.

1.133    ***Unimpaired*** means a Claim that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.134    ***Voting Deadline*** means the date by which a Holder of a Claim entitled to vote on the Plan must deliver a Ballot to accept or reject the Plan as set forth in the order of the Bankruptcy Court approving the instructions and procedures relating to the solicitation of votes with respect to the Plan.

*Rules of Interpretation and Computation of Time.* For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest, includes that entity's successors and assigns; (e) all references in the Plan to Sections and Articles are references to Sections and Articles of or to the Plan; (f) the words "herein," "hereunder," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) subject to the provisions of any contract, certificates of incorporation, bylaws, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (k) "including" means "including without

limitation"; and (l) with reference to any Distribution under the Plan, "on" a date means on or as soon as reasonably practicable after that date.

   *Exhibits*.  All Exhibits are incorporated into and are a part of the Plan as if set forth in full herein, and, to the extent not annexed hereto or to the Disclosure Statement, such Exhibits shall be filed with the Bankruptcy Court no later than seven (7) days prior to the Voting Deadline.  Holders of Claims and Interests may obtain a copy of the Exhibits upon written request to the Debtors.  Upon their filing, the Exhibits may be inspected (a) in the office of the clerk of the Bankruptcy Court or its designee during normal business hours; (b) on the Bankruptcy Court's website at http://nysb.uscourts.gov (registration required); or (c) at the Debtors' case website at https://cases.stretto.com/vice/.  The documents contained in the Exhibits shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

   *Controlling Document*.  In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document).  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided, that* if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

## ARTICLE II

## UNCLASSIFIED CLAIMS

   In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims) and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

   2.1  *Administrative Claims*. To the extent not required to be filed by the Interim Administrative Claims Bar Date of November 23, 2023 established by the Bankruptcy Court, all requests for payment of Administrative Claims (other than (i) Professional Fee Claims, and (ii) Administrative Claims that have been Allowed on or before the Effective Date) or were not made in writing or filed and required to be filed in connection with the Interim Administrative Bar Date, must be in writing and filed with the Bankruptcy Court and served on the Debtors, the Creditors' Committee, the Plan Administrator, and the U.S. Trustee so as to be received by 5:00 p.m. (Eastern Time) on the date that is thirty (30) days after the service of notice of occurrence of the Effective Date (the "*Administrative Claims Bar Date*").  Such request for payment must include at a minimum:  (A) the name of the holder of the asserted Administrative Claim; (B) the amount of the Administrative Claim; (C) the basis of the Administrative Claim; and (D) supporting documentation for the Administrative Claim.  Failure to file and serve such proof of Administrative Claim timely and properly shall result in the Administrative Claim being forever barred and released and the Holder thereof shall be

enjoined from commencing or continuing any action, employment of process or act to collect, offset, or recover such Administrative Claim. On or as soon as reasonably practicable after the earlier of (a) the Effective Date or (b) the first Business Day after the date that is thirty (30) calendar days after the date on which an Allowed Administrative Claim becomes Allowed or payable under any agreement related thereto, unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Plan Administrator, as applicable, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, and release, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim.

2.2    **Payment of U.S. Trustee Fees.**  On the Effective Date, the Debtors shall pay all accrued and outstanding U.S. Trustee Fees, if any.  Following the Effective Date, the Plan Administrator shall remain obligated to pay quarterly fees to the U.S. Trustee on behalf of the Estates, if any, in accordance with Section 12.1.

2.3    **Professional Fee Claims**.

(a)    To the extent not filed prior to the Effective Date, Professionals shall submit final fee applications seeking approval of all Professional Fee Claims by the Bankruptcy Court no later than thirty (30) days after the Debtors serve the Effective Date Notice.  These applications remain subject to Bankruptcy Court approval under the standards established by the Bankruptcy Code, including the requirements of sections 327, 328, 330, 331, 363, 503(b), and 1103 of the Bankruptcy Code, as applicable.

(b)    Professionals shall estimate in good faith their Accrued Professional Compensation rendering services to the Debtors before and as of the Effective Date and shall deliver such good faith estimate to the Debtors no later than five (5) Business Days prior to the Effective Date.  If a Professional does not provide an estimate, the Debtors shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional.

(c)    As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash equal to the Professional Fee Escrow Amount, and no Liens, Claims, or interests shall encumber the Professional Fee Escrow in any way.  The Professional Fee Escrow (including the funds held therein) (x) shall not be and shall not be deemed property of the Debtors or the Estates and (y) shall be held in trust for Professionals; *provided, that* any funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full shall become available for distribution by the Plan Administrator as provided for in this Plan.

(d)    Allowed Professional Fee Claims shall be paid in Cash to such Professionals from the funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court, and subject to any agreed-upon voluntary reduction of fees by a Professional in connection with achieving a confirmable Plan.

(e)      The Debtors and the Plan Administrator, as applicable, are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course without the need for Bankruptcy Court approval.

2.4      *Priority Tax Claims*.  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code

2.5      *DIP Facility Claims.*  Except as otherwise set forth in Amendment No. 3 to Asset and Equity Purchase Agreement, dated as of July 31, 2023 [Docket No. 334], the outstanding balance under the DIP Credit Agreement was deemed satisfied effective as of the closing of the Sale.  DIP Facility Claims were paid in full (other than certain claims for professional fees and expenses provided for under the DIP Credit Agreement and DIP Financing Order, which will be paid pursuant to the Committee Stipulation, prior to the Effective Date). Accordingly, holders of Claim relating to the DIP Facility will not receive any distributions under the Plan.

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

3.1      *Classification in General*.  Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

3.2      *Formation of Debtor Group for Convenience Only.*  The Plan (including, but not limited to, Sections 2 and 3 of the Plan) groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and Distributions to be made in respect of Claims against the Debtors under the Plan. Such grouping shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets.  Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

3.3      *Summary of Classification*.

The Plan (including, but not limited to, Articles II and III of the Plan) provides for the procedural consolidation of the Debtors for plan purposes only and shall serve as a motion by the Debtors for entry of an order of the Bankruptcy Court

granting such relief. The Debtors propose procedural consolidation to avoid the inefficiency of proposing, voting on, and making Distributions in respect of entity-specific claims.

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to accept or reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3.3. All of the potential Classes for the Debtors are set forth herein. The Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 3.4 hereof.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 4 | Prepetition Senior Secured Credit Agreement Claims | Impaired | Yes |
| 5 | JPM Overdraft Facility Claims | Impaired | Yes |
| 6 | Senior Subordinated Notes Claims | Impaired | Yes |
| 7 | Pulse Notes Claims | Impaired | Yes |
| 8 | General Unsecured Claims | Impaired | Yes |
| 9 | Interests | Impaired | No (deemed to reject) |

3.4     *Treatment of Classes*.

(a)     *Class 1 – Secured Tax Claims*

(i)     *Claims in Class:* Class 1 consists of all Secured Tax Claims.

(ii)     *Treatment:* Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to different, less favorable treatment, each Holder of

an Allowed Secured Tax Claim will receive, in full and final satisfaction, settlement, and in exchange for such Allowed Secured Tax Claim, Cash in an amount equal to the Allowed amount of such Allowed Secured Tax Claim on the earlier of (x) the Effective Date and (y) as soon as practicable after its Secured Tax Claim becomes Allowed.

(iii)    *Voting*: Claims in Class 1 are Unimpaired.  Holders of Allowed Secured Tax Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Secured Tax Claims are not entitled to vote to accept or reject the Plan.

(b)    *Class 2 – Other Secured Claims*

(i)    *Claims in Class:*  Class 2 consists of all Other Secured Claims.

(ii)    *Treatment:* Except to the extent that a Holder of an Allowed Other Secured Claim agrees to different, less favorable treatment each Holder of an Allowed Other Secured Claim will receive, in full and final satisfaction, settlement, and in exchange for such Allowed Other Secured Claim, Cash in an amount equal to the Allowed amount of such Other Secured Claim on the earlier of (x) the Effective Date and (y) as soon as practicable after its Other Secured Claim becomes Allowed.

(iii)    *Voting:*  Claims in Class 2 are Unimpaired.  Holders of Allowed Other Secured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

(c)    *Class 3 – Other Priority Claims*

(i)    *Claims in Class:*  Class 3 consists of all Other Priority Claims.

(ii)    *Treatment:*  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a different, less favorable treatment, each Holder of an Allowed Other Priority Claim will receive, in full and final satisfaction, settlement, and in exchange for such Allowed Claim, Cash in an amount equal to such Holder's Allowed Other Priority Claim on the earlier of (x) the Effective Date and (y) as soon as practicable after its Other Priority Claim becomes Allowed.

(iii)    *Voting:*  Claims in Class 3 are Unimpaired.  Holders of Allowed Other Priority Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

(d)    **Class 4 – Prepetition Senior Secured Credit Agreement Claims**

(i)    *Claims in Class:*  Class 4 consists of all Prepetition Senior Secured Credit Agreement Claims.

(ii)     *Treatment:* Except to the extent that a Holder of an
Allowed Prepetition Senior Secured Credit Agreement Claim agrees to different, less
favorable treatment, each Holder of an Allowed Prepetition Senior Secured Credit
Agreement Claim will receive, upon and after the satisfaction of the Sharing Threshold
under the Committee Settlement, a Pro Rata share of the Plan Administrator Net Recovery
available for Distribution to the extent available on each such Distribution Date, in full and
final satisfaction, settlement, and in exchange for such Allowed Prepetition Senior Secured
Credit Agreement Claim.  Until satisfaction of the Sharing Threshold under the
Committee Settlement, any portion of the Plan Administrator Net Recovery that would
otherwise be distributed on account of the Prepetition Senior Secured Credit Agreement
Claims, including as a result of the enforcement of the Turnover Provisions with respect to
the Senior Subordinated Notes Claims and Pulse Notes Claims, shall be made available for
Distribution to Holders of General Unsecured Claims.  Any Distribution actually received
by a Holder of an Allowed Prepetition Senior Secured Credit Agreement Claim (which
shall not include any Distribution up to the Sharing Threshold made available for Holders
of Allowed General Unsecured Claims pursuant to this Section 3.4(d)(ii)) shall be subject
to the Proceeds Sharing Agreement.

(iii)     *Voting:*  Claims in Class 4 are Impaired.  Pursuant to
section 1126 of the Bankruptcy Code, the Holder of an Allowed Prepetition Senior Secured
Credit Agreement Claim is entitled to vote to accept or reject the Plan.

(e)     ***Class 5 – JPM Overdraft Facility Claims***

(i)     *Claims in Class:*  Class 5 consists of all JPM Overdraft
Facility Claims.

(ii)     *Treatment:* Except to the extent that a Holder of an
Allowed JPM Overdraft Facility Claims agrees to different, less favorable treatment
(including, without limitation, pursuant to the Asset Purchase Agreement, the Committee
Settlement, and/or the Sale Order, or such other recovery as is necessary to satisfy section
1129 of the Bankruptcy Code), each Holder of an Allowed JPM Overdraft Facility Claim
agrees it will receive, in full and final satisfaction, settlement, and in exchange for such
Allowed Claim, the treatment and terms it has agreed to with the Purchaser, including
without limitation the novation of certain account agreements.

(iii)     *Voting:*  Claims in Class 5 are Impaired.  Pursuant to
section 1126 of the Bankruptcy Code, the Holder of an Allowed JPM Overdraft Facility
Claim is entitled to vote to accept or reject the Plan.

(f)     ***Class 6 –Senior Subordinated Notes Claims***

(i)     *Claims in Class:*  Class 6 consists of all Senior
Subordinated Notes Claims.

(ii)     *Treatment:* Pursuant to section 510(a) of the Bankruptcy
Code, except to the extent that a Holder of an Allowed Senior Subordinated Notes Claim
agrees to different, less favorable treatment, each Holder of an Allowed Senior

Subordinated Notes Claim shall receive such Holder's Pro Rata share of the Plan Administrator Net Recovery available for Distribution on each such Distribution Date as provided under the Plan and the Plan Administrator Agreement in full and final satisfaction, settlement, and in exchange for such Allowed Senior Subordinated Notes Claim; *provided* that until such time as the Allowed Prepetition Senior Secured Credit Agreement Claim has been repaid in full, any Distribution on account of an Allowed Senior Subordinated Notes Claim, pursuant to the Turnover Provisions, shall be distributed to Holders of the Allowed Prepetition Senior Secured Credit Agreement Claim subject to the treatment provided under Section 3.4(d)(ii) hereof; *provided further* that any Distribution actually received by a Holder of an Allowed Prepetition Senior Secured Credit Agreement Claim (which shall not include any Distribution up to the Sharing Threshold made available for Holders of Allowed General Unsecured Claims pursuant to Section 3.4(d)(ii)) shall be subject to the Proceeding Sharing Agreement and, for the avoidance of doubt, any portion of such Distribution transferred to any Senior Preferred Shareholder pursuant to the Proceeds Sharing Agreement may be retained by such Senior Preferred Shareholder consistent with the Proceeds Sharing Agreement notwithstanding the previous proviso.

(iii)    *Voting:*  Claims in Class 6 are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, the Holder of an Allowed Senior Subordinated Notes Claim is entitled to vote to accept or reject the Plan.

(g)    ***Class 7 –Pulse Notes Claims***

(i)    *Claims in Class:*  Class 7 consists of all Pulse Notes Claims.

(ii)    *Treatment:* Pursuant to section 510(a) of the Bankruptcy Code, except to the extent that a Holder of an Allowed Pulse Notes Claim accepts different, less favorable treatment, each Holder of an Allowed Pulse Notes Claim shall receive such Holder's Pro Rata share of the Plan Administrator Net Recovery available for Distribution on each such Distribution Date as provided under the Plan and the Plan Administrator Agreement; *provided* that until such time as the Allowed Prepetition Senior Secured Credit Agreement Claim has been repaid in full, any Distribution on account of an Allowed Pulse Notes Claim, pursuant to the Turnover Provisions, shall be distributed to Holders of the Allowed Prepetition Senior Secured Credit Agreement Claim subject to the treatment provided under Section 3.4(d)(ii) hereof; *provided further*, that after the Allowed Prepetition Senior Secured Credit Agreement Claim has been repaid in full, except to the extent that a Holder of an Allowed Pulse Notes Claim agrees to different, less favorable treatment, each Holder of an Allowed Pulse Notes Claim will receive a Pro Rata share of the Plan Administrator Net Recovery available for Distribution to the extent available on each such Distribution Date, in full and final satisfaction, settlement, and in exchange for such Allowed Claim.

(iii)    *Voting:*  Claims in Class 7 are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, the Holder of an Allowed Pulse Notes Claim is entitled to vote to accept or reject the Plan.

(h)    *Class 8 – General Unsecured Claims*

(i)    *Claims in Class:* Class 8 consists of all General Unsecured Claims.

(ii)    *Treatment:* Subject to the Committee Settlement and the Sharing Threshold therein, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to different, less favorable treatment, in full and final satisfaction, settlement, and release of, and in exchange for, all such Allowed Claims, each Holder of an Allowed General Unsecured Claim shall receive such Holder's Pro Rata share of the Plan Administrator Net Recovery available for Distribution on each such Distribution Date as provided under the Plan and the Plan Administrator Agreement.

(iii)    *Voting:* Claims in Class 8 are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

(i)    *Class 9 – Interests*

(i)    *Claims in Class:* Class 9 consists of all Interests.

(ii)    *Treatment:* On the Effective Date, all Interests shall be eliminated, and Holders of Interests shall not receive or retain any property under the Plan on account of such Interests.

(iii)    *Voting*: Interests in Class 9 are Impaired.  Holders of Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holders of Interests are not entitled to vote to accept or reject the Plan.

3.5    *Alternative Treatment*.  Notwithstanding any provision herein to the contrary, any Holder of an Allowed Claim may receive, instead of the Distribution or treatment to which it is entitled hereunder, any other Distribution or treatment to which it and the Debtors or the Plan Administrator, as applicable, may agree in writing; *provided, however*, that under no circumstances may the Debtors agree to provide any other Distribution or treatment to any Holder of an Allowed Claim that would adversely impair the Distribution or treatment provided to any other Holder of an Allowed Claim.

3.6    *Special Provision Regarding Unimpaired Claims*.  Except as otherwise provided in the Plan, nothing shall affect the Debtors' or the Plan Administrator's rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs against or recoupments of Unimpaired Claims.

3.7    *Controversy Concerning Impairment*.  If a controversy arises as to whether any Claims, or any Class of Claims, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV

## ACCEPTANCE OR REJECTION OF THE PLAN

      4.1     *Acceptance by Class Entitled to Vote*.  Classes 4, 5, 6, 7 and 8 are entitled to vote to accept or reject the Plan.

      4.2     *Presumed Acceptance of the Plan*.  Classes 1, 2, and  3 are Unimpaired.  Therefore, such Classes are deemed to have accepted the Plan by operation of law and are not entitled to vote to accept or reject the Plan.

      4.3     *Presumed Rejection of the Plan.*  Class 9 will receive no Distribution under the Plan.  Therefore, such Class is deemed to have rejected the Plan by operation of law and are not entitled to vote to accept or reject the Plan.

      4.4     *Elimination of Classes.*  To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

      4.5     *Cramdown.*  The Debtors request Confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Trustee reserves the right to modify this Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

      5.1     *Implementation of the Plan.*  Following the Effective Date, the Plan will be implemented by the Plan Administrator in a manner consistent with the terms and conditions set forth in the Committee Settlement, Plan, the Plan Administrator Agreement, and the Confirmation Order.

      5.2     *Vesting of Assets.*  Except as otherwise provided in this Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, including any Excluded Assets under the Asset Purchase Agreement, any GUC Reserved Litigation Claim, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries shall re-vest in each applicable post-confirmation Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (subject to  the discharge of the reasonable and documented accrued and unpaid fees and expenses of the Prepetition Term Agents or the DIP Agents reasonably necessary for the implementation of this Plan), except for the Liens and Claims established under this Plan.  On and after the Effective Date, except as otherwise provided in this Plan, each  Debtor may operate its business and may use, acquire, or dispose of property and maintain, prosecute, abandon, compromise or settle any Claims, Interests, or Causes of

Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, subject only to those restrictions expressly imposed by this Plan or the Confirmation Order, as well as the documents and instruments executed and delivered in connection therewith, including the documents, exhibits, instruments, and other materials comprising the Plan Supplement. Notwithstanding anything herein to the contrary, property in each estate shall not include any Purchased Assets under the Asset Purchase Agreement, and nothing in this Plan shall alter or amend the Asset Purchase Agreement or the Sale Order.  To the extent any Debtor has not transferred any interest in a Purchased Entity (as defined in the Asset Purchase Agreement), such interest shall vest in the applicable post-confirmation Debtor subject to the Sale Order, and solely for purposes of transferring such interest to Purchaser.  Neither the DIP Secured Parties nor the Prepetition Secured Parties shall be required to take any action to implement this Plan; provided that, to the extent any Debtor requests the DIP Secured Parties or the Prepetition Secured Parties to take any such action to implement this Plan, including but not limited to the release of any Liens, or the DIP Secured Parties or Prepetition Secured Parties reasonably determine that they require the assistance of outside counsel to implement this Plan and provide advance notice to the Debtors, the Debtors shall be solely responsible for paying the reasonable out-of-pocket fees or expenses incurred by the DIP Secured Parties or the Prepetition Secured Parties in taking such action.

5.3     *Consolidation of the Debtors for Plan Purposes Only*  On the Effective Date:  (a) all assets (and all proceeds thereof) and liabilities of each Debtor shall be merged or treated as though they were merged into and with the Assets and liabilities of the other Debtors, (b) no Distributions shall be made under the Plan on account of intercompany claims among the Debtors and all such Claims shall be eliminated, (c) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated and extinguished so that any Claim against any Debtor and guarantee thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors, (d) each and every Claim filed or to be filed against any Debtor shall be filed against the consolidated Debtors, and shall be deemed one Claim against and obligation of the consolidated Debtors, and (e) for purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be setoff against the debts of the other Debtors. Such substantive consolidation shall not (other than for purposes related to the Plan) affect the legal and corporate structures of the Debtors.  Entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Debtors for Plan purposes.

5.4     *Funding of Plan.*  The primary source of funding the Distributions and payments required to be made under the Plan shall be Plan Administrator Net Recovery.

5.5      *Powers and Obligations of the Plan Administrator.*

    (a)      The Confirmation Order shall provide for the appointment of the Plan Administrator.  The compensation of the Plan Administrator shall be as set forth in the Plan Supplement.  The Plan Administrator shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority, and responsibilities specified under sections 704 and 1106 of the Bankruptcy Code.

    (b)      Upon the distribution of all assets pursuant to the Plan and the filing by the Plan Administrator of a certification to that effect with the Bankruptcy Court (which may be included in the application for the entry of the final decree), the Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith, provided, however, that the Debtors may, but will not be required to, take appropriate action to dissolve under applicable law.

    (c)      Following the Effective Date, the Debtors shall not engage in any business or take any actions, except those necessary to consummate the Plan and wind down their affairs, including as necessary, the wind down, dissolution or abandonment of the non-debtor affiliates and subsidiaries of the Debtors, under applicable law free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than the restrictions imposed by the Plan or the Confirmation Order.

    (d)      The Plan Administrator may act for the Debtors' Estates in a fiduciary capacity for the Estates, subject to the provisions of the Plan.  On the Effective Date, the Plan Administrator shall succeed to all of the rights of the Debtors with respect to the assets of the Estates.  The powers and duties of the Plan Administrator shall include, without further order of the Court, except where expressly stated otherwise, the following rights or obligations:

      (i)      to take such steps as may be necessary or otherwise desirable to administer and close any and all of the transactions as may be contemplated by the terms of the Sale, the Committee Settlement or this Plan, as well as the Committee Stipulation or the Antenna Stipulation;

      (ii)      to invest Cash and withdraw and make Distributions of Cash to holders of Allowed Claims and to pay taxes and other obligations owed by the Estates or incurred by the Debtors or the Plan Administrator in connection with the wind-down of the Estates in accordance with the Plan;

      (iii)      to receive, manage, invest, supervise, and protect the Assets, including paying taxes or other obligations incurred in connection with administering the assets;

      (iv)      to engage attorneys, consultants, agents, employees, and all professional persons, to assist with respect to the Plan

Administrator's responsibilities;

(v)     to pay the fees and expenses for the attorneys, consultants, agents, employees and professional persons engaged by the Plan Administrator and to pay all other expenses in connection with administering the Plan and for winding down the affairs of the Estates in accordance with the Plan;

(vi)    to satisfy any liabilities, expenses, and other Claims incurred by the Debtors and/or Plan Administrator in the ordinary course of business and without further order of the Court;

(vii)   to execute and deliver all documents, and take all actions, necessary to consummate the Plan and close the Chapter 11 Cases;

(viii)  to dispose of, abandon or deliver title to others of, or otherwise realize the value of, all the remaining Assets in accordance with the terms provided for herein;

(ix)    to oversee compliance with the Estates' accounting, finance, and reporting obligations;

(x)     to prepare such periodic reports as may be required by the U.S. Trustee;

(xi)    except as otherwise provided for in the Plan, to object to Claims against the Debtors' Estates;

(xii)   except as otherwise provided for in the Plan, to compromise and settle Claims against the Debtors' Estates;

(xiii)  to implement and/or enforce all provisions of the Plan;

(xiv)   to implement and/or enforce all agreements entered into prior to the Effective Date;

(xv)    to perform the duties, exercise the powers, and assert the rights of a trustee under sections 704 and 1106 of the Bankruptcy Code, including, without limitation, enforcing contracts, and asserting claims, defenses, offsets, and privileges;

(xvi)   to investigate, prosecute, settle and collect upon GUC Reserved Litigation Claims; and

(xvii)  to use such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan or order of the Bankruptcy Court or as may be necessary and proper to carry out the provisions of the Plan.

5.6     ***Preservation of Causes of Action.***  On and after the Effective Date, the Plan Administrator may pursue on behalf of the Debtors' Estates any GUC Reserved Litigation Claim in his or her sole discretion.  No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any GUC Reserved Litigation Claims against them as any indication that the Debtors or the Plan Administrator, as applicable, will not pursue any and all available Causes of Action against them.  The failure of the Debtors to specifically list any claim, right of action, suit, proceeding, or other GUC Reserved Litigation Claim in this Plan, the Plan Supplement, the Disclosure Statement, or otherwise, does not, and will not, be deemed to constitute a waiver or release by the Debtors or the Plan Administrator, as applicable, of such claim, right of action, suit, proceeding, or other GUC Reserved Litigation Claim.  The Debtors and the Plan Administrator, as applicable, will retain the right to pursue such claims, rights of actions, suits, proceedings, and other GUC Reserved Litigation Claims in their sole discretion and, therefore, the failure to list a claim, right of action, suit, proceeding, or other GUC Reserved Litigation Claim shall not result in a limitation of the right to pursue the same on and after the Effective Date based on any preclusion doctrine, including, but not limited to, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches.

5.7     ***Termination of Current Officers, Directors, Employees and Professionals***.  On the Effective Date, the employment, retention, appointment, and authority of all officers, directors, employees, and Professionals of the Debtors, subject to the Antenna Stipulation as applicable, and the Creditors' Committee shall terminate.

5.8     ***Compliance with Asset Purchase Agreement and Antenna Stipulation.***  Notwithstanding anything in this Plan or the Confirmation Order to the contrary, the Plan Administrator shall be obligated to perform any remaining obligations of the Debtors under the Asset Purchase Agreement, including but not limited to the obligation to transfer any remaining equity interests in the Purchased Entities (as defined in the Asset Purchase Agreement) to the Purchaser, and any obligations under Section 7.02 of the Asset Purchase Agreement.  The Plan Administrator shall be required to ensure the appointment of directors of the New Director Entities (as defined in the Antenna Stipulation) until the full and final transfer of all of the Debtors' interests in the Purchased Entities under applicable (including foreign) law.  For the avoidance of doubt and as set forth in the Antenna Stipulation, the Debtors shall (i) be responsible for any reasonable out-of-pocket fees, costs or expenses (including reasonable attorneys' fees and expenses) incurred in connection with transferring the Debtors' Interests in the Joint Venture free and clear of all Encumbrances, including in connection with the release of any Encumbrances held by the Collateral Agent, (ii) as a condition to the release of any Encumbrances held by the Collateral Agent, pay to Collateral Agent a $5,000 fee and the fees, costs and expenses and (iii) be responsible for any reasonable out-of-pocket fees, costs or expenses incurred by the Collateral Agent in connection with the release of any Encumbrances against the Debtors' property upon the effective date of any chapter 11 plan.

5.9     ***Further Authorization***.  The Debtors and the Plan Administrator, as applicable, shall be entitled to seek such orders, judgments, injunctions, and rulings as they deem necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.

5.10    *Preservation of Insurance.*  Notwithstanding anything to the contrary in the Plan (including Article X of the Plan) or Confirmation Order, nothing contained in the Plan shall diminish or impair the enforceability of any insurance policy, including the D&O Policies, that may cover claims against the Debtors or any additional insureds, including the directors and officers thereof.

5.11    *Dissolution of the Debtors.*  Upon the entry of final decrees in these Chapter 11 Cases pursuant to section 350 of the Bankruptcy Code, the Debtors shall be deemed dissolved without any further notice, action, or order.

5.12    *Subordinated Claims.*  The allowance, classification, and treatment of all Allowed Claims and Interests, including but not limited to the Senior Subordinated Notes Claims and the Pulse Notes Claims, and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE VI

## DISTRIBUTIONS

6.1    *Disbursing Agent.*  The Plan Administrator shall serve as the Disbursing Agent under the Plan or select another Entity to serve as the Disbursing Agent.  Any Entity other than the Plan Administrator that acts as the Disbursing Agent for the Plan Administrator will be an agent of the Plan Administrator and not a separate taxable Entity with respect to, among other things, the assets held, income received, or disbursements or Distributions made on behalf of the Plan Administrator.  The Disbursing Agent shall make all Distributions required under the Plan.  The Disbursing Agent, if not the Plan Administrator, shall be authorized, after consultation with the Plan Administrator, to implement such procedures as it deems necessary to make Distributions pursuant to the Plan so as to efficiently and economically assure prompt and proportionate Distributions.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Plan Administrator.  Furthermore, any such entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

6.2    *No Postpetition Interest on Claims.*.  Unless otherwise specifically provided for in the Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Additionally, and without limiting the foregoing, unless otherwise specifically provided for in the Plan or as otherwise required by section 506(b) of the Bankruptcy

Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

6.3     ***Date of Distributions***.  Unless otherwise provided in the Plan, any Distributions and deliveries to be made under the Plan shall be made on or before the Effective Date or as soon thereafter as is practicable, in the Plan Administrator's sole discretion or as otherwise required by the Plan Administrator Agreement.  For the avoidance of doubt, no Holder of an Allowed Claim shall receive any Distribution on account of such Allowed Claim until all Plan Reserve Obligations have been satisfied in full or otherwise Disallowed and the Claims Objection Deadline has passed.  Further, the Plan Administrator, in its sole discretion, may withhold from Distributions and retain such amounts as are reasonably necessary to (i) to pay Post-Effective Date Expenses, (ii) satisfy other liabilities to which the Plan Administrator is otherwise subject, in accordance with the Plan and the Plan Administrator Agreement, and (iii) establish any necessary reserve(s).

6.4     ***Distribution Record Date***.  Unless a notice of transfer of Claim has been filed with the Bankruptcy Court prior to the Distribution Record Date in accordance with Bankruptcy Rule 3001, the Disbursing Agent will rely on the Claims Register when determining Holders on the Distribution Record Date.

6.5     ***Books and Records***.  The Debtors and the Plan Administrator, including the Plan Administrator and his or her professionals, shall retain reasonable access to the books and records of the Debtors for the purposes of responding to disclosure obligations related to any investigation conducted by a Governmental Unit, performing Claims reconciliation, and the administration of the Plan Administrator, irrespective of whether such books and records are in the possession of the Debtors or the Purchaser; *provided*, *however*, that reasonable access will be provided during normal business hours and in a manner not to interfere with the normal business operations of the Purchaser, following a request, of at least two (2) Business Days, by the Debtors or the Plan Administrator, as applicable, including the Plan Administrator and his or her professionals.  Further, any books and records designated by the Plan Administrator shall be preserved by the Debtors or the Purchaser, as applicable, until the earlier of notice of de-designation of such books and records or the dissolution of the Plan Administrator.  The Debtors, the Purchaser, the Plan Administrator, and Disbursing Agent (if other than the Plan Administrator) shall cooperate in good faith to comply with the reporting and withholding requirements outlined in Section 6.14 of the Plan, and the provisions of the Sale Order and the Asset Purchase Agreement.

6.6     ***Delivery of Distributions***.  Subject to Sections 6.3, 6.7, 6.9, 6.10, 6.11, 6.13, 6.15, and 6.16 of the Plan, the Disbursing Agent will issue or cause to be issued the applicable consideration under the Plan and, subject to Bankruptcy Rule 9010, will make all Distributions as and when required by the Plan to Holders of Allowed Claims to the address of the Holder listed on such Holder's Proof of Claim or the address in any written notice of address change delivered to the Debtors, the Plan Administrator, or the Disbursing Agent, as applicable, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the event that any Distribution is returned as undeliverable, the Disbursing Agent shall use reasonable

efforts to locate the Holder of an Allowed Claim whose Distribution is returned as undeliverable.  If such reasonable efforts are not successful, no further Distributions to such Holder of such Claim shall be made unless and until the Disbursing Agent is notified of then-current address of such Holder of the Claim at which time all missed Distributions shall be made to such Holder of the Claim or Interest without interest, dividends, or accruals of any kind.  Amounts in respect of undeliverable Distributions shall be returned to the Plan Administrator until such Distributions are claimed or become subject to Section 6.7.

6.7    *Reversion*.  Any Distribution under the Plan that is an Unclaimed Distribution for a period of six (6) months after such Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revert to and vest in the Plan Administrator, free and clear of any restrictions thereon.  Upon vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be cancelled and forever barred, notwithstanding federal or state escheat, abandonment, or unclaimed property laws to the contrary.

6.8    *Manner of Payment Under Plan*.  Except as specifically provided herein, at the option of the Debtors or the Plan Administrator, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors or the Plan Administrator, as applicable.

6.9    *De Minimis Cash Distributions*.  The Disbursing Agent shall not have any obligation to make a Distribution that is less than (i) $50 in Cash to the Holder of an Allowed Claim or (ii) $200,000 in the aggregate.  If either (a) all Allowed Claims have been paid in full or (b) the aggregate amount of Cash available for Distributions to Holders of Allowed Claims is less than $200,000, then no further Distribution shall be made by the Plan Administrator, and the Plan Administrator can elect to give funds to a charity selected by the Plan Administrator.

6.10    *No Distribution in Excess of Amount of Allowed Claim*.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim.

6.11    *Allocation of Distributions Between Principal and Interest*.  Except as otherwise provided in the Plan and subject to Section 3.4 of the Plan, to the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated first to the principal amount (as determined for federal income tax purposes) of the Claim and then to accrued but unpaid interest.

6.12    *Setoffs and Recoupments*.  The Plan Administrator or each Debtor or its designee as instructed by such Plan Administrator or such Debtor, as applicable, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that the Plan Administrator or the Debtors or their successors, as applicable,

32

may hold against the Holder of such Allowed Claim after the Effective Date to the extent that such setoff or recoupment is either (a) agreed in amount among the Plan Administrator or Debtors, as applicable, and Holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder will constitute a waiver or release by the Plan Administrator or the Debtors or their successor, as applicable, of any claims, rights, or Causes of Action that the Plan Administrator or the Debtors or its successor or assign, as applicable, may possess against such Holder.

6.13    *Rights and Powers of Disbursing Agent.*

(a)    *Powers of the Disbursing Agent.*  The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable Distributions or payments provided for under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (1) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date) or pursuant to the Plan, or (2) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b)    *Expenses Incurred on or After the Effective Date.*  Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Plan Administrator, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement Claims (including, without limitation, for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Plan Administrator.

6.14    ***Withholding and Reporting Requirements.***  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Debtors or the Plan Administrator, as applicable, shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions under the Plan shall be subject to any such withholding and reporting requirements.  In the case of a non-Cash Distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate the Cash necessary to pay over the withholding tax.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Under the backup withholding rules of the Internal Revenue Service, a Holder may be subject to backup withholding with respect to Distributions or payments made pursuant to the Plan, unless the Holder (a) comes within certain exempt categories (which includes corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding.

Notwithstanding the above, each Holder of an Allowed Claim or Beneficiary of the Plan Administrator that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder or Beneficiary by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution. The Debtors or the Plan Administrator, as applicable, have the right, but not the obligation, to not make a Distribution until such Holder or Beneficiary has made arrangements satisfactory to any issuing or disbursing party for payment of any such tax obligations.

The Debtors or the Plan Administrator, as applicable, may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable to each such Holder. If the Debtors or the Plan Administrator, as applicable, make such a request and the Holder fails to comply before the date that is 180 days after the request is made, the amount of such Distribution shall irrevocably revert to the Debtors or the Plan Administrator, as applicable, and any Claim in respect of such Distribution shall be discharged and forever barred from assertion against the Debtors or the Plan Administrator, as applicable, or its respective property.

6.15   *Claims Paid or Payable by Third Parties*.

(a)   *Claims Paid by Third Parties.* The Debtors or the Plan Administrator, as applicable, shall reduce a Claim, and such Claim shall be Disallowed without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not the Debtors or the Plan Administrator. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not the Debtors or the Plan Administrator on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Distribution to the Debtors or the Plan Administrator, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under Plan. The failure of such Holder to timely repay or return such Distribution shall result in the Holder owing the Debtors or the Plan Administrator, as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day period specified above until the amount is repaid.

(b)   *Claims Payable by Third Parties.* Except as otherwise provided in the Plan, (i) no Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, and (ii) to the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged

34

without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)     *Applicability of Insurance Proceeds.*  Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Plan Administrator, or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein (i) constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers, or (ii) establish, determine, or otherwise imply any liability or obligation, including any coverage obligation, of any insurer.

6.16     ***Distributions on Disputed Claims.***

(a)     *No Distributions Pending Allowance.*  Notwithstanding any provision to the contrary in the Plan, and except as otherwise agreed by the relevant parties, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim.

(b)     *Special Rules for Distributions to Holders of Disputed Claims*.  All Distributions made pursuant to the Plan on account of a Disputed Claim that is later deemed an Allowed Claim by the Bankruptcy Court shall be made together with any other Distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class (or Holders of unclassified Claims, as applicable); *provided*, *however*, that no interest shall be paid on account of such Allowed Claims unless required under applicable bankruptcy law.

(c)     *Disputed Claims Reserve*.  The Plan Administrator shall establish and administer the Disputed Claims Reserve.  Each Holder of a Disputed General Unsecured Claim that becomes an Allowed General Unsecured Claim after the Effective Date shall receive the treatment set forth in Section 3.4 of the Plan.  On each Distribution Date, the Disputed Claims Reserve on account of a Disputed General Unsecured Claim that has become Disallowed in whole or in part (or has been Allowed in an amount less than its Provisionally Allowed amount) shall be redistributed ratably among (A) Holders of Allowed General Unsecured Claim and (B) the Disputed Claims Reserve.

## ARTICLE VII

## PROCEDURES FOR DISPUTED CLAIMS

7.1     ***Allowance of Claims***.  After the Effective Date, the Plan Administrator shall have and retain any and all rights and defenses the Debtors had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

7.2     ***Objections to Claims***.

(a)     *Authority*.  The Plan Administrator is authorized to (i) file objections to any Claim, and to withdraw any objections to any Claim that they may file, (ii) settle, compromise, or litigate to judgment any objections to any Claim, and (iii) except as set forth above, resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.  Any Claims filed after the applicable Bar Date shall be deemed Disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Plan Administrator unless the Person or entity wishing to file such Claim has received prior Bankruptcy Court authority to file such Claim after the applicable Bar Date.

(b)     *Amendments to Claims*.  After the Confirmation Date, a Proof of Claim may not be amended without the authorization of the Bankruptcy Court.  Any Claim amended after the Confirmation Date shall be deemed Disallowed in full and expunged without any action by the Plan Administrator, unless the Holder of such Claim has obtained prior Bankruptcy Court authorization to file the amendment.

(c)     *Objection Deadline*.  As soon as practicable, but no later than the Claims Objection Deadline, the Debtors, and after the Effective Date, the Plan Administrator, may file objections with the Bankruptcy Court and serve such objections on the Holders of the Claims to which such objections are made.  Nothing contained herein, however, shall limit the right of the Debtors or the Plan Administrator, as applicable, to object to Claims, if any, filed or amended after the Claims Objection Deadline.  The Claims Objection Deadline may be extended by the Bankruptcy Court upon the filing of a notice by the Debtors or the Plan Administrator, as applicable.

7.3     ***Estimation of Disputed Claims***.  For purposes of calculating and making Distributions and establishing reserves under the Plan, the Plan Administrator, as applicable, may at any time after the Confirmation Date in good faith request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Plan Administrator previously objected to such Disputed Claim or whether the Bankruptcy Court has ruled on any such objection,

36

and the Bankruptcy Court will retain jurisdiction to estimate any Disputed Claim at any time during litigation concerning any objection to any Disputed Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Plan Administrator, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

7.4    *Resolution of Claims*.  Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, Plan Administrator shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or the Estates may hold against any Person, without the approval of the Bankruptcy Court, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.  The Plan Administrator or their respective successors may pursue such retained Claims, rights, Causes of Action, suits, or proceedings, as appropriate, in accordance with the best interests of the Plan Administrator, as applicable.

7.5    *Disallowed Claims.*  All Claims held by persons or entities against whom or which the Plan Administrator have commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code shall be deemed Disallowed Claims pursuant to section 502(d) of the Bankruptcy Code and Holders of such Claims shall not be entitled to vote to accept or reject the Plan.  Claims that are deemed Disallowed pursuant to this Section 7.5 shall continue to be Disallowed for all purposes until such Claim has been settled or resolved by Final Order and any sums due to the Plan Administrator from such party have been paid.

## ARTICLE VIII

## TREATMENT OF EXECUTORY CONTRACTS

8.1    *Rejection of Executory Contracts*.  Except as otherwise provided in the Plan, on the Effective Date, all Executory Contracts shall be deemed rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract (a) has previously been assumed by order of the Bankruptcy Court in effect as of the Effective Date (which order may be the Confirmation Order); (b) is the subject of a motion to assume filed on or before the Effective Date; (c) is set forth in the Schedule of Assumed and Assigned Executory Contracts; or (d) has expired or terminated pursuant to its own terms.  The Confirmation Order will constitute an order of the Bankruptcy Court under sections 365

and 1123(b) of the Bankruptcy Code approving the assumptions or assumption and assignments or rejections described herein as of the Effective Date.  Unless otherwise indicated, all assumptions, assumptions and assignments, and rejections of Executory Contracts in the Plan will be effective as of the Effective Date.  Each Executory Contract assumed or assumed and assigned pursuant to the Plan, or by Bankruptcy Court order, will vest in and be fully enforceable by the Debtors or the assignee in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.

       8.2     *Claims Based on Rejection of Executory Contracts*.  Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of Executory Contracts pursuant to the Plan must be filed no later than the applicable Bar Date.  Any Proofs of Claim arising from the rejection of the Debtors' Executory Contracts that are not timely filed by the applicable Bar Date shall be Disallowed automatically, forever barred from assertion, and shall not be enforceable against the Debtors or the Plan Administrator without the need for any objection by any Person or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of such Executory Contract shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection of Executory Contracts under the Plan shall be classified as General Unsecured Claims and shall be treated in accordance with the particular provisions of the Plan for such Claims; *provided*, *however*, that if the Holder of an Allowed Claim for rejection damages has an unavoidable security interest in any collateral to secure obligations under such rejected Executory Contract, the Allowed Claim for rejection damages shall be treated as an Other Secured Claim to the extent of the value of such Holder's interest in such collateral, with the deficiency, if any, treated as a General Unsecured Claim.

       8.3     *Reservation of Rights.*  Nothing contained in the Plan shall constitute an admission by the Debtors that any particular contract or lease is in fact and Executory Contract, as applicable, or that the Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, and the Plan Administrator, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter and to provide appropriate treatment of such contract or lease.

## ARTICLE IX

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

       9.1     *Conditions Precedent to the Effective Date*.  The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with the terms hereof:

       (a)     the Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall have become a Final Order, which Confirmation Order, shall, among other things, include findings that the treatment of Holders of Claims under this Plan is consistent with the

terms and conditions of the Turnover Provisions and the Proceeds Sharing Agreement, and that the Plan does not violate or breach the rights, remedies, or obligations of any party to Senior Note Subordination Agreements, the Pulse Notes Subordination Agreement, or the Proceeds Sharing Agreement;

(b)    the Plan Supplement shall have been filed with the Bankruptcy Court;

(c)    the Professional Fee Escrow Account shall have been funded with the Professional Fee Escrow Amount, the Plan Reserve Account shall have been funded with the Plan Reserve Amount.

(d)    the Debtors shall have made all Distributions required to be made on or before the Effective Date;

(e)    all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan, if any, shall have been obtained, if any, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(f)    all documents and agreements necessary to implement the Plan shall have (i) been tendered for delivery and (ii) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements;

(g)    the Bankruptcy Court shall have entered orders approving the Antenna Stipulation and Committee Stipulation and the Confirmation Order, in form and substance acceptable to the Debtors, the Committee, and the Prepetition Term Agents, and the Antenna Stipulation and Committee Stipulation, Confirmation shall be effective and unstayed, and all payments contemplated under the Antenna Stipulation or Committee Stipulation shall have been paid; and

(h)    all reasonable and documented accrued and unpaid professional fees and expenses of the Prepetition Term Agents or the DIP Agents reasonably necessary for the implementation of this Plan shall have been paid in full.

9.2    ***Waiver of Conditions Precedent***.  Each of the conditions precedent in Section 9.1 may be waived only if waived in writing by the Debtors and the Creditors' Committee without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

## ARTICLE X

## EFFECT OF PLAN CONFIRMATION

10.1    *Binding Effect*.  Following the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, the Estates, the Plan Administrator, all present and former Holders of Claims and Interests, whether or not such Holders voted in favor of the Plan, and their respective successors and assigns.

10.2    *Releases and Related Matters*.

(a)    *Release by the Debtors*.  WITHOUT LIMITING ANY OTHER APPLICABLE PROVISIONS OF, OR RELEASES CONTAINED IN, THE PLAN, THE SALE ORDER, AND SALE DOCUMENTS, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AS OF THE EFFECTIVE DATE, THE DEBTORS, THEIR ESTATES, THE PLAN ADMINISTRATOR, AND ANY OTHER PERSON OR ENTITY SEEKING TO EXERCISE THE RIGHTS OF THE ESTATES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED, AND WAIVED ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE THAT SUCH PERSON OR ENTITY SEEKING TO EXERCISE THE RIGHTS THE ESTATES HAS, HAD, OR MAY HAVE AGAINST THE RELEASED PARTIES BASED ON OR RELATING TO THE DEBTORS, THE ESTATES, THE CHAPTER 11 CASES, ANY PREPETITION FINANCING ARRANGEMENTS, THE DEBTOR'S FINANCIAL STATEMENTS, THE DEBTOR-IN-POSSESSION FINANCING, THE SALE OR TRANSFER OF ANY AND ALL ASSETS OF THE DEBTOR (INCLUDING THE SALE), THE TRANSITION SERVICES AGREEMENT, THE NEGOTIATION, CONSIDERATION, FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION, OR CONSUMMATION OF THE PLAN, THE PLAN SUPPLEMENT AND EXHIBITS, THE DISCLOSURE STATEMENT, ANY AMENDMENTS THEREOF OR SUPPLEMENTS THERETO, OR ANY OTHER TRANSACTIONS IN CONNECTION WITH THESE CHAPTER 11 CASES OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION THEREWITH OR IN CONNECTION WITH ANY OTHER OBLIGATION ARISING UNDER THE PLAN OR THE OBLIGATIONS ASSUMED HEREUNDER (INCLUDING ANY CLAIM BASED ON THEORIES OF ALLEGED NEGLIGENCE, MISREPRESENTATION, NON-DISCLOSURE, OR BREACH OF FIDUCIARY DUTY).  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE:  (I) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PERSON OR ENTITY UNDER THE PLAN, THE TRANSITION SERVICES AGREEMENT, THE SALE ORDER, OR THE SALE DOCUMENTS, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN; OR (II) THE LIABILITY OF ANY RELEASED PARTY THAT WOULD OTHERWISE RESULT FROM ANY ACT OR OMISSION OF SUCH

40

RELEASED PARTY TO THE EXTENT THAT SUCH ACT OR OMISSION IS
DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED GROSS
NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD).  FOR THE
AVOIDANCE OF DOUBT, NOTHING IN THE PLAN, PLAN SUPPLEMENT,
CONFIRMATION ORDER, OR ANY RELATED DOCUMENTS SHALL IMPAIR,
RELEASE, MODIFY, DISCHARGE, LIMIT, WAIVE, EXCULPATE, OR ENJOIN
ANY CLAIMS OR CAUSES OF ACTION AGAINST THE RELEASED PARTIES
ARISING FROM FACTS THAT OCCUR AFTER THE EFFECTIVE DATE BASED
ON A BREACH OR AN ALLEGED BREACH OF THE STANDARDS AND
PRACTICES APPLICABLE TO THE RELEASED PARTIES ARISING FROM OR
RELATED TO THE OWNERSHIP, CUSTODIANSHIP, PRESERVATION, AND/OR
RETENTION OF THE DEBTORS' DOCUMENTS (INCLUDING, BUT NOT
LIMITED TO, WRITTEN DOCUMENTS AND COMMUNICATIONS,
ELECTRONICALLY STORED DOCUMENTS, EMAILS, BANKING AND OTHER
FINANCIAL RECORDS, EMPLOYEE FILES, COMPENSATION RECORDS, TAX
DOCUMENTS, AND ANY AND ALL ELECTRONIC SERVERS AND/OR OTHER
MEDIA CONTAINING ANY OF THE FOREGOING).  NOTHING IN THE PLAN
RELEASES ACTIONS AGAINST THE RELEASED PARTIES UNDER SECTIONS
542 AND 543 OF THE BANKRUPTCY CODE.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an
order approving the foregoing release by the Debtors pursuant to Bankruptcy Rule
9019, and further, shall constitute the Bankruptcy Court's finding that the release
is:  (1) essential to the Confirmation of the Plan; (2) an exercise of the Debtors' business
judgment; (3) in exchange for the good and valuable consideration and substantial
contributions provided by the Released Parties; (4) a good-faith settlement and
compromise of the Claims and Causes of Action released by such release; (5) in the best
interests of the Debtor and all Holders of Claims and Interests; (6) fair, equitable, and
reasonable; (7) a bar to any of the Releasing Parties asserting any Claim or Cause of
Action released pursuant to the foregoing releases by the Debtors.

(b)    *Releases by the Releasing Parties.*  TO THE
GREATEST EXTENT PERMISSIBLE AND WITHOUT LIMITING ANY OTHER
APPLICABLE PROVISIONS OF, OR RELEASES CONTAINED IN, THE PLAN, THE
DIP FINANCING ORDER, THE SALE ORDER, AND SALE DOCUMENTS, AS OF
THE EFFECTIVE DATE, IN CONSIDERATION FOR THE OBLIGATIONS OF THE
DEBTOR UNDER THE PLAN, AND THE CONSIDERATION AND OTHER
WAIVERS, CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS, OR
DOCUMENTS TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH
THE PLAN, EACH RELEASING PARTY SHALL BE DEEMED TO HAVE
CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND
FOREVER RELEASED, AND WAIVED ANY AND ALL CAUSES OF ACTION,
WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING
OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT SUCH
RELEASING PARTY HAS, HAD, OR MAY HAVE AGAINST ANY RELEASED
PARTY BASED ON OR RELATING TO THE DEBTORS, THE ESTATES, THE
CHAPTER 11 CASES, ANY PREPETITION FINANCING ARRANGEMENTS, THE
DEBTORS' FINANCIAL STATEMENTS, THE DEBTOR IN POSSESSION
FINANCING, THE SALE OR TRANSFER OF ANY AND ALL ASSETS OF THE

DEBTORS (INCLUDING THE SALE), THE TRANSITION SERVICES
AGREEMENT, THE NEGOTIATION, CONSIDERATION, FORMULATION,
PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION, OR
CONSUMMATION OF THE PLAN, THE PLAN SUPPLEMENT AND EXHIBITS,
THE DISCLOSURE STATEMENT, ANY AMENDMENTS THEREOF, OR
SUPPLEMENTS THERETO, OR ANY OTHER TRANSACTION IN CONNECTION
WITH THIS CHAPTER 11 CASE OR ANY CONTRACT, INSTRUMENT, RELEASE,
OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO OR
ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION
THEREWITH OR IN CONNECTION WITH ANY OTHER OBLIGATIONS
ARISING UNDER THE PLAN AND THE OBLIGATIONS ASSUMED
HEREUNDER (INCLUDING ANY CLAIM BASED ON THEORIES OF ALLEGED
NEGLIGENCE, MISREPRESENTATION, NON-DISCLOSURE, OR BREACH OF
FIDUCIARY DUTY).  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN
THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT
RELEASE:  (I) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PERSON OR
ENTITY UNDER THE PLAN, THE TRANSITION SERVICES AGREEMENT, THE
SALE ORDER, OR THE SALE DOCUMENTS, OR ANY DOCUMENT,
INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE
PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN; OR (II) THE
LIABILITY OF ANY RELEASED PARTY THAT WOULD OTHERWISE RESULT
FROM ANY ACT OR OMISSION OF SUCH RELEASED PARTY TO THE EXTENT
THAT SUCH ACT OR OMISSION IS DETERMINED BY A FINAL ORDER TO
HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT
(INCLUDING FRAUD).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's
approval of the Third-Party Release which includes by reference each of the related
provisions and definitions contained herein, and, further, shall constitute the
Bankruptcy Court's finding that the Third-Party Release is:  (1) essential to the
Confirmation of the Plan; (2) given in exchange for the good and valuable consideration
and substantial contributions provided by the Released Parties; (3) a good-faith
settlement and compromise of the Claims released by the Third-Party Release; (4) in the
best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6)
given and made after due notice and opportunity for hearing; (7) consensual as to the
Holders of Claims that do not opt out of the Third-Party Release on their Ballots; and (8)
a bar to any of the Releasing Parties asserting any Claim or Cause of Action released
pursuant to the Third-Party Release.

10.3    *Waiver of Statutory Limitation on Releases.*  **Without limiting
any other applicable provisions of, or releases contained in, the Plan, each Releasing
Party in each of the releases contained in the Plan (including under this Section)
expressly acknowledges that although ordinarily a general release may not extend to
Claims which the Releasing Party does not know or suspect to exist in his favor,
which if known by it may have materially affected its settlement with the party
released, it has carefully considered and taken into account in determining to enter
into the above releases the possible existence of such unknown losses or
claims.  Without limiting the generality of the foregoing, each Releasing Party
expressly waives any and all rights conferred upon it by any statute or rule of law**

which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Parties.  The releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

10.4    *Exculpation and Limitation of Liability.*  **NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, EFFECTIVE AS OF THE EFFECTIVE DATE, TO THE EXTENT PERMITTED UNDER SECTION 1125(e) OF THE BANKRUPTCY CODE AND PROFESSIONAL RULES OF CONDUCT, THE EXCULPATED PARTIES SHALL NOT HAVE OR INCUR ANY LIABILITY FOR ANY ACT OR OMISSION TAKEN OR NOT TAKEN IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THE CHAPTER 11 CASES, THE NEGOTIATION AND FILING OF THE DISCLOSURE STATEMENT, THE PLAN OR ANY DOCUMENT IMPLEMENTING THE PLAN, THE PLAN ADMINISTRATOR AGREEMENT, THE PLAN SUPPLEMENT, THE TRANSITION SERVICES AGREEMENT, THE SALE DOCUMENTS, THE DIP FINANCING ORDER, THE FILING OF THE CHAPTER 11 CASES, THE SETTLEMENT OF CLAIMS OR RENEGOTIATION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN, OR THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, EXCEPT FOR ACTS OR OMISSIONS THAT ARE DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD), OR CLAIMS FOR LEGAL MALPRACTICE, RELEASE OF WHICH IS PROHIBITED BY RULE 1.8(H) OF THE NEW YORK RULES OF PROFESSIONAL CONDUCT (22 N.Y.C.R.R. 1200, OR ANY OBLIGATIONS THAT THEY HAVE UNDER OR IN CONNECTION WITH THE PLAN OR THE TRANSACTIONS CONTEMPLATED IN THE PLAN, AND IN ALL RESPECTS SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND OBLIGATIONS UNDER THE PLAN.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE EXCULPATION SET FORTH ABOVE DOES NOT EXCULPATE ANY OF THE EXCULPATED PARTIES' POST-EFFECTIVE DATE OBLIGATIONS UNDER THE PLAN, THE SALE ORDER, OR THE SALE DOCUMENTS, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING, BUT NOT LIMITED TO, THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.**

10.5    *No Discharge.*  Because the Debtors are liquidating, they are not entitled to a discharge of obligations pursuant to section 1141 of the Bankruptcy Code.

10.6    *Term of Bankruptcy Injunction or Stays.*  Unless otherwise provided, all injunctions or stays arising under or entered during these Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Cases.

10.7    *Post-Effective Date Retention of Professionals*.  Upon the Effective Date, any requirement that professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate and the Plan Administrator will employ and pay professionals in the ordinary course of business.

**ARTICLE XI**

**RETENTION OF JURISDICTION**

11.1    *Retention of Jurisdiction*.  Pursuant to sections 105(e) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction (unless otherwise indicated) over all matters arising in, arising out of, and/or related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract to which any Debtor is a party or with respect to which the Debtors may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(b)    decide or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

(c)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, the Plan Supplement, or the Confirmation Order;

(d)    resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any entity's rights arising from, or obligations incurred in connection with, the Plan or such documents;

(e)    modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

(f)  hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b), and 1129(a)(4) of the Bankruptcy Code; *provided*, *however*, that from and after the Effective Date the payment of fees and expenses by the Debtors or the Plan Administrator, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(g)  issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation, or enforcement of the Plan or the Confirmation Order;

(h)  adjudicate controversies arising out of the administration of the Estates or the implementation of the Plan;

(i)  resolve any cases, controversies, suits, or disputes that may arise in connection with Claims, including without limitation, the Bar Date, related notice, claim objections, allowance, disallowance, estimation, and Distribution;

(j)  hear and determine GUC Reserved Litigation Claims by or on behalf of the Debtors or the Plan Administrator;

(k)  enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or Distributions pursuant to the Plan are enjoined or stayed;

(l)  determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, the Transition Services Agreement, the Plan Administrator Agreement, or any contract, instrument, release, or other agreement or document created in connection with the foregoing;

(m)  enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

(n)  hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

(o)  enter an order closing the Chapter 11 Cases.

11.2  ***No Limitation on Enforcement by SEC or the U.S. Attorney's Office on Non-Debtors***.  Notwithstanding any language to the contrary contained herein, in the Disclosure Statement, or in the Confirmation Order, no provision of the Plan or the Confirmation Order shall (a) preclude the SEC or the U.S. Attorney's Office from

enforcing its police or regulatory powers; or (b) enjoin, limit, impair, or delay the SEC or the U.S. Attorney's Office from commencing or continuing any claims, causes of action, proceedings, or investigations against any non-Debtor person or non-Debtor entity in any forum.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

      12.1    *Payment of Statutory Fees*.  All U.S. Trustee Fees payable after the Effective Date, if any, shall be paid by the Plan Administrator until the earlier of the conversion or dismissal of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or the closing of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code.  The Plan Administrator shall file and serve on the U.S. Trustee quarterly reports of the disbursements made, within fifteen (15) days after the conclusion of each such period, until the Chapter 11 Cases are converted, dismissed, or closed by entry of a final decree.  Any such reports shall be prepared consistent with (both in terms and format) of the applicable Bankruptcy Court and U.S. Trustee Guidelines for such matters.

      12.2    *Dissolution of the Creditors' Committee*.  On the Effective Date, the Creditors' Committee shall be dissolved and the members of the Creditors' Committee, and professionals retained by the Creditors' Committee in accordance with section 1103 of the Bankruptcy Code, shall be deemed released from their respective fiduciary obligations, duties, and responsibilities arising from or related to the Chapter 11 Cases, except with respect to:  (i) prosecuting applications for Professionals' compensation and reimbursement of expenses incurred as a member of the Creditors' Committee; (ii) asserting, disputing, and participating in the resolution of Professional Fee Claims; and (iii) defending any appeal of the Confirmation Order or any request for reconsideration thereof, in either case prior to entry of a Final Order or Final Orders approving all Professional final fee applications in accordance with Section 2.3 of the Plan.  Upon the conclusion of (i) through (iii) above, the Creditors' Committee shall be immediately dissolved and released.

      12.3    *Amendment or Modification of the Plan*.  Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Debtors reserve the right to alter, amend, or modify the Plan or any Plan Supplement at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan, subject to the express written consent of the Creditors' Committee and the Prepetition Term Agents.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder.

      12.4    *Substantial Consummation*.  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

12.5     *Severability of Plan Provisions*.  If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court, at the request of the Debtors and with the consent of the Creditors' Committee (not to be unreasonably withheld), to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

12.6     *Revocation, Withdrawal, or Non-Consummation*.  The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file other chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or consummation of the Plan does not occur, then:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Class of Claims), assumption or rejection of Executory Contracts effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person, (ii) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (iii) constitute an admission of any sort by the Debtors or any other Person.

12.7     *Governing Law*.  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an Exhibit or Plan Supplement document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of law thereof.

12.8     *Time*.  In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.9     *Notice of Effective Date.*   On or before five (5) Business Days after the Effective Date, the Debtors shall mail or cause to be mailed to all Holders of Claims a notice that informs such Entities of (a) the Confirmation of the Plan and occurrence of the Effective Date, (b) notice of the Professional Fee Claims Bar Date, and (c) such other matters as the Debtor deems appropriate or as may be ordered by the Bankruptcy Court.

12.10     *Immediate Binding Effect*.  Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable

and deemed binding upon and inure to the benefit of the Debtors, the Holders of
Claims and Interests, the Released Parties, the Releasing Parties, the Exculpated Parties,
and each of their respective successors and assigns, including the Plan Administrator.
The Debtors will request that the Confirmation Order include a finding by the
Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation
Order shall take effect immediately upon its entry.

   12.11 *Entire Agreement*.  On the Effective Date, the Plan, the Plan
Supplement, and the Confirmation Order shall supersede all previous and
contemporaneous negotiations, promises, covenants, agreements, understandings, and
representations on such subjects, all of which have become merged and integrated into
the Plan.

   12.12 *Notice*.  All notices, requests, and demands to or upon the Debtors
to be effective shall be in writing and, unless otherwise expressly provided herein, shall
be deemed to have been duly given or made when actually delivered or, in the case of
notice by facsimile or other electronic transmission, when received and telephonically
confirmed, addressed as follows:

   TOGUT, SEGAL & SEGAL LLP
   One Penn Plaza, Suite 3335
   New York, New York 10019
   (212) 594-5000
   Attn:  Frank A. Oswald, Esq. and  Brian F. Moore, Esq.,
   Email:  foswald@teamtogut.com and bmoore@teamtogut.com

   *Counsel to the Debtors*

   - and -

   PACHULSKI STANG ZIEHL & JONES LLP
   780 Third Avenue, 34th Floor
   New York, New York 10017
   (212) 561-7700
   Attn:  Robert J. Feinstein, Esq., Bradford J. Sandler, Esq., and
     Colin R. Robinson, Esq.
   Email:  rfeinstein@pszjlaw.com, bsandler@pszjlaw.com, and
     crobinson@pszjlaw.com

   *Counsel to the Creditors' Committee*

      *[Remainder of Page Left Blank Intentionally]*

## ARTICLE XIII

## CONFIRMATION REQUEST

The Debtors request Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

Dated: March 5, 2024
      New York, New York

                          VENUS LIQUIDATION INC. (F/K/A VICE
                          GROUP HOLDING, INC.), *ET AL.*


              By:      */s/ Frank Pometti*
                      Name:  Frank Pometti
                      Title:    Chief Restructuring Officer